**United States District Court**
**Northern District of Indiana**

| | |
|---|---|
| **Ryan Klaassen, Jaime Carini, D.J.B.**, by and though his next friend and father, Daniel G. Baumgartner**, Ashlee Morris, Seth Crowder, Macey Policka, Margaret Roth,** and **Natalie Sperazza**, | Civ. No. ____1:21-cv-238_____ |
| *Plaintiffs*, | **Verified Complaint for Declaratory and Injunctive Relief** |
| *v.* | |
| **The Trustees of Indiana University**, | |
| *Defendant*. | |

# Verified Complaint for Declaratory and Injunctive Relief

Plaintiffs Ryan Klaassen, Jaime Carini, D.J.B., by and though his next friend and father, Daniel G. Baumgartner, Ashlee Morris, Seth Crowder, Macey Policka, Margaret Roth, and Natalie Sperazza complain against Defendant as follows:

## Introduction

1.    This is a civil action for declaratory and injunctive relief arising under the Fourteenth Amendment and Indiana Code § 16-39-11-5 (Indiana's "**Vaccine Passport Law**").

2.    It concerns the constitutionality of Indiana University's Vaccine Mandate (**"IU's Mandate"**), which requires that all students to receive one of the available COVID vaccines.

3.    IU's Mandate violates the liberty protected by the Fourteenth Amendment to the U.S. Constitution, which includes rights of personal autonomy and bodily integrity, and the right to reject medical treatment.

4.    IU's Mandate also violates Indiana's new Vaccine Passport Law which prohibits state

-1-

and local units (including Indiana University ("**IU**")) from requiring or issuing vaccine "passports" that indicate an individual's COVID immunization status.

## Jurisdiction and Venue

**5.**   This action arises under the Fourteenth Amendment and Indiana Code § 16-39-11-5.

**6.**   This Court has jurisdiction over all claims pursuant to 28 U.S.C. Sections 1331 and 1343(a). It also has jurisdiction pursuant to the Declaratory Judgment Act as codified at 28 U.S.C. Sections 2201 and 2202.

**7.**   Venue is proper under 28 U.S.C. Section 1391(b) because Defendant resides in this District and because a substantial part of the events giving rise to the claim occurred in this District.

## Parties

**8.**   Plaintiff Ryan Klaassen is a resident of Noble County, Indiana and an incoming sophomore at IU.

**9.**   Plaintiff Jaime Carini is a resident of Rogers County, Oklahoma and is currently pursuing two doctorates at IU—a Doctor of Music (D.M.) in organ performance and literature, and a Ph.D. in musicology.

**10.**   Plaintiff D.J.B., by and though his next friend and father, Daniel G. Baumgartner, is a resident of Cook County, Illinois and an incoming freshman at IU.

**11.**   Plaintiff Ashlee Morris is a resident of Jennings County, Indiana and an incoming 1L at the McKinney School of Law.

**12.**   Plaintiff Seth Crowder is a resident of Marion County, Indiana and is currently pursuing

his Masters of Business Administration at the Kelley School of Business.

**13.** Plaintiff Macey Policka is a resident of Hamilton County, Indiana and a senior at IU.

**14.** Plaintiff Margaret Roth is a resident of Marion County, Indiana and an incoming freshman at IU.

**15.** Plaintiff Natalie Sperazza is a resident of Hendricks County, Indiana and an incoming sophomore at IU.

**16.** Defendant The Trustees of Indiana University ("**Board of Trustees**") is the governing body, legal owner, and final authority of IU. IU "is recognized as the university of the state." IC § 21-20-2-1. The Board of Trustees has broad "powers, duties, and responsibilities" to govern IU. *See* IC § 21-27 *et seq.*; *see also* IC § 21-39-2-2 ("The board of trustees . . . may govern, by regulation and other means, the conduct of students, faculty, employees, and others while upon the property owned, used, or occupied by the state educational institution.") and Indiana University Board of Trustees, *About the Board of Trustees*, https://trustees.iu.edu/about-the-board/index.html (last visited on June 17, 2021) ("The Board of Trustees is Indiana University's governing board, its legal owner, and its final authority."). The Board of Trustees is a body politic. IC § 21-20-2-2. The Board of Trustees may "in the name of 'The Trustees of Indiana University' . . . be sued." *Id.* at § 21-27-4-2.9.

# I. Facts

**A.   IU's Mandate Overview and Implementation**

### 1.   IU's Mandate and Exemptions

**17.**   On May 21, 2021, IU announced to all faculty, staff, and students that there would be a requirement to receive a COVID-19 ("**COVID**") vaccine for the fall 2021 semester. Indiana University, *New COVID-19 vaccine requirement*, attached as Exhibit 1.

**18.**   This announcement was delivered via email to all current faculty, staff, and students of every IU campus. *See id*.

**19.**   IU's Mandate requires that all students, faculty, and staff receive one of the available COVID vaccines by either August 15 or when they return to campus after August 1, whichever is earlier. Indiana University, *COVID-19 Vaccine*, https://www.iu.edu/covid/prevention/covid-19-vaccine.html (last visited June 17, 2021).

**20.**   In order to comply with IU's Mandate, IU has suggested that students have their first dose of the COVID vaccine by July 1, 2021. *Id*.

**21.**   There are "strong consequences" for those who refuse the vaccine and do not receive an exemption. *Id*. Students will have their class registration canceled, their university-issued IDs, known as "Crimson Cards," terminated, and will be restricted from any on-campus activity. *Id*.

**22.**   Under IU's Mandate, individuals may request an exemption if they fit an extremely limited and narrow set of criteria. *Id*; *see also* Indiana University, *COVID-19 Frequently Asked Questions*, https://www.iu.edu/covid/faq/index.html#vaccine-req (last visited June 17, 2021) ("exemptions will be extremely limited").

23.  Exemption from IU's Mandate applies to anyone with a religious objection, a documented allergy to the vaccine, medical deferrals, and for online students in a completely online course with no on-campus presence. *Id*.

24.  IU's Mandate does not include an exemption for those with natural immunity to COVID, including those who have previously been infected and fully recovered, or those students will a medical condition where the COVID vaccination is contra-indicated, even under their attending physician's advice.

25.  Initially, IU stated that the exemption process would become available on June 15, 2021; however on June 1, 2021, all faculty, staff, and students received an email with a live exemption form. *Fall 2021 Restart Guidance*, Indiana University, attached as Exhibit 2.

26.  The exemption request form provides three exemption options coinciding with the aforementioned criteria. *Exemption Criteria*, attached as Exhibit 3.

27.  Once an exemption form is completed online, IU's Medical Response Team reviews the exemption request and responds within five business days, presumably to approve or deny the exemption. Indiana University, *COVID-19 Vaccine*, https://www.iu.edu/covid/prevention/covid-19-vaccine.html (last visited June 17, 2021).

28.  Those who qualify for and are granted an exemption are still subject to additional requirements ("**Extra Requirements**").

29.  These Extra Requirements include requiring exempt individuals to participate mitigation testing twice a week, a mandatory quarantine if exposed to someone who tests positive for COVID, mandatory face masks in public spaces, and a mandatory return to their home address if

the campus has a serious outbreak of the virus. Indiana University, *COVID-19 Frequently Asked Questions*, https://www.iu.edu/covid/faq/index.html#vaccine-req (last visited June 17, 2021)

**30.**  These Extra Requirements apply to all types of exemptions, regardless of which exemption an individual qualifies for. *Id*.

**31.**  There are no exemptions from these Extra Requirements for those who qualify for a religious or medical exemption. *See infra ¶¶* 197, 199. There is no exemption from wearing a face mask in public spaces. *Id*. There is no exemption from participating in the mandatory twice a week mitigation testing. *Id*.

**32.**  If a person with an exemption is discovered not wearing a face mask or does not participate in the mitigation testing, they face "disciplinary action up to and including dismissal or termination from the university." *Id*.

**33.**  If a person chooses to receive the vaccination, IU requires that such person use "IU's COVID-19 vaccine report form to attest that they are vaccinated and report all doses of [the] vaccine." Indiana University, *COVID-19 Vaccine*, https://www.iu.edu/covid/prevention/covid-19-vaccine.html (last visited June 17, 2021). The form should be completed after each dose. *Id*; *see also* Indiana University, COVID-19 Frequently Asked Questions, https://www.iu.edu/covid/faq/index.html#vaccine-req (last visited June 17, 2021) ("All students, faculty and staff will need to report their vaccine using IU's COVID-19 vaccine self report form. As part of this process, you will need to know the dates of your vaccine dose(s) and can upload a photo or scan of your verified vaccine card received at your vaccine appointment (for example, CDC card) to be entered in the incentive program.").

**34.**   Alternatively, the reporting individual can upload a copy of their vaccine documentation to be eligible to be entered into IU's incentive program. Indiana University, *COVID-19 Vaccine*, https://www.iu.edu/covid/prevention/covid-19-vaccine.html (last visited June 17, 2021). "In most cases, this [documentation] will be a photo or scan of the CDC card [received at the] vaccination appointment that notes the date and type of vaccine [ ] received." *Id*.

**35.**   IU's incentive program includes: a student parking permit, bookstore giftcard, on-campus dining credit, Apple watch, AirPods Pro, JBL speaker, Yeti cooler, credit for full-time in-state tuition, and season tickets for the Colts or Indiana Repertory Theatre. Indiana University, *Get vaccinated, win prizes*, https://www.iu.edu/covid/prevention/incentive-program.html (last visited June 17, 2021).

### 2.   Decision to Implement IU's Mandate

**36.**   IU's Mandate came from the recommendation of IU's Restart Committee. *Indiana University Restart Committee Recommendations For Fall 2021* (May 26, 2021), attached as Exhibit 4.

**37.**   The IU Restart Committee was charged by IU President Michael McRobbie with delivering recommendations and advice on how to restart the entire university's "normal" pre-pandemic operations. *Id*. at 4. Executive Vice President and Dean of the School of Medicine Jay Hess was the chair of the Restart Committee. *Id*.

**38.**   The Restart Committee's report does not provide a clear process as to how the Committee came to the decision to recommend IU's Mandate. *See generally Indiana University Restart Committee Recommendations For Fall 2021* (May 26, 2021), attached as Exhibit 4. However, it

does establish that "[i]n developing recommendations for the 2021 Fall semester, we are operating under the *assumption* that the vast majority of our constituents will be vaccinated, allowing us to achieve herd immunity in our community." *Id*. at 7 (emphasis added).

**39.**   No explanation for this assumption is given. Nor is there any explanation as to why IU's Mandate is needed if the vast majority of students will already be vaccinated, allowing IU's community to achieve herd immunity.

**40.**   Without evidence to the contrary, it appears the Restart Committee arbitrarily decided that IU's Mandate would be necessary due to an unsupported premise.

**41.**   The Restart Committee did not explain why it was necessary to implement IU's Mandate, the provisions of which far exceed those imposed by the CDC, state and county authorities on the general public, and other universities. *See infra* Parts I.B.2.–I.B.6. (detailing the requirements for each).

**42.**   No other details have been released by the Restart Committee. None of their meeting minutes, records, or decision-making processes have been released to the IU community or public at large.

**43.**   Plaintiffs' counsel filed a public records request, requesting copies of all public records related to IU's decision to implement IU's Mandate. To date, no documents have been provided.

**B.   Context Surrounding IU's Mandate**

**1.   IU's Mandate is Contrary to the FDA Emergency Use Authorization**

**44.**   Currently, all three publicly-available COVID vaccines have only "Emergency Use Authorization" status. These COVID vaccines are not vaccines licensed by the Food and Drug

Administration ("FDA"), as they have not received full FDA approval.

45.  A drug classified under "Emergency Use Authorization" is a drug authorized by the Secretary of Health and Human Services for the duration of an emergency under 21 U.S.C.A. § 360bbb-3.

46.  As a matter of law, a drug given Emergency Use Authorization (EUA) status is one not already approved or licensed under the Public Health Service Act. 21 U.S.C.A. § 360bbb-3.

47.  A drug receives EUA status once the Secretary, in consultation with the Assistant Secretary for Preparedness and Response, the Director of the National Institutes of Health, and the Director of the Centers for Disease Control and Prevention, concludes that (1) "that an agent . . . can cause a serious or life-threatening disease or condition;" (2) it is reasonable to believe the drug may be effective in diagnosing, preventing, or treating, the agent, and the known benefits of taking the drug outweigh the known risks; and (3) "that there is no adequate, approved, and available alternative to the product for diagnosing, preventing, or treating such disease or condition[.]" 21 U.S.C.A. § 360bbb-3©

48.  A vaccine authorized under Emergency Use Authorization requires complete, informed, and voluntary consent. Indeed, as a condition of authorization under the Emergency Use Authorization provisions, the Secretary is required:

> "to ensure that individuals to whom the product is administered are informed—
>    (I)   that the Secretary has authorized the emergency use of the product;
>    (II)  *of the significant known and potential benefits and risks of such* use, and of the extent to which such benefits and risks are unknown; and
>    (III) *of the option to accept or refuse administration of the product*, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

**Verified Compl. for**
**Decl. and Inj. Relief**                          -9-

21 U.S.C.A. § 360bbb-3(e)(1)(A)(ii)(I)-(III) (emphases added).

**49.**  Consequently, all COVID vaccines currently available under EUA can only be administered to individuals in accordance with 21 U.S.C.A. § 360bbb-3(e)(1)(A)(ii)(III), which requires the informed consent of the consumer before they receive the vaccination and the option to refuse or accept the drug.

**50.**  The statute requires and, if followed, produces *medical* informed consent—consent based on medical information from medical providers. The "consequences" of refusing the product that are considered *and for which consent is secured* are medical consequences, not other types of consequences, like loss of employment or virtual expulsion from school.

**51.**  The threat of virtual expulsion from school for students who refuse to take the vaccine and who do not qualify for an exemption is not an attempt to garner consent—it is coercion. In other contexts, even subtle, implied threats cannot constitutionally support "consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973) (coerced police searches unconstitutional); *see also*, *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010) (arbitration "is a matter of consent, not coercion").

**52.**  While IU is not a provider and is not directly subject to the informed consent statute, the principles supporting EUA itself, as well as the informed consent law, supports voluntary informed consent from IU students—not coercion from IU's administration.

**53.**  Accordingly, the same processes should be used, and consents obtained, when suggesting that students get a vaccine that has only been approved for emergency use.

**54.**  IU's Mandate is contrary to these principles, processes, and consents. It does not inform

**Verified Compl. for
Decl. and Inj. Relief**                           -10-

students that (1) the vaccines are only authorized for emergency use, (2) that there are "significant known and potential benefits and risks of such use" (or "the extent to which such benefits and risks are unknown") or (3) that students have the "option to accept or refuse administration of the product[.]"

**55.**  Contrary to the requirements imposed the general public, no IU student is given the option to accept or refuse the vaccine, it is mandated.

### 2.  IU's Mandate is Contrary to Modern Medical Ethics

**56.**  IU's Mandate is contrary to the fundamental tenet of medical ethics which require voluntary and informed consent for any procedure, or drug that imposes a medical risk to an individual. "A person may freely choose to accept medical risks for the benefit of others . . . we don't harvest organs without consent, even if doing so would save many lives. Those who make such sacrifices for others must truly be volunteers, not conscripts drafted by college administrators." Aaron Kheriaty and Gerard V. Bradley, *University Vaccine Mandates Violate Medical Ethics*, WALL STREET JOURNAL (June 14, 2021, 12:47 PM), https://www.wsj.com/articles/university-vaccine-mandates-violate-medical-ethics-11623689220 (last visited June 18, 2021).

**57.**  In some circumstances, our society has resolved this medical ethics quandary in favor of mandatory vaccines. But it is critical to look at the specific contexts in which this has occurred.

**58.**  In elementary schools, pediatric vaccines are mandatory for illnesses that *pose significant medical risks to those children*, like polio or measles. *See id.* Likewise, colleges usually require its students to have been vaccinated against these illnesses.

**59.**  The risks of side effects and serious complications from these types of mandatory

**Verified Compl. for
Decl. and Inj. Relief**                             -11-

vaccines are generally known due to long-time use and years of research on the specific popula-

tion in question. The risks of serious illness or death due to the diseases far outweighs the known

risks of the vaccines to those same diseases.

60.  Here, the risk of serious morbidity and mortality from COVID for those under 30 are

close to zero. *Id.*; *see also*, Part I.C.2. The known and unknown risks associated with COVID

vaccines, particularly in those under 30, outweigh the risks to that population from the disease

itself, by any rational measure.

61.  For instance, "a June 10 review by the FDA's Vaccines and Related Biological Products

Advisory Committee indicated an excess risk for heart inflammation, especially in men 30 and

younger." Kheriaty*, supra.*

62.  Forced COVID vaccinations are also imposed on "populations that were deliberately

excluded from clinical trials," such as patients who have recovered from COVID, as well as

pregnant and breast-feeding women. *Id.* Thus, any risks to them were completely unknown.

63.  People with higher risks of serious COVID complications, such as individuals over 60

and people with underlying health conditions, are not required to be vaccinated and can choose to

take the vaccine to protect themselves, if they wish.

64.  The much smaller subset of people who are at higher COVID risk and who cannot

safely receive the vaccine can mitigate their risks by practicing social distancing and wearing a

mask.

65.  "Protection of others," especially in the COVID context, does not relieve our society

from the central canon of medical ethics requiring voluntary and informed consent.

**66.** The FDA requirement of voluntary and informed consent is based on the medical ethics. However, history is replete with societies which violated this central tenet of medical ethics. In 1932, the United States did not receive voluntary and informed consent from African Americans for a study in conjunction with the Tuskegee Institute on syphilis. The Tuskegee Study intentionally refused to reveal to the participants that they had syphilis, intentionally withheld widely available treatments, like penicillin, from them and intentionally failed to get their informed consent to participate in the study. *The* Centers for Disease Control and Prevention, *U.S. Public Health Service Syphilis Study at Tuskegee Timeline*, https://www.cdc.gov/tuskegee/timeline.htm (last visited June 18, 2021).

**67.** It took *forty years* for the U.S. government to put an end to the Tuskegee Study. *Id.* The Tuskegee Study prompted then-President Bill Clinton to state, "with [scientific and technical changes] we must work harder to see that as we advance we don't leave behind our conscience. No ground is gained and, indeed, much is lost if we lose our moral bearings in the name of progress." Pres. Bill Clinton, *Apology For Study Done in Tuskegee* (May 16, 1997), https://clintonwhitehouse4.archives.gov/textonly/New/Remarks/Fri/19970516-898.html (last visited June 18, 2021).

**68.** Of course, the historical example of the Tuskegee Study differs from IU's Mandate because IU has no intent to risk harm to its students and they are not conducting a "study." And Plaintiffs do not claim otherwise. However, However, IU's Mandate does not provide for voluntary and informed consent to the taking of the vaccine, a fundamental tenet of medical ethics, which the Tuskegee Institute also failed. Thus, IU's Mandate is contrary to modern

medical ethics.

### 3.  IU's Mandate is Contrary to CDC's Recommendations

**69.**  The CDC guidelines for unvaccinated people remain largely unchanged from when the pandemic officially began on March 11, 2020. Currently, the CDC's guidance for unvaccinated people is to wear a mask, social-distance at least six feet apart from other individuals, avoid any sort of crowd whether it be outside or inside, and sanitize often. *See* Center for Disease Control, *Guidance for Unvaccinated People: How to Protect Yourself and Others*, Updated June 11, 2021, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited June 18, 2021).

**70.**  Furthermore, the CDC suggests that people get vaccinated, but does *not* require it. *Id*.

**71.**  IU's Mandate is contrary to CDC recommendations, as the CDC simply suggests that individuals get vaccinated and use other protective measures. The CDC does not recommend *requiring* any individual to be vaccinated.

### 4.  IU's Mandate is Contrary to Indiana State Requirements.

**72.**  The current guidelines for Indiana were established in Governor Holcomb's latest executive orders. 2021 *Ind. Exec. Order 21-14* (May 28, 2021), https://www.in.gov/gov/files /Executive-Order-21-14-Fiftenth-Renewal-of-Emergency-Declaration.pdf (last visited June 18, 2021) and 2021 *Ind. Exec. Order 21-15* (May 28, 2021) https://www.in.gov/gov/files/Executive-Order-21-15-Continuation-of-Health-and-Welfare-Provsions.pdf (last visited June 18, 2021).

**73.**  In *Order 21-14*, the Governor rescinded most statewide guidelines for COVID. However, several statewide guidelines remain in place temporarily. *See* Amelia Pak-Harvey,

**Verified Compl. for**
**Decl. and Inj. Relief**                    -14-

*Gov. Eric Holcomb extends health emergency, lifts some requirements starting in June*,
Indianapolis Star, (May 28, 2021), https://www.indystar.com/story/news/politics/2021/05/28/
indiana-gov-holcomb- renews-health-emergency-lifts-some-requirements/5248601001/ (last
visited June 18, 2021).

**74.** General requirements for all Hoosiers are to follow CDC guidelines depending on
whether an individual is vaccinated or unvaccinated. *Order 21-15* at 3.

**75.** The State encourages anyone who has not obtained a vaccine to do so. *Id.* at 3.

**76.** Furthermore, the State still encourages an individual to be tested for COVID if they
show its symptoms, regardless of vaccination status. *Id*. at 3.

**77.** Those who have not obtained a vaccination are still "encouraged" to socially distance
themselves, but there is no longer a requirement to do so. *Id.* at 4.

**78.** Lastly, face-masks are no longer required in state facilities, except for anyone in State
facilities ran by the Department of Corrections, State Hospitals, the Indiana Veterans Home, and
the Indiana Law Enforcement Academy. *Id*. Masks are also required at COVID testing or
vaccination sites and all K-12 educational facilities. *Id.*

**79.** However, Governor Holcomb has announced that "[a]ll directives in executive orders
which have continued throughout the public health emergency will be rescinded and cease on
June 30." State of Indiana, *Gov. Holcomb Signs COVID-19 Executive Orders* (May 28, 2021),
https://events.in.gov/event/gov_holcomb_signs_covid-19_executive_orders_4054?utm_campaig
n=widget&utm_medium=widget&utm_source=State+of+Indiana (last visited June 20, 2021).

**80.** The State of Indiana has not issued a vaccination mandate.

**Verified Compl. for**
**Decl. and Inj. Relief**                             -15-

**81.** The State of Indiana has not even issued a vaccination mandate for its State employees.

**82.** Indiana does not require that anyone show proof of vaccination. Such proof would violate State law. *See infra* Part I.B.7.

**83.** IU's Mandate is contrary to Indiana recommendations, going significantly further than any recommendations from the State and violating State law in the process, by requiring that students prove their vaccination status.

### 5. IU's Mandate is contrary to Allen County, Marion County, and Monroe County's Recommendations

**84.** While IU has multiple campuses and contacts across the State, three of the bigger locations are in Allen County, Marion County, and Monroe County. The recommendations for these counties are discussed in turn.

**85.** Allen County has no COVID requirements for its residents. Allen County Department of Health, Health Commissioner Recommends County Residents Continue COVID-19 Precautions (Apr. 1, 2021), https://www.allencountyhealth.com/health-commissioner-recommends-county-residents-continue-covid-19-precautions/ (last visited June 18, 2021) ("the Department will not implement any local restrictions at this time.").

**86.** Allen County is recommending that residents continue to wear masks, social distance, sanitize regularly, stay home when sick, get vaccinated, etc. *Id.*

**87.** Allen County is not requiring its residents or county employees to get vaccinated. And it is not requiring any proof of vaccination status. *Id.*

**88.** Marion County has lifted the mask mandate for vaccinated persons. Marion County Public Health Department, *Public Health Order 12-2021* (June 8, 2021), https://www.wishtv.co

m/wp-content/uploads/2021/06/Community-Updated-Final-PHO-12-2021-for-June-8-2021.pdf

(last visited June 18, 2021). It still requires masks for non-vaccinated persons. *Id*. Marion County

encourages social distancing, frequent sanitizing, vaccination, etc. *Id*. It limits large gatherings

and capacity for certain places, like bars, restaurants, and nightclubs. *Id*.

89.  Marion County is not requiring its residents or county employees to get vaccinated. And

it is not requiring any proof of vaccination status. *Id*.

90.  Monroe County has rescinded any mask requirements and the limitations on gatherings

of people. Dr. Thomas Sharp, Monroe County Health Department, *COVID-19 Health Order/*

*Regulation will be Rescinded Starting Monday, May 17* (May 14, 2021), https://www.co.mon

roe.in.us/egov/documents/1621029168_52145.pdf (last visited June 18, 2021). No other

restrictions have been issued by the county government since.

91.  Monroe County is not requiring its residents or county employees to get vaccinated.

And it is not requiring any proof of vaccination status.

92.  No local governments in Indiana have issued a vaccination mandate for their residents.

93.  No local governments in Indiana has even issued a vaccination mandate for local county

employees.

94.  IU's Mandate is contrary to applicable county requirements—going significantly further

than any of the relevant counties' recommendations and requirements.

### 6.  IU's Mandate is Contrary to other Public Universities

95.  No other public university in the State of Indiana has issued a vaccination mandate.

Indiana University is the sole public education institution to require the Vaccine. As a result,

students attending Indiana University are treated differently and unequally as a result of IU's Mandate.

**96.** Ball State University does not have a COVID vaccination mandate. Instead, Ball State University simply "encourage[s] all to adhere to essential protective behaviors such as wearing face coverings, physical distancing, maintaining proper hygiene, and receiving the COVID-19 vaccine as they become eligible[.]" Ball State University, *Cardinals Care*, https://bsu.edu/about/ administrativeoffices/emergency-preparedness/pandemicfluprep/coronavirus/cardinals-care (last visited June 18, 2021).

**97.** Indiana State University does not have a COVID vaccination mandate. Indiana State University is simply encouraging "students living in residence halls and apartments on campus . . . to get vaccinated." Indiana State University, *Student FAQs*, https://www.indstate.edu/sites/ default/files/media/student-covid-faq-21-22.pdf (last visited June 18, 2021). Indiana State also stated that "every individual is expected to take responsibility for their own health and safety and act in a manner that demonstrates respect and consideration for others around them." Indiana State University, *Students and Families*, https://www.indstate.edu/covid/students-families (last visited June 18, 2021).

**98.** Purdue University does not have a vaccine mandate. Purdue's current vaccine policy is to strongly encourage students to get vaccinated and to document their status. Purdue University, *Vaccine Information*, https://protect.purdue.edu/vaccine-information/ (last visited June 18, 2021).

**99.** Ivy Tech Community College does not have a vaccine mandate. Indiana's largest community college system is only encouraging students to get vaccinated. Ivy Tech Community

College, *Current COVID-19 Policies*, https://www.ivytech.edu/coronavirus.html (last visited June 18, 2021).

**100.**     The University of Southern Indiana does not have a vaccine mandate. It is only encouraging, but not mandating, that students be vaccinated. University of Southern Indiana, *COVID-19 (coronavirus) Information*, https://www.usi.edu/covid-19/ (last visited June 18, 2021).

**101.**     Vincennes University does not have a vaccine mandate. The university is simply encouraging students to get vaccinated. Vincennes University, *Frequently Asked Questions*, https://www.vinu.edu/covid-19-faq (last visited June 18, 2021).

**102.**     Indiana University stands alone as the sole public university in Indiana with a vaccine mandate. *See* Shari Rudavsky and Isaiah Seibert, *Here's which Indiana colleges and universities will require COVID-19 vaccines this fall*, Indianapolis Star (May 21, 2021), https://www.indystar.com/story/news/education/2021/05/21/iu-requiring-covid-vaccine-ball-state-iupui-purdue-notre-dame/5207192001/ (last visited June 18, 2021).

### 7.   IU's Mandate Violates Indiana's Ban on Vaccine Passports

**103.**     Under Indiana law, state and local units are prohibited from requiring or issuing vaccine "passports" that indicate an individual's COVID immunization status. IC § 16-39-11-5.

**104.**     Legislative intent to prevent the state from requiring vaccine passports can be inferred from Representative Jacob's comments on the House floor, "The thought of a state mandating that people take a vaccine that is still experimental according to the manufacturers of the vaccine would be considered a gross violation of the individual freedom of Hoosiers." Taylor

Dixon, *Indiana government will be prohibited from requiring 'vaccine passports' under new amendment*, TheStateHouseFile.com (Apr. 22, 2021), http://thestatehousefile.com/indiana-gove rnment-will-be-prohibited-from-requiring-vaccine-passports-under-new-amendment/ (last visited June 18, 2021).

**105.**    In a recent opinion, Indiana Attorney General Todd Rokita advised the Vaccine Passport Law applies to public colleges and universities like IU because they are "arm[s] of the state." State of Indiana Office of the Attorney General, *Official Opinion 2021-1 on University Policies on COVID-19 Vaccination* (May 26, 2021) ("Opinion Letter or "Op. Letter") attached as Exhibit 5.

**106.**    Attorney General Rokita made clear that the Vaccine Passport Law does not prohibit an entity from requesting proof of COVID immunization status, *provided no negative consequence arises from not producing the record*. Op. Letter, Exhibit 5, at 4 (emphasis added).

**107.**    As shown above, every IU student is required to be vaccinated for COVID, unless they qualify for an exemption. But it is not enough for an IU student to merely *receive* the COVID vaccine—he or she "will need to report their vaccine using IU's COVID vaccine self report form." *See* Indiana University, *Frequently Asked Questions*, https://www.iu.edu/covid/ faq/index.html#vaccine-req (last visited June 18, 2021). Therefore, IU mandates not only the vaccine, but also mandates the student *prove* his or her COVID immunization status.

**108.**    IU students who fail to provide proof of their COVID immunization status (or who have not been granted an exemption) will suffer severe negative consequences in direct violation of the Vaccine Passport Law. *See supra* Part I.A.1.

**Verified Compl. for**
**Decl. and Inj. Relief**                    -20-

**109.** In short, if a student doesn't provide IU with his or her COVID immunization status, IU virtually expels that student. Virtual expulsion from school for refusing to provide COVID immunization status is a "negative consequence" that directly violates Indiana law.

**110.** IU's Mandate "unquestionably violates the new law." Op. Letter, 7.

**C. Current Risk to IU Students of COVID Infection and Adverse Outcomes**

**1. Current State of the Pandemic**

**111.** The pandemic is virtually over. The CDC recently reported the lowest number of cases since March of 2020 (the beginning of the COVID pandemic). Sam Baker & Andrew Witherspoon, *COVID-19 cases hit lowest point in U.S. since pandemic began*, AXIOS (June 3, 2021), https://www.axios.com/coronavirus-cases-infections-vaccines-success-fa7673a1-0582-4e 69-aefb-3b5170268048.html (last visited June 20, 2021).

**112.** In Indiana, Governor Holcomb has already declared the end of the COVID emergency on June 30, when nearly all State COVID restrictions will end. *See ¶* 79.

**113.** According to a report from Harvard doctors, a pandemic is over when herd immunity is reached, which they define as at least 70% of the population either being vaccinated or exposed to the virus. Alvin Powell, *Vaccines can get us to herd immunity, despite the variants*, HARVARD GAZETTE (Feb. 25, 2021), https://news.harvard.edu/gazette/story/2021/02/vaccines- should-end-the-pandemic-despite-the-variants-say-experts/#:~:text=A%20Harvard%20immunolo gist%20said%20current,fight%20against%20the%20disease.

**114.** Further, according to Dr. Peter McCullough who has extensively researched COVID and its treatments, herd immunity is calculated by a specific formula.

**115.**     Dr. McCullough's formula is as follows: ((CC*6) + V + (.15*P)) ÷ P = HIN

CC= COVID cases in the state
6= the current CDC multiplier[1]
V= number of vaccinated in the state
15%= of the total people in the state, this represents the number of people in a given state that will not get COVID
P=Population of a state (i.e. Indiana)
HIN=Herd Immunity Totals

**116.**     According to Dr. McCullough, you take the total cases of COVID in Indiana

(753,000[2]) times 6—this equals 4,518,000—then add the total number of vaccinated

(2,880,635[3]), and finally add 15% of the population (1,009,800), which equals 8,408,435, as

shown below:

(753,000*6) + 2,880,635 + (.15*6,732,000) = 8,408,435

4,518,000 + 2,880,635 + 1,009,800 = 8,408,435

**117.**     If you add all these numbers together you get 8,408,435, which you then divide by

the total population of Indiana (6,732,000[4]), which equals 125% of the population.

8,408,435 ÷ 6,732,000 = 125%

**118.**     This number is over 100% due to the overlap of people who were infected with

COVID and also received the vaccine, so they are counted twice. While the number of people in

_____

[1] Centers for Disease Control and Prevention, Estimated Disease Burden of COVID-19 (May 19, 2021), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/burden.html

[2] Indiana State Department of Health, *Indiana COVID-19 Dashboard and Map* (June 18, 2021), https://www.coronavirus.in.gov/2393.htm (last visited June 20, 2021).

[3] Indiana State Department of Health, *Vaccine Dashboard*, (June 18, 2021), https://www.coronavirus.in.gov/vaccine/2680.htm (last visited June 20, 2021).

[4] United States Census, *QuickFacts Indiana* (July 1, 2019), https://www.census.gov/quickfacts/IN (last visited June 20, 2021).

this group is not known,[5] the percentage of overlap would have to be over 50% to get below the number for herd immunity to fall below 70%, which is very unlikely.

119.     Additionally, infection rates continue to decline. According to the official Indiana COVID numbers, the infection rate was a mere 2.7% during the week of June 2, 2021, and it continues to decline daily.

**Table A.**



Indiana State Department of Health, *Indiana COVID-19 Dashboard and Map* (June 18, 2021), https://www.coronavirus.in.gov/2393.htm.

120.     The June 14, 2021, infection rate was only 2.4%. *Id.*

121.     As the numbers continue to decline, such draconian measures as requiring all students to be vaccinated is not reasonable.

### 2. Risk to the College-Age Group from a COVID Infection

122.     Moreover, as of May 30, 2021, the positivity test rate for new COVID cases at IU-

---

[5] There is no specific data from the CDC or the Indiana Department of Health detailing how many people have had both.

**Verified Compl. for**
**Decl. and Inj. Relief**                    -23-

Bloomington was 0%. Indiana University, *IU Bloomington COVID-19 Testing Dashboard*, https://www.iu.edu/covid/dashboard/bloomington (last visited June 20, 2021). The highest IU infection rate ever was 7.51% on August 30, 2020, and it has steadily declined since then with no indication of a new wave. *Id.*

123.     The current risk of getting COVID is very low, and college and graduate students do not generally spread it.

124.     The lack of so called "super spreader events" further shows that the pandemic is over. This generally occurs where large masses of people gather in close quarters and the virus spreads rapidly and easily.

125.     However, the Indianapolis 500 recently occurred and there were over 135,000 fans in the stadium. Vocal opponents of the event said that there would be a huge uptick in COVID cases.

126.     However, since the event on May 30, 2021, there has been a continued decline of COVID in Indiana. *See* **Table B** COVID-19 Cases Continue to Decline after Indy 500, attached as Exhibit 6.

127.     This is because large gatherings are not the problem. Epidemic spread of COVID, like all other respiratory viruses, notably influenza,[6] is driven by symptomatic persons; asymptomatic spread is trivial and inconsequential.

128.      A meta-analysis of contact tracing studies published in The Journal of the American Medical Association showed asymptomatic COVID spread was 0.7%. Zachary J.

---

[6] Eleni Patrozou & Leonard A. Mermel, *Does Influenza Transmission Occur from Asymptomatic Infection or Prior to Symptom Onset?*, 124 Pub. Health Rep. 193 (2009).

**Verified Compl. for**
**Decl. and Inj. Relief**                    -24-

Madewell, PhD; Yang Yang, PhD; Ira M. Longini Jr, PhD; M. Elizabeth Halloran, MD, DSc;

Natalie E. Dean, PhD, *Household Transmission of SARS-CoV-2: A Systematic Review and Meta-analysis*, JAMA Network Open, available at https://jamanetwork.com/journals/jamanetworko

pen/fullarticle/2774102 (last visited June 20, 2021).

129.    Accordingly, a rational and ethical prevention measure to reduce the spread of

COVID is a simple requirement, as part of formal policies, that persons with active symptomatic,

febrile (feverish) respiratory illnesses, like COVID, should isolate themselves. Indeed during the

H1N1 influenza A pandemic, fully open, unmasked college campuses were advised by federal

health officials, *"Flu-stricken college students should stay out of circulation"* and *"if they can't*

*avoid contact they need to wear surgical masks."* Great Falls Tribune, *Advice: Flu-stricken*

*college students should stay out of circulation*, August 21, 2009, page 5, section A, available at

https://www.newspapers.com/image/243611045.

130.    Specifically in Monroe County, where one of IU's campuses is located, only four

cases per 100,000 people have been reported for the past seven days, and statistically there has

been less than one death per 100,000 people. CNNhealth, *Tracking Covid-19 cases in the US*,

https://www.cnn.com/interactive/2020/health/coronavirus-us-maps-and-cases/ (last visited June

20, 2021).

131.    Despite a high frequency of COVID infections, as determined by standard testing,

serious COVID cases among college and graduate students is a rare event. Brown University

physician epidemiologist, Andrew Bostom, MD, MS, compiled data from 100 major university

and college COVID data dashboards, in conjunction with national and local news reports of

campus-related hospitalizations, August 2020 through the November 2020, Thanksgiving holiday break (11/22/20).

**132.** The COVID positive tests and related hospitalizations from 100 universities/ colleges, from August 2020–November, 2020 are detailed in **Table C**, attached as Exhibit 7.

**133.** As depicted in Table C, among students on campus during this period, even though there were 139,000 positive COVID tests, there were a mere 17—typically short-term— reported COVID hospitalizations. This was driven by a cluster of seven hospitalizations from Dayton University, i.e., only 0.012% of total positive tests resulting in hospitalization.

**134.** Within this large sample, there were zero medically-confirmed, albeit one possible, COVID related death. This very reassuring data accrued in the absence of any COVID vaccination of the student population.

**135.** Importantly, as shown by this data, no one has died from COVID at Indiana University and only one person was hospitalized—even at the peak of the pandemic. The risks for this age group to developing serious side effects from COVID is extremely low. Studies show that there is only a .0002% chance of dying from COVID for people ages 20-49.

**136.** Further, the CDC has released charts depicting the risks by age, as shown below.

**Table D.**



**Table E.**



137. These charts (Tables D and E) show the minimal risk 18-29 year olds face across the United States. For example, for every one 18-29 year old that dies from COVID, 4.5 30-39 year olds die, 13 40-49 year olds die, 44 50-64 year olds die, 130 65-74 year olds die 320 75-84 year olds die, and 870 over 85 die.

**Verified Compl. for**
**Decl. and Inj. Relief**                         -27-

138.     These studies do not take into account pre-existing conditions and co-morbidities, which greatly increase the likelihood of death in COVID patients. The people who are at the highest risk and have the greatest need for the vaccine are those over the age of fifty. The risk for young people is near minuscule with the achievement of herd immunity and highly effective treatments.

139.     As shown, according to the CDC, no 18-29 year olds have died from COVID in 2021 in Indiana.

140.     The lower risks associated with catching and treating COVID make IU's Mandate unreasonable.

141.     Further, college students are not the spreaders of the virus to the community. There was a recent study from Dr. Arnold and colleagues that reported the results of a longitudinal serosurvey (blood sampling) of community residents in Centre County, Pennsylvania, home to Pennsylvania State University, University Park campus. *See* Callum R K Arnold, Sreenidhi Srinivasan, Catherine M Herzog, Abhinay Gontu, Nita Bharti, Meg Small, Connie J Rogers, Margeaux M Schade, Suresh V Kuchipudi, Vivek Kapur, Andrew Read, Matthew J Ferrari, *SARS-CoV-2 Seroprevalence in a University Community: A Longitudinal Study of the Impact of Student Return to Campus on Infection Risk Among Community Members*, medRXiv (Feb. 19, 2021), available at https://pubmed.ncbi.nlm.nih.gov/33619497/ (last visited June 20, 2021).

142.     The return of approximately 35,000 students to the campus in August 2020 increased the county population size by nearly 20%. *Id*. Over 4,500 cases of COVID infections were detected among the student population during the Fall 2020 term (before and just after

student return). *Id*. Between August 7, 2020, and October 2, 2020, these investigators enrolled

community residents and tested their serum for the presence of anti-Spike Receptor Binding

Domain (S/RBD) IgG (a class of immunoglobulin "antibodies"), to confirm prior COVID

exposure. *Id*. This was repeated in the same community during December 2020 (after the

departure of students), and seroprevalence for both sampling waves was recorded and analyzed.

Moreover, returning students were enrolled in a longitudinal cohort, and IgG seroprevalence

results were reported from the first wave of sampling (between October and November 2020,

prior to the end of the term). Here is how Arnold and colleagues summarized their findings:

> Of 345 community participants, 19 (5.5%) were positive for SARS-CoV-2 IgG antibodies at their first visit between 7 August and 2 October. Of 625 returning student participants, 195 (31.2%) were positive for SARS-CoV-2 antibodies between 26 October and 23 November. 28 (8.1%) of the community participants had returned a positive result by 9 December. Only contact with known SARS-CoV-2-positive individuals and attendance at small gatherings (20-50 individuals) were significant predictors of IgG antibodies among returning students (adjusted odds ratio, 95% Confidence Interval: 3.24, 2.14-4.91, p<0.001; and 1.62, 1.08-2.44, p<0.05; respectively).

They concluded:

> Despite high seroprevalence observed within the student population, seroprevalence in a longitudinal cohort of community residents was low and stable from before student arrival for the Fall 2020 term to after student departure, implying limited transmission between these cohorts…The demographic shift associated with student return to campus was not associated with increased SARS-CoV-2 seroprevalence in this cohort of community residents.

*Id*.

**143.** College students face little chance of actually catching COVID and little chance of

spreading it to the greater community.

144.    Even if students catch the virus, the treatment of the virus has improved tremendously since the advent of COVID. Studies have shown several different treatment methods, which have proven effective. A combination of medications for a minimum of five days and acutely administered supplements used for the initial ambulatory patient with suspected and or confirmed COVID-19 (moderate or greater probability) has proven effective. Brian C Procter, Casey Ross, Vanessa Pickard, Erica Smith, Cortney Hanson, Peter A McCullough, *Clinical outcomes after early ambulatory multidrug therapy for high-risk SARS-CoV-2 (COVID-19) infection*, Reviews in Cardiovascular Medicine (December 30, 2021), available at https://rcm.imrpress.com/EN/10.31083/j.rcm.2020.04.260 (last visited June 20, 2021).

**Table F**

| Agent (drug) | Rationale |
| --- | --- |
| Zinc | Inhibits SARS-CoV-2 RNA synthesis |
| Hydroxychloroquine 200 mg po bid | Inhibits endosomal transfer of virions, anti-inflammatory |
| Ivermectin (200 mcg/kg) usual dose 12 mg po qd x 3 days | Attenuates importin $\alpha/\beta$-mediated nuclear transport of SARS-CoV-2 into nucleus |
| Azithromycin 250 mg po bid | Covers respiratory bacterial pathogens in secondary infection |
| Doxycycline 100 mg po bid | Covers respiratory bacterial pathogens in secondary infection |
| Inhaled budesonide, Dexamethasone 8 mg IM | Treats cytokine storm |
| Folate, thiamine, vitamin 12 | Reduce tissue oxidative stress |
| Intravenous fluid | Intravascular volume expansion |

145.    This study, conducted by Dr. McCullough, evaluated patients between the ages of 12 and 89 years. The average age was 50.5 and 61.6% were women. The study found that primary care physicians can treat COVID patients with low hospitalization and death. The study showed that administration of the medicines and supplements shown in table produces a less than 2% chance of facing hospitalization or death. As this study was done with mainly higher risk patients

at the peak of the pandemic, this is a highly successful treatment plan and just one of the many new treatments that have been used in the last year. *Id*.; *see also* National Institutes of Health, *Therapeutic Management of Adults With COVID-19* (Updated May 24, 2021), https://www.covid19treatmentguidelines.nih.gov/management/therapeutic-management/ (last visited June 21, 2021).

146.    Treatment has improved so drastically for COVID that according to the CDC, there were 16 deaths in Indiana for young adults aged 18-29 in 2020, but zero in 2021. This is evidence of better treatment and less risk for college aged students.

147.    Even the Restart Committee acknowledged that "The IU population to date has had a very low rates of hospitalization and death due to COVID-19 infection." *Indiana University Restart Committee Recommendations For Fall 2021*, Exhibit 4, p. 8. This was true even in the height of the pandemic.

148.    As shown, the pandemic is virtually over, herd immunity has been achieved, and there is an extremely minimal risk of COVID to IU students, making IU's Mandate irrational and unreasonable.

### 3. Risks to the College-Age Groups for other Causes.

149.    Table G shows the numbers of deaths for Indiana residents between the ages of 15 - 24 in 2019, for various non-COVID causes:

**Table G**

| Cause of Death | Number of Indiana Residents, Ages 15 - 24 |
|---|---|
| Homicide | 146 |
| Road Traffic Accidents | 143 |
| Suicide | 117 |
| Poisonings | 107 |
| Other Injuries | 18 |
| Inflammatory/Heart | 13 |
| Congenital Anomalies | 11 |
| Endocrine Disorders | 10 |

World Life Expectancy, *Indiana Health Rankings*, https://www.worldlifeexpectancy.com/indiana-cause-of-death-by-age-and-gender (last visited June 19, 2021) (citing recent data from the CDC, NIH, and individual state and county databases for verification and supplementation for USA data).

**150.** Plaintiffs' counsel has submitted a public record's request to the Indiana Department of Health to supplement this data, but have not yet received a response. However, even using the general data in the table above shows the risk of death for college-age students from any number of causes unrelated to COVID far outnumber the risk of death from COVID.

**D. Current Benefits and Risks to IU Students of COVID Vaccinations**

**1. Benefits of COVID Vaccination for IU Students**

**151.** The vaccine has proven to be effective to prevent COVID—studies show that the Vaccines are anywhere from 70-95% effective in preventing COVID.

**2. Known Risks of COVID Vaccination for IU Students**

**152.** Even if the pandemic was still occurring, it is unreasonable for students to get a risky, relatively untested vaccine.

**153.** There are emerging trends showing that the vaccine is especially risky for those 18-

**Verified Compl. for**
**Decl. and Inj. Relief** -32-

29.

**154.**    Increasingly the medical community is acknowledging the possible risks and side

effects including myocarditis, Bell's Palsy, Pulmonary Embolus, Pulmonary Immunopathology,

and severe allergic reaction causing anaphylactic shock. *See* Chien-Te Tseng, Elena Sbrana,

Naoko Iwata-Yoshikawa, Patrick C Newman, Tania Garron, Robert L Atmar, Clarence J Peters,

Robert B Couch, *Immunization with SARS coronavirus vaccines leads to pulmonary*

*immunopathology on challenge with the SARS virus,* https://pubmed.ncbi.nlm.nih.gov/22536382/

(last visited June 21, 2021); Centers for Disease Control and Prevention, *Allergic Reactions*

*Including Anaphylaxis After Receipt of the First Dose of Pfizer-BioNTech COVID-19 Vaccine —*

*United States, December 14–23, 2020* (Jan 15, 2021),  https://www.cdc.gov/mmwr/volumes/70/

wr/mm7002e1.htm (last visited June 21, 2021).

**155.**    For example, 19-year-old Simone Scott at Northwestern University died from

complications of myocarditis after receiving her second dose of the Moderna COVID vaccine.

Megan Redshaw, *19-Year-Old College Freshman Dies From Heart Problem One Month After*

*Second Dose of Moderna Vaccine*, Children's Health Defense, (June 15, 2021) https://childrenshe

althdefense.org/defender/19-year-old-dies-heart-problem-moderna-vaccine/ (last visited June 21,

2021).

**156.**    Also, a 21-year-old in New Jersey who was required to get the vaccine to attend

college in the fall developed myocarditis after receiving the vaccine and had to be hospitalized.

Megan Redshaw, *Exclusive: Dad Says Life 'Not the Same' for 21-Year-Old Student Who*

*Developed Myocarditis After Second Moderna Shot,* Children's Health Defense (June 15, 2021),

https://childrenshealthdefense.org/defender/21-year-old-new-jersey-student-severe-heart-inflamm

ation-moderna-covid-vaccine/ (last visited June 21, 2021).

157.    Multiple recent studies and news reports detail people 18-29 dying from myocarditis

after receiving the COVID vaccine. According to the CDC, 475 cases of pericarditis and

myocarditis[7] have been identified in vaccinated citizens aged 30 and younger. *See* FDA, *Vaccines*

*and Related Biological Products Advisory Committee June 10, 2021 Meeting Presentation*,

https://www.fda.gov/media/150054/download#page=17 (last visited June 21, 2021).

158.    The FDA found that people 12-24 account for 8.8% of the vaccines administrated,

but 52% of the cases of myocarditis and pericarditis reported. *Id*.

**Table H**



159.    The CDC even has a warning on their website now, stating that myocarditis is a

potential risk for young adults, but they believe the risks outweigh the benefits even though this is

a surging problem and a risk with both the Moderna and Pfizer vaccine. Centers for Disease

---

[7] Myocarditis is inflammation of the heart muscle, whereas pericarditis is inflammation of
the sac-like tissue around the heart called the pericardium.

Verified Compl. for
Decl. and Inj. Relief                                    -34-

Control and Prevention, *COVID-19 Vaccines for Children and Teens* (Updated May 27, 2021),

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/adolescents.html (last

visited June 21, 2021).

**160.**     Multiple medical studies are starting to come out detailing this problem.[8]

**161.**     Further, milder side effects from the vaccine include changes in hormone and

menstrual cycles in women, fever, swelling at the injection site, etc. Jill Seladi-Schulman, Ph.D,,

*Can COVID-19 or the COVID-19 Vaccine Affect Your Period?* (May 25, 2021),  https://www.heal

thline.com/health/menstruation/can-covid-affect-your-period#covid-19-and-menstrual-cycles (last

visited June 21, 2021); Rachael K. Raw, Clive Kelly, Jon Rees, Caroline Wroe, David R.

Chadwick, *Previous COVID-19 infection but not Long-COVID is associated with increased*

*adverse events following BNT162b2/Pfizer vaccination*, (pre-print) https://www.medrxiv.org/con

tent/10.1101/2021.04.15.21252192v1 (last visited June 21, 2021).

**162.**     Additionally, there are a host of unknown side effects that may exist as the vaccine

has only gone through human testing for seven months.

### 3. Known Risk of Administering COVID Vaccinations to IU Student who have already had a COVID Infection.

**163.**     There is also recent research on the fact that the COVID vaccine is dangerous for

---

[8] *See, e.g.,* Tommaso D'Angelo MD, Antonino Cattafi MD, Maria Ludovica Carerj MD, Christian Booz MD, Giorgio Ascenti MD, Giuseppe Cicero MD, Alfredo Blandino MD, Silvio Mazziotti MD, *Myocarditis after SARS-CoV-2 Vaccination: A Vaccine-induced Reaction?*, Pre-proof, Canadian Journal of Cardiology, https://www.onlinecjc.ca/action/show Pdf?pii=S0828-282X%2821%2900286-5 (last visited June 21, 2021); Jeffrey Heller, *Israel sees probable link between Pfizer vaccine and myocarditis cases* (June 2, 2021), https://www.reuters. com/world/middle-east/israel-sees-probable-link-between-pfizer-vaccine-small-number-myocard itis-cases-2021-06-01/ (last visited June 21, 2021).

**Verified Compl. for**
**Decl. and Inj. Relief**                    -35-

those who have already had COVID.

**164.** A medical study of United Kingdom healthcare workers who had already had COVID and then received the vaccine found that they suffered higher rates of side effects than the average population. Rachel K. Raw, et al., *Previous COVID-19 infection but not Long-COVID is associated with increased adverse events following BNT162b2/Pfizer vaccination*, medRxiv (pre-print), https://www.medrxiv.org/content/10.1101/2021.04.15.21252192v1 (last visited June 21, 2021).

**165.** The test group experienced more moderate to severe symptoms than the study group that did not previously have COVID. *Id.*

**166.** The symptoms included fever, fatigue, myalgia-arthralgia and lymphadenopathy. *Id.*

**4. Comparison of Immunity Conferred by a previous COVID Infection and by the COVID Vaccination.**

**167.** Those who have previously had COVID do not even need the vaccine.

**168.** In a CDC document entitled "Questions & Answers: Vaccine Against 2009 H1N1 Influenza Virus," the CDC stated that: *"If you have had 2009 H1N1 flu, as confirmed by an RT-PCR test, you should have some immunity against 2009 H1N1 flu and CAN CHOOSE NOT (emphasis added) to get the 2009 H1N1 vaccine."* Centers for Disease Control and Prevention, *Questions & Answers: Vaccine Against 2009 H1N1 Influenza Virus*, https://www.cdc.gov/h1n1flu /vaccination/public/vaccination_qa_pub.htm (last visited June 21, 2021).

**169.** Fast forward just over a decade later, and after intensive investigation for the past 16-months, both laboratory and real world clinical data demonstrate convalescent, unvaccinated COVID immunity is just as robust as vaccine-acquired COVID immunity.

**Verified Compl. for**
**Decl. and Inj. Relief**                    -36-

170.     Indeed multiple laboratory studies conducted by highly respected U.S. and European academic research groups have reported that convalescent mildly or severely infected COVID patients who are unvaccinated can have greater virus neutralizing immunity—especially more versatile, long-enduring T- cell immunity—relative to vaccinated individuals who were never infected. *See* Athina Kilpeläinen, et al., *Highly functional Cellular Immunity in SARS-CoV-2 Non-Seroconvertors is associated with immune protection*, bioRxiv (pre-print), https://www.bior xiv.org/content/10.1101/2021.05.04.438781v1 (last visited June 21, 2021); Tongcui Ma, et al., *Protracted yet coordinated differentiation of long-lived SARS-CoV-2-specific CD8+ T cells during COVID-19 convalescence*, bioRxiv (pre-print), https://www.biorxiv.org/content/10.110 1/2021.04.28.441880v1 (last visited June 21, 2021); Claudia Gonzalez, et al., *Live virus neutrali- sation testing in convalescent patients and subjects vaccinated against 19A, 20B, 20I/501Y.V1 and 20H/501Y.V2 isolates of SARS-CoV-2*, medRxiv (pre-print), https://www.medrxiv.org/ content/10.1101/2021.05.11.21256578v1 (last visited June 21, 2021); Carmen Camara, et al. *Differential effects of the second SARS-CoV-2 mRNA vaccine dose on T cell immunity in naïve and COVID-19 recovered individuals*, bioRxiv (pre-print), https://www.biorxiv.org/content/10.1 101/2021.03.22.436441v1 (last visited June 21, 2021); Ellie N. Ivanova, et al., *Discrete immune response signature to SARS-CoV-2 mRNA vaccination versus infection*, medRxiv (pre-print), https://www.medrxiv.org/content/10.1101/2021.04.20.21255677v1(last visited June 21, 2021); Catherine J. Reynolds, et al, *Prior SARS-CoV-2 infection rescues B and T cell responses to variants after first vaccine dose*, (pre-print), https://pubmed.ncbi.nlm.nih.gov/33931567/ (last visited June 21, 2021); Yair Goldberg, et al., *Protection of previous SARS-CoV-2 infection is similar to that of BNT162b2 vaccine protection: A three-month nationwide experience from*

*Israel*, medRxiv (pre-print), https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1 (last visited June 21, 2021).

171.     An enormous real world Israeli national follow-up study of ~6.4 million individuals, demonstrated clearly that naturally-acquired COVID convalescence immunity was equivalent to vaccine-acquired immunity in preventing COVID infection, morbidity, and mortality. Yair Goldberg, et al., *Protection of previous SARS-CoV-2 infection is similar to that of BNT162b2 vaccine protection: A three-month nationwide experience from Israel*, medRxiv (pre-print), https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1 (last visited June 21, 2021).

172.     Faring at least as well as those vaccinated, 187,549 unvaccinated COVID positive persons who tested positive between June 1, 2020 to September 30, 2020, and were followed through March 20, 2021, revealed 894 [0.48%] were reinfected; 38 [0.02%] were hospitalized, a mere 16 [0.008%] hospitalized with severe disease, and only 1 [one]/187,549 died—an individual over 80 years old. *Id.*

173.     The Israeli investigators concluded, *"Our results question the need to vaccinate previously infected individuals." Id.*

174.     Cleveland Clinic investigators have confirmed the Israeli findings in a study of their own employees. Nabin K. Shrestha, Patrick C. Burke, Amy S. Nowacki, Paul Terpeluk, Steven M. Gordon, *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv (pre-print), https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2 (last visited June 21, 2021). They found zero SARS-CoV-2 reinfections during 5-month follow-up among n=1359 infected employees who remained unvaccinated and concluded such persons are *"unlikely to*

**Verified Compl. for**
**Decl. and Inj. Relief**                    -38-

*benefit from covid-19 vaccination." Id.*

**175.** The risks of the vaccine and the fact that people who have already had COVID have at least equally strong protection from the virus makes IU's Mandate irrational and unnecessary.

### 5. Comparison of Risks of COVID Vaccinations with Vaccinations for other Infectious Diseases

**176.** The vaccine is also far less safe than previous vaccines like the meningicoccal meningitis vaccine that is typically required on college campuses.

**177.** For example, the VERS (Vaccine Adverse Event Reporting System) data from the CDC shows, for 18-29 year olds in Indiana, there have been no deaths from the meningitis vaccine.

**178.** The main side effects people reported are headache, injection site pain, nausea, chills, and a fever, and even these were limited as no more than fifteen of each were reported . Centers for Disease Control and Prevention, WONDER data, https://wonder.cdc.gov/controller/datarequest/D8;jsessionid=18AD7080CCFA8D95903AEDB6B601 (last visited June 21, 2021).

**Table I**

Vaccine Adverse Event Reporting System (VAERS) Data for Indiana 18 to 29 Year Olds, Comparing Covid-19 and Influenza Vaccines

| Vaccine-Associated Adverse Events Among 18 to 29 Year Olds in Indiana | Covid-19 Vaccines Given in <6 Months (Feb 1–June 4, 2021)[a] | Influenza Vaccines Given in >20 Years (2000-2021)[b] |
|---|---|---|
| Hospitalizations | 23 | 13 |
| Life Threatening Events | 7 | 3 |
| Myocarditis/Myopericarditis | 7 | 0 |
| Anaphylaxis/Severe Allergic Reaction | 3 | 1* |
| Bell's Palsy (Facial Paralysis) | 3 | 3 |
| Pulmonary Embolus | 1 | 0 |
| Thrombocytopenia/Low Platelets | 1 | 0 |
| Deaths | 1 | 0 |

a,b. Using a very conservative comparison for the number of persons given influenza vaccines over 20 years would be at least 10-fold the denominator for the number of persons receiving covid-19 vaccines in the past < 6 months. Data accessed at the VAERS weblink, https://wonder.cdc.gov/vaers.html 6/12/21
* The individual received pneumococcal pneumonia vaccine in addition to influenza vaccine

**179.** However, in the brief time the COVID vaccines have been available, there have been many more serious symptoms and even a death reported for 18-29 year olds in Indiana. *See* Table

**Verified Compl. for**
**Decl. and Inj. Relief** -39-

I.

### E.   Factual Allegations of Plaintiffs

180.     Plaintiff Ryan Klaassen is an incoming Sophomore at IU. He has a sincerely held religious objection to receiving the COVID Vaccine. As a result, he sought and was granted a religious exemption to the Vaccine.

181.     Mr. Klaassen also objects generally to the extra requirements of masks and testing applied to him. He objects to these extra requirements given their unreasonableness and the extremely minimal risk of COVID to those in his age group.

182.     Plaintiff Jaime Carini is currently pursuing two doctorates at IU— a Doctor of Music (D.M.) in organ performance and literature, and a Ph.D. in musicology. She has a sincerely held religious objection to receiving the COVID Vaccine. As a result, she sought and was granted a religious exemption to the Vaccine.

183.     Miss Carini also objects generally to IU's Mandate. She objects to taking the Vaccine, given the known and unknown risks associated with it, and the extremely minimal risk of COVID to her age group. Specifically, Miss Carini does not feel safe taking the Vaccine which hasn't been around long enough to know the long-term side effects.

184.     Miss Carini suffers from multiple chronic illnesses. As a result of these illnesses, Miss Carini is treated by a world-renowned infectious disease doctor. Infectious disease doctors treat illnesses caused by various pathogens, including bacteria, viruses, and parasites—so diseases like HIV/AIDS, Lyme disease, malaria, West Nile virus, and COVID-19 fall under their purview.

185.     When Miss Carini saw her physician at her last appointment, the doctor's parting

**Verified Compl. for**
**Decl. and Inj. Relief**                    -40-

words were, "No vaccine for you. Let me know if you need a letter for the university."

**186.**     Miss Carini's physician provided such a letter stating that "Due to the inflammatory nature of [her] illness it's our strong medical opinion that she not receive any immunization at this time." The physician further stated that the Vaccine could cause a relapse, impede progress, and prolong recovery.

**187.**     Despite all this, Miss Carini was horrified to discover that IU's Mandate prohibits Miss Carini from receiving a medical exemption, given the Mandate's extremely narrow criteria for obtaining such exemption.

**188.**     What is most troubling to Miss Carini about IU's Mandate is that it allows hardly any exemptions at all. Most critically, the medical exemption form gives Miss Carini's practitioner no room to express his expert medical opinion outside the confines of IU's Mandate.

**189.**     IU is saying that it has the right to insert itself into the relationship between Miss Carini and her physician. IU is saying that they know better than world-renowned infectious disease physicians what Miss Carini's vaccination status should be. IU is saying that it has the right to change Miss Carini's highly skilled physician's medical treatment plan for her.

**190.**     Miss Carini wants to be free to follow her provider's directives. IU's Mandate directly interferes with and contradicts the medical treatment prescribed for Miss Carini by her physician.

**191.**     Miss Carini should not be required to put her health at risk in order to comply with IU's Mandate and objects to doing so.

**192.**     Miss Carini also objects to the extra requirements of masks and testing applied to

him. She objects to these extra requirements given their unreasonableness and the extremely minimal risk of severe complications or death from COVID for somebody in her age group.

193.    Miss Carini has been notified by her physician that given the medications she is on (specifically, Ivermectin), she is protected against COVID. As a result, she sought an exemption from the mandatory testing, which IU denied, despite her not being at risk for COVID.

194.    While Miss Carini did obtain a religious exemption, she would rather be exempt from IU's Mandate for medical reasons. Doing so ensures that she is not targeted, harassed, or bullied for her religious views. Yet, Miss Carini has not had the option to obtain a medical exemption.

195.    Miss Carini does not have to option to simply transfer universities, to one which wouldn't require the vaccine or the extra requirements, due to her significant time investment in the IU doctoral programs and the fellowships she has been awarded at IU.

196.    Plaintiff D.J.B. is an incoming freshman at IU. As a minor, he is represented in this case by his father and next friend, Daniel G. Baumgartner. Mr. D.J.B. has a religious objection to receiving the COVID Vaccine. As a result, he sought and was granted a religious exemption to the Vaccine.

197.    Mr. D.J.B. also has a sincerely held religious objection to the extra requirements applied to him. He sought a religious exemption to these requirements but was refused. Mr. D.J.B. received a response from the IU COVID Response Team, stating that:

> Exemptions from IU's vaccine mandate for religious reasons are only available to those individuals who attest that their sincerely held religious beliefs prevent them from receiving a vaccination. Anyone who is granted an exemption on this basis is required to wear a mask at all times on IU property and is subject to routine mitigation testing. There are no

**Verified Compl. for**
**Decl. and Inj. Relief**                              -42-

exemptions from these masking and mitigation testing requirements. Failure to comply with masking and mitigation testing requirements will result in disciplinary action up to and including dismissal or termination from the university.

198.    Mr. D.J.B. recently had a COVID antibody test which revealed that he still has antibodies. As a result, he sought a medical exemption to IU's Mandate (and attached the relevant lab results showing the antibodies). This request for medical exemption was refused.

199.    The IU COVID Response Team stated that "[n]atural antibodies are not a criteria for medical exemption" and that:

> there are no exemptions from masking and mitigation testing requirements at Indiana University unless fully vaccinated. Failure to comply with masking and mitigation testing requirements will result in disciplinary action up to and including dismissal or termination from the university.

200.    Mr. D.J.B. also objects generally to the extra requirements of masks and testing applied to him. He objects to these extra requirements as they are not necessary, since he already has natural antibodies. He also objects given their unreasonableness and the extremely minimal risk of COVID to those in his age group.

201.    Plaintiff Ashlee Morris is an incoming 1L at the McKinney School of Law. She has a sincerely held religious objection to receiving the COVID Vaccine. As a result, Miss Morris sought and was granted a religious exemption to the Vaccine.

202.    Miss Morris also has a sincerely held religious objection to the extra requirements applied to her. She tried to apply for an exemption to the masking and testing requirements but the IU COVID Response Team refused her request. Miss Morris received a substantially similar response as detailed in ¶ 197 from the IU COVID Response Team.

203.    Miss Morris has worked for six years to be accepted into law school, taking the

LSAT multiple times and applying four times. After years of hard work, she accomplished her goal and was accepted into McKinney School of Law. However, if required to comply with these unreasonable requirements, she will not attend. This will result in years of hard work and money wasted.

204.     Miss Morris would still like to attend McKinney School of Law if her religious objections are respected and she is not subjected to extra requirements, which make her a target for discrimination, bullying, and unwanted attention.

205.     Plaintiff Seth Crowder is currently pursuing his Masters of Business Administration through the Kelley School of Business. He has a sincerely held religious objection to receiving the COVID Vaccine. As a result, Mr. Crowder sought and was granted a religious exemption to the Vaccine.

206.     Mr. Crowder also has a sincerely held religious objection to the extra requirements applied to him. He tried to apply for an exemption to the masking and testing requirements but the IU COVID Response Team refused his request.

207.     Plaintiff Macey Policka is a senior at IU. She has a sincerely held religious objection to receiving the COVID Vaccine. As a result, she sought and was granted a religious exemption to the Vaccine.

208.     Miss Policka also objects generally to the extra requirements of masks and testing applied to her. She objects to these extra requirements given their unreasonableness and the extremely minimal risk of COVID to those in her age group.

209.     Plaintiff Margaret Roth is an incoming freshman at IU. Miss Roth objects generally

to IU's Mandate. She objects to taking the Vaccine, given the known and unknown risks associated with it, and the extremely minimal risk of COVID to all age groups, especially her age group.

210.    Miss Roth has a significant family history of cancer and other health conditions. Her mother passed away from cancer at 35, her sister is in treatment for Hodgkin's Lymphoma, two of her aunts suffered from early-onset breast cancer, and her great-aunt passed away from breast cancer. Her aunt suffered from Bell's Palsy. Miss Roth also suffers skin reactions from cosmetics, moisturizers, hygiene products, and often has hives/skin rashes that appear without known cause. All of this makes it much more likely that Miss Roth will suffer adverse reactions from the Vaccine. As a result, she is not willing to take the Vaccine for medical reasons. Despite this, Miss Roth does not qualify for a medical exemption under IU's extremely narrow set of exemptions.

211.    Additionally, asthma runs in Miss Roth's family, so masks are also not an acceptable alternative. Nor is repeated exposure to the carcinogenic chemicals on the nasal testing swabs, especially with her family history of cancer.

212.    Miss Roth should not be required to put her health at risk in order to comply with IU's Mandate and objects to doing so.

213.    Miss Roth also has a sincerely held religious objection to IU's Mandate. Miss Roth has not filed for such exemption because she does not believe that it adequately protects her from IU's Mandate.

214.    Plaintiff Natalie Sperazza is an incoming sophomore at IU. Miss Sperazza objects generally to IU's Mandate. She objects to taking the Vaccine, given the known and unknown risks

associated with it, and the extremely minimal risk of COVID to her age group.

**215.** Miss Sperazza has spent significant time researching the Vaccine and does not feel safe taking it when those in her age group are developing heart problems as a result of the Vaccine, and when the long-term side effects of the Vaccine are unknown. She believes that taking the Vaccine puts her health at risk.

**216.** Miss Sperazza also objects to the extra requirements of masks and testing applied to her. She objects to these extra requirements given their unreasonableness and the extremely minimal risk of COVID to those in her age group.

**217.** For all of the reasons shown above (*see generally* ¶¶ 17-216), all Plaintiffs object to IU's Mandate.

**218.** All Plaintiffs also object to the Vaccine on the basis that it has only received Emergency Authorization from the FDA. None are willing to take the Vaccine while it is only approved under that Emergency Authorization.

**219.** Plaintiffs should not be required to put their health at risk (given the known and unknown risks of the Vaccine) in order to comply with IU's Mandate and object to doing so.

**220.** Plaintiffs are irreparably harmed by IU's Mandate.

**221.** Plaintiffs have no adequate remedy at law.

## Count I
### IU's Mandate Violates Fourteenth Amendment Liberty.

**222.** Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

**223.** IU's Mandate violates the liberty protected by the Fourteenth Amendment to the

U.S. Constitution, which includes rights of personal autonomy and bodily integrity, *see, e.g.*, *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), and the right to reject medical treatment, *Cruzan v. Director, Missouri Dep't Health*, 497 U.S. 261 (1990).

**224.**    Historically, many have understood *Jacobson v. Commonwealth of Massachusetts*. 197 U.S. 11 (1905), to authorize near *carte blanche* for government to mandate vaccinations in response to pandemics on the basis that such individual liberty must yield to the common good—all with great deference to legislatures and little or no evidence contrary to their choice reviewed. So cases entitled to higher scrutiny have instead received the highly deferential *Jacobson* analysis. But even *Jacobson* was not absolute *carte blanche* because it recognized an exception where rights are violated or a mandate is unreasonable for not advancing health:

> If there is any . . . power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, [1] has no real or substantial relation to those objects, or [2] is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Id.* at 31 (citations omitted).

**225.**    *Jacobson*'s analysis doesn't resemble today's jurisprudence, which has less or no deference where rights are involved and requires evidence. Since *Jacobson*, Fourteenth Amendment liberty has been recognized as strongly protecting contraception, *Griswold v. Connecticut*, 381 U.S. 479 (1965), abortion, *Roe v. Wade*, 410 U.S. 113 (1973), same-sex marriage, *Obergefell v. Hodges*, 576 U.S. 644 (2015), and refusing medical treatment, *Cruzan*, 497 U.S. 261. And *Jacobson* was part of a Progressive Era emphasis on enhancing governmental power at the expense of the individual that included a eugenics movement culminating in the infamous

**Verified Compl. for**
**Decl. and Inj. Relief**                    -47-

decision approving involuntary sterilization in *Buck v. Bell*, 274 U.S. 200 (1927), which cited *Jacobson* as authority for its decision. *Id.* at 207. Those attitudes have since been widely repudiated along with their low valuation of individual liberty.

226.     Under *today's* jurisprudence, even rational-basis review, applicable for example to economic regulations, is "not toothless." *See, e.g.*, *Mathews v. Lucas*, 427 U.S. 495, 510 (1976) (citing, e.g., *Jimenez v. Weinberger*, 417 U. S. 628 (1974); *Frontiero v. Richardson*, 411 U. S. 677, 691 (Stewart, J., concurring in judgment, Powell, J., concurring in judgment)); *Reed v. Reed*, 404 U.S. 71 (1971)). Even under rational-basis review there must be "a sufficient factual context for [a court] to ascertain some relation between [what the restriction does] and the purpose it served," *Romer v. Evans*, 517 U.S. 620, 632-33 (1996), so the judiciary definitely has power to weigh evidence considered by the legislature and hear expert testimony on competing views.[9] Thus, there must be, demonstrably, "a rational relationship to an independent and legitimate legislative end." *Id.* at 633.

227.     In 2020, in light of these discrepancies between *Jacobson* and current jurisprudence, the Supreme Court implicitly narrowed the perceived breadth of *Jacobson* in *Roman Catholic Diocese of Brooklyn v. Cuomo*. 141 S. Ct. 63 (2020) (per curiam), not by mentioning *Jacobson* and expressly abrogating it, but by holding that (i) *normal* strict scrutiny applied to a Free Exercise Clause challenge to non-neutral pandemic restrictions on the number people in houses of worship, (ii) challengers had likely merits success and other injunction factors weighed in their

---

[9] And though *Jacobson* disallowed evidence as to the efficacy and safety of the vaccination itself, which would not be precluded under today's jurisprudence, *Jacobson*'s own stated exception to its deference would have required (and thus allowed) relevant evidence.

**Verified Compl. for**
**Decl. and Inj. Relief**                    -48-

favor, and (iii) this justified an injunction during appeal, *id.* at 66-69. Under *Jacobson*, a highly deferential, limited-judicial-role, little-evidence-required analysis would have applied, not strict scrutiny, so without any need to mention *Jacobson* the Court simply abandoned it by applying its *current* jurisprudence. Strict scrutiny requires the government to prove its restriction to be the least restrictive means to further a compelling interest, and to do so by evidence. The normally applicable scrutiny level is applicable to challenges to restrictions under pandemic-fighting authority, i.e., not *Jacobson*'s analysis.

228.    *Roman Catholic Diocese* was preceded by a similar case (church occupancy limits in the pandemic) in *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2630 (2020) (Mem. Op.). There Justice Alito dissented, joined by Justices Thomas and Kavanaugh, noting that "at the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules," "[b]ut a public health emergency does not give . . . public officials *carte blanche* to disregard the Constitution as long as the medical problem exists." *Id.* at 2605. Rather, "[a]s more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights." *Id.* That dissenting view was essentially adopted by *Roman Catholic Diocese*, meaning that "blunt rules" may be permitted initially, but fine-tuning to actual scientific evidence is then required—requiring an *evidence-focused* inquiry in judicial review. Applying the normally required, current jurisprudence in that case required the government to justify itself under strict scrutiny, which eschews blunt rules and mandates narrow tailoring to the least restrictive means to further a compelling interest.

229.    The Seventh Circuit noted the sea-change wrought by *Roman Catholic Diocese* in

*Cassell v. Snyders*, 990 F.3d 539, 543, 545 (7th Cir. 2021).

**230.**     So *Jacobson*'s analysis does not control here. States no longer have near *carte blanche* to impose restrictions in the name of preventing pandemics, Instead, the applicable scrutiny under *today's* jurisprudence applies, with evidence clearly admissible and needed to determine whether government action meets the relevant level of scrutiny. And even were *Jacobson* deemed yet viable and applicable here, it recognized an exception where restrictions violate rights or are unreasonable, e.g., by not actually promoting public health, and *Roman Catholic Diocese* eliminated *Jacobson*'s extreme deference.

**231.**     In modern jurisprudence, fundamental-liberty burdens require strict scrutiny. *Washington v. Glucksberg*, 521 U.S. 702 (1997) ("narrowly tailored to serve a compelling state interest").

**232.**      Refusing medical treatment is a fundamental right. The test is whether it was deemed fundamental in "our nation's history, legal traditions, and practices," *Glucksberg*, 521 U.S. at 710. The *Cruzan* majority assumed such refusal is fundamental and five Justices said it was. 497 U.S. at 287, 301, 330.

**233.**     As mandated vaccinations are a substantial burden, IU must prove narrow tailoring to a compelling interest that *justifies mandatory vaccinations*, not any more general interest. But while government may have a general interest in mitigating COVID, the following problems reveal no narrow tailoring to any compelling interest exists. Indiana imposes no student vaccination requirement, Ind. Dept. Health, Back to School Guidance (Fall 2021),[10] and Indiana Univer-

---

[10] https://www.coronavirus.in.gov/files/Fall%202021%20COVID-19%20One%20Page%20Guidance%20(6.8.21).pdf (last visited June 21, 2021).

**Verified Compl. for**
**Decl. and Inj. Relief**                        -50-

sity lacks any uniqueness to justify doing so. University students have very low risk for serious COVID illness, Part I.C.2, so IU lacks an interest in forcing vaccinations for such risks. University students pose little risk of COVID transmission to the surrounding community. *Id.* University students' higher adverse-reaction risk from COVID vaccinations versus those for influenza, Part I.D., undercuts an interest in compelling COVID vaccinations. Naturally acquired immunity from COVID is as robust as vaccine-acquired immunity, Part I.D.4., so there is no compelling interest in vaccinating those who've had COVID. Given natural and vaccine immunity, Indiana has de facto COVID herd immunity. *See generally* Parts I.C. and I.D. So IU has no compelling interest in mandating student COVID vaccination.

234.    The same evidence establishes that, even if there were a compelling interest in mandating vaccinations, IU's Mandate is not narrowly tailored to such an interest. For example, a blanket mandate ignores individual factors increasing (older age, co-morbidities) or decreasing (having had COVID) students' risks to themselves or to others. Mandating vaccines for all is the sort of blunt rule perhaps appropriate at the beginning of a pandemic but not when the pandemic has faded and much more is known about the risks in light of available treatments and studies.

235.    Furthermore, IU's Mandate fails modern rational basis scrutiny and under Jacobson's exemption, since IU's Mandate is "unreasonable" and "has no real or substantial relation" "to protect[ing] the public health." 197 U.S. at 31, *i.e.*, it goes "beyond what [i]s reasonably required for the safety of the public," *id.* at 28. The same evidence that shows there is no compelling interest or narrow tailoring with IU's Mandate shows that it fails even under *Jacobson*.

236.    Furthermore, note the internal illogic of IU's position. In some situations it mandates

masks and distancing. For that to be rational, it must be presumed that those work for preventing virus spread. But if those work, there is no need for vaccination. IU blurs three groups: (1) those who had COVID, who need no vaccination for their sake or others'; (2) those who have COVID, who can and should be quarantined to protect others, after which these will have natural immunity; and (3) those who haven't had and don't have COVID and are unvaccinated. No protection is needed against the first two groups, other than quarantining those now affected, and no vaccine is warranted. Others can protect themselves against the third group obtaining a vaccination, if they wish, by masking and distancing. Mandating vaccination in the present state of knowledge has no real, substantial relation to protecting public health.

237.    In sum, IU's Mandate is unconstitutional under both current strict-scrutiny jurisprudence and *Jacobson*'s exception.

# Count II
## IU's Mandate Violates Indiana's Vaccine Passport Law.

238.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

239.    Under Indiana law, state and local units are prohibited from requiring or issuing vaccine "passports" that indicate an individual's COVID immunization status. IC § 16-39-11.

240.     IU's Mandate not only requires IU students to take the COVID vaccine, but it also requires them to prove they have taken it by filling out a form which requires them to: (1) certify they took the COVID vaccine, and (2) report the dates they received COVID vaccine doses—this violates the Vaccine Passport Law.

241.    Indiana Attorney General Todd Rokita asserted the Vaccine Passport Law applies to

public colleges and universities like IU because they are "arm[s] of the state." Op. Letter Ex. 5, p. 1; *see also Severson v. Bd. of Trustees of Purdue Univ.*, 777 N.E.2d 1181, 1191-92 (Ind. Ct. App. 2002).

242.     Attorney General Rokita made clear that the Vaccine Passport Law does not prohibit an entity from requesting proof of COVID immunization status, *provided no negative consequence arises from not producing the record*. Op. Letter, Exhibit 5, p. 4 (emphasis added).

243.     Every IU student is required to be vaccinated for COVID, unless they qualify for an exemption. But it is not enough for an IU student to merely *receive* the COVID vaccine—he or she "will need to report their vaccine using IU's COVID vaccine self report form." *See* Indiana University, *COVID-19 Frequently Asked Questions*, https://www.iu.edu/covid/faq/index.html#vaccine-req (last visited June 17, 2021).

244.     Therefore, IU's Mandate does not only require the vaccine, but also requires the student *prove* his or her COVID immunization status.

245.     IU students who fail to provide proof of their COVID immunization status (or who have not been granted an exemption) will suffer severe negative consequences in direct violation of the Vaccine Passport Law.

246.     "Students who fail to comply [with the vaccination mandate or an exemption and the required reporting of same ] 'will have their class registration cancelled, CrimsonCard access terminated, access to IU systems (Canvas, email, etc.) terminated, and will not be allowed to participate in any on campus activity.'" *See ¶* 21.

247.     In short, if a student doesn't provide IU with his or her COVID immunization status,

IU virtually expels that student. Virtual expulsion from school for refusing to provide COVID immunization status is a "negative consequence" that directly violates Indiana law.

**248.**     Plaintiffs Roth and Sperazza are students at IU who have not been vaccinated for COVID and who not qualify for an exemption. Therefore, they cannot provide IU's requested proof of COVID vaccination and will be subject to virtual expulsion by IU, in violation of Indiana law.

**249.**     In sum, IU's Mandate violates Indiana's Vaccine Passport Law.


## Prayer for Relief

Wherefore, Plaintiffs request the following relief:

**250.**     Declare IU's Vaccine Mandate unconstitutional on its face;

**251.**     Declare IU's Mandate unconstitutional as applied to each Plaintiff;

**252.**     Enjoin IU from enforcing IU's Mandate on its face or as applied;

**253.**     Grant Plaintiffs their costs and attorneys fees under 42 U.S.C. Section 1988 and any other applicable authority; and

**254.**     Grant any and all other such relief as this Court deems just and equitable.

Dated: June 21, 2021                          Respectfully Submitted,

<u>/s/ James Bopp, Jr.</u>
James Bopp, Jr., Ind. Bar No. 2838-84
Richard E. Coleson, Ind. Bar No. 11527-70
Courtney Milbank, Ind. Bar No. 32178-29
Melena S. Siebert, Ind. Bar No. 35061-15
THE BOPP LAW FIRM
1 South 6th Street
Terre Haute, Indiana 47807
Telephone: (812) 232-2434
Facsimile: (812) 235-3685
jboppjr@aol.com
rcoleson@bopplaw.com
cmilbank@bopplaw.com
msiebert@bopplaw.com
*Counsel for Plaintiffs*

**Verified Compl. for**
**Decl. and Inj. Relief**                   -55-