UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| RYAN KLAASSEN, JAIME CARINI, | ) | |
| D.J.B., by and though his next friend and | ) | |
| father, DANIEL G. BAUMGARTNER, | ) | |
| ASHLEE MORRIS, SETH CROWDER, | ) | |
| MACEY POLICKA, MARGARET ROTH, | ) | |
| and NATALIE SPERAZZA, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:21-cv-00238 |
| | ) | |
| vs. | ) | |
| | ) | |
| TRUSTEES OF INDIANA | ) | |
| UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**INDIANA UNIVERSITY'S RESPONSE IN OPPOSITION
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# Table of Contents

I. Introduction ......................................................................................................................... 1

II. Relevant Facts ...................................................................................................................... 1

    A. COVID-19 Pandemic ...................................................................................................... 1

        1. COVID-19 ................................................................................................................... 1

        2. Brief History of the Pandemic ................................................................................... 2

        3. COVID-19 Vaccinations ............................................................................................ 3

        4. COVID-19 Risks for Unvaccinated Individuals ....................................................... 4

        5. The pandemic is ongoing. ........................................................................................... 5

        6. Guidance for Institutions of Higher Education ......................................................... 5

    B. IU ..................................................................................................................................... 7

    C. IU's COVID-19 Policies .................................................................................................. 7

    D. Plaintiffs ........................................................................................................................ 10

III. Legal Standard .................................................................................................................. 11

IV. Argument ........................................................................................................................ 111

    A. Plaintiffs have not challenged IU's masking or testing policies. ................................. 111

    B. Plaintiffs lack standing to challenge "IU's Mandate." ................................................ 122

        1. Plaintiffs who have received an exemption lack standing. ...................................... 13

        2. Plaintiff Roth lacks standing because she failed to seek an exemption. .................. 133

    C. "IU's Mandate" should not be preliminarily enjoined. ................................................. 14

        1. Plaintiffs are unlikely to succeed on the merits ..................................................... 144

            a. "IU's Mandate" does not offend Due Process. ................................................... 144

                i. The Policy is constitutional under *Jacobson*. ............................................... 15

                    1. *Jacobson* remains good law. ................................................................... 16

                    2. The pandemic is ongoing, and *Jacobson* controls. ................................. 19

                    3. Plaintiffs' disagreements with science do not undermine *Jacobson*'s application. ................................................................................................. 19

                ii. "IU's Mandate" is constitutional even absent *Jacobson* ............................... 20

                    1. "IU's Mandate" is subject to—at most—rational-basis scrutiny. ........................ 20

                      a. Plaintiffs have no fundamental right to education. ............................................ 21

                      b. "IU's Mandate" does not infringe Plaintiffs' religious rights. .......................... 21

                      c. "IU's Mandate" does not invade Plaintiffs' privacy rights. ........................... 211

                      d. The Policy does not invade Plaintiffs' rights to bodily integrity or to refuse medical treatment. .................................................................................... 22

           2. Under any level of scrutiny, "IU's Mandate" is constitutional. ................................... 23

a.  IU's Masking and Testing Policies are constitutionally sound. ................................. 244

b.  "IU's Mandate" does not violate the "Vaccine Passport" Law ................................ 265

    i.     Plaintiffs have no private right of action under the Vaccine Passport Law. ......... 26

    ii.    The Vaccine Passport law is inapplicable to IU. .................................................... 27

    iii.   Even if applicable, IU is not violating the statute. ............................................ 2929

3.     Plaintiffs have not shown they will suffer irreparable harm. ...................................... 300

4.     The remaining considerations also support "IU's Mandate." ....................................... 33

a.  The harm to IU if the "Mandate" is enjoined outweighs any harm Plaintiffs might suffer. ................................................................................................................................ 33

b.  The public interest supports "IU's Mandate." ............................................................ 34

V.   Conclusion ....................................................................................................................... 35

**Table of Authorities**

**Page(s)**

**FEDERAL CASES**

*Abbott Labs. v. Mead Johnson & Co.*,
  971 F.2d 6 (7th Cir. 1992) ....................................................................................................11

*Altman v. Cty. of Santa Clara*,
  464 F. Supp. 3d 1106 (N.D. Cal. 2020) ................................................................................34

*Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*,
  780 F.2d 589 (7th Cir. 1986) ................................................................................................11

*Aviles v. Blasio*,
  No. 20 CIV. 9829 (PGG), 2021 WL 796033 (S.D.N.Y. Mar. 2, 2021)..................................25

*Baer-Stefanov v. White*,
  773 F. Supp. 2d 755 (N.D. Ill. 2011) ....................................................................................14

*Bridges v. Houston Methodist Hosp.*,
  No. CV H-21-1774, 2021 WL 2399994 (S.D. Tex. June 12, 2021) .....................22, 24, 25, 29

*Buck v. Bell*,
  274 U.S. 200 (1927)......................................................................................................17, 18

*Calvary Chapel Dayton Valley v. Sisolak*,
  140 S. Ct. 2603 (2020)..............................................................................................17, 18, 19

*Cassell v. Snyders*,
  458 F. Supp. 3d 981 (N.D. Ill. 2020), *aff'd*, 990 F.3d 539 (7th Cir. 2021) ...........................23

*Cassell v. Snyders*,
  990 F.3d 539 (7th Cir. 2021) .............................................................................11, 18, 33, 34

*Caviezel v. Great Neck Pub. Sch.*,
  500 F. App'x 16 (2d Cir. 2012) .......................................................................................18, 19

*Charleston v. Bd. of Trustees of Univ. of Ill. at Chi.*,
  741 F.3d 769 (7th Cir. 2013) ................................................................................................21

*Combs v. Kleopfer*,
  No. 2:16-CV-327-WTL-MJD, 2016 WL 4506878 (S.D. Ind. Aug. 29, 2016).......................12

*Cruzan v. Director, Missouri Department of Health*,
  497 U.S. 261 (1990)..............................................................................................................22

*Doe v. Zucker*,
No. 1:20-CV-840, 2021 WL 619465 (N.D.N.Y. Feb. 17, 2021) ................................18, 21, 22

*Duthie v. Matria Healthcare, Inc.*,
543 F. Supp. 2d 958 (N.D. Ill. 2008) .................................................................................32

*E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*,
414 F.3d 700, 703 (7th Cir. 2005) ....................................................................................31

*Forbes v. Cty. of San Diego*,
No. 20-cv-00998-BAS-JLB, 2021 WL 843175 (S.D. Cal. Mar. 4, 2021) .............................25

*George v. Kankakee Cmty. Coll.*,
No. 14-cv-2160, 2014 WL 6434152 (C.D. Ill. Nov. 17, 2014) ............................16, 20, 21, 22

*GlaxoSmithKline LLC v. Glenmark Pharms. Inc., USA*,
No. CV 14-877-LPS-CJB, 2017 WL 8944996 (D. Del. May 11, 2017) ................................20

*Hodges v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*,
No. CV 20-1456, 2020 WL 5017665 (E.D. La. Aug. 25, 2020) .....................................30, 31

*Jacobson v. Commonwealth of Mass.*,
197 U.S. 11 (1905)............................................................................................... passim

*Kashani v. Purdue Univ.*,
813 F.2d 843 (7th Cir. 1987) .............................................................................................28

*Lewis v. Silverman*,
No. 2:05-CV-352 PS, 2005 WL 8170424, at *2 (N.D. Ind. Sept. 16, 2005) .....................32

*Little Rock Fam. Plan. Servs. v. Rutledge*,
458 F. Supp. 3d 1065 (E.D. Ark. 2020)..............................................................................25

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)...........................................................................................................14

*Matter of LaSalle Rolling Mills, Inc.*,
832 F.2d 390 (7th Cir. 1987) .............................................................................................12

*Middleton v. Pan*,
No. CV 16-5224-SVW (AGR), 2016 WL 11518596 (C.D. Cal. Dec. 15, 2016) ..............16, 19

*Nowlin v. Pritzker*,
No. 1:20-CV-1229, 2020 WL 5850844 (C.D. Ill. Oct. 1, 2020)......................................13, 21

*Oakes v. Collier Cty.*,
No.: 2:20-cv-568-FtM-38NPM, 2021 WL 268387 (M.D. Fla. Jan. 27, 2021) ......................25

*Olson v. Paine, Webber, Jackson & Curtis, Inc.*,
    806 F.2d 731 (7th Cir. 1986) ....................................................................................16, 17

*Orr v. Shicker*,
    953 F.3d 490 (7th Cir. 2020) ..........................................................................................11

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984)...........................................................................................................34

*Phillips v. City of New York*,
    775 F.3d 538 (2nd Cir. 2015)..............................................................................16, 19, 21

*Pucket v. Hot Springs Sch. Dist. No. 23-2*,
    526 F.3d 1151 (8th Cir. 2008) .........................................................................................14

*Roland Machinery Co. v. Dresser Industries, Inc.*,
    749 F.2d 380 (7th Cir. 1984) ..........................................................................................34

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020)...........................................................................................17, 18, 23

*Snodgrass v. Berklee Coll. of Music*,
    559 F. App'x 541 (7th Cir. 2014) ...................................................................................19

*South Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020)....................................................................................................17

*Stewart v. Justice*,
    No. 3:20-0611, 2021 WL 472937 (S.D. W. Va. Feb. 9. 2021)...............................25

*Students v. United States Dep't of Educ.*,
    No. 16-CV-4945, 2016 WL 6134121 (N.D. Ill. Oct. 18, 2016) ........................32, 33

*Taylor v. McCament*,
    875 F.3d 849 (7th Cir. 2017) ....................................................................................12, 13

*Thornley v. Clearview AI, Inc.*,
    984 F.3d 1241 (7th Cir. 2021) .........................................................................................12

*United States v. Newton*,
    996 F.3d 485 (7th Cir. 2021) ............................................................................................8

*Univ. of Notre Dame v. Sebelius*,
    No. 3:12-CV-253-RLM, 2012 WL 6756332 (N.D. Ind. Dec. 31, 2012)...............13

*Vill. of Orland Park v. Pritzker*,
    475 F. Supp. 3d 866 (N.D. Ill. 2020) ...........................................................................23

*Wade v. Indiana Univ. Sch. of Med.*,
   No. 1:16-CV-02256-TWP-MJD, 2019 WL 3067519 (S.D. Ind. July 12, 2019) ...................28

*Whitfield v. Cuyahoga Cty. Pub. Libr. Found.*,
   No. 1:21 CV 0031, 2021 WL 1964360 (N.D. Ohio May 17, 2021) ........................................25

*Whitlow v. California*
   203 F.Supp.3d 1079, 1089 (S.D. Cal. 2016).........................................................................16

*Williams v. Santiago*,
   No. 1:16-CV-01065-MJS (PC), 2016 WL 6494268 (E.D. Cal. Nov. 1, 2016) .....................22

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).................................................................................................................11

*Wolfe v. Schaefer*,
   619 F.3d 782 (7th Cir. 2010) ...............................................................................................22

*Workman v. Mingo Cty. Sch.*,
   667 F. Supp. 2d 679 (S.D. W. Va. 2009), *aff'd Workman v. Mingo Cty. Bd. of Educ.*,
   419 F. App'x 348 (4th Cir. 2011) ...............................................................................16, 19, 20

*Zubik v. Sebelius*,
   911 F. Supp. 2d 314 (W.D. Pa. 2012)...................................................................................13

*Zucht v. King*,
   260 U.S. 174 (1922).................................................................................................15, 16, 19

### STATE CASES

*Doe #1 v. Ind. Dep't of Child Servs.*,
   81 N.E.3d 199 (Ind. 2017) .........................................................................................26, 27, 28

*Green v. Alachua Cty.*,
   No. 1D20-1661, 2021 WL2387983 (Fla. Dist. Ct. App. June 11, 2021)...............................22

*Howard Reg'l Health Sys. v. Gordon*,
   952 N.E.2d 182 (Ind. 2011) .................................................................................................26

*Kiel, J.D. v. The Regents of the Univ. of Cal.*,
   No. HG20-072843, 2020 WL 9396579 (Cal. Super. Dec. 04, 2020) ...............................18, 31

*Shirey v. Flenar*,
   89 N.E.3d 1102 (Ind. Ct. App. 2017)................................................................................26, 27

*Viemeister v. White*,
   72 N.E. 97 (N.Y. 1904).........................................................................................................16

## FEDERAL STATUTES

21 U.S.C. § 360bbb-3 ................................................................................................24, 25

42 U.S.C. § 1983 ...........................................................................................................28

## STATE STATUTES

Ind. Code ch. 16-39-11 ........................................................................................26, 27, 28

Ind. Code ch. 34-12-5 ...................................................................................................29

Ind. Code § 16-19-3-18 .................................................................................................27

Ind. Code § 16-34.5-1-2 ................................................................................................28

Ind. Code § 16-39-7.1-6 ................................................................................................27

Ind. Code § 16-39-11-3 .................................................................................................26

Ind. Code § 16-39-11-5 .......................................................................................26, 28, 30

Ind. Code § 16-41-2-7 ...................................................................................................27

Ind. Code § 21-20-2-2 .....................................................................................................7

Ind. Code § 21-34-4-1 ...................................................................................................28

Ind. Code § 21-39-2-2 ...................................................................................................30

Ind. Code § 21-40-3-1 ..............................................................................................28, 30

## RULES

Rule 12(b)(1) .................................................................................................................13

## REGULATIONS

Exec. Order No. 21-16, *avail. at*: https://www.in.gov/gov/files/Executive-Order-21-16-
    Sixtenth-Renewal-of-Emergency-Declaration.pdf ............................................5, 19

Exec. Order No. 21-17, *avail. at*: https://www.in.gov/gov/files/Executive-Order-21-17-
    Continuation-of-Limited-Health-and-Welfare-Provsions.pdf ................................ 24

## CONSTITUTIONAL PROVISIONS

First Amendment ......................................................................................................18, 21

Fourteenth Amendment ........................................................................................... passim

**OTHER AUTHORITIES**

HEA 1002, Section 13.........................................................................................................29

Reg. Sess. S.B. 1 at 3:31-33, *available at*: http://iga.in.gov/static-
    documents/b/c/b/d/bcbd92c6/SB0001.04.COMH.AMH002.pdf.......................................27, 28

## I.      Introduction

After months of diligent and considered deliberation, Indiana University released its Restart Committee Recommendations for the fall 2021 semester on May 26, 2021. ECF 1-5. IU's goal is to return as much normalcy to the campus experience as it can safely accomplish consistent with comprehensive guidelines issued by the Centers for Disease Control and the United States Department of Education to keep its students and communities safe.

In summary, IU's resulting policies require students who are not eligible for a religious or medical exemption or deferral to be vaccinated against COVID-19. ECF 1-5 at 13-14. Exempt students will have "regular, non-random testing" and be required to mask on campus. *Id*. at 9-10. All IU students (whether vaccinated or not) will be subject to random surveillance testing unless an exemption is granted. *Id.* at 16.

Eight IU student plaintiffs (most with no Article III standing) seek to enjoin IU's COVID-19 safety measures, claiming that they violate Plaintiffs' rights under the Constitution and Indiana law. But long-standing, controlling Supreme Court precedent confirms that IU's approach is constitutionally sound. IU's policies are well-founded in current public health guidance and are unquestionably reasonably related to IU's interest in ensuring the safety of its campus communities. Plaintiffs have no private right of action under Indiana's "immunization passport" law, which does not apply to IU, and which IU is not violating in any event. Nor will the Plaintiffs suffer irreparable harm if IU is permitted to enforce its policies. Plaintiffs' Motion for Preliminary Injunction should be denied.

## II.     Relevant Facts

### A.  COVID-19 Pandemic

#### 1.  COVID-19

"COVID-19 is an infectious disease caused by the novel coronavirus (SARS-CoV-2)."

1

ECF 1-5 at 7. COVID-19 spreads "primarily through respiratory droplets and through aerosol transmission." ECF 1-5 at 7. People of all ages can contract and transmit COVID-19. Declaration of Cole Beeler, M.D. ("Beeler Decl."), ¶ 7, attached hereto as **Exhibit A**.

People who catch COVID-19 may suffer from immediate severe illness, have "ongoing health problems, extending several weeks or months" (even if they were initially asymptomatic), or die. *Id.*, ¶ 8. It presents an "increased risk of suffering severe illness . . . for individuals with certain underlying medical conditions." *Id.*, ¶ 9. While COVID-19 often affects children less severely than adults, some children develop severe illness, particularly if they have underlying medical conditions. *Id.*, ¶ 10. All individuals who contract COVID-19 risk giving it to others "who may suffer severe illness or death." *Id.*, ¶ 11.

### 2.  Brief History of the Pandemic

The Indiana State Department of Health ("ISDH") confirmed Indiana's first case of COVID-19 on March 6, 2020 and first COVID-19 related death on March 16, 2020. *Id.* ¶ 13. During June through August 2020, COVID-19 incidence was highest in persons aged 20-29 years old, who accounted for greater than 20% of all confirmed cases. *Id.*, ¶ 16. According to the New York Times, "over 700,000 cases of COVID-19 have been linked to colleges and universities in the U.S. since the pandemic began and more than 260,000 COVID-19 cases have been linked to colleges and universities just since January 1, 2021" *Id.*, ¶ 17.

Since March 6, 2020, Indiana has had over 750,000 confirmed COVID-19 cases and over 13,000 deaths. *Id.*, ¶ 14. Since July 2020, IU has had almost 12,000 students test positive for COVID-19. *Id.*, ¶ 18. According to the CDC, an estimated 25.8% of Indiana's population has been infected with COVID-19. *Id.*, ¶ 14. 18.4% of Indiana's positive COVID-19 cases have been reported by individuals between the ages of 20 and 29—more than any other age demographic. *Id.* A small number of those individuals have died from the virus. *See id.*

2

### 3.  COVID-19 Vaccinations

"COVID-19 vaccination is an important tool to help stop the pandemic" because widespread vaccination will help achieve "herd immunity," which is when enough people in a community are sufficiently protected from COVID-19 to stem its spread. *Id.*, ¶¶ 19-20; CDC, *COVID-19 Vaccines Are Free to the Public* (last visited June 27, 2021), *avail. at*: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/no-cost.html; CDC, *Key Things to Know about COVID-19 Vaccines* (last visited June 27, 2021) ("CDC Key Things"), *avail. at*: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html.

The CDC does not yet know "[t]he percentage of people who need to have protection to achieve herd immunity" from COVID-19. CDC Key Things; Beeler Decl., ¶¶ 21, 43-44. In fact, experts still debate whether herd immunity is achievable for COVID-19. *See, e.g.*, Beeler Decl., ¶ 21. Accordingly, currently, vaccination is the leading prevention strategy to protect individuals from COVID-19 disease and end the COVID-19 pandemic. *Id.*, ¶ 22.

There are three COVID-19 vaccinations available in Indiana at no cost: Pfizer, Moderna, and Johnson & Johnson vaccine (collectively, "Vaccine"). *Id.*, ¶ 23. According to the CDC, the Vaccines are "proven safe and effective." *Id.*, ¶ 24. They "were developed using science that has been around for decades," "are not experimental," "went through all the required stages of clinical trials," including "[e]xtensive testing and monitoring," and "have received and continue to undergo the most intensive safety monitoring in U.S. history." *Benefits of Getting a COVID-19 Vaccine* (last visited June 27, 2021), *avail. at*: https://www.cdc.gov/ coronavirus/2019-ncov/vaccines/vaccine-benefits.html; *see also* ISDH COVID-19 Vaccine Fact Sheet (pub. Jan. 2021), *avail. at*: https://www.coronavirus.in.gov/files/Fact%20Sheet.pdf (They "build[] on work already done over the last decade . . . . [and] must pass several tests to make sure it is safe and effective before it is released."); Beeler Decl., ¶ 24. The Vaccines are extremely unlikely to

3

cause serious side effects that could result in long-term health problems. Beeler Decl., ¶ 25.

The Vaccines prevent the spread of COVID-19 and are effective against the variants that have been detected in Indiana. *Id.*, ¶ 26. An individual who has received a Vaccine is considered fully vaccinated two weeks after the second dose of a two-dose vaccine or two weeks after a one-dose vaccine. *Id.*, ¶ 27. Fully vaccinated individuals are less likely to catch COVID-19 and less likely to spread it to others. *Id.*, ¶ 28. The Vaccines thus help protect not only those who receive them but also those around them, including people who may not be able to receive the vaccine for medical reasons. *Id.*, ¶¶ 46-47. The Vaccines also help stop mutation of COVID-19, so variants will not emerge or spread. *Id.*, ¶ 29.

Because vaccination provides a strong boost in protection in people who have recovered from COVID-19 and because the odds of catching COVID-19 again increase with time as natural immunity decreases and new variants emerge, the CDC and ISDH recommend that even individuals who have had COVID-19 receive the Vaccine. *Id.*, ¶ 31. The CDC also recommends that children twelve and older receive the Vaccine as soon as possible because vaccinating minors helps to protect the minor, their families, and others with whom they interact. *Id.*, ¶ 32. While the CDC has received increased reports of myocarditis and pericarditis in adolescents and young adults after vaccination, it continues to recommend the Vaccine for anyone 12 years of age and older because these reports are rare, and the known and potential benefits of the Vaccine outweigh the known and potential risks, including the possible risk of myocarditis or pericarditis. *Id.*, ¶ 33. People with underlying medical conditions can be vaccinated as long as they have not had an immediate or severe allergic reaction to the Vaccine or to any of its ingredients. *Id.*, ¶ 34.

### 4.   COVID-19 Risks for Unvaccinated Individuals

"COVID-19 is still a threat to people who are unvaccinated." *Benefits of Getting a COVID-19 Vaccine* (last visited June 27, 2021), *avail. at*: https://www.cdc.gov/coronavirus/

4

2019-ncov/vaccines/vaccine-benefits.html; Beeler Decl., ¶ 38. Unvaccinated Hoosiers make up

99.3% of COVID-19 cases in Indiana. Beeler Decl, ¶ 39.

   5.  **The pandemic is ongoing.**

   As of this filing, the CDC advises that community transmission of COVID-19 in Indiana

is "moderate." *Id.* ¶ 35. Indiana has not reached "herd immunity," as evidenced by the hundreds

of new COVID-19 cases reported each day. *Id.*, ¶¶ 43-44. On June 30, 2021, Governor Holcomb

extended Indiana's COVID-related public health emergency through at least July 31, 2021. Exec.

Order No. 21-16 ("EO 21-16"), *avail. at*: https://www.in.gov/gov/files/Executive-Order-21-16-

Sixth-Renewal-of-Emergency-Declaration.pdf.

   Moreover, variants of COVID-19 continue to develop and spread in the United States.

*Id.*, ¶ 36; *see also, e.g.*, ECF 1-5 at 8 ("A number of potentially more contagious genetic variants

of [COVID-19] emerged in the second half of 2020 and are rapidly spreading within the United

States."). Indiana, specifically, has seen an increase in variants. "Variants are concerning because

they can be spread much more easily tha[n] other strains and can cause more severe infection."

ISDH, *Variant Details* (last visited June 27, 2021), *avail. at*: https://www.coronavirus.in.gov

/map/VariantDetails.pdf; Beeler Decl., ¶ 37. Over 60% of the samples tested in Indiana are

positive for a variant, and the most recent variant—the Delta variant—is confirmed to be present

in Indiana. *See* Indiana COVID-19 Data Report (last visited June 27, 2021), *avail. at*:

https://www.coronavirus.in.gov/.

   6.  **Guidance for Institutions of Higher Education**

   The CDC and U.S. Department of Education ("ED") have provided specific guidance for

institutions of higher education ("IHEs") to operate during the COVID-19 pandemic. Declaration

of Aaron Carroll, M.D., M.S., ("Carroll Decl."), ¶ 7, attached hereto as **Exhibit B**. The CDC

advises that IHEs should determine how to implement this guidance while considering: "the

needs and circumstances of the IHE within the context of [its] local community"; "health equity considerations"; and state and local public health officials and applicable law. *Id.*, ¶¶ 8-9.

The CDC, ED, and ISDH are all clear that that IHEs are "critical" to helping promote vaccination, which will help "slow the spread of COVID-19" and is "the leading prevention strategy IHEs can use to return to normal operations." *Id.*, ¶ 10. The CDC advises IHEs to "consider maintaining documentation of individuals' vaccination status to inform testing, contact tracing efforts, and quarantine/isolation practices." *Id.*, ¶ 11.

If all of an IHE's constituents are fully vaccinated before the fall 2021 semester, the CDC advises that the IHE "can return to full capacity in-person learning, without requiring or recommending masking or physical distancing for people who are fully vaccinated." *Id.*, ¶ 12. Conversely, if some of an IHE's constituents are unable to be vaccinated, IHEs will need to determine prevention strategies, accommodations, and policies for any [unvaccinated constituents]." CDC Guidance for IHEs, *available at*: https://www.cdc.gov/coronavirus/2019-ncov/community/colleges-universities/considerations.html, Section 2. IHEs are advised to make policy decisions "to protect the people who are not fully vaccinated." Carroll Decl., ¶ 13.

The CDC and ED also offer IHEs specific sets of guidance on, among other things, COVID-19 masking and testing policies. Carroll Decl., ¶ 14.

*IHE Masking Guidance*. ED explains that at least "[o]ne analysis found that statewide mask mandates were associated with a 5.6% decline in COVID-19 related hospitalizations for individuals between the ages of 18 and 64 years." *Id.*, ¶ 16. Accordingly, both ED and the CDC recommend that IHEs continue some measure of masking. *Id.*, ¶ 15. The CDC recognizes that IHEs may continue universal masking policies. *Id.*, ¶ 17. For IHEs that do not, it recommends that unvaccinated individuals continue to wear masks indoors and in crowds or "sustained close

contact with other [unvaccinated] people." *Id.* Generally, fully vaccinated individuals "do not need to wear masks," though the CDC recognizes that there may be circumstances under which even fully vaccinated individuals must wear a mask or physically distance—for example, when an IHE holds "gatherings or events that include individuals who are not fully vaccinated such as campus visitors or others from outside of the IHE." *Id.*, ¶ 18. Neither the CDC nor ED recommends providing religious exemptions to masking policies. *Id.*, ¶ 19.

*IHE Testing Guidance.* The CDC and ED continue to recommend that IHEs conduct testing programs. *Id.*, ¶ 20. Under both agencies' guidance, IHEs do not need to routinely test fully vaccinated individuals unless they experience COVID-19 symptoms; indeed, the CDC recommends that IHEs exclude non-symptomatic, fully vaccinated individuals from "routine screening testing programs." *Id.*

## B.  IU

IU is a state educational institution and a body politic under Indiana law. *See* Ind. Code § 21-20-2-2. IU has seven campuses, two regional centers, and three medical education centers, and offers a variety of online education programs, which serve more than 90,000 undergraduate and graduate students. Carroll Decl., ¶ 4. IU has over 40,000 employees. *Id.*

## C.  IU's COVID-19 Policies

Since the pandemic began, IU has implemented a number of protective measures to stem the spread of COVID-19, including masking, physical distancing, and testing. *Id.*, ¶ 21. These measures helped IU avoid a COVID-19 positivity rate above 8% on its campuses before the Vaccines were available. *Id.*

IU's President established the IU Restart Committee ("Committee") to recommend and advise IU "on when and under what conditions the university can restart, . . . in whole or part, normal face-to-face operations." ECF 1-5 at 5; Carroll Decl., ¶ 22. The Committee was led by

7

IU's Executive Vice President for University Clinical Affairs and School of Medicine Dean and made up of 15 members, including two deans of public health and other experts in "public health, epidemiology, virology, and other relevant areas of the health sciences, including health equity," as well as legal advisors. ECF 1-5 at 5; Carroll Decl., ¶ 23. It met regularly to analyze and evaluate "relevant research, modeling and clinical data," including "various reports, articles, data and other inputs from major and respected sources." ECF 1-5 at 5; Carroll Decl., ¶ 24.

The Committee aimed to develop COVID-19 safety policies that protect IU's constituents and the communities in which it operates. *See* ECF 1-5 at 7. In developing recommendations for Fall 2021, the Committee considered "a wide range of resources," including (a) guidelines from the CDC, IU Health, the ISDH, the Indiana Governor's Office, and the Central Indiana Corporate Partnership, among others; (b) scientific literature and data, and (c) input from other in- and out-of-state IHEs. *Id.*; Carroll Decl., ¶ 24. As the Seventh Circuit has noted, CDC guidance is a "reliable source of our country's best understanding about COVID-19." *United States v. Newton*, 996 F.3d 485, 489 (7th Cir. 2021).

The Committee also considered IU's own experience with COVID-19. For example, in fall 2020, 33 of the 42 housed student organizations were placed in quarantine at least once. Carroll Decl., ¶ 25. IU also analyzed the number of individuals within its population and determined that due to age or medical conditions, over 8,500 employees are at increased risk for developing complications if they contract COVID-19. *Id.*, ¶ 26.

Based on the Committee's recommendations, "to stop the spread of the virus and keep[] the IU community safe," IU has implemented a number of COVID-19-related safety precautions for the fall 2021 semester, including vaccination, masking, and testing policies. ECF 1-5 at 9-10, 18; Carroll Decl., ¶ 29.

IU's vaccination policy requires all students, faculty, and staff to be fully vaccinated before returning to campus for the fall 2021 semester—specifically, by the earlier of August 15, 2021 or when the individual returns to campus after August 1. *See* ECF 1-2 at 2;[1] Carroll Decl., ¶ 31. ISDH's COVID-19 Vaccine Patient Intake Form requires a vaccinating health care professional to obtain the patient's consent before administering the COVID-19 Vaccine. Carroll Decl., ¶ 33. IU asks all returning students, faculty, and staff to attest that they are fully vaccinated and provide IU with the dates on which they received their vaccinations. *See id.*, ¶ 34; ECF 1-3 at 3. IU does not require individuals to upload any documentation regarding their vaccination status; it is instead offering an incentive program for individuals who elect to do so. *See* Carroll Decl., ¶ 34.

"IU's Mandate" also outlines specific exemptions from the vaccination requirement, including: religious exemptions; medical exemptions; medical deferrals for individuals who are nursing or pregnant, certain immunocompromised patients, those who have received COVID-specific monoclonal antibodies in the past 90 days; and individuals enrolled in online-only programs with no on-campus component who attest that they will not be coming to campus. *See* ECF 1-5 at 13-14; *see also, e.g.*, ECF 1-3 at 2; Carroll Decl., ¶ 35. IU does not require students to disclose the specific basis for their religious exemptions; it simply asks them to certify that their representation that they qualify for the requested exemption is true to the best of their knowledge and to agree that misrepresenting their eligibility for the exemption can result in disciplinary action. *See* ECF 1-4 at 2; Carroll Decl., ¶ 36. To date, IU has not denied any student's request for a religious exemption. *Id.*, ¶ 37.

IU's masking policy permits all students to mask and requires masking for students who

---

[1] Plaintiffs refer to this requirement as "IU's Mandate."

are not fully vaccinated. ECF 1-3 at 3; ECF 1-5 at 10; Carroll Decl., ¶ 38. IU also will require masks for all attendees of large indoor events with non-IU attendees, unvaccinated official campus visitors, and all unofficial campus visitors. ECF 1-5 at 10, 13; Carroll Decl., ¶ 39.

IU's testing policy contemplates two types of COVID-19 testing: surveillance testing and mitigation testing.[2] *See* ECF 1-5 at 9, 16; Carroll Decl., ¶ 41. IU will ask a random selection of students, faculty, and staff, who are vaccinated for COVID-19 to participate in surveillance testing each week to help IU monitor for rates of breakthrough infections. Carroll Decl., ¶ 44; ECF 1-3 at 3; ECF 1-5 at 17. Those who are not fully vaccinated also must participate in mitigation testing. Carroll Decl., ¶ 43; ECF 1-3 at 3; ECF 1-5 at 9, 11. This distinction is based upon unvaccinated individuals' increased likelihood of contracting COVID-19. *See, e.g.*, ECF 1-5 at 13 ("Individuals who [are] exempt from vaccination are at higher risk for becoming infected with COVID-19. They should continue to wear a mask and need to monitor symptoms regularly."). IU's mitigation testing has always focused on those who are most at risk for infection. Carroll Decl., ¶ 42. In the 2020-2021 academic year, for instance, IU's highest risk populations were those in congregate living environments. *Id*. IU therefore required all those who lived in dorms or Greek Houses to be tested twice a week in the Spring of 2021. *Id*.

All IU testing is conducted using saliva samples and is non-invasive. *Id.*, ¶ 40.

## D. Plaintiffs

Plaintiffs are eight current or prospective IU students. Six plaintiffs—Ryan Klaassen, Jaime Carini, D.J.B., Ashlee Morris, Seth Crowder, and Macey Policka—have already obtained exemptions to "IU's Mandate" based on their sincerely held religious objections to the Vaccine

---

[2]   IU also will continue to offer testing for individuals experiencing COVID-19 symptoms and voluntary testing for those who are vaccinated but want to be tested more often. *See, e.g.*, ECF 1-5 at 15; Carroll Decl., ¶ 41.

("Exempt Plaintiffs"). ECF 1, ¶¶ 180, 182, 196, 201, 205, 207. Plaintiff Roth has sincerely held religious objections to the Vaccine that qualify her for an exemption, but she has so far chosen not to file for it. ECF 1, ¶ 213; Dep. of Margaret Roth at 43:21-44:10 (attached as **Exhibit C**). Plaintiff Sperazza objects to "IU's Mandate" but believes she does not qualify for a religious or medical exemption. *See* ECF 1, ¶¶ 214-16, 248; Dep. of Natalie Sperazza at 47:12-23 (attached as **Exhibit D**).

## III.    Legal Standard

Preliminary injunctions are "extraordinary remed[ies]" that courts should avoid entering except in the clearest of cases. *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). As the party seeking the injunction, Plaintiffs must first show "(1) some likelihood of succeeding on the merits, and (2) that [they have] no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied." *Cassell v. Snyders*, 990 F.3d 539, 544-45 (7th Cir. 2021) (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992) (quotations omitted)). Only if they make this showing should the Court then also consider "(3) the irreparable harm [IU] will suffer if preliminary relief is granted, balancing . . . against the irreparable harm to [Plaintiffs] if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Id.* at 545 (quoting *Abbott Labs.*, 971 F.2d at 11-12). The latter balancing analysis invokes a "sliding scale" approach, aimed at minimizing the consequences of being mistaken. *Id.* (quoting *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 593 (7th Cir. 1986)).

## IV.    Argument

### A.    Plaintiffs have not challenged IU's masking or testing policies.

As an initial matter, according to Plaintiffs, their Complaint "concerns the constitutionality of Indiana University's Vaccine Mandate ('IU's Mandate'), which requires that

all students receive one of the available COVID vaccines." ECF 1 ¶¶ 2, 17; ECF 1-2; *see also* ECF 8-1 at 6 (similarly defining mandate). Plaintiffs, as masters of their Complaint, have limited their challenge in this case to the requirement that students either be vaccinated or receive an exemption in order to attend in-person classes. *See, e.g.*, *Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 1246 (7th Cir. 2021) (confirming that "a plaintiff is the master of her own complaint" and courts should not read unalleged assertions into a complaint). Plaintiffs separately define IU's masking and testing policies as so-called "Extra Requirements," but seek no relief from these requirements. *Compare* ECF 1, ¶¶ 28-31 (describing "Extra Requirements"), *with id.*, ¶¶ 250-252 (requesting Court enjoin only "IU's Mandate"), ECF 7 (failing to reference "Extra Requirements), & ECF 8-1 at 6 (identifying issue on injunction as whether "mandate violates the Fourteenth Amendment") & 38 (seeking injunction against mandate only).

Defining the scope of Plaintiffs' challenge affects not only Plaintiffs' standing, but their alleged basis for claimed irreparable harm. Because Plaintiffs' claims and the relief they seek concern only "IU's Mandate," the Court should not construe Plaintiffs' claims to somehow encompass IU's COVID-19 masking and testing policies. *See, e.g.*, *Combs v. Kleopfer*, No. 2:16-CV-327-WTL-MJD, 2016 WL 4506878, at *1 (S.D. Ind. Aug. 29, 2016) ("[T]he Court may not rewrite a complaint to include claims that were not presented."); *Matter of LaSalle Rolling Mills, Inc.*, 832 F.2d 390, 392 n.6 (7th Cir. 1987) (addressing procedural question disposing of case first to "avoid[] deciding a constitutional question" unnecessarily).

## B. Plaintiffs lack standing to challenge "IU's Mandate."

Plaintiffs bear the burden of establishing standing. *See, e.g.*, *Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017). To establish standing, Plaintiffs must show that they (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of IU, (3) that a favorable decision is likely to redress. *Id.* "If the plaintiff lacks standing, the federal court lacks

subject matter jurisdiction and the suit must be dismissed under Rule 12(b)(1)." *Id.*

**1. Plaintiffs who have received an exemption lack standing.**

Exempt Plaintiffs lack standing to pursue their claims because they have not identified any injury in fact that they stand to suffer under "IU's Mandate." IU has already granted each permission to return for the fall 2021 semester without having received any Vaccine.

Exempt Plaintiffs are akin to those plaintiffs who challenged the Affordable Care Act's preventative services requirement, even though they fit within an exemption. Those plaintiffs lacked standing because they "face[d] no penalty or restriction based on the existing regulatory requirement" and therefore could not satisfy Article III's injury in fact requirement. *Univ. of Notre Dame v. Sebelius*, No. 3:12-CV-253-RLM, 2012 WL 6756332, at *3 (N.D. Ind. Dec. 31, 2012); *see also, e.g.*, *Zubik v. Sebelius*, 911 F. Supp. 2d 314, 328 (W.D. Pa. 2012) (no standing where "there [was] no authentic threat of imminent enforcement"). Exempt Plaintiffs likewise face no penalty or restriction under "IU's Mandate."[3]

Exempt Plaintiffs' alleged objections to the Extra Requirements do not confer standing to challenge "IU's Mandate" because enjoining "IU's Mandate"—Plaintiffs' only requested relief—would not redress their objections to the "Extra Requirements." *See Univ. of Notre Dame*, 2012 WL 6756332 at *3 (confirming "challenged regulatory requirement" must cause the injuries of which the plaintiffs are complaining to confer standing); *contra* ECF 8-1 at 32.[4]

**2. Plaintiff Roth lacks standing because she failed to seek an exemption.**

Plaintiff Roth lacks standing to challenge "IU's Mandate" because her alleged injury is

---

[3]    Having received exemptions from "IU's Mandate," Exempt Plaintiffs' claims are also moot because Exempt Plaintiffs no longer face any threat of enforcement. *See, e.g.*, *Nowlin v. Pritzker*, No. 1:20-CV-1229, 2020 WL 5850844, at *3 (C.D. Ill. Oct. 1, 2020) (finding request to enjoin executive orders based on alleged violation of constitutional rights was mooted by religious exemption).

[4]    Plaintiffs' lack of harm arising from the Extra Requirements is discussed further, *infra*, at 31-33.

not fairly traceable to IU. Rather, she could avoid any injury she alleges she will suffer by applying for the religious exemption for which she qualifies. *See* ECF 1, ¶ 213; Ex. C at 43:21-44:10. Roth's choice not to seek an exemption for which she admits she is eligible does not confer standing. *See, e.g.*, *Baer-Stefanov v. White*, 773 F. Supp. 2d 755, 759 (N.D. Ill. 2011) ("[W]here the acts necessary to make the injury happen are at least partly within the plaintiff's own control, the injury-in-fact requirement calls for a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all." (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n. 2 (1992) (internal quotations omitted)); *see also, e.g.*, *Pucket v. Hot Springs Sch. Dist. No. 23-2*, 526 F.3d 1151, 1163 (8th Cir. 2008) (confirming plaintiffs may not "deliberately fail[] to request [the relief they seek] in an attempt to create a case or controversy for the overriding purpose of challenging the constitutionality of [a policy]").

Nor can Roth credibly argue futility. Six Plaintiffs have already received a religious exemption based on the same facts she has alleged, and IU has granted a religious exemption to every applicant who has requested one. *See* ECF 1, ¶¶ 180, 182, 196, 201, 205, 207; Carroll Decl., ¶ 37; *see also Baer-Stefanov*, 773 F. Supp. 2d at 759 (rejecting futility argument).

**C. "IU's Mandate" should not be preliminarily enjoined.**

Even if the Court deems Plaintiffs to have standing to challenge "IU's Mandate," they are not entitled to a preliminary injunction. Plaintiffs are highly unlikely to succeed on the merits and do not stand to suffer irreparable harm. Moreover, the harm that IU and its constituents will suffer and the public interest greatly outweigh any harm that Plaintiffs can legitimately allege. Accordingly, their preliminary injunction request should be denied.

**1. Plaintiffs are unlikely to succeed on the merits.**

**a. "IU's Mandate" does not offend Due Process.**

A century's worth of law confirms that "IU's Mandate" is constitutionally sound and

14

IU's Extra Requirements are likewise constitutional.

### i. The Policy is constitutional under *Jacobson*.

Over 100 years ago, the Supreme Court held that a state enactment mandating vaccination, and subjecting objectors to fines or imprisonment, was a constitutional exercise of the state's police powers to establish reasonable health laws to "protect the public health and the public safety." *Jacobson v. Commonwealth of Mass.*, 197 U.S. 11, 25-26 (1905). The Court rejected the plaintiff's argument—like that of the Plaintiffs' here—that the compulsory vaccination requirement was "unreasonable, arbitrary and oppressive" and therefore invaded his constitutionally protected liberty interest, and the Court reiterated the "fundamental principle" that individual liberty is not boundless and must yield "to secure the general comfort, health, and prosperity" of the greater citizenry. *Id.*, 197 U.S. at 26. Because the challenged law had a "real or substantial relation to the protection of the public health and the public safety," it was reasonable and, therefore, constitutional. *Id.*, 197 U.S. at 31.

Plaintiffs' suggestion that *Jacobson* has an established "exception"—which requires courts to "adjudge the constitutionality" of a challenged law "if it [1] has no real or substantial relation to [its] objects, or [2] is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law"—is nothing more than a restatement of *Jacobson*'s standard. ECF 8-1 at 23. Plaintiffs cite no authority—*Jacobson* or otherwise—referring to this "exception," *see generally id.* at 23, 29-30, which is unsurprising because the *Jacobson* Court applied that very standard in evaluating the mandatory vaccination requirement challenged there and concluded it passed both prongs. *See Jacobson*, 197 U.S. at 31.

And in the nearly 120 years since, courts nationwide, including at least one district court in this Circuit, have repeatedly confirmed that mandatory vaccination requirements for attending public school are constitutional as a valid exercise of the state's police power. *See, e.g., Zucht v.*

15

*King*, 260 U.S. 174, 175-177 (1922) (upholding dismissal of constitutional challenge to public

school mandatory vaccination requirement); *George v. Kankakee Cmty. Coll.*, No. 14-cv-2160,

2014 WL 6434152 (C.D. Ill. Nov. 17, 2014) (dismissing under *Jacobson* substantive due process

challenge to mandatory student-vaccination requirement); *Phillips v. City of New York*, 775 F.3d

538, 542 (2nd Cir. 2015) (upholding dismissal of substantive due process challenge to public

school mandatory vaccination requirement); *Workman v. Mingo Cty. Sch.*, 667 F. Supp. 2d 679,

690-91 (S.D. W. Va. 2009), *aff'd Workman v. Mingo Cty. Bd. of Educ.*, 419 F. App'x 348, 353-

354 (4th Cir. 2011) (rejecting facial substantive due process challenge to mandatory student-

immunization requirement because the Supreme Court "long ago settled that it is within the

police power of a State to provide for compulsory vaccination" (quotations omitted)).[5]

### 1. *Jacobson* remains good law.

The Supreme Court has not overruled *Jacobson*. Plaintiffs ask the Court to cross a series

of tenuously constructed bridges that they say will lead the Court to conclude otherwise. *See*

ECF 8-1 at 23-25. But the Court need not, and should not, take that step. And, even if the Court

were so inclined to inspect Plaintiffs' bridges, it would find them unsound.

Lower courts may not "declar[e] a decision or doctrine of a higher court defunct" unless

the court is "certain or almost certain" that the decision "would be rejected by the higher court if

a case presenting the issue came before it." *Olson v. Paine, Webber, Jackson & Curtis, Inc.*, 806

F.2d 731, 741 (7th Cir. 1986). Plaintiffs acknowledge *Jacobson*'s status as binding precedent for

---

[5]   *See also, e.g.*, *Middleton v. Pan*, No. CV 16-5224-SVW (AGR), 2016 WL 11518596, at *7 (C.D. Cal.
Dec. 15, 2016) (dismissing substantive due process challenge to mandatory student vaccination
requirement); *Whitlow v. California*; 203 F.Supp.3d 1079, 1089 (S.D. Cal. 2016) (declining to enjoin
elimination of exemption to mandatory student vaccination requirement because "[u]nquestionably,
imposing a mandatory vaccine requirement . . . as a condition of enrollment does not violate
substantive due process," and "the State is well within its powers to condition school enrollment on
vaccination"); *Viemeister v. White*, 72 N.E. 97, 98 (N.Y. 1904) (upholding mandatory public school
vaccination requirement).

over 100 years (during which the Supreme Court has cited it in scores of opinions), and that the Court has never explicitly overruled it. *See, e.g.*, ECF 8-1 at 25 (asserting only "implicit repudiation"). In fact, Chief Justice Roberts's concurrence in *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020), and Justice Gorsuch's concurrence in *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020), both make clear that *Jacobson* remains good law. Under these circumstances, "the very high degree of confidence necessary to justify disregarding decisions of a higher court" is not present. *Olson*, 806 F.2d at 742.

Moreover, Plaintiffs' reliance on *Buck v. Bell*, 274 U.S. 200 (1927), *Roman Catholic*, and *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603 (2020), to support their asserted rejection of *Jacobson* is misplaced. *Contra* ECF 8-1 at 24-29. None of these cases is directly applicable, and none implicitly overruled *Jacobson*.

*Buck*. As Plaintiffs' note, *Buck* concerns the propriety of an involuntary sterilization law, not mandatory vaccination requirements. 274 U.S. at 205; ECF 8-1 at 24. At most, *Buck* extends the principle underlying *Jacobson*—the breadth of the state's constitutional exercise of its police power to protect the public health—to a different context. *See Buck*, 274 U.S. at 207. Moreover, as Plaintiffs acknowledge, the Supreme Court has never explicitly repudiated *Buck*, either. *See* ECF 8-1 at 25. Thus, Plaintiffs' argument that the Court should decline to apply *Jacobson* here based on a later, implicit overruling of *Buck* is a bridge too far.

*Roman Catholic*. Plaintiffs next argument—that, without even mentioning *Jacobson*, the Supreme Court "implicitly narrowed [its] breadth" in *Roman Catholic*—is equally unavailing. ECF 8-1 at 26. *Roman Catholic* also did not involve mandatory vaccination requirements or the Fourteenth Amendment; it concerned a First Amendment challenge to an executive order that restricted attendance at religious services in areas that were COVID-19 hot spots. *See Roman*

17

*Cath.*, 141 at 65-66. As Justice Gorsuch observed in his concurrence—on which Plaintiffs heavily rely—*Jacobson* "involved an entirely different mode of analysis, an entirely different right, and an entirely different kind of restriction." *Id.*, 141 S. Ct. at 70 (Gorsuch, J., concurring); ECF 8-1 at 27.[6] Thus, Plaintiffs' argument that the majority's analysis in *Roman Catholic* somehow modified *Jacobson* is no basis for the Court to ignore *Jacobson* here.

In fact, since *Roman Catholic*, at least two courts have cited *Jacobson* in upholding mandatory school vaccination requirements. *See, e.g.*, *Kiel, J.D. v. The Regents of the Univ. of Cal.*, No. HG20-072843, 2020 WL 9396579, at *5 (Cal. Super. Dec. 04, 2020); *Doe v. Zucker*, No. 1:20-CV-840, 2021 WL 619465, at *22 (N.D.N.Y. Feb. 17, 2021) ("It is well-settled that it is within a state's police power to establish regulations implementing mandatory vaccine laws and vest local officials with enforcement authority."). The Court should follow their lead.

*Calvary Chapel.* Finally, the Court can quickly dispense with Plaintiffs' reference to *Calvary Chapel*. *See* ECF at 27-28. Plaintiffs do not rely on a majority opinion in *Calvary Chapel* because there is not one—the Court denied a requested injunction without opinion; so, instead, Plaintiffs cite a dissent. *Id.* And, like *Roman Catholic*, the case involves a First Amendment challenge to a COVID-19 executive order unrelated to mandatory student vaccination requirements. *See, e.g.*, *Calvary Chapel*, 140 S. Ct. at 2604-05 (Alito, J., dissenting).

At bottom, Plaintiffs are really asking the Court to disregard binding Supreme Court precedent. *See, e.g.*, ECF 8-1 at 23 (arguing *Jacobson* "is not today's jurisprudence" without citing any cases overturning *Jacobson*). The Court should decline Plaintiffs' bold invitation. *See, e.g.*, *Caviezel v. Great Neck Pub. Sch.*, 500 F. App'x 16, 19 (2d Cir. 2012) (rejecting similar

---

[6]    For these same reasons, Plaintiffs' reliance on the Seventh Circuit's discussion of *Roman Catholic* in *Cassell*, 990 F.3d at 543, which likewise involved a First Amendment Free Exercise Clause challenge, is similarly misplaced. ECF 8-1 at 28-29.

argument); *Snodgrass v. Berklee Coll. of Music*, 559 F. App'x 541, 543 (7th Cir. 2014) ("[W]e are bound by Supreme Court precedent.").

### 2. The pandemic is ongoing,[7] and *Jacobson* controls.

*Jacobson*'s progeny make clear that its application does not depend on the existence of a pandemic. Contrary to Plaintiffs' attempted limitation of *Jacobson*, courts have consistently applied it to uphold mandatory student vaccination requirements in a non-pandemic context. *Compare* ECF 8-1 at 14; *with, e.g.*, *Zucht*, 260 U.S. at 175-177 (confirming constitutionality of public school vaccination requirement without pandemic); *Phillips*, 775 F.3d at 542 (same); *Workman*, 667 F. Supp. 2d at 690-691 (same); *Middleton*, 2016 WL 11518596 at *7 (same).

### 3. Plaintiffs' disagreements with science do not undermine *Jacobson's* application.

Plaintiffs' assertion that "IU's Mandate" is unreasonable even under *Jacobson* because "the latest scientific data" allegedly shows the Vaccine to be "unnecessary" is doubly inaccurate. ECF 8-1 at 18-19. Besides being factually incorrect, *see supra* at 3-5, courts have repeatedly rejected similar arguments. *See, e.g.*, *Phillips*, 775 F.3d at 542 ("Plaintiffs argue that a growing body of scientific evidence demonstrates that vaccines cause more harm to society than good, but as *Jacobson* made clear, that is a determination for the [policy-maker], not the individual objectors."); *Workman*, 667 F. Supp. 2d at 681, 690-691 (rejecting substantive due process challenge to mandatory student-immunization requirement because, among other things, "little evidence support[ed] the claim that [the challenged vaccinations were] unsafe").

Moreover, as Dr. Beeler explains, Plaintiffs' "scientific data" is controverted roundly by many sources, including the CDC. *Compare, e.g.* McCullough Decl. (attached hereto as **Exhibit E**) at 16 (Table 5) (discussing unproven COVID-19 treatments), *with* Beeler Decl., ¶¶ 56-59;

---

[7]   *See, e.g.*, Beeler Decl., ¶ 35; EO 21-16.

McCullough Decl., ¶¶ 37-38 (misstating risk of myocarditis), *with* Beeler Decl., ¶¶ 33, 66-69; McCullough Decl., ¶¶ 68-72 (exaggerating "natural" immunity protection), *with* Beeler Decl., ¶¶ 70-78. There is no basis for the Court to even credit Plaintiffs' expert's opinions,[8] which contradict the entire body of current United States federal public health policy, let alone rely on those opinions as a basis to disregard well-established Supreme Court precedent.

### ii. "IU′s Mandate" is constitutional even absent *Jacobson*.

#### 1. "IU′s Mandate" is subject to—at most—rational-basis scrutiny.

Even if the Court declines to apply *Jacobson*, the Court need find only that "IU's Mandate" is rationally related to a legitimate end. "IU's Mandate" easily passes that test. Absent *Jacobson*, courts analyze Fourteenth Amendment substantive due process challenges under one of two frameworks: where the claim implicates a fundamental right, courts apply strict scrutiny; but where no fundamental right is at issue, rational basis scrutiny applies. *See, e.g.*, *George*, 2014 WL 6434152 at *3 ("Substantive Due Process requires only that a government practice or regulation be rationally related to a legitimate government interest, unless it encroaches on a fundamental right." (quotations omitted)).

Plaintiffs' challenge to "IU's Mandate" does not implicate any fundamental right. Without a single legal citation, Plaintiffs purport to identify a host of "fundamental" rights that they contend are at issue: "rights of personal choice, bodily autonomy, medical privacy, and religious convictions," and "loss of an education." ECF 8-1 at 18-19, 21. None of these rights, even if recognized as fundamental in some instances, are implicated here.

---

[8]   Dr. McCullough is a cardiologist, not an infectious disease expert, and it is far from clear that he would satisfy the *Daubert* standard for the opinions he offers. *See, e.g. GlaxoSmithKline LLC v. Glenmark Pharms. Inc., USA*, No. CV 14-877-LPS-CJB, 2017 WL 8944996, at *4 (D. Del. May 11, 2017) (referencing Dr. McCullough as plaintiffs' "infringement expert" in pharmaceutical patent case).

**a.   Plaintiffs have no fundamental right to education.**

Working backwards, Plaintiffs have no fundamental right to continued graduate study. *See, e.g.*, *George*, 2014 WL 6434152 at *3 ("As the Seventh Circuit has recently reiterated, there is no "fundamental right to a graduate education.") (quoting *Charleston v. Bd. of Trustees of Univ. of Ill. at Chi.*, 741 F.3d 769, 774 (7th Cir. 2013)); *see also, e.g.*, *Zucker*, 2021 WL 619465 at *20 (confirming no fundamental right to public school education in context of challenge to mandatory school vaccination requirement).

**b.   "IU's Mandate" does not infringe Plaintiffs' religious rights.**

Plaintiffs cannot backdoor an unpled First Amendment Free Exercise challenge through a Fourteenth Amendment Substantive Due Process Claim. *See, e.g.*, *Nowlin*, 2021 WL 669333 at *6 ("Plaintiffs' rights to freedom of assembly and speech are already protected by a specific constitutional provision—the First Amendment. A substantive due process claim cannot succeed . . . when a specific constitutional provision protects the right allegedly infringed upon." (quotations omitted)). Moreover, Plaintiffs have not alleged that "IU's Mandate" "is religiously motivated," "applies only to those who hold certain religious beliefs," or is anything other than "a generally applicable, neutral policy," so any First Amendment challenge would fail on the merits. *George*, 2014 WL 6434152 at *4; *see also Phillips*, 775 F.3d at 543 (rejecting Free Exercise challenge to neutral mandatory student-vaccination requirement).

**c.   "IU's Mandate" does not invade Plaintiffs' privacy rights.**

"IU's Mandate" does not invade Plaintiffs' fundamental right to medical privacy. *Contra, e.g.*, ECF 8-1 at 18. First, Plaintiffs do little to articulate *how* exactly they contend IU's Policy interferes with their privacy rights. In any event, a sister court rejected just this type of argument in evaluating a mandatory school vaccination requirement because "except when dealing with searches and seizures, the Supreme Court . . . has confined the label 'privacy' mainly to sexual

21

and reproductive rights, such as the right to use contraceptives or have an abortion or engage in homosexual acts." *George*, 2014 WL 6434152 at *4 (citing *Wolfe v. Schaefer*, 619 F.3d 782, 784 (7th Cir. 2010)). As there, Plaintiffs here do not, and could not credibly, assert that "IU's Mandate" concerns their sexual or reproductive rights.

Neither *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990), nor *Green v. Alachua Cty.*, No. 1D20-1661, 2021 WL2387983, *1 (Fla. Dist. Ct. App. June 11, 2021), necessitates a different conclusion. *See* ECF 8-1 at 26. *Cruzan* concerns a liberty interest in the right to refuse medical treatment, rather than an invasion of privacy, and, as explained below, "IU's Mandate" does not invade that right either. *See infra*. And *Green* assessed whether *Florida's* express constitutional right to privacy, which is "broader," "embraces more privacy interests, and extends more [individual] protection" than the U.S. Constitution, precluded a state mask mandate. 2021 WL2387983 at *3-4. *Green* is inapplicable.

> ### d. The Policy does not invade Plaintiffs' rights to bodily integrity or to refuse medical treatment.

Finally, "IU's Mandate" does not invade Plaintiffs' fundamental rights to bodily integrity or to refuse medical treatment. IU is not forcing Plaintiffs to receive a Vaccine against their will. *See, e.g.*, Carroll Decl., ¶ 32. In similar contexts, courts have rejected arguments that vaccine requirements are "coerci[ve]" or intrude on bodily integrity. *Compare* ECF 8-1 at 34, *with, e.g.*, *Zucker*, 2021 WL 619465 at *21 (explaining mandatory vaccination requirement does "not force . . . consent to vaccination"); *Bridges v. Houston Methodist Hosp.*, No. CV H-21-1774, 2021 WL 2399994, at *2 (S.D. Tex. June 12, 2021) (holding that policy requiring employee to receive COVID-19 vaccination was not coercive because employee "can freely choose to accept or refuse a COVID-19 vaccine . . . if she refuses, she will simply need to work somewhere else"); *Williams v. Santiago*, No. 1:16-CV-01065-MJS (PC), 2016 WL 6494268, at *4 (E.D. Cal. Nov.

1, 2016) (dismissing Due Process Clause challenge premised on "unjustified intrusions into the body" because plaintiff alleged only that he was prescribed medical treatment that he did not want and was able to refuse). Like the policies in these cases, "IU's Mandate" permits Plaintiffs to choose whether to receive the COVID-19 Vaccine. *See, e.g.*, ECF 1, ¶ 33 ("If a person *chooses* to receive the vaccination . . ." (emphasis added)).

### 2.   Under any level of scrutiny, "IU's Mandate" is constitutional.

IU's interest in "[s]temming the spread of COVID-19 is unquestionably a compelling interest" and, therefore, satisfies rational basis scrutiny, or even strict scrutiny, should the Court choose to apply it. *Roman Cath.*, 141 S. Ct. at 67; *see also, e.g.*, *Vill. of Orland Park v. Pritzker*, 475 F. Supp. 3d 866, 885 (N.D. Ill. 2020) (confirming that "preventing the spread of a dangerous infectious disease" like COVID-19 is a compelling state interest). Since the pandemic began, more than a quarter the state's population has been infected with COVID-19; it has killed over 13,000 Hoosiers and over 600,000 people nationwide. Beeler Decl., ¶¶ 14-15. And the risk of hospitalization from COVID-19 for an unvaccinated Hoosier remains 97 times higher than it is for a vaccinated Hoosier. *Id.*, ¶ 39. Other courts have previously rejected Plaintiffs' argument that the pandemic is "virtually over" so policies aimed at stemming the spread of COVID-19 are no longer justified is not grounded in fact. *Compare id.*, ¶¶ 41, 43 (noting that Indiana has not reached herd immunity and other reasons COVID-19 rates may be temporarily declining), *with* ECF 8-1; *Cassell v. Snyders*, 458 F. Supp. 3d 981, 1000 (N.D. Ill. 2020), *aff'd*, 990 F.3d 539 (7th Cir. 2021) ("[T]he virus continues to proliferate, Illinoisans continue to die, and restrictions remain vital to ensuring that hospitals are not overwhelmed. In these exceptional circumstances, controlling the spread of COVID-19 counts as a compelling interest.").

"IU's Mandate" is also narrowly tailored to advance those ends—again, unquestionably satisfying rational basis scrutiny or even strict scrutiny. College-aged individuals (ages 20

23

through 29) in Indiana have reported more positive COVID-19 cases than any other demographic. *See* Beeler Decl., ¶ 14. And these individuals not only can suffer severe consequences if they contract the virus, but they also can spread it to others who face an even higher risk of bad outcomes. *Id.*, ¶¶ 7-11. The Vaccines "are some of the most effective vaccines that have ever been developed," and "vaccinating individuals against COVID-19 currently is the leading prevention strategy to protect individuals from the virus and end the pandemic." *Id.*, ¶¶ 22, 62; *see also, e.g.*, Holcomb Executive Order 21-17 ("the data has shown us that the spread of COVID-19 in the Hoosier state and in other areas can be significantly reduced where there are robust vaccinations and adherence to mitigation efforts"), *available at:* https://www.in.gov/gov/ files/Executive-Order-21-17-Continuation-of-Limited-Health-and-Welfare-Provsions.pdf.

Moreover, "IU's Mandate" is not contrary to the Emergency Use Authorization provisions in 21 U.S.C. § 360bbb-3, as Plaintiffs' contend. *Contra* ECF 8-1 at 31. That statute addresses powers and responsibilities of the Secretary of the Department of Health and Human Services, not an educational institution like IU. *See, e.g.*, 21 U.S.C. § 360bbb-3(e) ("the Secretary . . . shall . . ."); *Bridges*, 2021 WL 2399994 at *2. Even if it were applicable, IU's vaccination policy does not preclude individuals from "accept[ing] or refus[ing] administration of" the COVID-19 vaccine. *Id.*, § 360bbb-3(e)(1)(ii)(III). *See supra* at 22-23. The statute does not preclude IU from implementing policies that address non-exempt individuals who decline to be vaccinated. *Id.* Rather, "IU's Mandate" closely tracks the CDC's guidance for IHEs, as well as guidance from the ISDH. *Compare, e.g.*, Carroll Decl., ¶¶ 7-20 (guidance), *with id.*, ¶¶ 21-44 (IU's policies). IU's close adherence to state and federal guidance demonstrates narrow tailoring.

### a.   IU's Masking and Testing Policies are constitutionally sound.

Even if the Court construes Plaintiffs' claims to encompass IU's COVID-19 masking and testing policies, they fare no better. Courts have consistently rejected substantive due process

claims to masking requirements under the standards set forth above—finding they clearly survive *Jacobson* and rational basis scrutiny and do not implicate any fundamental rights to trigger strict scrutiny. *See, e.g.*, *Whitfield v. Cuyahoga Cty. Pub. Libr. Found.*, No. 1:21 CV 0031, 2021 WL 1964360, at *3 (N.D. Ohio May 17, 2021) (finding "there is no general constitutional right to wear, or to refuse to wear a face mask in public places" and advising that "Plaintiff's assertion under the Fourteenth Amendment that the government can never regulate personal attire, including face covering, is without merit"); *Stewart v. Justice*, No. 3:20-0611, 2021 WL 472937 (S.D. W. Va. Feb. 9. 2021) (rejecting substantive due process challenge to mask mandate); *Forbes v. Cty. of San Diego*, No. 20-cv-00998-BAS-JLB, 2021 WL 843175 (S.D. Cal. Mar. 4, 2021) (same); *see also, e.g.*, *Oakes v. Collier Cty.*, No.: 2:20-cv-568-FtM-38NPM, 2021 WL 268387 (M.D. Fla. Jan. 27, 2021) (evaluating Equal Protection claim and concluding that, "[a]s a general matter, a mask mandate is rationally related to the County's legitimate governmental interest. . . . It would be difficult to contend with a straight face that a mask requirement does not bear a rational relation to protecting people's health and preventing the spread of COVID-19. [Plaintiffs] do not point to a single court holding otherwise.").

And at least one court has also rejected a request to preliminarily enjoin a mandatory COVID-19 student testing regime on the basis of a substantive due process challenge, finding the students had no fundamental right to education and the testing program was reasonably related to the state's compelling interest in stemming the spread of COVID-19. *Aviles v. Blasio*, No. 20 CIV. 9829 (PGG), 2021 WL 796033, at *18 (S.D.N.Y. Mar. 2, 2021); *see also, e.g.*, *Little Rock Fam. Plan. Servs. v. Rutledge*, 458 F. Supp. 3d 1065, 1074 (E.D. Ark. 2020) (applying *Jacobson* to uphold requirement that women obtain negative COVID-19 test before medical procedure). Plaintiffs are not entitled to a preliminary injunction of IU's masking and testing policies.

**b.** **"IU's Mandate" does not violate the "Vaccine Passport" Law.**

Plaintiffs' second challenge concerns a new Indiana statute that prohibits "immunization passports." ECF 8 at 35-36; Ind. Code § 16-39-11-5(a) ("the state or a local unit may not issue or require an immunization passport"); Ind. Code § 16-39-11-3 (defining "immunization passport" as "written, electronic, or printed information regarding an individual's immunization status"). There are several reasons why Plaintiffs are unlikely to succeed on this claim.

**i.** **Plaintiffs have no private right of action under the Vaccine Passport Law.**

On its face, the Vaccine Passport law grants no private right of action, and no such right may be properly implied. Whether Indiana courts would imply a private right of action under the Vaccine Passport law is a question of law that "begins with an examination of legislative intent." *Howard Reg'l Health Sys. v. Gordon*, 952 N.E.2d 182, 187 (Ind. 2011) (internal citation omitted). Implied private rights of action are disfavored in Indiana. *Doe #1 v. Ind. Dep't of Child Servs.*, 81 N.E.3d 199, 202 (Ind. 2017) ("We have long been reluctant to infer . . . unwritten intent, since the legislature often creates rights of action using clear language" (internal quotation omitted)). Indeed, omission of "clear language" creating a right of action is "evidence that [the legislature] did not intend to create a private remedy." *Shirey v. Flenar*, 89 N.E.3d 1102, 1105 (Ind. Ct. App. 2017). Courts' "reluctance to invade the legislature's purview has developed into a two-part rule: [courts] usually will not infer a private right of action when the statute 1) primarily protects the public at large and (2) contains an independent enforcement mechanism." *Doe #1*, 81 N.E.3d at 202; *see also, e.g.*, *Shirey*, 89 N.E.3d at 1105.

The Vaccine Passport law is just such a statute. Its apparent intent is to protect Indiana citizens from being *required* by the state or a local government unit to maintain written, electronic, or printed information regarding one's own immunization status. *See* Ind. Code ch. 16-39-11. The legislature housed it in Title 16 of the Indiana Code, which contains an

26

enforcement provision applicable to the entire title. Ind. Code § 16-19-3-18(b) ("Section 18(b)") ("Except as otherwise provided, the state department [of health] may bring an action to enforce this title, except as otherwise stated"); *Shirey*, 89 N.E.3d at 1106 (Section 18(b) is Title 16's "enforcement mechanism").

Section 18(b) twice states that it governs unless the legislature provides otherwise. Ind. Code § 16-19-3-18(b). This is a clear signal that the legislature did not intend for individuals to enforce Title 16. Indeed, where the legislature has carved out exceptions to Section 18(b), it has done so in clear and unambiguous language. *See, e.g.*, Ind. Code § 16-41-2-7 (creating civil cause of action), *id.* § 16-39-7.1-6 (creating criminal penalty). That type of language is noticeably absent here. For example, proposed versions of a separate vaccine passport law included an explicit civil cause of action. Ind. House Am., 2021 Reg. Sess. S.B. 1 at 3:31-33 *available at*: http://iga.in.gov/static-documents/b/c/b/d/bcbd92c6/ SB0001.04.COMH.AMH002. pdf (proposing to add "Sec. 4. (a) An individual who is subject to a violation of this chapter may bring a civil action against the employer in the county of employment"). Ind. Code ch. 16-39-11 contains no such provision; implying one would be inconsistent with Section 18(b).

"According to [the Indiana] Supreme Court, 'When a statute expressly provides one enforcement mechanism, courts may not engraft another.'" *Shirey*, 89 N.E.3d at 1106 (quoting *Doe #1*, 81 N.E.3d 199, 204 (Ind. 2017)). This is true even where a statute was arguably designed to "benefit particular individuals" rather than the public in general. *Id.* at 1107 (finding no implied private right of action arising from statute requiring medical providers to provide records to patients upon request). This analysis controls here; the Vaccine Passport law already has an enforcement provision and the Court "may not engraft another" for Plaintiffs.

### ii.  The Vaccine Passport law is inapplicable to IU.

Even were the Court to imply a private right of action allowing Plaintiffs to enforce the

Vaccine Passport law, their challenge fails because that statute does not apply to IU. The plain

language of the statute limits its application to "the state or a local unit." Ind. Code § 16-39-11-

5.[9] Neither Chapter 11 nor Title 16 defines "state" for purposes of Chapter 11. While IU may be

deemed "the state" for some legal purposes, such as sovereign immunity (ECF 1-6 at 3-4 (citing

*Kashani v. Purdue Univ.*, 813 F.2d 843 (7th Cir. 1987))) or 42 U.S.C. § 1983 claims by

employees (*Wade v. Indiana Univ. Sch. of Med.*, No. 1:16-CV-02256-TWP-MJD, 2019 WL

3067519, at *7 (S.D. Ind. July 12, 2019)), it is unquestionably not "the state" for all purposes.

For example, the legislature has several terms that it uses when it wants to separately

distinguish distinct entities like IU from "the state" itself. Statutes throughout the Indiana Code

refer to state educational institutions as separate and distinct from "the state." The terms "state

educational institution," "political subdivision," and "political subdivision of the state" are all

used to refer to state entities that are distinct from the state. *See, e.g.*, Ind. Code § 21-40-3-1

(referencing setting "conditions and standards of admission . . . in the best interests of the state

and the state educational institution"); *id.*, § 21-34-4-1 (outlining "the policy of the state"

regarding "joint use of building facilities" to benefit the "state educational institutions" and "the

state"); *id.*, § 16-34.5-1-2 (precluding "[t]he state, a state educational institution, or a political

subdivision of the state" from using public funds for certain purposes). Indeed, just this

legislative session, the legislature used "political subdivision," defined to include "state

educational institution," to extend certain COVID-related immunity to public universities. HEA

---

[9]     Even Attorney General Rokita, while opining that the statute does apply to IU, stopped short of
declaring IU "the state" itself. ECF 1-6 at 2-3 (referring to IU as "arm of the state"). Rokita also
acknowledged a media statement by one of the bill's authors that the law was not intended to apply to
public universities. *Id.* at 3; *see* Sullivan, Kayla, *What Does Indiana's New Vaccine Passport Law
Do?*, Fox59 News, *https://fox59.com/indianapolitics/what-does-indianas-new-vaccine-passport-law-
do/amp/.* This view is consistent with discussion on the House floor that Chapter 11 would not apply
to publicly funded hospitals. *See* http://iga.in.gov/information/archives/2021/video/house/ (House
Chamber Apr. 22, 2021 video at 9:55).

1002, Section 13 (creating Ind. Code ch. 34-12-5). In sum, when the legislature refers to "the state" it does not always mean IU.

In this context, this is a distinction with an important difference. The Vaccine Passport law evidences an intent by the legislature to forbid the government itself from requiring all citizens within its jurisdiction to maintain records of their vaccination status. From a policy perspective, IU is different. It does not "regulate" its students as would the state or a local unit regulate their citizens; rather, students may voluntarily choose to attend the university or not. Just like private employers are free to require vaccination for those who choose to be in their employ, *Bridges*, 2021 WL 2399994, at \*2, so may IU require vaccination for those who choose to attend their courses in person. Allowing IU to require vaccination leaves undisturbed the Vaccine Passport law's apparent desire to prohibit a general government vaccine mandate that would apply to, for example, all citizens statewide. IU, because it is not the state, has no such power. "IU's Mandate" simply does not implicate the generally applicable government regulation that the Vaccine Passport law is designed to prohibit.

### iii. Even if applicable, IU is not violating the statute.

Finally, for these same reasons, even if IU were deemed "the state" for this purpose, it cannot be deemed to be requiring an "immunization passport." IU is not "requiring" that anyone have or create such a record any more than it is "forcing" students to get vaccinated. *See supra* at 22-23. Indeed, IU requires no documentation of having received a vaccine (*e.g.*, a CDC card). Carroll Decl., ¶ 34. Rather, IU requests that non-exempt students who wish to attend IU courses in person attest that they have been vaccinated. *Id.* For those who submit an attestation, IU requests their vaccination dates to confirm that they are fully vaccinated by the date they return

29

to campus.[10] *Id.* And the statute is clear that IU (if it is deemed the state in this context) may maintain, create, or store records of individuals' immunization statuses, including for the purpose of public health administration. Ind. Code § 16-39-11-5(b)(1), (4). Query how else IU could accomplish that permissible goal other than by requesting the record and then maintaining it (something the CDC also advises IHEs to consider doing).

IU's reading of the statute is consistent with the Board of Trustees' statutory authority to govern admissions and conduct at its campuses. For example, the Board may: "govern, by regulation and other means, the conduct of students, faculty, employees, and others while upon the property owned, used, or occupied by the state educational institution" (Ind. Code § 21-39-2-2); and "set the conditions and standards of admission of students upon criteria that are in the best interests of [it and] the state." Ind. Code § 21-40-3-1. IU's thoroughly considered policies regarding COVID-19 are well within its authority and do not require any student to have a "vaccine passport."

### 3. Plaintiffs have not shown they will suffer irreparable harm.

The Exempt Plaintiffs stand to suffer no injury from "IU's Mandate." As a threshold matter, courts nationwide have been clear that delays in graduate education, including due to suspensions and expulsions for failing to follow university requirements, do not constitute irreparable harm. *See, e.g.*, *Hodges v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. CV 20-1456, 2020 WL 5017665, at *3 (E.D. La. Aug. 25, 2020) (collecting cases). Thus, even if the Court gives Plaintiffs the benefit of their argument that IU's application of its "Mandate" will result in Plaintiffs' "virtual expulsion," that consequence is not irreparable and is

---

[10]   Attorney General Rokita agrees that such a "request" is acceptable but only "provided no negative consequences arise" from not producing it. ECF 1-6 at 5. This caveat, relied upon by Plaintiffs, is not reflected in the statute's plain language. *See* ECF 1 ¶ 247.

insufficient to warrant an injunction. ECF 8-1 at 34. The Court can deny Plaintiffs' preliminary injunction on this basis alone because they have not shown irreparable harm. *See, e.g.*, *E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 703 (7th Cir. 2005) (confirming that if a party moving for preliminary injunction cannot show irreparable harm, "a court's inquiry is over and the injunction must be denied" (internal citation omitted)).

Moreover, six Plaintiffs already have an exemption from "IU's Mandate" and Plaintiff Roth has verified that she satisfies the criteria for one. *See supra* at 10-13; Ex. C at 43:21-44:10. These seven plaintiffs thus have no irreparable harm. *See, e.g.*, *Kiel, J.D.*, 2020 WL 9396579 at *5 (denying plaintiffs' request to enjoin university's flu vaccine mandate where they could apply for a religious exemption). This leaves Sperazza. Plaintiffs have done nothing to articulate the irreparable harm they contend she will suffer specifically, beyond their "forced injection" and "virtual expulsion" arguments (ECF 8-1 at 36-27), both disposed of above. At her deposition, Sperazza testified that if "IU's Mandate" is not enjoined, she will not attend IU in August, but instead will "continue working full time and possibly find a different college to attend." Ex. D (Sperazza) at 40:12-41:12; *see also, e.g.*, *Hodges*, 2020 WL 5017665 at *3 (rejecting argument that plaintiff's choice to attend another institution while expelled showed irreparable harm). Moreover, Sperazza admits that the other harm she is concerned about—her belief that the vaccine poses more risk to her than contracting COVID-19—is not something she has discussed with or been told by any medical professional. Ex. D at 19:11-20:16. Thus, there is no basis for concluding that Sperazza, individually, stands to suffer irreparable harm, either.

Even if the Court construes Plaintiffs' claim to include the "Extra Requirements," no Plaintiff has established irreparable harm as a result. All Plaintiffs testified that they wore masks on many occasions during the pandemic. Ex. C (Roth) at 29:13-33:18; Ex. D (Sperazza) at

11:25-12:21, 28:12-31:2, 32:8-10; Dep. of Ryan Klaassen at 25:8-18 (attached hereto as **Exhibit F**); Dep. of Jaime Carini at 41:2-20 (attached hereto as **Exhibit G**); Dep. of D.J.B. at 16:20-20:4 (attached hereto as **Exhibit H**); Dep. of Ashlee Morris at 34:6-35:21; 55:8-55:19 (attached hereto as **Exhibit I**); Dep. of Seth Crowder at 20:10-21:23 (attached hereto as **Exhibit J**); Dep. of Macey Policka (attached hereto as **Exhibit K**) at 15:23-17:13; 17:19-18:5. While some cited concerns about hypothetical "segregation" or "discrimination," against those wearing masks on campus this fall, those concerns are merely speculative and do not constitute irreparable harm. *Duthie v. Matria Healthcare, Inc.*, 543 F. Supp. 2d 958, 960 (N.D. Ill. 2008) ("Alleged harm that is remote or speculative will not be considered irreparable; rather, the movant must demonstrate that the threatened harm is imminent."). Ex. C (Roth) at 25:20-29:8; 51:1-25 Ex. D (Speuzza) at 32:18-35:2; Ex. F (Klaassen)  at 33:23-39:15; Ex. G (Carini) at 47:12-50:22; Ex. H (D.J.B) at 32:15-33:15; Ex. I (Morris) at 45:8-45:24; 54:6-13; 57:8-59:9; Ex. J (Crowder) at 30:10-31:8, 35:18-37:16; Ex. K (Policka) at 21:8-17; 24:22-25:3.

Several Plaintiffs also have been tested for COVID multiple times with no resulting irreparable harm. Ex. D (Speuzza) at 23:3-26:19; Ex. K (Policka) at 13:23-15:11; Ex. I (Morris) at 33:2-34:5; Ex. F (Klaassen) at 25:19-27:5; 29:21-31:8. And a few Plaintiffs cited concerns about the safety of nasal testing swabs, but IU's testing uses saliva. Ex. C (Roth) at 33:19-35:17; Ex. H (D.J.B) at 36:9-38:25; Ex. J (Crowder) at 37:22-39:7, 40:5-16; Ex. B ¶ 40.

Finally, some Plaintiffs simply cited their view that the Extra Requirements were unnecessary or inconvenient, neither of which rises to the level of establishing irreparable harm. *Lewis v. Silverman*, No. 2:05-CV-352 PS, 2005 WL 8170424, at *2 (N.D. Ind. Sept. 16, 2005) (finding asserted "inconvenience" was not "immediate and irreparable harm"); *Students v. United States Dep't of Educ.*, No. 16-CV-4945, 2016 WL 6134121, at *38 (N.D. Ill. Oct. 18,

2016) ("[M]ere inconvenience . . . does not constitute irreparable harm."); Ex. D (Sperazza) at 37:7-39:8;  Ex. F (Klaassen) at 30:19-31:8; Ex. I (Morris) at 67:9-68:24; 71:17-72:24; Ex. J (Crowder) at 40:5-16.

      **4.   The remaining considerations also support ″IU′s Mandate.″**

          **a.   The harm to IU if the ″Mandate″ is enjoined outweighs any harm Plaintiffs might suffer.**

IU's interest and obligation in keeping its students, faculty, and staff safe, alive, and healthy far outweighs the potential harm to one individual in either receiving a vaccination, wearing a mask, or being subject to non-invasive testing. *See, e.g.*, *Cassell*, 990 F.3d at 550 (recognizing that—because of COVID-19's "insidious risk of non-symptomatic contagion"— enjoining restrictions on in-person worship would "increase the risk of disease" "far beyond the congregation" to "many others who did not consent to that trade-off"). The Vaccines are currently the most effective tool IU has to help stem the spread of the pandemic in the communities in which its campuses sit and in which its students, faculty, and staff reside. *See, e.g.*, Beeler Decl., ¶¶ 59, 62. Beyond that, IU's masking and testing policies for unvaccinated individuals will help IU ensure that it mitigates spread among the unvaccinated community and quickly identifies any outbreaks. *Id.*, ¶¶ 40, 55.

Beyond keeping its campuses safe from COVID-19 infections, the policy also serves IU's goal of providing students with a more normal campus experience. Carroll Decl., ¶ 30. And the IU community supports the policy. As of late June, over 42,000 students had already been fully vaccinated. *Id.*, ¶ 46.  IU faculty, staff, and Graduate and Professional Student Government overwhelmingly support "IU's Mandate" and other COVID-19 vaccination policies because they are the best way to ensure that all of IU's constituents can return to as close to a normal fall semester as possible without risking their health or their lives. *Id.*, ¶¶ 47-50.

33

### b.  The public interest supports "IU's Mandate."

The public interest supports upholding "IU's Mandate." The Court must consider the effects of enjoining "IU's Mandate" on the safety and health of others. *See, e.g.*, *Cassell*, 990 F.3d at 550 ("Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest'" (quoting *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386-87 (7th Cir. 1984))). Enjoining "IU's Mandate" would not only increase the risk of infection for Plaintiffs, it would also increase the risk of transmission of COVID-19 among all other IU students, faculty, and staff. *See, e.g.*, Beeler Decl., ¶¶ 22, 40, 55; *Cassell*, 990 F.3d at 544 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117, 123 n.34 (1984)).

Plaintiffs' opinion that "IU's Mandate" requires those least affected by COVID to be vaccinated oversimplifies the risk to the IU community should "IU's Mandate" be enjoined. *See* ECF 8-1 at 38. While the risk of transmission mitigated by "IU's Mandate" is difficult to quantify, this scientific uncertainty further supports upholding it. *Cassell*, 990 F.3d at 549 ("[T]he scientific uncertainty surrounding the pandemic further cautions against enjoining state coronavirus responses unless absolutely necessary.").

The public interest in reducing the risk of transmission among IU students, faculty, and staff outweighs any interest asserted by the Plaintiffs, especially because Plaintiffs have failed to establish a likelihood of success on the merits. *Altman v. Cty. of Santa Clara*, 464 F. Supp. 3d 1106, 1134 (N.D. Cal. 2020) ("[T]he public's interest in controlling the spread of COVID-19 outweighs its interest in preventing the constitutional violations alleged here, especially given that Plaintiffs have failed to establish a likelihood of success on the merits.") Therefore, the public interest supports upholding "IU's Mandate" and Extra Requirements.

**V.      Conclusion**

IU respectfully requests that Plaintiffs' Motion for Preliminary Injunction be denied.

Date:  July 2, 2021                          FAEGRE DRINKER BIDDLE & REATH LLP

                                             */s/ Anne K. Ricchiuto*
                                             Anne K. Ricchiuto (#25760-49)
                                             Stephanie L. Gutwein (#31234-49)
                                             300 North Meridian Street, Suite 2500
                                             Indianapolis, IN 46204
                                             Telephone:  317-237-0300
                                             Fax:  317-237-1000
                                             anne.ricchiuto@faegredrinker.com
                                             stephanie.gutwein@faegredrinker.com

                                             *Attorney for defendant Trustees of Indiana
                                             University*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 2, 2021, a copy of the foregoing was filed electronically.

Service of this filing will be made on all ECF-registered counsel of record by operation of the

Court's electronic filing system. Parties may access this filing through the Court's system.

            James Bopp, Jr.
            Richard E. Coleson
            Courtney Milbank
            Melena S. Siebert
            THE BOPP LAW FIRM
            1 South 6th Street
            Terre Haute, Indiana 47807

                        */s/ Anne K. Ricchiuto*

35