# EXHIBIT C

## Page 1

ROUGH DRAFT-UNCERTIFIED COPY

THE FOLLOWING FILE IS NOT AN OFFICIAL TRANSCRIPT. IT IS INTENDED ONLY TO AID IN CASE PREPARATION. THE FINAL TRANSCRIPT WILL BE DIFFERENT, BOTH IN FORM AND SUBSTANCE, FROM THIS ROUGH DRAFT TRANSLATION. YOU MAY SEE ERRORS AND OMISSIONS DURING THE REALTIME TRANSLATION  THIS IS NOT AN UNUSUAL PROCESS AND THESE ERRORS AND OMISSIONS WILL BE CORRECTED ON THE FINAL TRANSCRIPT.

UNOFFICIAL DRAFT TRANSCRIPT
THIS IS AN UNOFFICIAL DRAFT TRANSCRIPT!

This transcript has not been checked, proofread or corrected. It is a draft transcript, NOT a certified transcript. As such, it may contain computer-generated mistranslations of stenotype code, resulting in inaccurate or nonsensical word combinations, or untranslated stenotype symbols which cannot be deciphered by non-stenotypists. Corrections will be made in the preparation of the

## Page 2

1  ROUGH DRAFT-UNCERTIFIED COPY
2  certified transcript, resulting in differences in
3  page and line numbers, punctuation, and formatting.
4  THIS DRAFT TRANSCRIPT IS SUPPLIED TO YOU ON
5  THE CONDITION THAT UPON RECEIPT OF THE CERTIFIED
6  TRANSCRIPT, THIS DRAFT AND ANY COPIES THEREOF (IN
7  CONDENSED FORMAT OR OTHERWISE) WILL BE DESTROYED.
8  THE CERTIFIED TRANSCRIPT IS THE ONLY OFFICIAL
9  TRANSCRIPT WHICH MAY BE RELIED UPON FOR PURPOSES OF
10 VERBATIM CITATION OF TESTIMONY.

## Page 3

1           ROUGH DRAFT-UNCERTIFIED COPY
2           THE REPORTER: All parties to this deposition
3  are appearing remotely and have agreed to the
4  witness being sworn in remotely.
5           Due to the nature of remote reporting,
6  please pause briefly before speaking to ensure all
7  parties are heard completely.
8           Counsel will be noted on the
9  stenographic record.
10          Counsel, do you so stipulate to the
11 remote swearing in of the witness?
12          MS. SIEBERT: Plaintiffs' counsel does.
13          MS. RICCHIUTO: IU does.
14          (WHEREUPON, the witness was duly
15          sworn.)
16 BY MS. RICCHIUTO:
17     Q.   Hi, Margaret. My name is Anne
18 Ricchiuto. I'm a lawyer for IU and I'm defending
19 them in this lawsuit that you are one of the
20 Plaintiffs in.
21          The other note I want to make about
22 technical issues, I know you've already had one and
23 we all have them all the time. If anything else
24 happens, we will just kind of notify each other and
25 stay in touch and get connected back together as

## Page 4

1           ROUGH DRAFT-UNCERTIFIED COPY
2  quickly as we can. Does that work for you?
3      A.  Yep.
4      Q.  Okay. Is there anybody in the room with
5  you on your end?
6      A.  Yes. My stepmother.
7      Q.  Okay. Hello.
8          And that's just fine. We were -- we
9  were aware that that was a possibility.
10         The one thing I just want to say,
11 Margaret, is if there is a time that you want to
12 talk to her for some reason or talk to your lawyer,
13 I need you to tell me that.
14         And can you make a commitment that
15 you're not going to text or use any chat feature or
16 otherwise communicate with her while you're
17 testifying?
18     A.  Yes.
19     Q.  Okay. Have you ever had your deposition
20 taken before?
21     A.  I have not.
22     Q.  Okay. So, I'll briefly go over the
23 process. This is just some time for me to ask you
24 some questions and just learn a little bit more
25 about your position in this case.

Page 5

ROUGH DRAFT-UNCERTIFIED COPY

You understand you're under oath to testify truthfully today, correct?
A. Yes.
Q. And I will pose questions to you and I'll be interested in whatever your answers are to those. There aren't right or wrong answers. I'm just trying to understand what your view is.
Do you have any notes or documents there with you?
A. Nope.
Q. Okay. If you -- if I ask you a question and you don't understand it, which happens from time to time, I want you to tell me or ask me to rephrase it. If you answer a question that I ask you, I'm going to assume that you understood it. So, if you don't understand it, please let me know.
The Court Reporter is taking down what we say. You can't see her hands, but they are moving really quickly and so we need to help her out by making sure that our answers are audible. So, nods and head shakes and uh-huh and uh-uh, things that we would do in normal conversation, we have to try to make sure not to do because that makes Corey's job harder. So, if I ask you a

Page 6

ROUGH DRAFT-UNCERTIFIED COPY

question, I'm going to ask you to answer me audibly.
Does that work for you?
A. That works.
Q. Okay. The last thing I want to let you know is it's possible that your attorney will have an objection to a question that I ask you and that's just fine if she does.
For the most part you're going to go ahead and answer the question anyway unless she specifically instructs you not to. So, I just want to let you know that it's possible that she could have an objection and that's perfectly fine.
Will you please state your name for the record, Margaret.
A. My name is Margaret Roth.
Q. Tell me about the lawsuit that we're here to talk about today.
A. We are -- well, I'm personally objecting to getting the vaccine. I don't know what to say.
Q. Okay. That's okay. That's okay.
Is there anything else that you -- that caused you to want to be part of this lawsuit?
A. I wanted to be part of this lawsuit to

Page 7

ROUGH DRAFT-UNCERTIFIED COPY

defend other people's rights to not get the vaccine.
Q. Okay.
A. I wanted to protect my future health, my future ability to have children.
Q. Okay. We'll talk more about those things a little bit later.
How did you learn about the opportunity to be part of this lawsuit?
A. My father and my stepmother presented it to me and told me that it would be an option to pursue going to IU.
Q. Do you know how they found out about it?
A. Not specifically, no.
Q. Okay. Were they recommending that you become involved as a Plaintiff?
A. No. I volunteered.
Q. When you said it was an option to attend IU, what do you mean by that?
A. I mean that if we can't get this to go through that I will not be attending Indiana University.
Q. So, if your injunction is not granted, you will not attend starting in August?

Page 8

ROUGH DRAFT-UNCERTIFIED COPY

A. Most likely, yes.
Q. So, you might attend?
A. Can I speak to my lawyer?
Q. Not while a question is pending. I need you to answer the question and then you can talk to her.
A. Can you say that again then, please.
Q. Sure. I'm just trying to understand if the injunction is not granted whether you will attend IU in August or not.
A. If the injunction is not granted, then I will not be attending IU.
Q. Have you registered for classes already?
A. I have.
Q. Do you have living arrangements? What campus are you going to go to Margaret?
A. Bloomington.
Q. Do you have living arrangements signed up down there?
A. I have applied, but they haven't been released.
Q. Okay. So, is it your testimony that you will withdraw entirely from IU if the injunction is not granted?

Page 25

ROUGH DRAFT-UNCERTIFIED COPY

   A.  Yeah.
   Q.  To see if you thought you would qualify?
   A.  I didn't personally look into it, but my lawyers and my parents looked into it.
   Q.  And it sounds like your understanding is whatever the criteria are, you don't qualify for that. Is that accurate?
   A.  I believe so, yes.
   Q.  Okay. The next paragraph of your Complaint says, "Additionally, asthma runs in Miss Roth's family, so masks are also not an acceptable alternative."
      Do you have asthma, Margaret?
   A.  I do not have asthma that has presented.
   Q.  Have you ever been tested for asthma?
   A.  I don't remember.
   Q.  Which family members have asthma?
   A.  My father and my sister.
   Q.  And, so, on the basis of your father and your sister having asthma, is that the basis for your testimony or your allegation in the Complaint that masks are not a -- not something that you can wear or what do you -- what's your limitations with respect to masks?

Page 26

ROUGH DRAFT-UNCERTIFIED COPY

   A.  I mean, yes, there's the asthma portion, but there's also a psychological portion that accompanies it. If I were forced to wear a mask, then I would almost definitely be segregated against, I'd almost definitely be outcast, I would essentially be wearing a scarlet letter as they've been calling it and singling myself out.
   Q.  Okay. So, your concern -- I don't want to -- I want you to tell me. It sounds like you have a concern that if you wore a mask at IU, then you would potentially be treated differently. Is that what you're saying?
   A.  Yes.
   Q.  Where does that understanding come from?
   A.  It comes from personal experience. It comes from seeing posts about other people on social media. It comes from just how I view other people who wear masks or don't.
   Q.  Let's start with that. How do you view people who wear masks or don't?
   A.  I -- I can't really say anything specifically about that because everyone has their own view and their own situation.
   Q.  Okay. Well, you said that a factor for

Page 27

ROUGH DRAFT-UNCERTIFIED COPY

your concern that you'd be treated differently is how you view people whether or not they wear a mask, and I'm just trying to understand what that means.
   A.  I mean, it's -- my view has changed as the COVID pandemic has changed. I don't know.
   Q.  What did your view used to be about people that wear masks or didn't?
   A.  Well, my view has always been that it's sort of silly, but if I find out that they think it's protecting them, then that's good for them.
      I don't think anyone should be forced to a mask. There's been multiple studies that show that masks aren't completely preventative.
   Q.  Are there any studies that show that masks provide some preventative benefit?
   A.  I don't remember.
   Q.  Do you remember anything else about the studies that said that they don't provide a benefit or they don't provide I think you said a complete benefit?
   A.  Or benefit at all. I've seen a few studies that have said that, the particles of COVID-19 are too small and get through masks

Page 28

ROUGH DRAFT-UNCERTIFIED COPY

anyway.
   Q.  Okay. So, one of the factors that you gave me was how you view people. Another one was posts that you've seen that gave you the impression that you would be treated differently if you wore a mask at IU. Can you say more about what you meant by that?
   A.  Well, just being on social media as teenagers do, I've seen posts where people criticize and berate others for either not wearing masks or if someone is forced to wear a mask because they're not -- they haven't gotten the shot, people will also view them differently and almost attack them.
   Q.  Do people who do get the shot ever get attacked for having gotten the shot?
   A.  I suppose, yes, from others who -- yes.
   Q.  And then another factor that I think you said was your personal experience that these are factors that led to your concern that you might be treated differently at IU.
      Can you tell me about that personal experience that you were referencing?
   A.  That's just from hearing peers,

Page 29

ROUGH DRAFT-UNCERTIFIED COPY

classmates, co-workers, whoever, talk about others who are either not wearing masks or wearing masks and just saying how they would act if they interacted with that person I suppose.

Q. Did any of this experience happen at IU Bloomington campus?

A. No.

Q. When you see someone wearing a mask, are you able to tell if that person has been vaccinated or not?

A. No.

Q. When the sort of world shut down in March of 2020 last year, there were a lot of mask mandates and orders. Some were State, some were local.

Has there been any times since the pandemic started in March of 2020 that you have worn a mask for COVID purposes?

A. Yes.

Q. Can you tell me about those times?

A. I've been forced into wearing a mask because of the mandates and such, although I didn't want to.

Q. Can you give me some examples of where

Page 30

ROUGH DRAFT-UNCERTIFIED COPY

you've worn a mask?

A. In school, at my work.

Q. Ever go shopping?

A. Yeah.

Q. When you go into a business that requires masks, do you wear one?

A. If I have to, yes. Otherwise I'll do online orders or online shopping.

Q. Well, have you ever gone to a store that had a sign on the front that said masks required and not worn a mask in that store?

A. I don't remember.

Q. Do you go or did you -- I guess you're a grad now. Did you go to public school or private school?

A. Private.

Q. Were you guys on hybrid or full time? How much time were you wearing a mask for school during the school year last year?

A. Our schedule changed a lot. We went from hybrid to all online, back to hybrid, in person, hybrid. It was all over the place.

Q. Did you have to wear a mask any time you were at the school building?

Page 31

ROUGH DRAFT-UNCERTIFIED COPY

A. Yeah.

Q. About how often was that?

A. I mean --

Q. Understanding that it changed, but let's say like a hybrid week, how much would you be at school?

A. It would be 14 to 21 hours about.

Q. In a week?

A. In a hybrid week.

Q. Okay. Where do you work?

A. I work at an ice cream store.

Q. How often do you do that?

A. Three to five times a week.

Q. How long have you had that job?

A. A little over two years.

Q. Did you work three to five times a week even during the school year?

A. No.

Q. Those are kind of summer hours?

A. Yes.

Q. What about during the school year?

A. During the school year I worked about once a week.

Q. And are you required to wear a mask

Page 32

ROUGH DRAFT-UNCERTIFIED COPY

while you are working at the ice cream store?

A. Yes.

Q. Do you wear a mask while you're working at the ice cream store?

A. Most of the time.

Q. Have you ever considered quitting that job so you didn't have to wear a mask?

A. Yes.

Q. But you're still employed there?

A. Yes.

Q. Okay. So, school, work, shopping. Anywhere else that you can think of that you've worn a mask in the last year?

A. Not really, no.

Q. Have you been harmed by that mask wearing?

A. What do you mean by that?

Q. Have you experienced any physical harm as a result of wearing a mask at school, work and shopping?

A. I guess I could say just general overheating, a little bit difficulty to breathe.

Q. Do those things happen every time you wear a mask?

Page 33

ROUGH DRAFT-UNCERTIFIED COPY

2  A. Yes.
3  Q. Have you tried different kinds of masks
4  to see if anything worked better for you?
5  A. What kinds of different masks do you
6  mean?
7  Q. Well, I don't know. If there were
8  something that had a different material that didn't
9  make you as hot or other things to accommodate
10 these experiences that you've had.
11 A. Then, yeah, I've tried different
12 materials.
13 Q. Other than what you told me earlier
14 about your concern that you might be treated
15 differently at Bloomington if you wear a mask, are
16 there other ways that you believe that you will be
17 harmed by wearing a mask at Bloomington?
18 A. I don't know specifically.
19 Q. Another part of your Complaint, and this
20 is in paragraph 211, and again if it doesn't ring a
21 bell, it's totally fine for you to look at it. It
22 says, "Nor is repeated exposure to the carcinogenic
23 chemicals on the nasal testing swabs, especially
24 with her family history of cancer."
25    And I want to ask you about the nasal

Page 34

ROUGH DRAFT-UNCERTIFIED COPY

1  testing swabs. So, what's your understanding of
2  what carcinogenic chemicals are on nasal testing
3  swabs?
4  A. I don't know specifically, but I know
5  that it's substances that are potentially
6  carcinogenic, and I don't want that introduced into
7  my body.
8  Q. And how do you know? You said you know
9  that. How do you know?
10 A. Know what exactly?
11 Q. That there is something potentially
12 carcinogenic on the swabs.
13 A. From -- I guess I don't know
14 specifically.
15 Q. Do you remember when you heard that or
16 where you heard that?
17 A. No.
18 Q. Has a physician ever told you that the
19 testing swabs are potentially carcinogenic?
20 A. Not personally.
21 Q. What do you mean by that?
22 A. I have never had a doctor tell me face
23 to face.
24 Q. Have you had a doctor tell you some

Page 35

ROUGH DRAFT-UNCERTIFIED COPY

2  other way?
3  A. No.
4  Q. Has anyone ever told you that being
5  tested for COVID will increase your risk for
6  cancer?
7  A. I've been told that there is a potential
8  risk.
9  Q. And who told you that?
10 A. My parents.
11 Q. Do you know where they got -- how they
12 learned that information?
13 MS. SIEBERT: Objection; hearsay. You can go
14 ahead and answer, though, Margaret.
15 BY THE WITNESS:
16 A. From their own research and -- yeah,
17 from their own research.
18 Q. Have your parents ever been tested for
19 COVID?
20 A. I don't know.
21 Q. Have you ever been tested for COVID?
22 A. No.
23 Q. If you were to be tested for COVID in
24 some way other than with a nasal swab, would you
25 have the same concern about being tested for COVID?

Page 36

ROUGH DRAFT-UNCERTIFIED COPY

2  A. I don't know.
3  Q. Let's do some hypotheticals. What if
4  you could be tested for COVID using a blood test?
5  A. I don't know, but that just seems
6  excessive.
7  Q. What if you could be tested for COVID by
8  some kind of -- seeing something that's on the palm
9  of your hand?
10 A. I don't know.
11 Q. Well, does that seem harmful to you?
12 Would you have the same concerns about harm?
13 A. It just depends on what it is.
14 Q. What about if you could be tested for
15 COVID using your saliva?
16 A. I don't know.
17 Q. Well, it sounds to me like your concern
18 about the swab is the swab's contact with your
19 body. Is that part of what you're concerned about
20 with the swab?
21 A. Yes.
22 Q. So, if you could be tested for COVID in
23 a way where no testing implement had contact with
24 your body, would you feel that that was a less
25 risky way to be tested?

Page 41

ROUGH DRAFT-UNCERTIFIED COPY

2 the mandate. And first I want to ask you what do
3 you mean by the mandate there?
4   A.  By the mandate, is that what you said?
5   Q.  Yeah, let me read it to you just so you
6 can have it. This is the sentence. This is in
7 paragraph 213 of the Complaint.
8        "Miss Roth also has a sincerely held
9 religious objection to IU's mandate."
10       And I --
11  A.  I believe that's in reference to the
12 vaccination mandate. Sorry for interrupting.
13  Q.  No. I am here to hear from you. So,
14 thank you for that answer.
15       So, you have a sincerely held religious
16 objection to receiving the COVID vaccine or being
17 required to receive the COVID vaccine or is it
18 something else?
19  A.  Can you repeat that?
20  Q.  I just want to understand what is your
21 objection specifically to?
22  A.  It's an objection to being mandated to
23 receive something that possibly contains aborted
24 fetal cells.
25  Q.  Okay. Where does the understanding come

Page 42

ROUGH DRAFT-UNCERTIFIED COPY

2 from that -- do I take it that you believe that the
3 vaccine may have some kind of aborted fetal cells
4 or you tell me what's your understanding about
5 that?
6   A.  From what I understand, it's possible
7 that one is produced using aborted fetal cells and
8 it's possible that one has aborted fetal cells
9 directly in it.
10  Q.  Do you know which ones those are?
11  A.  No.
12  Q.  Have you ever tried to find out?
13  A.  No.
14  Q.  Are you aware that there's three kind of
15 generally available vaccines in the U.S.?
16  A.  Yeah.
17  Q.  So, you described two. Does that mean
18 that there's a third that you don't have a
19 religious objection to?
20  A.  I don't know.
21  Q.  Well, do you have a religious objection
22 to all three of the COVID vaccines?
23  A.  I have a religious objection to the
24 possibility that there's aborted fetal cells in it
25 and if it's in one, then it's completely possible

Page 43

ROUGH DRAFT-UNCERTIFIED COPY

2 that it's in another no matter if it's hidden or
3 not. And I don't want that in my body.
4   Q.  If you were to learn that there was no
5 fetal cells involved in the production of the
6 vaccine or actually in the vaccine, would you still
7 have a religious objection to it?
8   A.  I don't know.
9   Q.  Was there any other basis for your
10 religious objection other than these potential
11 cells?
12  A.  I don't know.
13  Q.  Based on the objection that we just
14 talked about, did you file for religious exemption
15 from being vaccinated to attend IU Bloomington?
16  A.  No.
17  Q.  Why not?
18  A.  Because if we filed for the religious
19 exemption then I would still have to wear a mask
20 and submit to testing.
21  Q.  If you filed for the religious exemption
22 and it were granted, are you aware that you would
23 not have to get the vaccine?
24  A.  Yes.
25  Q.  Do you have plans to seek an exemption

Page 44

ROUGH DRAFT-UNCERTIFIED COPY

2 so that you don't have to get the vaccine?
3   A.  I don't know.
4   Q.  Well, it sounds like you qualify for
5 one. Do you agree with that?
6   A.  Yes.
7   Q.  But you haven't filed for one, correct?
8   A.  That's correct.
9   Q.  But you could, correct?
10  A.  Yes.
11  Q.  Your objections to masking and testing,
12 are those religious objections or are those
13 objections based on something else?
14  A.  Can you say that again?
15  Q.  Sure. I think we've established that
16 you have a sincerely held religious objection to
17 receiving the COVID vaccine. Do you agree with
18 that?
19  A.  Yes.
20  Q.  Or at least the COVID vaccines that do
21 or may contain cells or tissue that are of concern
22 to you, correct?
23  A.  Correct.
24  Q.  And you've also told me some reasons why
25 you have concerns about mask, wearing a mask and