**United States District Court**
**Northern District of Indiana**

| | |
|---|---|
| **Ryan Klaassen, Jaime Carini, D.J.B.**, by and though his next friend and father, Daniel G. Baumgartner**, Ashlee Morris, Seth Crowder, Macey Policka, Margaret Roth,** and **Natalie Sperazza**, | |
| *Plaintiffs*, | **Civ. No.   1:21-cv-238-DRL-SLC** |
| *v.* | |
| **The Trustees of Indiana University**, | |
| *Defendants*. | |

# Reply in Support of Plaintiffs' Motion for Preliminary Injunction

**Prelim. Inj. Reply**                               i

# Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [-1-](#)

I. Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [-2-](#)

II. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [-4-](#)
    A.    Students Have Challenged All Parts of IU's Mandate . . . . . . . . . . . . . . . . . . . . [-4-](#)
    B.    Students Have Standing to Challenge IU's Mandate . . . . . . . . . . . . . . . . . . . . [-5-](#)
    C.    IU's Mandate Should Be Preliminarily Enjoined. . . . . . . . . . . . . . . . . . . . . . . [-9-](#)
        1.    Students Will Likely Succeed on the Merits of
             Their Constitutional Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [-9-](#)
            a.    IU's Mandate Violates the Rights of Students Under the Due Pro-
                cess Clause of the 14th Amendment. . . . . . . . . . . . . . . . . . . . . [-10-](#)
                i.    The U.S. Supreme Court Now Requires Normal
                      Scrutiny Appropriate to the Context. . . . . . . . . . . . . . [-11-](#)
                ii.    The IU Mandate Is Unconstitutional Under Current
                      Strict Scrutiny Requirements. . . . . . . . . . . . . . . . . . . . . [-15-](#)
                iii.    IU's Mandate Is Unconstitutional Under *Jacobson*'s
                      Exception and Modern Rational Basis Review. . . . . . . [-16-](#)
        2.    Students Have Irreparable Harm If IU's Mandate
            Is Not Enjoined. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [-18-](#)
        3.    The Balance of Equities Favors a Preliminary Injunction. . . . . . . . . . . [-19-](#)
        4.    The Public Interest Favors a Preliminary Injunction. . . . . . . . . . . . . . [-19-](#)

III. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [-20-](#)

**Prelim. Inj. Reply**              ii

## Introduction

IU claims enormous power over its students. This is manifest in numerous ways in its Response, some spoken and others unspoken. First, IU never refers to or acknowledges that their students are almost universally *adults*, not children, and are entitled to all constitutional and decision making rights of every American adult citizen.

Second, IU claims the enormous power to force vaccination of its students, a severe requirement that no U.S. state or local government has imposed on anyone and no federal agency has recommended. We are not at the height of the COVID pandemic. In fact, we are at the end of it, and IU's Mandate is imposed on the least vulnerable to a COVID infection, by hundreds of times.

Third, IU believes that their policy is nearly unreviewable by the courts, even though they are the government coercing students into injecting a vaccine, with known and unknown risks, thereby violating their fundamental constitutional rights. They claim this power through a discredited and supplanted line of cases beginning with *Jacobson* in 1904, ending in *Buck v. Bell* in 1927. However, modern constitutional jurisprudence has since recognized constitutional rights it did not in and has established three levels of scrutiny unheard of then. The days of unreviewable deference to "experts," leading from forced vaccinations to forced sterilization is over.

Fourth, IU believes there are no rights involved when they virtually expel a student for resisting their coercive attempt to force a student to give up their constitutional rights to bodily integrity, to voluntarily consent to medical treatment, and to practice their religion, since the student "could just go to school elsewhere." In effect, IU claims authority to impose any unconstitutional condition of attendance at IU that they choose. Where does this end?

**Prelim. Inj. Reply**                                    -1-

IU must think that these powers never end, since IU asserts that the COVID pandemic has not ended and may never end, and, in any event, they have these powers regardless of any pandemic. But, under modern constitutional jurisprudence, government power waxes and wanes depending on the urgency of the situation and the justification for its measures.

As Justice Alito explained in *Calvary Chapel*, "[A]t the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules," "[b]ut a public health emergency does not give . . . public officials *carte blanche* to disregard the Constitution as long as the medical problem exists." 140 S. Ct. 2603, 2605 (2020) *(Mem. Op.)*. Rather, "[a]s more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights." *Id*. This is precisely what the Students are asking this Court to do here.

# I. Facts

IU does little to rebut Students' facts—which showed that IU's Mandate is unnecessary in light of current COVID circumstances; is contrary to FDA Emergency Use Authorization, modern medical ethics, and CDC recommendations, and actions taken by Indiana, relevant counties, and other public university; is imposed on the least vulnerable population; and poses significant risks to students and those who have previously had COVID. PI Mem., ECF 8-1, p. 8-18.

IU briefly discusses the history of COVID and the pandemic (PI Resp., ECF 21, p. 10-11), but does not show why IU's Mandate is necessary in light of *current* circumstances. Students do not dispute that COVID is a serious virus that has caused significant infections and injuries or that vaccinations are beneficial. Instead, Students have shown that, without any vaccination mandates, COVID is being controlled, the pandemic is virtually over, and the same concerns that may

have existed at the beginning of the pandemic no longer exist. *See* Declaration of Peter A. McCullough, ("McCullough Decl.), Ex 8, ¶¶ 13-20, 32-35; Compl., ECF 1, ¶¶ 111-148; PI Mem., ECF 8-1, 14-15. IU also does not show why IU needs to impose more extreme COVID requirements than imposed, or even recommended, by the CDC, FDA, Indiana, relevant counties, and all other public universities in the State, upon the least vulnerable population. PI Mem., ECF 8-1, p. 12-13.

IU notes that Governor Holcomb extended Indiana's public health emergency (PI Resp., ECF 21, 14), but fails to account for Governor Holcomb eliminating almost all restrictions and regulations associated with COVID, and certainly did not impose, much less mandate compulsory COVID vaccinations on anyone. 2021 *Ind. Exec. Order 21-16* (June 30, 2021), https://www.in.gov/gov/files/Executive-Order-21-17-Continuation-of-Limited-Health-and-Welfare-Provsions.pdf. Indeed, as of July 1, 2021, Governor Holcomb has rescinded all prior executive orders and the remaining provisions solely relate to licensing, registration of health care providers, insurance, who can administer COVID vaccinations, unemployment, and the like. *Id*. The current executive order has no mask requirement, testing requirement, or vaccine mandate, as IU has imposed on Students. *Id*.

In discussing the COVID vaccines (PI Resp., ECF 21, p. 12-13), IU fails to even mention that such vaccines have only been approved for Emergency Use under restrictions by the FDA, Compl., ECF 1, ¶¶ 44-55; PI Mem., ECF 8-1, p. 8-10, to acknowledge the significant risks of the vaccine, particularly to those in Students' age group, McCullough Decl, Ex. 8, ¶¶ 41-61 (detailing the vaccine risks to students), or to fully acknowledge the increased risk of vaccination for those who have already had COVID. *Id*. at 62-69 (detailing the vaccine risks for those recovered

**Prelim. Inj. Reply**                    -3-

from COVID).

While IU describes the CDC's and U.S. Department of Education's guidance for institutions of higher education (IHE), IU fails to mention that neither suggested *mandating* that students receive the vaccine. PI Resp., ECF 21, p. 14-15. Accordingly, IU only needs to recommend that students receive the vaccine to be in full compliance with this guidance. In sum, IU has not shown why IU's Mandate is necessary under *current* circumstances, as applied to college-aged students, in light of the benefits to them and the known and unknown risks.

## II. Argument

### A.    Students Have Challenged All Parts of IU's Mandate.

IU argues that "Plaintiffs have not challenged IU's masking or testing policies." PI Resp., ECF 21, p. 20-21. This is an inaccurate statement about Students' challenge, as Students challenged the entirety of IU's Mandate, not bits and pieces of it.

IU's Mandate is multifaceted. It requires *inter alia* that all students, faculty, and staff **(1)** receive one of the available COVID vaccines, **(2)** report their vaccination status, or **(3)** obtain an exemption and **(4)** comply with the Extra Requirements if such exemption is granted, or **(5)** be virtually expelled. These "Extra Requirements" include *inter alia* participating in twice a week COVID testing and mandatory face masks in public spaces. IU's Mandate also provides "strong consequences" for those who refuse the vaccine and do not receive an exemption, including being virtually expelled. *Id.* These are part and parcel of IU's Mandate.[1]

---

[1] Of course, IU lumps these various parts of IU's Mandate under a general "COVID-19 vaccine requirement" umbrella. On IU's website on COVID-19 is a "frequently asked questions" page, which includes a section entitled "COVID-19 vaccine requirement," which provides that vaccinations are required (*Indiana University*, COVID-19 FAQ, Ex. 8. at 3-4), the deadlines for such vaccinations (*id*. at 4), that students "will need to report" their vaccination status (*id*. at 4-5), that exemptions are available but extremely limited (*id*. at 5), the extra requirements that those

**Prelim. Inj. Reply**                              -4-

As shown, Students collectively referred to the entirety of the Mandate and all of its various requirements as "IU's Mandate"—including all parts, facets, requirements, and consequences. Students have challenged IU's Mandate broadly and their requested relief seeks a declaration and injunction of IU's Mandate broadly, not one single aspect of it. Accordingly, IU's argument fails.

**B.    Students Have Standing to Challenge IU's Mandate.**

IU argues that multiple Students lack standing. PI Resp., ECF 21, p. 22-23. As shown below, all Students have standing to challenge IU's Mandate.

IU is correct that, to establish standing, Students must show **(1)** they have suffered an injury in fact, **(2)** that is fairly traceable to the challenged action of IU; and **(3)** that it is likely that the injury will be redressed by a favorable decision. *Id.* p. 21-22. However, IU fails to acknowledge that, as long as one Plaintiff has standing, the Court need not consider whether other Plaintiffs do. *Horne v. Flores*, 557 U.S. 433, 446 (2009) ("Because the superintendent clearly has standing . . . we need not consider whether the Legislators also have standing to do so."); Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 189, n. 7 (2008) (stating that one petitioner had standing and "that there is no need to decide whether the other petitioners also have standing."); *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."). IU does not argue that Plaintiff Sperazza does not have standing, conceding her standing to bring this suit. PI Resp., ECF 21, p. 21-23. Given Miss Sperazza's standing, this Court need not consider whether the other Students

---

who receive an exemption will have to follow (*id.*), and the consequences for failing to get the vaccine (*id.* at 6). This is IU's "COVID-19 vaccine requirement," which Students call "IU's Mandate."

have standing.

Nevertheless, all the other Students satisfy the required elements. First, Students have suffered an injury in fact. All Students have alleged that IU's Mandate unconstitutionally impairs their Fourteenth Amendment rights. Specifically, Miss Roth is injured, Compl. ¶ 213, but IU argues that she does not have standing because she hasn't sought a religious exemption. (PI Resp., ECF 21, p. 23). But Miss Roth is not required to apply for an exemption that does not offer her the protection that she seeks. Indeed, her injuries will not be avoided by applying for the exemption, as she will still have to comply with the Extra Requirements—which she believes will put her health at risk and subject her to harassment, bullying, and targeting. Compl., ECF 1, ¶¶ 209-213; Margaret Roth Dep. 48:16 - 23. Miss Roth's situation differs from those in *Baer-Stefanov v. White*, 773 F. Supp. 2d 755 (N.D. Ill. 2011) and *Pucket v. Hot Springs Sch. Dist. No. 23-2*, 526 F.3d 1151 (8th Cir. 2008), as plaintiffs in those cases could have sought an exemption that would have completely alleviated their injuries. Here, no such exemption exists. If it did, Miss Roth would have applied for it. Miss Roth is injured by IU's Mandate and the religious exemption would do nothing to prevent that injury.

Students Carini, D.J.B., and Roth are also injured by IU's Mandate, because each has underlying medical conditions that make the vaccination contra-indicated, but they do no qualify for the extremely narrow medical exemption.[2] Miss Carini has been instructed by her attending physician that she should not get the COVID vaccine, because her current medications give her

---

[2]In Plaintiffs' opening brief, they mistakenly stated that Miss Carini and Miss Roth have both been refused medical exemptions. PI Mem., ECF 8-1, p. 34. In fact, neither have been able to apply for such exemptions. Miss Carini tried but was told she was unable to apply for such exemption because she had been granted a religious exemption. Carini Dep. 57:18 -22 (from ROUGH). Miss Roth has not applied for the exemption because, despite her significant family history and personal medical issues, she does not qualify for the exemption. Roth Dep. 26:11 - 13.

**Prelim. Inj. Reply**                    -6-

coverage from COVID, Carini Dep. 69:18 - 71:13. Plaintiff D.J.B. has natural antibodies and is therefore at risk if he obtains the COVID vaccine, and Ms. Roth's family history of cancer is a key factor in her refusal to take the COVID vaccine.

Students Klaassen, D.J.B., Carini, Morris, Crowder, and Policka are injured by IU's Mandate, since the religious exemption, which they have received, still subjects them to the Extra Requirements and is thus not a true religious exemption. *See* PI Mem., ECF 8-1, p. 32-33. Instead the so-called "religious exemption" labels students with a virtual Scarlet Letter; subjects students to harassment, bullying, and targeting; subjects them to harmful bacteria that accompany mask use, and takes substantial time away from their education in order to comply with the testing requirements. *Id.*

Plaintiff Carini is pursuing a Doctorate in Organ Performance and Literature and a Ph.D. in Musicology and, in order to complete her graduate program, she is required to perform at two separate organ recitals. Carini Dep. 22:14 - 15. Based upon her personal experience and observation, she knows that performing those recitals while masked will have an impact on her performance as organists use their whole bodies to perform. Just as athletes would have a difficult time performing at their best while masked (and are not required to do so while competing for IU), Ms. Carini will as well. This will negatively impact the education she has pursued her entire life. *See* Carini Dep. 15:6 - 8.

Plaintiff Policka is pursuing a degree in theater, and her primary focus is acting and the Extra Restrictions are "devastating" to her education. Policka Dep. 41:5 - 15. As an actor, wearing a mask has a huge impact on how she can interact with other actors and will put her at a distinct disadvantage to other student actors who will not. *Id.* This will negatively impact her educa-

tion and cause her harm.[3]

Plaintiffs here differ from those who challenged the Affordable Care Act (*see* PI Resp., ECF 21, p. 22) because, even with the exemptions, Students face serious consequences if they do not comply with the Extra Requirements. Those challenging the Affordable Care Act did not have standing because they fit into a safe harbor provision and were not subject to any restrictions or penalties. *Univ. of Notre Dame v. Sebelius*, Case No. 3:12CV253RLM, 2012 WL 6756332, (N.D. Ind. Dec. 31, 2012); *Zubik v. Sebelius*, 911 F. Supp. 2d 314 (W.D. Pa. 2012). Here, no such safe harbor exists, exempting Students from both the vaccination requirement and the Extra Requirements.

Second, this injury is caused by IU, which is the governing body and legal authority over the Students; and which is imposing and enforcing IU's Mandate.

Third, Students' requested relief—declaring IU's Mandate unconstitutional and enjoining its enforcement—will redress Students' harm. Allowing Students to attend IU without having to **(1)** obtain the COVID vaccine, **(2)** report their vaccination status, **(3)** comply with the Extra Requirements, or **(4)** comply with any of the other parts of IU's Mandate.

For the reasons above, all Students have standing to challenge IU's Mandate.

---

[3] In addition, many of the Students have experienced psychological harm that they have endured over the past year, including being "depressing," "isolating," and "like prison." *See, e.g.* Sperazza Dep. 50:6 - 11. Psychological harms such as these are no less impactful than physical harms and can lead to clinical depression and suicide. HHS.gov, *Does depression increase the risk for suicide?*, https://www.hhs.gov/answers/mental-health-and-substance-abuse/ does-depression-increase-risk-of-suicide/index.html#:~:text=Although%20the%20majority%20of%20people,the%20 severity%20of%20the%20depression. These Students have the reasonable belief that those psychological harms will continue if IU's Mandate is not enjoined and they have to comply with the Extra Requirements. Klaassen Dep. 46:22 - 47:10.

**Prelim. Inj. Reply**                                    -8-

**C.      IU's Mandate Should Be Preliminarily Enjoined.**

A party seeking a preliminary injunction must demonstrate (1) some likelihood of suc-

ceeding on the merits, (2) that it has no adequate remedy at law and will suffer irreparable harm

if preliminary relief is denied, (3) the irreparable harm the non-moving party will suffer if prelim-

inary relief is granted, balancing that harm against the irreparable harm to the moving party if

relief is denied; and (4) the public interest, meaning the consequences of granting or denying the

injunction to non-parties. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 - 12 (7th Cir.

1992) (internal citations omitted). The more likely the plaintiff is to win, the less heavily the bal-

ance of harms to the other parties and the public policy arguments for non-parties need to weigh

in the plaintiff's favor; the less likely a plaintiff is to win, the more need those factors must weigh

in the plaintiff's favor. *See Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018).

All four of these preliminary injunction factors favor Students. Therefore, Students' Mo-

tion for Preliminary Injunction should be granted.

**1.      Students Will Likely Succeed on the Merits of Their Constitutional Claim.[4]**

*Buck*'s forced sterilizations of disabled people stood on the pillar of *Jacobson*'s forced

vaccinations. *Jacobson*'s pillar rested in the foundation of the Progressive Era mindset that held

the "experts" in government should control policies with little to no judicial constitutional re-

view. IU wants to shore up not only the pillar of *Jacobson*, but it wants to cement the founda-

tional mindset that once gave the government such inordinate control that the US Supreme Court

Justice reached the horrifying conclusion that "three generations of imbeciles is enough." *Buck v.*

---

[4]Students agree Indiana's Vaccine Passport Law contains no private right of action and so they withdraw this claim. *See* Ind. Code § 16-39-11 *et seq.*

**Prelim. Inj. Reply**                                        -9-

*Bell*, 274 U.S. 200, 207 (1927). But constitutional questions of individual rights, bodily integrity, and religious freedom in the face of such government regulation has shifted significantly since the early Twentieth Century. This Court should apply modern constitutional jurisprudence, based on recognition of constitutional rights since *Jacobson*, not *Jacobson*'s antiquated analysis and disgraced progeny, which IU urges this Court to do.

> ### a.    IU's Mandate Violates the Rights of Students Under the Due Process Clause of the 14th Amendment.

Students allege that IU's Mandate violates Students' fundamental rights of personal choice, bodily autonomy, medical privacy, and religious convictions, by IU threatening a "loss of an education," if the student does not comply with its Mandate. PI Mem., ECF 8-1, p. 19. IU claims, however, that "none of these rights, even if recognized as fundamental in some instances, are implicated here," since "IU is not forcing Plaintiffs to receive a Vaccine against their will," because the students "can freely choose to accept or refuse a COVID19 vaccine . . . if she refuses, she will simply need to [go to school] somewhere else." PI Resp., ECF 21, p. 29, 31.

However, it is well established that "the government may not deny a benefit to a person because he exercises a constitutional right." *Regan v. Taxation With Representation*, 461 U.S. 540, 545 (1983). And here IU will withhold a benefit, an IU education, if a student exercises her constitutional rights. This principle "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (collecting cases).

Here, IU is coercing students to give up their right to bodily autonomy and free exercise of religion in exchange for the discretionary benefit of matriculating at IU. Even if "someone re-

**Prelim. Inj. Reply**                    -10-

fuses to cede a constitutional right in the face of coercive pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury," *id*. at 607, where the U.S. Supreme Court has "often concluded that denials of government benefits were impermissible under the unconstitutional conditions doctrine." *id*. at 606, even where there is "no entitlement to that benefit." *Id*. at 608. This is the situation here.

Strict scrutiny, therefore, should apply to the review of IU's Mandate because, under modern constitutional jurisprudence, an infringement on now-recognized fundamental rights of bodily integrity and religious freedom exist here by IU's conditional denial of benefits, seeking to coerce IU students into forfeiting their fundamental rights on the threat of virtual expulsion. Furthermore, IU's Mandate is also unconstitutional under the Fourteenth Amendment if this Court uses *Jacobson*'s exception or modern rational basis review. That is because IU's Mandate is unreasonable even in light of IU's legitimate government interest in public health..

> **i.      The U.S. Supreme Court Now Requires Normal Scrutiny Appropriate to the Context.**

Students established that the U.S. Supreme Court now requires normal scrutiny appropriate to the context, not the highly deferential, "no . . . function," little-evidence-required, analysis of *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), and that even *Jacobson* was not *carte blanche* for government restrictions in the name of public health. PI Mem., ECF 8-1, p. 21-29.

IU questions Students' use of the word "exception" to describe *Jacobson*'s exception to its general view that courts had "no . . . function" in reviewing legislative judgments, i.e., no "power in the judiciary to review legislative action in respect of a matter affecting the general welfare." *Id.* at 30-31; PI Resp., ECF 21, p. 24. Students made clear that this was the "exception" at

issue. PI Mem., ECF 8-1, p. 23. So no "authority" was required for that analytical label, as IU suggests. And *Jacobson did* follow its "no . . . function" analysis by sustaining the trial court's refusal to hear evidence disputing the legislature's choice, 197 U.S. at 30.

IU cites cases holding that requiring vaccinations to attend public schools is within the police power. PI Resp., ECF 21, p. 24-25. But every case cited there is pre-2020, i.e., before *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (per curiam), which did *not* apply *Jacobson*'s analysis. No cited authority is from a controlling jurisdiction, except *Zucht v. King*, 260 U.S. 174 (1922), but that case was based on *Jacobson*'s holding, *id*. at 176, and is before *Buck*, 274 U.S. 200. It is part of the Progressive Era mindset, before the establishment of substantial constitutional rights infringed by such laws, and is inconsistent with *Roman Catholic Diocese*. IU later cites two, nonbinding, post-*Roman Catholic Diocese* cases that "cited *Jacobson* in upholding mandatory school vaccination requirements." PI Resp., ECF 21, p. 27. But others have held that *Roman Catholic Diocese* requires normal scrutiny:

> Significant discussion has ensued regarding whether the 1905 Supreme Court decision, *USA v. Jacobson*, replaces the usual standards of scrutiny in the present case, and all cases challenging COVID-19 restrictions. 197 U.S. 11, 38 (1905). However, Justice Gorsuch's concurrence in *Roman Catholic Diocese of Brooklyn v. Cuomo*, informs the Court's analysis and instructs the Court to apply its usual tiers of scrutiny. 141 S. Ct. at 70 (Gorsuch, J., concurring) ("*Jacobson* hardly supports cutting the Constitution loose during a pandemic.").

*Plaza Motors of Brooklyn v. Cuomo*, No. 20-cv-4851, 2021 WL 222121, *5 (E.D.N.Y. Jan. 22, 2021); s*ee also Big Tyme Investments v. Edwards*, 985 F.3d 456, 470-71 (5th Cir. 2021) (Willet, J., concurring) (*Jacobson* displaced by *Roman Catholic Diocese*). And while the *existence* of police powers is undisputed, its *exercise* must be premised on a legitimate constitutional justification, which now turns on *evidence*, and the evidence here shows the exercise of that power is un-

**Prelim. Inj. Reply**                                   -12-

justified.

IU says "*Jacobson* remains good law" because, in the Seventh Circuit, "[l]ower courts may not 'declare a decision or doctrine of a higher court defunct' unless the court is 'certain or almost certain' that the decision would be rejected by the higher court if a case presenting the issue came before it.'" PI Resp., ECF 21, p. 25 (citation omitted). But that favors Students, so IU's contrary arguments fail. IU says "Chief Justice Robert's concurrence in *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020), and Justice Gorsuch's concurrence in [*Roman Catholic Diocese*] both make clear that *Jacobson* remains good law." PI Resp., ECF 21, p. 26. But as Students established, Justice Gorsuch noted that the unusual thing about *Roman Catholic Diocese* was that it required *normal* scrutiny levels instead of defaulting to *Jacobson*'s analysis, because *Jacobson* was *not* "a towering authority that overshadows the Constitution during a pandemic." PI Mem., ECF 8-1, p. 27 (citation omitted). And Justice Gorsuch noted that in *Roman Catholic Diocese* the Chief Justice downplayed his earlier citation of *Jacobson* in *South Bay*. *Id.* (citation omitted). So it *is* "certain or almost certain" that were *Jacobson* again brought before the U.S. Supreme Court in a case such as this, it would hold that *Jacobson*'s analysis has been displaced by normal scrutiny levels of current law.

IU attempts several distinctions of cases based on factual differences. PI Resp., ECF 21, p. 26-27. But those cases are cited for analytical points that don't turn on their unique facts, so saying they involved different facts establishes nothing analytically. Saying *Buck* involved involuntary sterilization, *Roman Catholic Diocese* involved restricted attendance, and *Calvary Chapel* also didn't involve mandatory vaccinations is meaningless. The *analysis* in those cases bears on

**Prelim. Inj. Reply**                    -13-

the present case.[5]

Regarding *Buck*, IU's assertions that (i) the U.S. Supreme Court hasn't expressly over-ruled *Buck*, (ii) *Buck* shows the breadth of the police power, and (iii) *Buck* and *Jacobson* are both viable manifestations of that police power is telling as to IU's own erroneous view of their *own* power. PI Resp., ECF 21, p. 26. So while the Supreme Court is applying modern evidence-based, non-deferential jurisprudence and not applying *Jacobson* in *Roman Catholic Diocese*, a COVID-restriction case, IU is clinging to their claimed *extreme* police power.

IU's assertion that "the Supreme Court has never explicitly repudiated *Buck*" is tell-ing—IU seems to support the proposition that this lack of explicit repudiation somehow means that *Buck*'s foundation in *Jacobson* should not be considered by this Court when deciding whether to apply *Jacobson*. Some cases are so repugnant, they need not be explicitly overruled in order to grasp the magnitude of the constitutional harm. As Chief Justice Roberts noted, *Korematsu*—the case that declared the forced internment of Japanese-Americans during World War II constitutional—was "gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—'has no place in law under the Constitution.'" *Trump v. Ha-waii*, 138 S. Ct. 2392, 2423 (2018) (quoting *Korematsu v. United States*, 323 U.S. 214, 248 (1944)* (Jackson, J., dissenting)).

IU, however, cites *Jacobson* and its progeny to say mandatory student vaccine is permit-ted *without* the existence of pandemic. PI Resp., ECF 21, p. 28. Some cases do hold that schools may require traditional, well-established, well-tested vaccines, to populations especially at risk,

---

[5]IU likewise factually distinguishes *Cassell v. Snyders*, 990 F.3d 539 (7th Cir. 2021), PI Resp., ECF 21, p. 27 n.6, though Students cited it for its recognition of the sea change wrought by *Roman Catholic Diocese*. PI Mem., ECF 8-1, p. 28.

**Prelim. Inj. Reply**                                         -14-

prophylactically, but that doesn't apply where not supported by the circumstances or the science. Blind deference to police power exercise is gone.

IU's expansive view of their own power is clear from their assertion that only the "policy-maker" gets to weigh *whether* the science supports their decision, citing *Jacobson*. PI Resp., ECF 21, p. 28. But that paternalistic power vanished with *Roman Catholic Diocese* and is wholly inconsistent with modern constitutional jurisprudence, which must be applied. And *Jacobson* itself said that the policy must actually advance public health, which mandates a weighing of the evidence under its exemption. IU's notion that they get to make the policy and courts can't weigh the circumstances and science against it is a relic of a long-gone era, akin to the now-rejected physician paternalism model of medicine.

In sum, IU is out of step with the times, on the wrong side of history, and its claim of unreviewable power based on *Jacobson* vanished with *Roman Catholic Diocese*.

### ii. The IU Mandate Is Unconstitutional Under Current Strict Scrutiny Requirements.

Strict scrutiny requires the government to prove its restriction to be narrowly tailored to the least restrictive means to further a compelling interest, and to do so by evidence. *See Roe v. Wade*, 410 U.S. 113, 155 (1973). Individual "liberty" interests requiring strict scrutiny have been repeatedly developed and affirmed by the Court's substantive due process jurisprudence since *Jacobson*—reaching a variety of cases that are founded in principles of personal choice and bodily autonomy. *See Griswold v. Connecticut*, 381 U.S. 479 (1965) (contraception); see also *Roe*, 410 U.S. 113 (abortion), same-sex marriage, *Obergefell v. Hodges*, 576 U.S. 644 (2015) (same-sex marriage), and *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261

(1990) (refusing medical treatment). These principles of bodily autonomy must apply first to humans at a fundamental level to control their own bodies before those rights could ever have been expanded to control their sexual and reproductive rights. Furthermore, coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to at least heightened scrutiny, if not strict scrutiny. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, n. 5 (1993).

IU states that its Mandate is "narrowly tailored to advance [the ends of preventing the spread of COVID]," but supplies no evidence or even analysis of exactly how it has accomplished the requisite tailoring. PI Resp., ECF 21, p. 32. IU does not merely recommend that IU students take the vaccine, it requires it for all non-exempted students. It does not allow IU students to pursue their education after deciding the risks of taking a vaccine under EUA outweighs the benefits they will receive, even if they agree to precautions such as social distancing and masking. It does not account for IU students who have natural immunity to COVID because of prior infection or who have medical conditions that mean that the COVID vaccination is contra-indicated. It does not account for the fact that virtually everyone on IU's campus, whether professors, staff, or students, and those in the Bloomington community, has the opportunity to take the vaccine, and to wear masks and social distance to protect themselves, if they want to. IU allows for one and only one option for IU students who do not qualify for its limited exemptions—take the vaccine or be virtually expelled from IU.

IU's Mandate does not pass the strict scrutiny that applies under current judicial standards and is unconstitutional under the Fourteenth Amendment.

**Prelim. Inj. Reply**                                    -16-

   **iii.**  **IU's Mandate Is Unconstitutional Under *Jacobson*'s Exception and Modern Rational Basis Review.**

   Students do not disagree with science. None of them denied COVID exists and that it can be a serious disease or stated that they don't think anyone should take the vaccine if they choose to. But all students have personal autonomy and bodily integrity and are rational adults who can evaluate the risks the vaccines pose relative to the risk of a COVID infection. They understand and have experienced the psychological, social, emotional, and educational difficulties masking requirements posed and will continue to pose. After carefully balancing these risks and benefits, they have chosen not to take the COVID vaccine.

   IU's Mandate does not take into account the current state of the COVID pandemic, the very low risks of COVID infection to college-age students, and the balancing of benefits and risks associated with the COVID vaccines, all of which are detailed in Dr. McCullough's report[6] and it does not account for natural immunity for those who have had COVID and who still have antibodies which protect them from getting and spreading COVID. In short, IU does not have sufficient factual support for the relationship between its Mandate and the purpose it purportedly serves.

   IU's Mandate is also contrary to the FDA's requirements of voluntary and informed consent for EUA of the COVID vaccines, and to modern medical ethics, upon which the FDA's requirement of voluntary and informed consent is based. Finally, IU's Mandate is also contrary to the recommendations of the CDC, the State of Indiana, the relevant Indiana counties, and other

---

  [6]Students' expert witness, Dr. Peter McCullough, has provided a well-sourced and data-supported report for this Court to consider. In contrast, IU has provided a declaration by Dr. Beeler that either makes broad statements unsupported by scientific citations or that are supported only by opinions of the CDC and FDA which anyone can read.

**Prelim. Inj. Reply**      -17-

public Indiana universities.

Finally, IU's Mandate does not have sufficient factual support for the relationship be-
tween its Mandate and the purpose it purportedly serves, does not take into account students who
have religious exemptions for the Extra Requirements, and subjects students with religious ex-
emptions to the real risk of ostracism and shaming based upon their visible and obvious Extra
Requirements. IU's Mandate does not account for students with natural COVID immunity due to
prior infection, but who still must be vaccinated.

Because of these reasons, and even under *Jacobson*'s exception and certainly under mod-
ern rational basis, IU's Mandate is unreasonable and unconstitutional.

### 2.    Students Have Irreparable Harm If IU's Mandate Is Not Enjoined.

IU's Mandate, which conditions the benefit of attending IU on students surrendering their
constitutional rights, fails under either strict scrutiny, *Jacobson*'s exception or rational basis re-
view. Therefore, Plaintiffs' constitutional rights under the Fourteenth Amendment have been vio-
lated. When such rights are violated, the harm is presumed irreparable. *See Ewell v. City of Chi-
cago*, 651 F.3d 684, 699 (7th Cir. 2011) (applying presumption to Second Amendment claim);
*see also Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r*, 194 F. Supp. 3d 818, 835
(S.D. Ind. 2016) (applying presumption to substantive due process rights).

While the overarching benefits Students seek—an IU education and the resulting benefits
obtained from that education—are discretionary and the Student here have refused to surrender
their constitutional right to IU's threats and coercion, it does not make the loss of their constitu-
tional rights any less irreparable. *See Koontz*, 570 U.S. at 605. Because IU has already violated
Plaintiffs' constitutional rights, these students have no adequate remedy at law. Therefore, they

**Prelim. Inj. Reply**                              -18-

will suffered irreparable harm by IU's Mandate.

### 3.    The Balance of Equities Favors a Preliminary Injunction.

Students' interests are personal and fundamental. They each have an interest in maintaining their ability to choose what to have injected into their own bodies, after carefully considering the risks and benefits, and protecting their free exercise of religion. IU's "choice" of taking the vaccine or being virtually expelled is coercion attached to a benefit and, as noted, is an unconstitutional condition. Students have an interest in avoiding the isolation, depression, anxiety, harassment, and social stigma connected with wearing a mask. Students have an interest in being able to effectively communicate with professors and other students as part of their education.

Of course, IU has an interest in taking reasonable measures to keep its students, faculty, and staff safe and healthy. PI Resp., ECF 21, p. 33. Given the current state of the pandemic, however, IU's interests can be protected without its Mandate, as absolutely everyone in the State of Indiana and throughout the United States is, save a few colleges and employers, employees, students, and staff have the option to get the vaccine, wear a mask, and practice social distancing—thereby protecting themselves from the virus. If such preventive measures work, as IU believes and Students agree, then there is no need to require students to get the vaccine to protect others, and it is against a fundamental tenant of medical ethics to force someone to do so.

Students personal interests in their bodily autonomy, religious liberty, medical treatment decision making, mental health, social well-being, and educational pursuits outweigh IU's interests in the collective at this stage of the pandemic.

### 4.    The Public Interest Favors a Preliminary Injunction.

IU argues that the public interest favors upholding IU's Mandate and that the Court

should consider the "safety and health of others." (PI Resp., ECF 21, p. 43), but this fails to account for the current state of the pandemic and that anyone can choose to protect themselves.

The current state of the pandemic does not justify IU's Mandate. Students have shown that COVID is being controlled, the pandemic is virtually over, and the same concerns that may have existed at the beginning of the pandemic no longer exist. McCullough Decl., Ex 8, ¶¶ 13-20, 32-35; Compl., ECF 1, ¶¶ 111-148; PI Mem., ECF 8-1, p. 14-15. In fact, the CDC reported the lowest number of cases since March 2020. McCullough Decl., Ex. 8, p. 6. The recent Indiana infection rate was just 3.1% and continues to decline daily. *Id*. at 6-7. No other state or county government or public university has a vaccine mandate and nearly all have rescinded their mask policies, including Indiana. Taking all of this together, it is clear that there is no need for IU's Mandate and the public is not served by such Mandate.

But even if this were not the case, IU's Mandate is not necessary to protect the health and safety of others. Anyone who is concerned about COVID can get the vaccine, free of charge, and protect their own health and safety. IU can decrease "the risk of transmission" by simply encouraging individuals to get the vaccine, like nearly all government bodies in Indiana. And if the vaccine works, as IU says it does, then unvaccinated persons pose no risk to the vaccinated. On the other hand, the loss of liberty caused by IU's Mandate is real and the public interest favors preservation of liberty, which will be lost if this Court does not enjoin IU's mandate.

The public interest weighs in favor of granting this injunction.

### III. Conclusion

For the foregoing reasons, Students respectfully ask this Court to grant a preliminary injunction against IU's Mandate.

**Prelim. Inj. Reply**                              -20-

Dated: July 6, 2021                               Respectfully Submitted,

                                                  /s/ James Bopp, Jr.
                                                  James Bopp, Jr., Ind. Bar No. 2838-84
                                                  Richard E. Coleson, Ind. Bar No. 11527-70
                                                  Courtney Milbank, Ind. Bar No. 32178-29
                                                  Melena S. Siebert, Ind. Bar No. 35061-15
                                                  THE BOPP LAW FIRM
                                                  1 South 6th Street
                                                  Terre Haute, Indiana 47807
                                                  Telephone: (812) 232-2434
                                                  Facsimile: (812) 235-3685
                                                  jboppjr@aol.com
                                                  rcoleson@bopplaw.com
                                                  cmilbank@bopplaw.com
                                                  msiebert@bopplaw.com
                                                  *Counsel for Plaintiffs*

**Prelim. Inj. Reply**                    -21-

## Certificate of Service

I hereby certify that a copy of the foregoing document was served on all counsel of record in this matter on July 6, 2021, via the Court's electronic filing system.

/s/ James Bopp, Jr._____