## Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

RYAN KLAASSEN, JAIME CARINI,              )
D.J.B., by and through his                )
next friend and father,                   )
DANIEL G. BAUMGARTNER,                    )
ASHLEE MORRIS, SETH CROWDER,              )
MACEY POLICKA, MARGARET ROTH,             )
and NATALIE SPERAZZA,                     )
                                          )
                  Plaintiffs,             )
                                          )  CASE NO.
          -vs-                            )  1:21-cv-00238
                                          )
THE TRUSTEES OF INDIANA                   )
UNIVERSITY,                               )
                                          )
                  Defendant.              )

DEPOSITION OF RYAN KLAASSEN
July 1, 2021

Remote oral deposition of RYAN KLAASSEN, commencing at 6:29 p.m., on the above date, before CORINNE T. MARUT, C.S.R. No. 84-1968, Registered Professional Reporter, Certified Realtime Reporter and Notary Public.

GOLKOW LITIGATION SERVICES
877.370.3377 ph / 917.591.5672 fax
deps@golkow.com

## Page 2

1   APPEARANCES
    All Parties Appearing Via Zoom Videoconference
2
3   ON BEHALF OF THE PLAINTIFFS:
4     THE BOPP LAW FIRM
       1 South 6th Street
5      Terre Haute, Indiana  47807
       812-232-2434
6      BY:  MELENA S. SIEBERT, ESQ.
            msiebert@bopplaw.com
7
8
9
10  ON BEHALF OF THE DEFENDANT:
11    FAEGRE DRINKER BIDDLE & REATH LLP
       300 North Meridian Street, Suite 2500
12     Indianapolis, Indiana  46204
       317-237-0300
13     BY:  ANNE K. RICCHIUTO, ESQ.
            anne.ricchiuto@faegredrinker.com
14
15
16  ALSO PRESENT:
17    JOHN KLAASSEN
18
19
20  REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
21
22
23
24

## Page 3

1              I N D E X
2   RYAN KLAASSEN                EXAMINATION
3     BY MS. RICCHIUTO..............  4
      BY MS. SIEBERT................ 44
4     BY MS. RICCHIUTO.............. 53
5
6
7              E X H I B I T S
8   KLAASSEN DEPOSITION EXHIBIT    MARKED FOR ID
9   No. 1   Signed Verification          14
10  No. 2   Verified Complaint for       35
            Declaratory and Injunctive
11          Relief

EXHIBIT 120

## Page 4

1       THE REPORTER:  All parties to this deposition
2   are appearing remotely and have agreed to the
3   witness being sworn in remotely.
4       Due to the nature of remote reporting,
5   please pause briefly before speaking to ensure all
6   parties are heard completely.
7       Counsel will be noted on the
8   stenographic record.
9       Counsel, do you so stipulate to the
10  remote swearing in of the witness?
11      MS. SIEBERT:  Plaintiffs' counsel does, yes.
12      MS. RICCHIUTO:  IU does.
13          (WHEREUPON, the witness was duly
14           sworn.)
15          RYAN KLAASSEN,
16  called as a witness herein, having been first duly
17  sworn, was examined and testified as follows:
18          EXAMINATION
19  BY MS. RICCHIUTO:
20      Q.  Hi, Ryan.  My name is Anne Ricchiuto.  I
21  am an attorney representing IU in this lawsuit.
22  Before we begin I just have a couple of more
23  reminders.
24      If any of us have technical issues while

Page 5

1  we're doing this in this interesting way today, can
2  we make a deal that we'll all, you know, try to get
3  back together as quickly as we can and get our
4  setups fixed and make sure that we can all hear one
5  another. We want everybody to be able to hear and
6  see everything. So, if you have a problem, you let
7  us know and we'll do the same.
8      Does that work for you?
9  A.  Yes, that works.
10 Q.  How old are you, Ryan?
11 A.  I am 19 years old.
12 Q.  Okay. And who is that that you have
13 sitting with you?
14 A.  This is my father.
15 Q.  What's his name?
16 A.  John Klaassen.
17 Q.  Okay. So, it's a little bit unusual for
18 you to have someone with you during your
19 deposition. We've agreed that that's acceptable
20 under the circumstances.
21     The only thing I want to ask you is that
22 if you feel like for some reason you want to talk
23 to your lawyer or your dad, I need you to tell me
24 that.

Page 6

1  I'm going to expect that you're not, you
2  know, texting or instant messaging or doing
3  anything that I am not aware of other than talking
4  to me and participating in the deposition.
5      Does that work for you?
6  A.  Yes, it does.
7  Q.  Okay. Have you ever had your deposition
8  taken before?
9  A.  I have not.
10 Q.  Okay. I'll briefly go over the process.
11 This is my opportunity to just ask some questions
12 and get a little bit better understanding of your
13 position in this case.
14     So, I know that it's a little bit
15 confusing because your dad is with you, but my
16 questions are for you and I'm interested in your --
17 your specific answers to the questions.
18     Do you have any notes or documents with
19 you?
20 A.  I do not.
21 Q.  Okay. If at any point I ask you a
22 question that you don't understand, which believe
23 me will happen, please let me know so that I can
24 try to ask you a better question. If you answer a

Page 7

1  question that I ask you, I'm going to assume that
2  you understood it.
3      Does that work for you?
4  A.  Yep.
5  Q.  And the other thing, for first-time
6  deposition givers, is we have got our intrepid
7  Court Reporter up here. At least for me she's on
8  the top of the screen. She is typing down what we
9  say.
10     We have to make sure that we do a good
11 job of speaking to each other audibly so that she
12 can get it down. So, nods and uh-huhs and things
13 that we would all naturally do make her job really
14 hard. I will remind you and you remind me, okay,
15 if we don't, if we are not speaking in a way that
16 she will be able to take it down.
17     Does that work for you too?
18 A.  It does.
19 Q.  The last thing before we get started
20 that I want to make sure that you know is that your
21 attorney from time to time may decide that she has
22 an objection to a question that I ask you. That's
23 perfectly fine. She is allowed to do that. When
24 she does that, generally you will still answer the

Page 8

1  question that's been asked unless she specifically
2  tells you not to. Okay?
3  A.  Okay.
4  Q.  Good job with the nod and then the
5  "Okay." You're a fast learner. It's odd to get
6  used to, for sure.
7      Ryan, what did you do to prepare to be
8  deposed this evening?
9  A.  I took part in a meeting with my lawyer
10 as well as I had my father help me prepare, like
11 come up with questions that might be asked of me so
12 I had them in mind.
13 Q.  Did you come up with answers that you'd
14 give if you got the questions that you thought you
15 might get?
16 A.  I did form general ways to go with it
17 because the questions won't be exact.
18 Q.  We'll see, right? Now I'm kind of
19 curious. I kind of want you to tell me like "That
20 was one we guessed."
21     MS. SIEBERT: I feel like we need a buzzer.
22     MS. RICCHIUTO: Right. Like "That was one."
23 BY MS. RICCHIUTO:
24 Q.  And you know what I forgot to have you

Page 9

1  do is state your name for the record.
2    A.  My name is Ryan Klaassen.
3    Q.  Klaassen, is that how you say it?
4    A.  Yep, Klaassen.
5    Q.  I'm so impressed by double vowels.  I
6  was like I can't wait to see how you say it.
7        Okay.  Tell me -- so, other than the
8  meeting with your lawyers, was that a Zoom meeting?
9    A.  It was on the --
10   Q.  Some kind of electronic?
11   A.  Yes.
12   Q.  Blue Jean?
13   A.  Blue Jean, yes.  That's what it was.
14   Q.  Jim likes Blue Jean.  I do know that.
15       So, other than that electronic meeting
16  you had with your lawyers, were there other
17  Plaintiffs present at that meeting?
18   A.  There were.
19   Q.  Have you ever talked to or met any of
20  the other Plaintiffs outside of that meeting or any
21  other meeting with your lawyers?
22   A.  I have not.
23   Q.  Tell me, do you know that other people
24  have been deposed in this case?

Page 10

1    A.  I haven't been told when other people
2  are -- have been taking their depositions.
3    Q.  Have you seen a transcript or a list of
4  questions that I've asked to other Plaintiffs?
5    A.  I have not.
6    Q.  Tell me about the lawsuit that we're
7  going to talk about this evening.
8    A.  Well, the lawsuit that's been formed has
9  multiple Plaintiffs.  I am the lead Plaintiff.  And
10  it is basically describing how the religious
11  exemption and how the extra requirements for
12  exemptions as well as some medical exemptions and
13  generally the policy that IU has enacted right now
14  is -- should not be continued and is illegal.
15       (Clarification requested by the
16        reporter.)
17   THE WITNESS:  Illegal.
18  BY MS. RICCHIUTO:
19   Q.  Okay.  Anything else you want to tell me
20  about the lawsuit that we're going to talk about
21  tonight?
22   A.  Not particularly.  I think I hit the
23  gist of it.
24   Q.  How did you come to be a Plaintiff?

Page 11

1    A.  Well, my -- I had -- I've never really
2  interacted with lawyers before or anything like
3  that.  So, initially it was my -- my dad who
4  brought it to Jim, and him and Jim kind of started
5  talking with me as well and we -- initially it was
6  my dad's idea because I'm still kind of becoming an
7  adult and I don't think, hey, I'm going to sue
8  somebody.
9        But this is my case and our case with
10  the other Plaintiffs as well, and that's kind of
11  how it came to be and -- yep.
12   Q.  So, when your dad brought the idea to
13  you, was it something that you were immediately
14  interested in doing, suing IU?
15   A.  Yeah, it was.  It's not something I
16  would like to have to do, but I feel it is
17  necessary in this circumstance.
18   Q.  Is there any significance to you
19  being -- you mentioned you're the lead Plaintiff.
20  Is there anything special or significant about
21  that?
22   A.  Jim hasn't told me anything about being
23  of any specific importance or anything.
24   Q.  Were you the first one signed up, do you

Page 12

1  know?
2    A.  I am not sure.
3    Q.  When you mentioned that your dad brought
4  the issue to Jim, I think you said, is Jim somebody
5  that your family knows?
6    A.  Not personally, but we have heard about
7  him from other cases he has done.
8    Q.  How have you heard about him?
9    A.  I guess other cases he's done.  He's
10  worked with other people.  Cases have gone to the
11  Supreme Court.  Just generally heard about them,
12  read about them, some fairly large rulings.
13   Q.  Can you give me any examples of a large
14  ruling?
15   A.  Nothing comes to mind at the moment.
16   Q.  How long ago was it that your dad
17  contacted Jim about this case?
18   A.  I don't know specifically.
19   Q.  Have you heard of an organization called
20  IU Families for Choice, Not Mandates?
21   A.  I have never heard of that.
22   Q.  Have you ever been involved in any other
23  litigation?  I think you said no, right?
24   A.  Correct.

Page 13

1  Q. Did you review the Complaint in this
2  case? That's the name for the document that sort
3  of starts the lawsuit.
4  A. I have reviewed that, yes.
5  Q. How many times have you reviewed it?
6  A. I went over it I think only once.
7  Q. Was that before or after it was filed?
8  A. It was after it was filed.
9  Q. Did you look at the exhibits to it?
10 Have you reviewed all the exhibits?
11 A. I did briefly look at them.
12 Q. When was that?
13 A. Probably -- I don't remember
14 specifically.
15 Q. Do you remember signing a document for
16 the lawyers to file with the lawsuit?
17 A. Not in my specific memory at this time.
18 Q. Okay. Do you have access to the
19 software that Melena would have sent you a link to?
20 A. I do. I don't think I got that, though.
21 What was it called?
22 MS. RICCHIUTO: We are going to go off the
23 record for a minute so we can get him set up.
24 MS. SIEBERT: Sure.

Page 14

1  (WHEREUPON, discussion was had off
2  the record.)
3  MS. RICCHIUTO: Back on the record.
4  BY MS. RICCHIUTO:
5  Q. Okay. So, Ryan, you have the exhibit
6  sharing platform pulled up in front of you, right?
7  A. I do.
8  Q. And do you see an Exhibit 1 there in the
9  folder?
10 A. I have it pulled up already.
11     (WHEREUPON, Klaassen Deposition
12     Exhibit No. 1 was marked for
13     identification: Signed
14     Verification.)
15 BY MS. RICCHIUTO:
16 Q. Okay. So, that's a document that says
17 "Verification" on the top. Have you seen that
18 document before?
19 A. I have, and I do recognize that
20 signature. That's definitely mine.
21 Q. Okay. So, you -- you wrote your name
22 there on the top and then signed your name there at
23 the bottom?
24 A. Correct, I did.

Page 15

1  Q. What does that document mean? Why did
2  your lawyers have you sign that?
3  A. I was -- I had to sign it because I had
4  to verify that I have to tell the truth when I am
5  called to testify.
6      I have to obviously tell them I am a
7  resident of Indiana and -- and I have to verify
8  that there are penalties -- that I understand that
9  there are penalties if I lie under oath.
10 Q. Okay. It looks like it's dated June the
11 16th. I will just tell you that the lawsuit was
12 filed on June 21. And you told me that you
13 reviewed the lawsuit after it was filed, right?
14 A. I did.
15 Q. So, you signed this document at a time
16 when you had not yet reviewed the lawsuit. Is that
17 correct?
18 A. That is correct.
19 Q. You are -- am I -- do I have this right,
20 are you an incoming sophomore, Ryan?
21 A. That is correct. I am an incoming
22 sophomore.
23 Q. Did you live on campus last year?
24 A. I did.

Page 16

1  Q. Which campus do you go to I should say?
2  A. Bloomington.
3  Q. Are you planning to live on campus again
4  this fall?
5  A. I'm not.
6  Q. Where are you going to live?
7  A. I am planning to live off campus near
8  Bloomington.
9  Q. In a different city?
10 A. Off-campus apartments.
11 Q. Okay. So, in -- in Bloomington the
12 city, but off of the IU campus?
13 A. Yes.
14 Q. Are you going to be living with friends?
15 A. I am, yeah.
16 Q. Okay. Have you signed a lease for that?
17 A. I have.
18 Q. Are you registered for classes for the
19 fall?
20 A. I am, yes.
21 Q. What do you study? What kind of classes
22 do you take?
23 A. I am -- I am studying for a degree in
24 biochemistry.

Page 17

1  Q. That is way over my head. So, good for
2  you.
3      Does that mean you're kind of a science
4  guy? Are you into science?
5  A. Very much so.
6  Q. What do you like about science?
7  A. I've always really been into math, but
8  not as much -- I've never -- okay. I never really
9  liked English class as a child, so I kind of went
10 towards the more math, science way. And that's
11 just how I ended up.
12 Q. Ryan, have you been vaccinated against
13 COVID-19?
14 A. I have not.
15 Q. Do you have any plans to be vaccinated
16 against COVID-19?
17 A. Not at this time.
18 Q. Have you ever considered it?
19 A. I have considered it a great deal.
20 Q. What would change your mind and cause
21 you to get the vaccine?
22 A. A few more years of evidence as to the
23 effects of it.
24 Q. The effects of the vaccine on the people

Page 18

1  that take the vaccine. Is that what you mean?
2  A. That is correct. The possible effects
3  that we do not yet know.
4  Q. Okay. So, is there any circumstance
5  where you would get a COVID vaccine sooner than a
6  few years from now?
7  A. It is within a realm of possibility.
8  Q. What would need to happen for that to
9  take place?
10 A. Well, I said it is within a realm of
11 possibility. I don't know exactly what would need
12 to happen. But there are a few things. It would
13 have to be affirmed to me, and I am not completely
14 sure within a few-year time span which can or could
15 confirm or affirm those to me.
16 Q. Affirm what to you?
17 A. That it is completely safe and the risks
18 of the vaccine are well below the risks that I
19 would -- that would come to me if I encountered the
20 virus.
21 Q. Do you have an understanding right now
22 as to how you perceive those two risks compared to
23 one another?
24 A. I do have a relative understanding.

Page 19

1  Q. Can you tell me about that?
2  A. Right now for college-age people such as
3  myself or generally college-age people like myself,
4  people in the same group as me -- I know not all
5  people who go to college are my age.
6      But generally in my age group there is
7  very, very minimal risk to the virus itself to
8  those who are healthy, from what I understand.
9      And for the COVID-19 vaccine or vaccines
10 that are currently out right now, there seems to be
11 some doubt and insecurity about whether it is
12 perfectly safe for the human body to intake.
13 Q. Okay. I want to ask you some follow-ups
14 on that answer.
15     Who has doubt and insecurity about
16 whether it's safe?
17     MS. SIEBERT: Objection; speculation. Go
18 ahead and answer, though, Ryan.
19 BY THE WITNESS:
20 A. Of whom I know, many of my -- some of my
21 co-workers, friends as well as people I may know
22 that reside in other places.
23 BY MS. RICCHIUTO:
24 Q. Do you know any medical professionals

Page 20

1  who have doubt or insecurity about whether the
2  vaccine is safe?
3  A. I do.
4  Q. Okay. Who are those people?
5  A. I am not sure it would be right for me
6  to name them.
7  Q. Are they physicians that you know?
8  A. They are.
9  Q. And they have -- have they ever told you
10 anything about whether the COVID vaccine is safe?
11 A. They have never told me.
12 Q. Have you ever had -- how many people are
13 we talking about here?
14 A. One specifically that I know of and
15 others that I have heard about.
16 Q. How have you heard about the others?
17 A. I've heard about them online, sometimes
18 through the news media, through social media,
19 mostly.
20 Q. So, there's just one -- do I understand
21 you correctly there is just one physician that
22 you've talked to that's told you that there is
23 doubt and insecurity about whether the vaccine is
24 safe?

Page 21

1    A.  I have not talked to them personally.
2    Q.  Okay. I'm sorry. I thought you said
3  you knew somebody who --
4    A.  I knew of somebody.
5    Q.  Okay.
6    A.  If I didn't make that clear, I
7  apologize.
8    Q.  No, no. I might have misunderstood. I
9  might have misunderstood, Ryan. That's fine.
10       Is the medical professional that you're
11 thinking about, is he somebody that's involved in
12 the litigation?
13   A.  They are not.
14   Q.  Good job. It could be a woman. You got
15 me on that.
16       Okay. So, you also said that
17 college-age people are at very minimal risk from
18 getting sick from the virus. Where does that
19 understanding come from, Ryan?
20   A.  It comes from -- my understanding of
21 that -- of people in my age group, which I
22 clarified earlier, are at minimal risk to the
23 virus. It comes from CDC-recorded numbers, which I
24 believe are in the lawsuit and are an exhibit.

Page 22

1       Bless you.
2    Q.  Thank you. I got the audio off in time
3  so I didn't blow everyone ears off.
4       So, those CDC numbers, Ryan, those are
5  numbers that reflect what?
6    A.  I can't remember specifically at this
7  time.
8    Q.  Are they numbers about people in your
9  age group that have died from COVID?
10   A.  I can't recall specifically.
11   Q.  Are they numbers about people who in
12 your age group who have gotten -- have been
13 hospitalized as a result of COVID?
14   A.  As I said, I cannot recall specifically.
15   Q.  Well, I get to try to see if I can jog
16 your memory. So, you got to bear with me, Ryan.
17       Are they numbers about people in your
18 age group who have been infected with COVID?
19   A.  The possibility that it is one of those
20 questions or one of those is medium to high.
21   Q.  Do you know where you saw these numbers?
22   A.  I have seen them in a variety of
23 locations. I saw them on the CDC website as well
24 as in the lawsuit.

Page 23

1       (Clarification requested by the
2        reporter.)
3       THE WITNESS: The lawsuit.
4  BY MS. RICCHIUTO:
5    Q.  Have you done your own research about
6  the risks to people in your age group from
7  contracting COVID?
8    A.  I have.
9    Q.  Tell me about that research.
10   A.  Well, it was back probably when I -- not
11 probably. Definitely when I was -- it was
12 definitely during second semester of the 2020-2021
13 school year. So, just this past winter-spring,
14 somewhere in there.
15       I -- it was all online research that I
16 did. I've been through a few research papers as
17 well as the CDC website just searching all over
18 there for information, stuff that I could find and
19 calculate in my head.
20       I can't remember anything specific that
21 I did because it was so long ago.
22   Q.  What made you decide to do that
23 research?
24   A.  Well, there are a lot of different

Page 24

1  opinions on what has been going on and the dangers,
2  safeties, things that we can do to combat the
3  virus. There has just been a lot of dissenting
4  opinion on all of that.
5    Q.  Are you aware of, if you spent some time
6  on the CDC website, are you aware of what CDC
7  guidance is about vaccination for your age group?
8    A.  I have not been on the website that
9  recently to completely understand what the
10 recommendation is.
11   Q.  Do you know what CDC's conclusions are
12 about the risks to people in your age group from
13 getting the virus?
14   A.  From my understanding, it is very
15 minimal.
16   Q.  Do you know anything about the CDC's
17 conclusion about whether the vaccine is safe for
18 people in your age group?
19   A.  I don't know specifically.
20   Q.  I think you said that you have
21 co-workers. Where do you work, Ryan?
22   A.  I work for the Town of Shipshewana.
23   Q.  What do you do there?
24   A.  I work in the Streets Department as an

Page 25

1  intern.
2    Q.  Is that a summer position?
3    A.  It is.
4    Q.  Did you -- have you had any other jobs
5  before that?
6    A.  I briefly worked at a local grocery
7  store.
8    Q.  When was that?
9    A.  It was July and part of August while I
10 was in high school after my sophomore year, but I
11 don't remember what year that was.
12   Q.  Before the pandemic it sounds like?
13   A.  Yes, yes.
14   Q.  Okay.  When you go to work at the -- for
15 the Town of Shipshewana, are you going into an
16 office building or do you have outdoor duties?
17   A.  Well, since I work in the Streets, I
18 work outside most of the time.
19   Q.  Okay.  Are you required ever to wear a
20 mask in connection with that job?
21   A.  I am not.
22   Q.  Do you know -- do you live in
23 Shipshewana?
24   A.  I do not.

Page 26

1    Q.  Do you happen to know if Shipshewana
2  ever required masking at any time since March of
3  2020?
4    A.  At one point they did, yes.
5    Q.  Let's talk a little bit about your
6  personal experience with masks.
7        You were -- you started your freshman
8  year, if I have this right, sort of five or so
9  months into the pandemic.  Does that sound right?
10   A.  I did start some months after the
11 pandemic started, that is correct.
12   Q.  August of '20, is that when you started
13 college?
14   A.  Yes.
15   Q.  And did you live in campus housing last
16 school year?
17   A.  I started out as a freshman in campus --
18 on campus housing, yes.
19   Q.  Did you live in it for the whole school
20 year?
21   A.  I did.
22   Q.  What dorm?  Did you live in a dorm?
23 Where did you live?
24   A.  I lived in Forest Quadrangle.

Page 27

1    Q.  While you were at school between
2  August of '20 and I guess recently, May of '21,
3  were you required to wear a mask at IU?
4    A.  I was, in most places.
5    Q.  Where did you not have to wear a mask?
6    A.  Outside while I was by myself and/or
7  social distancing.
8    Q.  Did you experience any harm from that
9  experience of wearing a mask at Bloomington last
10 school year?
11   A.  Not while everyone else was wearing one,
12 no.
13   Q.  Okay.  What about testing, have you ever
14 been tested for COVID?
15   A.  I have.
16   Q.  How many times?
17   A.  I don't think I can estimate that right
18 at this moment.
19   Q.  Is that because the number is high?
20   A.  It -- it is because it has been
21 happening since during the pandemic, and that is a
22 while ago.
23   Q.  Do you remember the reason when you ever
24 had a first COVID test?

Page 28

1    A.  My first COVID test was up here at home
2  in preparation to go down to IU.
3    Q.  Okay.  Have you -- and then were your
4  other COVID tests while you were at IU?
5    A.  Yes.
6    Q.  Were they required by IU?
7    A.  Yes.
8    Q.  Have you ever had a COVID test that was
9  not required by IU?
10   A.  I may have.  I do not remember
11 specifically.
12   Q.  Let me see if we can help you.
13       Have you ever had a COVID test -- where
14 is home?  Where do you live, Ryan?  Just what city?
15 I'm not coming to your house.
16   A.  Rome City.
17   Q.  Okay.  So, have you ever had a COVID
18 test when you were in Rome City?
19   A.  While I was living here, yes.
20   Q.  Was that the test that you needed to go
21 down to IU or something else?
22   A.  That was the test I needed to take to go
23 down to IU.
24   Q.  Have you ever felt sick, thought you

Page 29

1  might have had COVID, and gotten a COVID test?
2      A.  No.
3      Q.  Have you ever had COVID?
4      A.  Not to my knowledge.
5      Q.  Have you ever had COVID symptoms?
6      A.  There are a wide variety of symptoms
7  that could be -- that could be portrayed as COVID
8  symptoms.  So, it is possible.
9      Q.  Has there been a time since March of
10 2020 where you specifically suspected that you had
11 COVID?
12     A.  No.
13     Q.  Has anyone in your household had COVID
14 since March of 2020?
15     A.  Yes.
16     Q.  Did that person or persons get tested
17 for COVID at that time?
18     A.  Yes.
19     Q.  And those tests were positive?
20     A.  Yes.
21     Q.  How many members of your household?
22     A.  Three.
23     Q.  How many people live there total?
24     A.  Four.

Page 30

1      Q.  So, it sounds like at that time, maybe
2  the rest of the people in your household tested
3  positive for COVID.  You did not.  Were you
4  residing with those three people at the time or
5  were you in Bloomington?
6      A.  They were not all at the same time.
7      Q.  Okay.  So, at different times three
8  people in your household have had positive COVID
9  tests.  Do I have that right?
10     A.  Yes.
11     Q.  Okay.  Did any of those positive COVID
12 tests occur while you were living in the home with
13 those other three people?
14     A.  Yes.
15     Q.  And did you get tested at that time?
16     A.  I did not.
17     Q.  Did you wear a mask in your home at that
18 time?
19     A.  I did not.
20     Q.  Did your family members who had been
21 diagnosed with COVID wear a mask in the home?
22     A.  I don't know because I was rarely ever
23 home.
24     Q.  Because you were at Bloomington or

Page 31

1  because you're just a busy guy when you're in
2  Rome City?
3      A.  I am currently a very busy guy at the
4  moment.
5      Q.  At the different times that the people
6  in your household had COVID, positive COVID tests,
7  did your family quarantine from others?
8      A.  Yes.
9      Q.  Does that mean that you stayed in your
10 house?
11     A.  I did stay in my house and they stayed
12 in the house.  Well, one of them had COVID while
13 they were not at home, and they did not return
14 until they were done with it.
15     Q.  Okay.  The tests that you had while you
16 were a student at IU for COVID that they required
17 you to have, how were those tests performed?
18     A.  They were a spit test where you would
19 spit in a vial up to a certain line and then you
20 would seal it, sanitize it and deposit it in the
21 tray after injecting a solution that I don't
22 remember what it was.
23     Q.  So, nothing for those tests, if I
24 understand them correctly, nothing goes like into

Page 32

1  your body, is that right?
2      A.  Correct.
3      Q.  Did you experience any harm as a result
4  of those number of COVID tests that are too many to
5  count?
6      A.  They're not too many to count I'm sure,
7  but I don't remember when or where all of them were
8  or how many there were at this moment.
9          And I blanked on your question.  What
10 was your question?
11     Q.  No, you were correcting me on something
12 else.
13         My question was, have you experienced
14 any harm as a result of those COVID tests?
15     A.  Physical harm, no.  You can argue that
16 it took a long time because there were a lot of
17 people in the lines, yet I had to walk there.
18 Testing facilities were not generally close to my
19 dorm.
20     Q.  Did you get to choose when you got
21 tested?
22     A.  I did.
23     Q.  Other than taking up time, any other
24 harm that you experienced as a result of being

Page 33

```
 1   COVID tested at IU last semester?
 2       A.   Nope.
 3       Q.   Or last year I should say.  Last school
 4   year.
 5       A.   Still no.
 6       Q.   You had -- sorry.  What did you say?
 7       A.   I said still no, just to clarify.
 8            (Clarification requested by the
 9            reporter.)
10   BY THE WITNESS:
11       A.   Still no, I have not.
12   BY MS. RICCHIUTO:
13       Q.   Ryan, the Complaint in this lawsuit, and
14   I'm happy to show it to you if you'd like to see
15   it, it alleges that you have a sincerely held
16   religious objection to receiving the COVID vaccine.
17   Is that accurate?
18       A.   That is accurate, yes.
19       Q.   And you have been granted a religious
20   exemption from taking the vaccine to attend class
21   at IU.  Is that correct?
22       A.   I have, correct.
23       Q.   So, you understand that that means that
24   you may move to Bloomington and attend classes in
```

Page 34

```
 1   person without being vaccinated, correct?
 2       A.   Correct.
 3       Q.   There are also allegations in the
 4   Complaint about, what it says, "extra requirements
 5   of masks and testing applied to him."  That's you.
 6   "He" -- and you can look at this document if it
 7   would help you.
 8            "He objects to these extra requirements
 9   given their unreasonableness and the extremely
10   minimal risk of COVID to those in his age group."
11            MS. SIEBERT:  Anne, I'm sorry.  Can I
12   interrupt?
13            MS. RICCHIUTO:  Yes.
14            MS. SIEBERT:  I don't see that exhibit.
15            MS. RICCHIUTO:  I didn't mark it, but I can.
16   BY MS. RICCHIUTO:
17       Q.   Ryan, would you like to see it?
18            MS. SIEBERT:  Would you mind just so he can
19   pull it up.
20            MS. RICCHIUTO:  Yes.
21            MS. SIEBERT:  Ryan, after she does this, you
22   may just have to hit refresh and then another
23   exhibit should pop up that you could open.
24            MS. RICCHIUTO:  And that will be Exhibit 2,
```

Page 35

```
 1   and that will be the Complaint.
 2            (WHEREUPON, Klaassen Deposition
 3            Exhibit No. 2 was marked for
 4            identification:  Verified Complaint
 5            for Declaratory and Injunctive
 6            Relief.)
 7   BY MS. RICCHIUTO:
 8       Q.   And we will want to look at -- you can
 9   look at any part of it that you want to, Ryan.  I
10   will tell you that the paragraphs that I'm looking
11   at that are specifically about you are on page 40,
12   and they are paragraphs 180 and 181.
13            You've seen this document before, I
14   gather?
15       A.   I have.
16       Q.   So, we just talked about the facts that
17   are contained in paragraph 180, that you have an
18   exemption for the vaccine; and then the paragraph I
19   was reading from is 181, that you object generally
20   to the extra requirements of masks and testing.
21            Are the objections that you have to
22   masking and testing, are those religious
23   objections?
24       A.   They're not.
```

Page 36

```
 1       Q.   Okay.  What are your objections to masks
 2   and testing at IU?
 3       A.   For the objection to masking, it
 4   would -- to me, it would be equivalent to putting a
 5   mark on me because I would be one of the only --
 6   not one of the only.
 7            I would be one of the minority of people
 8   wearing masks, and that would -- that would bring
 9   in a possibility of being discriminated against
10   because I have to wear a mask and that would let
11   people know that I have not been vaccinated.
12       Q.   How would it let people know that?
13       A.   I have a very unique physical signature
14   on my face.
15       Q.   Well, but IU doesn't have a prohibition
16   on people who are vaccinated wearing a mask, does
17   it?
18       A.   It does not.
19       Q.   So, you can't tell by looking at
20   someone, at Bloomington or anywhere, who is wearing
21   a mask whether they have or haven't been
22   vaccinated, can you?
23       A.   People like to assume.
24       Q.   What people?
```

Page 37

1   A.   Human race.
2   Q.   So, do I understand you to be testifying
3   that you believe that if you wear a mask in
4   Bloomington that people will assume that you're not
5   vaccinated?
6   A.   That is what I believe.
7   Q.   And then I think you said that there's a
8   possibility of what?
9   A.   Discrimination.
10  Q.   By whom?
11  A.   Those who assume that I am not
12  vaccinated, correctly so, and that I may be
13  harassed as a result.
14  Q.   Why would people assume that you're not
15  vaccinated?
16  A.   Because I have a mask on and most of the
17  people who have masks on -- I can't assume that.
18  But people with masks on at IU in the fall may be
19  assumed to not have the vaccine.
20  Q.   May be assumed by whom?
21  A.   Anybody on an IU campus at any moment in
22  time.
23  Q.   Okay.  And that you also may be assumed
24  to be somebody who's vaccinated but has a family

Page 38

1   member in a really high risk category.  Is that
2   also a fair assumption when you see somebody
3   wearing a mask?
4   A.   Can you repeat that?
5   Q.   I'm trying to think of other reasons.  I
6   think your testimony seems to be that everyone who
7   sees you is going to assume that you're not
8   vaccinated.  Is that your belief?
9   A.   Not everybody who sees me will assume I
10  am not vaccinated, but some people will most
11  likely; and there is a risk that goes with that
12  that I may be harassed because of it.
13  Q.   Why would someone harass you for not
14  being vaccinated?
15  A.   There have been instances of people -- I
16  can -- I don't recall specifically, but there have
17  been instances of people who have been harassed
18  because of not being vaccinated.
19       And there -- and there are some people
20  that believe everybody needs to be vaccinated and
21  are willing to harass people and annoy the heck out
22  of them until they get it.
23  Q.   Do you think it's fair, Ryan, that there
24  are also some people that believe that nobody

Page 39

1   should be vaccinated?
2   A.   I think that is a fair assumption, yes.
3   Q.   And that it's possible that those people
4   could harass other people who have been vaccinated?
5   A.   I suppose that is true, yes.
6   Q.   When you said that you're aware of
7   instances of people that have been harassed, are
8   those personal experiences that you've had?
9   A.   They are not.
10  Q.   Are they people that you know of
11  personally?
12  A.   They are not.
13  Q.   What are the instances -- where is the
14  information coming from in terms of instances of
15  people that have been harassed for not being
16  vaccinated?
17  A.   This is mostly things that I see online
18  while I'm perusing the World Wide Web.
19  Q.   Social media or something else?
20  A.   Social media.  I would like to say news
21  media as well, but I cannot say for sure on the
22  news media.
23  Q.   Who are you concerned is going to harass
24  you, Ryan?  Not like their name, Joe.  But like

Page 40

1   professors or the person at the lunch counter or
2   who are you concerned is going to harass you for
3   wearing a mask?
4   A.   I am not concerned they are going to
5   harass me for wearing a mask.  I am concerned they
6   are going to harass me because I am not vaccinated
7   and they assume that I am not vaccinated.
8   Q.   Okay.  Thank you for that clarification.
9       Who are you concerned could do that?
10  A.   I am concerned professors may do that.
11  I am concerned that some students may do that as
12  well and possibly other staff.
13  Q.   Is there a difference in your mind
14  between -- I think you said discrimination and
15  harassment.  Are those different or the same to
16  you?
17  A.   They are different but could be linked
18  together in some instances.
19  Q.   What kind of discrimination are you
20  concerned that you might experience from not being
21  vaccinated?
22  A.   Professors, albeit they shouldn't, might
23  slip in a bad grade here or there on a paper that
24  they grade.  Students -- that would be

Page 41

1  discriminatory.
2       Students might physically, emotionally
3  and on social media harass me for not being
4  vaccinated.  And the same for students goes for
5  other staff and even professors as well.
6     Q.   Were you subject to any discrimination
7  or harassment last year at Bloomington related to
8  COVID precautions?
9     A.   I was not.
10    Q.   Why do you have a concern that that
11 would happen this year?
12    A.   That is because much less people on
13 campus will be wearing masks, classes will be --
14 classes can be in person and will mostly be in
15 person, so you will have face to face with
16 professors, students alike, whether you make
17 friends with them or enemies.
18    Q.   Anything else?
19    A.   No.
20    Q.   Is there any other harm that you believe
21 you will experience if you wear a mask and have
22 COVID tests this fall at Bloomington?
23    A.   No.
24    Q.   What are your plans with respect to

Page 42

1  August if this injunction is not granted?
2     A.   I am unsure about that.
3     Q.   What does it depend on?
4     A.   I'd have to discuss it with my family on
5  what I might do.
6     Q.   Are you registered for classes?  I think
7  you said yes, right?
8     A.   Yes, I am registered for classes.
9     Q.   And you've got an apartment or some kind
10 of lease, right?
11    A.   Correct.
12    Q.   Are you considering withdrawing from IU
13 if this injunction is not granted?
14    A.   I am considering that.
15    Q.   If you did withdraw from IU, what would
16 you do instead?
17    A.   Since it is a bit late to be
18 transferring schools, at least in -- from my view,
19 from my point of view, I would find a job and work
20 until the next school year comes or maybe semester
21 and transfer to another school.
22    Q.   Would that be a school that doesn't
23 require masking or testing?
24    A.   Or the vaccine.

Page 43

1     Q.   Are you aware of schools that don't
2  require any combination of those things?
3     A.   I am.
4     Q.   Can you give me an example?
5     A.   Hillsdale College does not require the
6  vaccine, masking or asymptomatic testing.
7     Q.   So, is that something you've looked
8  into, other options?
9     A.   My family and I have been looking into a
10 few other options, yes.
11    Q.   But you might -- you might still go to
12 Bloomington as planned this fall, is that right?
13    A.   That all depends on the injunction and
14 the outcome.
15    Q.   Well, if it's -- if your injunction is
16 granted, I assume you're going.  Is that fair?
17    A.   That is the plan.
18    Q.   Okay.  And if the injunction is denied,
19 it sounds like you might go and you might not.  You
20 just don't know yet?
21    A.   Correct.
22       MS. RICCHIUTO:  Just give me one second, Ryan.
23       I think that can be all the questions
24 that I have for now, Mr. Klaassen.  Melena might

Page 44

1  have questions for you, and then I'll warn you if
2  she does, I probably do.  And it's a whole thing.
3       We never tell anybody to expect it,
4  Melena, but we just keep going.
5       MS. SIEBERT:  I know.  Surprise.
6       Ryan, I do just have a couple
7  follow-ups, and then we'll see where we go from
8  there.
9            EXAMINATION
10 BY MS. SIEBERT:
11    Q.   First, do you still have the Complaint
12 up in front of you, Ryan?
13    A.   I do, yes.
14    Q.   When you look at paragraphs 180 and 181,
15 are the facts that are stated in there in regards
16 to you, are they accurate?
17    A.   They are.
18    Q.   Do you recall looking either at these
19 specific paragraphs or discussing about the facts
20 in those paragraphs before this Complaint was
21 filed?
22    A.   I do.
23    Q.   Okay.  So, I'd like you, if you could,
24 to turn back to the verification page, which was

Page 45

1    Exhibit 1.
2        A.  Yep.
3        Q.  Okay.  And I just -- I want to clarify;
4    and if this is inaccurate, please just let me know.
5            Paragraph 3 of the verification, how I
6    interpret this is that you're verifying that the
7    factual statements in the Complaint that concerned
8    you are true and correct?
9        A.  Um-hmm.
10       Q.  Okay.  So, did you review those facts
11   that were in the Complaint before you signed this
12   verification form?
13       A.  I did.
14       Q.  Okay.  So, earlier when you testified
15   that you did not read the Complaint before it was
16   filed, what did you mean by that?
17       A.  I didn't personally read it, but both my
18   parents -- my parents had read it and had talked
19   with me about it.
20       Q.  Okay.  But you did read the facts that
21   regarded you?
22       A.  I did not physically read them before I
23   signed.
24       Q.  Okay.  But you knew what they -- you

Page 46

1    were told what they were.  Clarify for me what
2    happened there.
3        A.  My parents had read the document over a
4    few times at that point and they had discussed with
5    me what it meant for me and what I was -- what --
6    what went into the suit.
7        Q.  Okay.  So, you were comfortable at that
8    point that you could verify that those facts were
9    true?
10       A.  That is correct.
11       Q.  Okay.  All right.
12           MS. SIEBERT:  And bless you, Anne.  I saw you
13   sneeze again.
14   BY MS. SIEBERT:
15       Q.  Okay.  I just wanted to clarify that.
16   Thank you, Ryan.
17           Anne had asked you earlier about what
18   kind of harms you might have from the masks.  Do
19   you recall her asking you that, from wearing a
20   mask?
21       A.  I do.
22       Q.  Okay.  Do you think you would suffer any
23   psychological harms from wearing the mask?
24           MS. RICCHIUTO:  Objection; leading.

Page 47

1    BY THE WITNESS:
2        A.  I do think that is a possibility.
3    BY MS. SIEBERT:
4        Q.  Could you describe those or what the
5    possibilities might be there?
6        A.  Well, the biggest thing that comes to
7    mind is having trouble making social connections
8    with professors and students and staff down at IU.
9    It might become a barrier -- it might impose a
10   barrier between me and making connections.
11       Q.  Okay.  I believe you testified that most
12   of your classes that you're signed up for are
13   scheduled to be in person.  Is that true?
14       A.  That is correct.
15       Q.  For this fall semester?
16       A.  That is correct.
17       Q.  How do you think wearing a mask would
18   impact in-person classes for you personally?
19       A.  Well, having to wear a mask inside
20   brings about the possibility of discriminations and
21   harassments that I had put forth beforehand.
22           But one class specifically that I am
23   taking, marching band, that would have a huge
24   impact on what I could do because I would have to

Page 48

1    play an instrument and I can't do that with a mask
2    on.  Or it -- let me clarify.  It impairs my
3    ability to play.
4        Q.  What do you play?
5        A.  I play the trumpet.
6        Q.  That was what my husband played.  We met
7    in marching band in college.  So, you are talking
8    to a former band geek here.  So, good for you.
9            How does that even work?  Is there an
10   exception?  Do you play the trumpet through --
11   through the mask?
12       A.  Well, for what we did for the fall of
13   2020 is we started off by using those disposable
14   masks, not the fabric ones.
15       Q.  Okay.
16       A.  That -- and we would cut a slit into the
17   middle of them and put our trumpet through them.
18   It didn't seem very effective.
19       Q.  So -- I'm sorry.  So, the -- was it --
20   I'm so sorry.
21           So, is it your understanding that the
22   point of a face mask during the pandemic is that
23   they are supposed to slow the spread of a
24   respiratory virus?

12 (Pages 45 to 48)

**Page 49**

1  A. That is what has been told.
2  Q. Okay. Do you think that cutting the
3  slit in a face mask lessens the effectiveness of a
4  face mask in spreading -- a potential spread of a
5  respiratory virus?
6  A. Pretty much so.
7  Q. Okay. Over the past year, have you had
8  conversations with people about COVID in general at
9  IU?
10  A. I have.
11  Q. Okay. That was an assumption I think we
12  can make about everyone, but just thought I'd ask.
13       What would you say in general from your
14  observation is the culture and attitude on IU's
15  campus toward people who might share similar
16  beliefs to you or to your beliefs about COVID and
17  the masking effectiveness and the vaccines and all
18  of that?
19       MS. RICCHIUTO: Object to form, vague,
20  compound.
21       BY MS. SIEBERT:
22  Q. Okay. Let me try and make that a better
23  question, Ryan.
24       In general what would you say based upon

**Page 50**

1  your observations are the culture and attitude on
2  IU's campus about -- toward people who don't want
3  to wear a mask?
4  A. In general, it -- it's kind of -- it's a
5  split decision.
6       There are people who -- there are people
7  who absolutely rebuke anyone who doesn't -- or they
8  did in the 2020-2021 school year. There are people
9  that would absolutely rebuke anyone who didn't wear
10  a mask anywhere, even if it was outside by
11  yourself. There were certainly people who would do
12  that. And there were people who would do the same
13  thing if you did wear a mask outside.
14       But I think as we come into this
15  2021-2022 school year, one side of those, which is
16  the side of -- I'm sorry. I'm trying to think this
17  through in my own head right now.
18  Q. Please, take your time. You're fine.
19  A. I think the side of the spectrum where
20  people would rebuke you for anything if you did
21  anything without a mask at all would -- I -- I
22  firmly believe that they would come down on the
23  people who don't have their vaccines and would
24  harass and discriminate against them in the same

**Page 51**

1  manner.
2  Q. Do you have any problem with people who
3  choose to take the vaccine?
4  A. I have no issue. I have no quarrel with
5  anybody who decides to take it.
6  Q. Have you had any conversations or
7  observed a culture on IU specifically over the past
8  school year that leads you to believe that people
9  who choose to take the vaccine would be looked down
10  upon?
11       MS. RICCHIUTO: Object to form.
12       BY THE WITNESS:
13  A. Can you repeat that, please?
14       BY MS. SIEBERT:
15  Q. Have you observed anything -- I may be
16  rephrasing this.
17       Over the past year on IU's campus, have
18  you observed anything that would lead you to
19  believe that people who choose to take the COVID
20  vaccine will be looked down upon?
21  A. Not to my recollection.
22  Q. Have you observed anything on IU's
23  campus over the past year that leads you to believe
24  that people who choose or refuse to take the

**Page 52**

1  vaccine will be looked down upon?
2       MS. RICCHIUTO: Object to form.
3       BY THE WITNESS:
4  A. I have seen some notions that might lead
5  you to think that, yes.
6       BY MS. SIEBERT:
7  Q. Can you tell me a little bit more about
8  that?
9  A. Specifically in the marching band, the
10  Marching Hundred that I took part in last fall,
11  fall of 2020, there was a lot of -- there's a lot
12  of hesitancy to do anything without a mask on. We
13  all had to completely change the way they've done
14  things in the past just to be able to do what we
15  were doing.
16       And I know there have been some
17  interactions within the instrumental groups that --
18  of a person harassing someone or voicing their
19  opinion upon them saying that they don't want to
20  take the vaccine.
21  Q. Just out of curiosity, were you guys
22  able to march last year during halftime at football
23  games?
24  A. During halftime, no. We recorded our

Page 53

1  halftime shows.
2      Q.   Okay.  And then did they just play them
3  on like the Jumbotron or whatever during football
4  games?
5      A.   I never got to see it on there.  So, I
6  really don't know.
7      MS. SIEBERT:  Okay.  All right.  I don't have
8  any other non-band-related questions.  So --
9      MS. RICCHIUTO:  I just have a couple, and two
10 of them are band-related, so I'll start with those.
11             FURTHER EXAMINATION
12 BY MS. RICCHIUTO:
13     Q.   It sounds to me, Ryan, like there were a
14 bunch of changes last year to the way that -- the
15 way that marching band typically would operate.
16 Does that sound accurate?
17     A.   That does sound accurate.
18     Q.   Do you attribute those changes to
19 anything except for an unprecedented pandemic that
20 we were all trying to work through the best we
21 could?
22     A.   I believe that the choices that were
23 made were -- some of the choices that were made to
24 prepare for that were unprecedented with what we

Page 54

1  were facing at that point in the pandemic.
2      Q.   Let me ask it a different way.
3      I think you said something about they
4  changed the way that things were done with respect
5  to band.  Is that right?
6      A.   That is correct.
7      Q.   Were there any changes that were made to
8  the way that things are done that were not
9  attributable to just the existence of the pandemic
10 generally?
11     A.   It could be -- it -- it depends on
12 everybody's opinion.  It could be argued that there
13 were some changes that were attributed -- not
14 attributed to the pandemic, but you could argue the
15 opposite way as well.
16     Q.   Was band the only thing that changed for
17 you during the pandemic or did you experience
18 changes to other aspects of your life that you were
19 used to?
20     A.   Classes that I was taking became all
21 online, which is a form of teaching that I do not
22 like at all.
23     Band didn't change for me because I had
24 never participated in the Marching Hundred before

Page 55

1  as an incoming freshman at that point.  But it was
2  a change from what had happened in the past,
3  attested to by other members of the band that I had
4  talked to and gotten to know.
5          More of my life was spent at home during
6  the early stages of the pandemic.  I became less
7  active.
8          Marching band that I did in my high
9  school did change.  We didn't do any parades, and
10 we -- the Indiana State fair ended up being
11 canceled.  So, we could not participate in the Band
12 Day competition there as well.  That was canceled
13 partway through our marching band season.
14     Q.   And those differences that you
15 experienced last year, those are all attributable
16 to the existence of the pandemic, correct?
17     A.   Correct.
18     Q.   You said you were planning to take
19 marching band again this fall.  When you registered
20 for that class, were you asked whether you had been
21 or would be vaccinated before class starts?
22     A.   I don't recall.
23     Q.   You think you might have been asked
24 specifically in connection with your band

Page 56

1  registration whether you had been vaccinated?
2      A.   As I said, I don't recall.
3      Q.   Has anybody contacted you on behalf of
4  the band and said that you will not be able to
5  participate in the band if you do not get
6  vaccinated?
7      A.   Nobody has contacted me from the band
8  and said that.
9      Q.   Okay.  You talked about a concern that
10 wearing a mask could be a barrier to making
11 connections with others I think you said.  Do you
12 remember saying that to Melena?
13     A.   I do recall saying something similar.
14     Q.   Okay.  Last year when you were on campus
15 and you had to wear a mask, was that a barrier to
16 making connections with others?
17     A.   It was not because we all had to.  We
18 all had to wear masks.
19     Q.   So, you believe that your experience
20 wearing a mask this fall will be different from
21 your experience wearing a mask last fall.  Is that
22 correct?
23     A.   That is correct.
24     MS. RICCHIUTO:  I think that's all the

Page 57

1  questions that I have.
2      MS. SIEBERT: I don't have any more either.
3      (Time noted: 7:43 p.m.)
4      FURTHER DEPONENT SAITH NAUGHT

Page 58

1      I, CORINNE T. MARUT, C.S.R. No. 84-1968,
Registered Professional Reporter and Certified
Shorthand Reporter, do hereby certify:
2          That previous to the commencement of the
examination of the witness, the witness was duly
sworn to testify the whole truth concerning the
matters herein;
3          That the foregoing deposition transcript
was reported stenographically by me, was thereafter
reduced to typewriting under my personal direction
and constitutes a true record of the testimony
given and the proceedings had;
4          That the said deposition was taken
before me at the time and place specified;
5          That the reading and signing by the
witness of the deposition transcript was agreed
upon as stated herein;
6          That I am not a relative or employee or
attorney or counsel, nor a relative or employee of
such attorney or counsel for any of the parties
hereto, nor interested directly or indirectly in
the outcome of this action.

                    _____
                    CORINNE T. MARUT, Certified Reporter

        (The foregoing certification of this
transcript does not apply to any
reproduction of the same by any means, unless under
the direct control and/or supervision of the
certifying reporter.)

Page 59

        INSTRUCTIONS TO WITNESS

        Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.
        After doing so, please sign the errata sheet and date it.
        You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.
        It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 60

            - - - - - -
            E R R A T A
            - - - - - -

PAGE  LINE  CHANGE
____  ____  _____
        REASON: _____
____  ____  _____
        REASON: _____
____  ____  _____
        REASON: _____
____  ____  _____
        REASON: _____
____  ____  _____
        REASON: _____
____  ____  _____
        REASON: _____
____  ____  _____
        REASON: _____
____  ____  _____
        REASON: _____
____  ____  _____
        REASON: _____
____  ____  _____
        REASON: _____

Page 61

```
 1       UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF INDIANA
 2            FORT WAYNE DIVISION
 3
    RYAN KLAASSEN, et al.,      )
 4                              )
            Plaintiffs,         )
 5                              )  CASE NO.
        -vs-                    )  1:21-cv-00238
 6                              )
    THE TRUSTEES OF INDIANA     )
 7  UNIVERSITY,                 )
                                )
 8          Defendant.          )
 9                    AFFIDAVIT
10
           I, RYAN KLAASSEN, the undersigned
11   affiant, being first duly sworn, on oath say that
     the testimony given at my deposition at the time
12   and place aforesaid is the truth, the whole truth,
     and nothing but the truth, and that I have read the
13   foregoing transcript consisting of Pages 1 to 62
     inclusive, and do subscribe and make oath that the
14   same is a true, correct, and complete transcript of
     my deposition so given as aforesaid, and includes
15   changes, if any, so made by me.
16         FURTHER AFFIANT SAITH NAUGHT.
17
           _____
18
              AFFIANT, RYAN KLAASSEN
19
20   SUBSCRIBED AND SWORN TO before me
21   this   day of    , A.D. 20 .
22   _____
23   Notary Public
24
```

Page 62

LAWYER'S NOTES

PAGE  LINE

(blank note lines 3–24)