UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

RYAN KLAASSEN, JAIME CARINI, D.J.B., by and through his next friend and father, DANIEL G. BAUMGARTNER, ASHLEE MORRIS, SETH CROWDER, MACEY POLICKA, MARGARET ROTH, and NATALIE SPERAZZA,

Plaintiffs,

-vs-

THE TRUSTEES OF INDIANA UNIVERSITY,

Defendant.

CASE NO. 1:21-cv-00238

DEPOSITION OF D.J.B.
June 29, 2021

Remote oral deposition of D.J.B., commencing at 4:00 p.m. Central Standard Time, on the above date, before CORINNE T. MARUT, C.S.R. No. 84-1968, Registered Professional Reporter, Certified Realtime Reporter and Notary Public.

GOLKOW LITIGATION SERVICES
877.370.3377 ph / 917.591.5672 fax
deps@golkow.com

APPEARANCES
All Parties Appearing Via Zoom Videoconference

ON BEHALF OF THE PLAINTIFFS:
THE BOPP LAW FIRM
1 South 6th Street
Terre Haute, Indiana 47807
812-232-2434
BY: MELENA S. SIEBERT, ESQ.
msiebert@bopplaw.com

ON BEHALF OF THE DEFENDANT:
FAEGRE DRINKER BIDDLE & REATH LLP
300 North Meridian Street, Suite 2500
Indianapolis, Indiana 46204
317-237-0300
BY: ANNE K. RICCHIUTO, ESQ.
anne.ricchiuto@faegredrinker.com
STEPHANIE GUTWEIN, ESQ.
stephanie.gutwein@faegredrinker.com

ALSO PRESENT:
DANIEL BAUMGARTNER
LISA BAUMGARTNER

REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968

I N D E X

| D.J.B. | EXAMINATION |
|---|---|
| BY MS. RICCHIUTO | 4 |
| BY MS. SIEBERT | 45 |

E X H I B I T S

| D.J.B. DEPOSITION EXHIBIT | | MARKED FOR ID |
|---|---|---|
| No. 1 | Signed Verification | 9 |
| No. 2 | Verified Complaint for Declaratory and Injunctive Relief | 13 |

EXHIBIT 122

THE REPORTER: All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.

Counsel will be noted on the stenographic record.

Counsel, do you so stipulate to the remote swearing in of the witness?

MS. SIEBERT: We do. Plaintiff's counsel does.

MS. RICCHIUTO: We do.

(WHEREUPON, the witness was duly sworn.)

MS. RICCHIUTO: Thank you.

D.J.B.,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. RICCHIUTO:

Q. Hi, Daniel. My name is Anne Ricchiuto. I'm a lawyer for Indiana University that's defending them in this lawsuit, and I'm going to be

the one taking your deposition today.

The only thing that I want to make sure to add to the reporter's kind of technical comments is that if we have any issues that arise, if you lose us or we lose you or Melena loses us, we will all let one another know and try to get back together as quickly and as smoothly as we can.

As the reporter mentioned, your lawyer might want to interpose some objections to some of my questions and if she does that, that's fine. You will still need to answer the question unless she tells you not to.

Have you ever had your deposition taken before?

A. I have not, no.

Q. Okay. So, just briefly about the process, and this is -- it's an odd process and it's especially odd to do kind of on the computer from your house.

But you understand that you're under oath to testify truthfully today to the best of your ability, correct?

A. Yes.

Q. Okay. And I'm going to be posing

questions to you, and I'm interested in your answers to those questions. So, I know that it's a little bit confusing since your folks are with you, but your answers are the ones that I'm interested in.

Do you have any notes or documents with you?

A. Yes.

Q. Okay. Are those notes that you created or that someone created for you?

A. My parents helped me with them.

Q. Okay.

MS. RICCHIUTO: Melena, we'll want to request a copy of those notes.

MS. SIEBERT: Okay.

MS. RICCHIUTO: Okay.

BY MS. RICCHIUTO:

Q. If you make any other notes, Daniel, while we are talking today, I just need to let you know -- I need you to let me know so that your lawyer can give those to me as well.

I'm going to try to ask clear questions that make sense for you to answer. If you don't understand my question, I want you to tell me. If

you answer the question, I'm going to assume that you understood it. Can we agree on that?

A. Yes.

Q. Okay. And then the other thing that's really hard is we know that we have the reporter and she can only take down things that she can hear. So, we have to do a good job of making sure that we're answering audibly, and I can help you or Melena can help you, you know. Shrugs or uh-uhs or um-hmms, the things that we all say naturally just don't transcribe very well. So, we'll try to work as a team to make sure that we get answers on the record that we can use going forward.

Now, I understand that you and your dad have the same first and last name, is that right?

A. That is correct.

Q. Okay. And your lawyer and I I think have agreed that I can call you Daniel during this deposition. Is that okay with you? Are you comfortable with that?

A. That's all right, yeah.

Q. Okay. Will you please state your name for the record.

A. D.J.B.

Q. How old are you, Daniel?

A. I'm 17.

Q. When do you turn 18?

A. July 11.

Q. What is your understanding of your involvement in this lawsuit?

A. To my understanding, I am -- I have been given a religious exemption, and I'm looking to get an exemption for mask and COVID testing.

Q. Okay. Who is the party to this lawsuit as far as you know? Is it you or your dad?

A. My father.

Q. Okay. How did you become aware that there was going to be a lawsuit suing Indiana University?

A. My parents informed me after contacting the law firm.

Q. Did they -- do you know, did they contact Mr. Bopp's firm specifically?

A. They did, yes.

Q. Okay. Whose idea was it to participate in the lawsuit? Was that something that you wanted to do or something that your parents want to do?

A. We all agreed on it.

Q. Okay. I want to show you a document, if I can pull it off, Daniel. Let's see. This will be our first test.
MS. RICCHIUTO: Do you have -- do they have, Melena, the exhibit portal up?
MS. SIEBERT: They were sent a link.
Do you have that up, Daniel, the link to the exhibit portal that I sent to you all?
THE WITNESS: I do not have it up now, no.
MS. SIEBERT: If you could just --
MS. RICCHIUTO: No problem.
MS. SIEBERT: -- get that up. We can give you a couple minutes. That's no problem.
Sorry to interrupt, Anne.
MS. RICCHIUTO: No, that's no problem.
THE WITNESS: We got it up.
(WHEREUPON, D.J.B. Deposition Exhibit No. 1 was marked for identification: Signed Verification.)
BY MS. RICCHIUTO:
Q. Okay. So, do you see a verification page that's got kind of some blue writing across the top?

A. Yes.
Q. Okay, great.
MS. RICCHIUTO: Melena, do you have that too? Are you able to get that?
MS. SIEBERT: I do.
BY MS. RICCHIUTO:
Q. So now we are all looking at the same document.
Is this a document that you've seen before, Daniel?
A. I don't know.
Q. Okay. Is that your handwriting on it? There is a printed name at the top and a signature at the bottom. Is that your handwriting and signature or is that your dad?
A. I'm not sure. It looks like my father's.
Q. Okay. That's fine. Do you have any understanding of what this verification does or means? This is something that was filed with the court in this case.
A. Yes.
Q. You do have an understanding of what it means?

A. Yes.
Q. Okay. What does this verification page mean?
A. That I have to answer to the best of my knowledge and understanding.
Q. Okay. This is a document that was filed -- I'll -- this is not meant to be -- this is not meant to be a quiz, so I'll just give you some context, Daniel.
This is a document that was filed with the Complaint, which is the document that kind of starts the lawsuit on behalf of you and some others against IU. And people who are filing a lawsuit that's called verified, they typically sign a document like this to say that the things that are about them in the lawsuit are true.
And, so, what I think this document does is say that your dad has verified that the information about you that's in the lawsuit that we'll look at is all true. But it sounds like at least this piece of paper, what didn't -- isn't necessarily something that you were involved with. Is that right?
A. That is correct.

Q. Yeah. And that's just fine. I'm just -- today is just a day for me to get some information. So, we're -- that's all I'm trying to do is just understand.
Have you read the Complaint in this case, the actual lawsuit document?
A. I have.
Q. Okay. Have you -- did you review all the exhibits to it?
A. I did.
Q. Okay. Do you know, if I asked you if you agree if everything in the Complaint is accurate, would you be able to answer that?
A. Yes.
Q. You agree that everything in the Complaint is accurate?
A. I do.
Q. And is your answer to that question limited to information about you or you agree that everything in the whole 254 paragraphs is correct?
A. I believe that it is all correct.
Q. Okay. You are an incoming freshman, is that right?
A. That is correct.

Q. Okay. Have you registered for your classes yet?
A. I have, yes.
Q. What are you going to be studying?
A. I was planning on studying business.
Q. Okay. Do you have a dorm assignment or living arrangements organized yet?
A. Nothing was assigned yet.
Q. Okay. Daniel, have you been vaccinated against COVID-19?
A. I have not.
Q. Whose decision was it for you not to be vaccinated against COVID-19?
A. It was my own.
Q. Do you have plans to get vaccinated in a couple weeks when you turn 18 or thereafter?
A. I have no plans on getting vaccinated.
Q. Okay. I'm going to show you one other document if I can. I think if you refresh that website, you will see one more document pull up.
(WHEREUPON, D.J.B. Deposition Exhibit No. 2 was marked for identification: Verified Complaint for Declaratory and Injunctive

Relief.)
BY MS. RICCHIUTO:
Q. And do you see at the top where there is the numbers like page 1 of 55, kind of in the left-hand corner?
A. Yes.
Q. Okay. We're going to be going to page 42. So, you can either type 42 in that box or you can scroll down to page 42. But we're looking for the allegations starting with the one numbered 196.
A. I got it.
Q. Okay. Are we together?
MS. RICCHIUTO: Melena, are you good?
MS. SIEBERT: I am.
MS. RICCHIUTO: Okay, great.
BY MS. RICCHIUTO:
Q. These paragraphs 196 through 200 of the Complaint that's been marked as Exhibit 2, and you can -- you're welcome to look at any part of the document. This is the part I'm going to focus on. But this is the lawsuit that was filed by your lawyers on your behalf, yours and others.
Paragraphs 196 through 200 are

specifically about you. You're referenced as Mr. D.J.B. or Plaintiff D.J.B. in this document.
Have you seen these specific paragraphs before?
A. I have, yes.
Q. Okay. And are they accurate?
A. They are accurate, yes.
Q. Okay. And one of the things that they say in paragraph 196 is that you sought and were granted a religious exemption to the vaccine, right?
A. That is correct.
Q. Do you see that?
A. That is correct, yes.
Q. Very briefly, can you just explain the basis of your religious objection to the vaccine.
MS. SIEBERT: Anne, I'm going to object to this line of questioning as any kind of State involvement into the basis for religious exemption would be unconstitutional.
Daniel, you may go ahead and answer.
BY THE WITNESS:
A. I have a moral conscience given to me by God telling me that I do not need a vaccine because

I have natural antibodies.
BY MS. RICCHIUTO:
Q. Okay. Then if we move on to paragraph 197, there is a reference to some extra requirements applied to you. Do you see that reference, Daniel?
A. I see that, yes.
Q. Do you have an understanding of what extra requirements are being referenced in that paragraph?
A. I do.
Q. Okay. And what are those?
A. Wearing a mask at all times on IU property and being tested for COVID two times a week.
Q. Okay. And it says that you also have a sincerely held religious objection to those two requirements. Is that accurate?
A. That is correct.
Q. Is that religious objection the same as the one that you just identified or is it something different?
MS. SIEBERT: Anne, I'm going to object again to that line of questioning because of the same

constitutional basis.

Daniel, you may answer.

BY THE WITNESS:

A. It is the same.

BY MS. RICCHIUTO:

Q. Okay. Do you attend any kind of house of worship, Daniel?

A. Yes.

MS. SIEBERT: Again, Anne, I'm going to object to this specific line of questioning.

Daniel, you may answer this -- this question.

BY MS. RICCHIUTO:

Q. And I'm just looking for, if it helps, I'm just looking for a yes or a no. I don't need to know what it is or what religion it is.

A. Yes.

Q. Okay. Did you visit that -- that physical location in person during 2020 at all?

A. Yes.

Q. Okay. About how many times?

A. I don't know.

Q. Was it closer to monthly, closer to weekly, closer to daily?

A. Monthly.

Q. Was there ever a time that that house of worship required masking since the pandemic started in March of 2020?

MS. SIEBERT: Anne, I'm going to object to this line of questioning again, first, on constitutional basis and, secondly, because whatever his house of worship requires has nothing to do with what IU may or may not require.

Daniel, I'll let you go ahead and answer this question. But I would state that too many more questions about his specific religious practices will not be answered.

BY MS. RICCHIUTO:

Q. And, again, I'm not asking a question about your religious practices, Daniel. I'm just asking if the physical location where you exercise your religion, whether they had any masking requirements since March of 2020.

A. Yes.

Q. Do you -- do you have any idea when those were implemented?

A. I don't know.

Q. Do you have any idea if those are still

in place today?

A. I don't know.

Q. Okay. Were there times that you physically attended this location and wore a mask?

A. Yes.

Q. Were there other times since March of 2020, without regard to your house of worship or other places that you might exercise your religion, that you have worn a mask specifically related, you know, not Halloween, but specifically related to the COVID-19 pandemic?

A. There were times I didn't have to.

Q. Okay. I'm trying to understand your mask wearing practices and experiences since March of 2020.

Like, for example, my parents live in Illinois. I know the orders there have been pretty stringent.

Have there been times since March of 2020 that you have worn a mask at any location?

A. Yes.

Q. Can you give me some examples of places that you have worn masks?

A. In school, at stores, two main examples.

Q. Have you, for example, flown on an airplane?

A. Yes, I have.

Q. Did you have to wear a mask to do that?

A. Yes, I did.

Q. Okay. Do you attend a public school or private school for high school? Did you I guess I should say.

A. Private.

Q. Private. Okay. And were you required to wear a mask at all times while you were at school?

A. They had a rule, yes.

Q. And did you comply with it?

A. I did.

Q. Okay. So, stores, schools. So, schools every day or were you on hybrid?

A. We were hybrid for the first semester.

Q. Okay. So, if I were trying to get a sense of how often since March of 2020 you have worn a mask, how would you help me identify that? Is it every time you left the house, something else?

A. It was not every time I left the house,

no.

Q. Is it -- sorry. Go ahead.

A. In school they required masks around once a week. The stores required masks. That was basically it.

Q. So, schools, stores and your place of worship are all places that you wore masks or have worn masks since March of 2020. Does that sum up your testimony?

A. That is correct.

Q. Okay. Anywhere else that you can think of that you have worn a mask to protect yourself or others from COVID-19 since 2020?

A. Nothing primarily, no.

Q. Okay. You -- the Complaint says, if we turn back to the -- to the document, paragraph 198, Daniel, which is on the next page there, it says, "Mr. D.J.B.," that's you, "recently had a COVID antibody test which revealed that he still has antibodies."

Do you see that?

A. I do, yes.

Q. I want to ask you about that. When was that recent COVID antibody test?

A. It was in the beginning of June.

Q. Okay. What was the result of that test?

A. The result showed that I still had COVID antibodies.

Q. And when you say "still," tell me what you mean by that.

A. That my body successfully fought off COVID and I have the antibodies.

Q. Was there another time before the beginning of June that you had a COVID antibody test?

A. There was not, no.

Q. Okay. Your early June COVID antibody test, did it tell you what level of antibodies you have?

A. I'm not sure, no.

Q. Do you have any understanding of what level of antibodies you need to be immune from COVID?

A. I don't know.

Q. Do you have any understanding of how long COVID antibodies last in the human body?

A. I don't know.

Q. Do you have any religious objections to

COVID antibody tests?

A. I do not.

Q. What was the reason that you got an antibody test in early June?

A. To see if I had the natural antibodies for COVID.

Q. Was it just something you were curious about or was there a reason that you were interested in that information?

A. My mother wanted to see if I had natural antibodies for COVID.

Q. And I assume you got that test at some sort of medical facility, is that right?

A. That is correct.

Q. And then as a result of that test, the Complaint says that you filed a medical exemption at IU, which is a separate exemption from the -- from the religious exemption. Is that right?

A. Yes, that is correct.

Q. Okay. And that exemption was not granted the Complaint says, is that right?

A. That is correct.

Q. Okay. What is the basis of your understanding that you do not need to be vaccinated

if you have antibodies?

A. I have a moral conscience that has been given to me by God telling me that I do not need the vaccination.

Q. Okay. I just want to make sure that I understand that answer. Does that answer depend upon whether or not you have antibodies, Daniel?

A. I'm not sure what you're asking.

Q. Okay. That was not a very good question. So, I'm glad you said that.

Earlier we talked about -- I think I got a similar answer to the question about just kind of generally what your objection was to receiving the vaccine, and now I'm trying to understand what your understanding is of why you wouldn't need to be vaccinated if you have antibodies.

A. I believe that I do not need the COVID vaccine because my moral conscience tells me that I have the antibodies and I do not require the vaccine.

Q. Okay. Is there anything else besides your moral conscience that your understanding that you don't need the vaccine is based on?

A. Can you please rephrase your question.

Q. Sure. Let's take a look at your Complaint. And it says in 200 -- I just want to make sure that you -- that I'm doing a better job with my questions.

In paragraph 200 it said, the second sentence says, "He objects to these extra requirements as they are not necessary since he already has natural antibodies."

Do you see that?

A. I do, yes.

Q. And that's what I'm trying to understand. What is the basis for that understanding, that masking and testing are not necessary because you have natural antibodies?

A. I believe that I do not need the COVID vaccine or to wear a mask or to be tested because I have natural antibodies and according to my moral conscience tells me I don't need them because of that.

Q. Has a physician told you that you don't need or any medical professional told you that you don't need to mask or be tested because of your antibodies?

A. No medical professional has directly

told me that, no.

Q. Has any medical professional told you that you would not benefit from receiving the COVID vaccine because of your antibodies?

A. No one has told me that, no.

Q. Okay. Have you had COVID in the past, Daniel?

A. Yes, I have.

Q. Do you know how many times?

A. I've had it one time.

Q. When was that?

A. I'm -- I don't know.

Q. Was it in 2020 or 2021?

A. 2020.

Q. How did you know that you had it?

A. Because it showed up on the antibody test.

Q. Okay. So, you just learned in June of 2021 that you had had COVID in 2020. Is that -- do I understand your testimony right?

A. That is correct.

Q. Did you have any -- have you ever had a COVID test?

A. I have not, no.

Q. Did you know that you had COVID at the time that you apparently had COVID?

A. I believed I did.

Q. Okay. So, tell me if I'm -- if I'm getting this right. I don't want to put words in your mouth.

Was there a time in 2020 that you thought you might have had COVID but you just didn't get tested to confirm that?

A. That is correct.

Q. Okay. Were you experiencing symptoms that have been known to be associated with COVID?

A. Yes, I was.

Q. Okay. And that was sometime in 2020?

A. Correct.

Q. So, without knowing at the time whether you actually had COVID, we get to June of 2021, and I think you said your mom wondered if you had antibodies, is that right?

A. That is correct.

Q. Do you know why she was interested in whether you had antibodies in June of 2021?

MS. SIEBERT: It looks like they might have frozen up, Anne.

MS. RICCHIUTO: I think you might be right.

(WHEREUPON, there was a short interruption.)

THE REPORTER: Back on the record.

MS. RICCHIUTO: Thank you.

BY MS. RICCHIUTO:

Q. Do you know why your mom was interested in June of 2021 in whether you had COVID antibodies?

A. To file for a medical exemption from the COVID.

Q. Okay. From the requirement at IU?

A. Yes, that's correct.

Q. Okay. Going back to when you believed that you may have had COVID in 2020. What were your symptoms?

A. Coughing, a high temperature fever, loss of taste, loss of taste and smell.

Q. Is that it?

A. That was it, yes.

Q. For how long were you sick?

A. Two days.

Q. Did you need any medical care?

A. I did not, no.

Q. Did you miss school?
A. I was hybrid for those days.
Q. Was there a reason why if you had COVID symptoms why you didn't get tested at the time?
A. I did not believe I needed to get tested.
Q. Why not?
A. Because I believed that I had the COVID.
Q. Okay. So, you felt certain that you had it and didn't think it was necessary to confirm that with a test. Is that fair?
A. That is correct.
Q. On these days that you had symptoms, were you living in a -- in a residence with other people?
A. I was, yes.
Q. Did you wear a mask at that time?
A. I did not, no.
Q. Did anybody else in the residence wear a mask on the days that you had COVID symptoms?
A. They did not, no.
Q. Why did you not wear a mask on the days that you had COVID symptoms?
A. I felt it would be ineffective.

Q. Ineffective in what way?
A. From spreading it.
Q. Okay. So, you have -- do I understand that it's your belief that masks are not effective in preventing the spread of COVID?
A. That is correct.
Q. Okay. In paragraph 200 of the Complaint, Daniel, which is where we were, it says that you object generally to the extra requirements, which we said were masks and testing I think you said.
And then that last sentence says, you object "given their unreasonableness and the extremely minimal risk of COVID to those in his age group." And I just want to ask you a few questions about that.
What do you consider to be your age group?
A. Young adults and teenagers.
Q. What is your understanding -- this says that there's an extremely minimal risk of COVID to those in your age group. What's your understanding of the risk of COVID to those in your age group?
A. That I am highly likely to recover from

COVID.
Q. Okay. So, it's not that you're not likely to get COVID, correct?
A. Correct.
Q. Is there something that you're -- that you're looking at or reading from, Daniel, when you're answering my questions?
A. I'm looking at the document that was shared.
Q. Okay. So, just to make sure that I understand, this sentence about extremely minimal risk of COVID to those in your age group, it's not a belief that people in your age group are not at risk to contract COVID. Is that correct?
Let me ask it a different way.
A. I'm not sure.
Q. That's probably too backwards. Let me ask it a different way.
Do you agree that people in your age group can and do contract COVID?
A. I do.
Q. And you yourself contracted COVID, right?
A. That is correct.

Q. Okay. So, I just want to make sure that I understand what it is that's the minimal risk, and what I think your testimony was is that the minimal risk is that you are likely to recover if you do get it. Is that accurate?
A. That is accurate.
Q. Okay. Is there anything that you want to -- is there any way that you want to say that differently than the way that I've kind of restated your testimony?
A. I do not, no.
Q. Okay. When you had COVID and were living with others, was that your folks?
A. Yes, it was.
Q. Okay. Did either of them develop COVID symptoms, either before or after you had your COVID symptoms?
A. Not after, no.
Q. Okay. Did one or both of your parents have COVID symptoms before you had yours?
A. My father.
Q. Okay. Do you know if your father had a COVID test when he had symptoms?
A. I'm not sure.

Q. Did anyone in the house wear masks while your father was experiencing his COVID symptoms?
A. No one wore masks, no.
Q. Do you know if you got COVID from your father or from some other source?
A. I'm not sure who I got it from, no.
Q. Okay. You weren't part of like some kind of contact tracing effort where someone contacted you and said, "This kid you sit next to in school has it," or something like that, is that right?
A. That is correct.
Q. Do you have any reason to think that you could have gotten COVID from someone other than your dad?
A. I'm not sure now.
Q. With respect to the minimal risk of COVID to those in your age group, do you -- I think we said you agree that you can get COVID. Do you agree that people in your age group can spread COVID to others?
A. I agree with that.
Q. Okay. Can you explain to me specifically how you are harmed by -- how you will

be harmed by wearing a mask on campus in Bloomington this fall?
A. I will feel discriminated against and peer-pressured to get the vaccine.
Q. Okay. Where did those -- those are things -- it sounds to me like those are things that you are thinking might happen in the future, right, that you will feel discriminated against and peer-pressured.
Are those things that have happened to you already?
A. I felt that way.
Q. Were you made to feel that way by Indiana University?
A. I'm not sure.
Q. Or by other students at IU?
You haven't gotten to school yet, right?
So, I'm just trying to figure out if these are things that you're worried about might happen or things that have happened to you as a result of your being an incoming student at IU.
A. These are things that I am worried about happening.
Q. Okay. Any other harm that will result

to you if you are required to wear a mask on campus this fall?
A. I believe there may be harm.
Q. And what would that harm be?
A. The mask itself harming my body.
Q. Okay. Let's talk about that.
What kind of harm are you worried about resulting from wearing a mask?
A. Breathing in the fabrics which had been proven to be harmful.
Q. Proven by whom?
A. The medical professional who spoke in this case prior to this one or prior to today.
Q. Okay. I've got to try to figure out who that might be.
Have you spoken to a medical professional with respect to this case that told you that breathing in fabrics have proven to be harmful?
A. I have not spoken directly, no.
Q. Okay. Do you know the name of this person?
A. I do not recall his name.
Q. Okay. But you think he's associated in

some way with this case?
A. Yes.
Q. Could he be somebody that maybe your lawyers have hired to express some scientific opinions?
A. I believe so, yes.
Q. Okay. Okay. So, this person says that breathing in fabrics has proven to be harmful. And what is the harm that results from breathing in fabrics, either based on this person or based on your own understanding?
A. I do not remember.
Q. But as you sit here you're concerned that if you wear a mask in Bloomington this fall you'll be harmed by breathing in the fabrics. Is that accurate or not?
A. That is correct.
Q. Okay. Did you have that concern in 2020 when you wore a mask at school and stores?
A. I did, yes.
Q. Have you experienced any harm as a result of wearing masks -- wearing a mask to school and stores in 2020?
A. I have not yet.

Q. Okay. That was -- that was -- talk about how masking might harm you. What is the harm that you will experience, if any, from being tested for COVID while you're at school at Bloomington?

A. Can you rephrase your question, please.

Q. Sure. One of the -- one of the things that is at issue in this case is how or whether you and the other Plaintiffs will be harmed if you are required to wear a mask and undergo COVID testing while you are at school this fall.

And, so, I want to -- I want to understand what is the harm that you expect or anticipate or are concerned about resulting specifically from being COVID tested this fall at Bloomington.

A. I'm not sure how to answer that.

Q. Okay. Well, let me start with something easier.

Do you believe that you will be harmed by being COVID tested in Bloomington this fall?

A. I do.

Q. Okay. In what way will you be harmed?

A. The chemicals of the cotton swab.

Q. Okay. Tell me more about that. Is this the cotton swab that would be used to conduct the testing?

A. Yes.

Q. Okay. And tell me about the chemicals of the cotton swab.

A. I don't know.

Q. Okay. Where does the -- where does your understanding come from that there could be chemicals on the cotton swab that would harm you if you were COVID tested?

A. The medical professional who spoke in this case earlier.

Q. Okay. Is this the same professional who gave you the information about the fabrics?

A. Yes.

Q. Okay. Is he somebody that you've spoke to live or got to see speak or is this something that you've seen that he wrote down?

A. Seen what he wrote down.

Q. Have you ever talked to him?

A. I have not.

Q. Okay. Have you ever talked to any medical professional about either the fabric, the breathing in the fabrics harm or the chemical cotton swab harm?

A. I have not spoken to a medical professional about those.

Q. So, when is -- when did you see this document that identified the chemical issue and the fabric issue?

A. I saw the document yesterday.

Q. Okay. So, that was after this lawsuit was filed, is that right?

A. That is correct.

Q. Okay. And before you saw that document, did you have any understanding of any harm that you could experience or would experience if you wore a mask on campus?

A. I believed that before, yes.

Q. Believed what before?

A. That masks and the fabrics in them could cause bodily harm before seeing the document.

Q. Did you have a concern about the chemicals on cotton swabs before yesterday?

A. Yes.

Q. And where did that concern come from? When's the first time you had that concern?

A. I'm not sure.

Q. Was it in 2020?

A. No.

Q. Do you know if it was before this lawsuit was filed?

A. It was not.

Q. Okay. So, sometime after the lawsuit was filed you became concerned that chemicals in a cotton swab could harm you if you're tested for COVID. Is that accurate?

A. That is correct.

Q. Okay. When are you scheduled to move to campus?

A. I'm not sure. I believe it is the week before classes start.

Q. I think that -- I think that's like the early 20s. Does that sound right to you?

A. Sounds right, yeah.

Q. Okay. Does your move to Bloomington depend upon whether an injunction is granted in this case?

A. I'm not sure yet.

Q. What will that depend on?

A. The mask restrictions and the testing.

Q. Okay. So, you know you're exempt from

the vaccine, right? So you won't -- you're free to move to Bloomington without the vaccine. Is that your understanding?
A. Yes.
Q. Okay. But if the -- if the Court determines that it is appropriate for you to wear a mask and undergo testing, is it your intention that you will or won't move to Bloomington as scheduled in August?
A. I have not decided yet.
Q. Okay. And what will that decision be based on?
A. My moral conscience.
Q. Who will make that decision about whether you go to Bloomington in August?
A. Myself.
Q. If you -- do you have any plans to get another antibody test, Daniel?
A. Not as of now.
Q. If you were to get an antibody test in the future and it reflected that you either no longer had antibodies or a medical professional told you that your antibodies were low enough that they weren't, you know, clinically effective with

respect to COVID, would any of the views that we've talked about in your deposition today, would any of those views change?
A. No.
Q. So, regardless of whether or not you have antibodies, you have a religious and practical objection to masking. Is that fair?
A. That is correct.
Q. And regardless of whether or not you have antibodies, you have a religious and/or practical -- I mean, you tell me -- objection to testing. I just want to make sure I understand your views.
A. That is correct, yes.
Q. Okay. In terms of -- in terms of this lawsuit, do you know any of the other Plaintiffs?
A. I do not, no.
Q. Have you had any communication with them?
A. There was a prep virtual call yesterday with them in there.
Q. Was that to talk about the depositions?
A. That is correct, yes.
Q. Okay. With your lawyers?

A. Yes.
Q. Okay. And I don't -- I'm not allowed to ask and I don't want to know what your lawyers talked to you about. I'm going to hope that it -- that the experience wasn't as bad as maybe they would have led you to believe that it could be. But you don't have to answer. That's not a real question.
Other than the meeting that you had with your lawyers and the other Plaintiffs to prepare for the deposition, do you -- you said you have had no contact with the other Plaintiffs, is that right?
A. I've had no contact, correct.
Q. Okay. Your antibody test, is that a blood test?
A. It was a blood test, correct.
Q. Okay. And do you have any kind of religious objection to blood testing?
A. I do not.
Q. Do you have religious objections to any other medical procedures?
A. I do not.
Q. Have you -- I've got two little boys. I

don't know if you're an accident-prone person.
Are you a kid who needed like stitches or who had broken bones a lot when you were growing up?
A. I was not, no.
Q. Okay. Have you ever had to go to the hospital?
A. A few times.
Q. Okay. And has there ever been -- and I don't need to know what it is. But has there ever been a treatment that's been offered to you medically that you have refused based on a religious objection?
A. I don't think so.
Q. Okay.
MS. RICCHIUTO: Melena, do you have any questions that you want to ask your witness on the record?
MS. SIEBERT: I just had actually just a couple.
MS. RICCHIUTO: Okay. I'll pass the witness for now. Okay.
MS. SIEBERT: I'm sorry. I missed that last part, Anne.

MS. RICCHIUTO: I just said I will pass the witness for now, then.
MS. SIEBERT: Okay, great.

EXAMINATION

BY MS. SIEBERT:
Q. Actually, Daniel, I think I just have one question.
Earlier Anne had asked you if you thought that everything in the Complaint was correct. Do you remember that?
A. Yes.
Q. Okay. And you, to my recollection, answered that you thought everything was correct?
A. Yes.
Q. Okay. I want to just clarify, were you -- when you answered that question, were you thinking about the specific allegations that might relate to the other Plaintiffs' specific situations or were you thinking more generally about the Complaint?
A. I was thinking more generally.
Q. Okay. Do you have any basis of personal knowledge for whether the allegations that specifically relate to the other Plaintiffs are

correct or not?
A. I'm not sure.
Q. Okay. Let me -- probably a bad question.
Do you have any personal knowledge about the background, either medical or religious or personal background, of the other Plaintiffs?
A. I do not, no.
Q. Okay.
MS. SIEBERT: I think that's all I have.
MS. RICCHIUTO: Okay. Thank you. Thank you, Daniel. Thank you to Mr. and Mrs. Baumgartner for letting us talk to your son tonight. That's all the questions that I have.
Melena, I don't know if you want to read and sign or anything. I'll let you.
MS. SIEBERT: Read and sign would be great.
And I don't know exactly how the process will be with roughs and the final and things like that that come through, but we'll comply with whatever timing needs to happen there.
MS. RICCHIUTO: Okay. And then the last thing I just want to make sure that we have on the record is the request for the notes that Daniel was

working from during his testimony.
MS. SIEBERT: Yes. Of course. He'll give those to us. We'll review of course for any privileged information. But then, yes, we will send those along.
MS. RICCHIUTO: Okay.
(Time Noted: 4:58 p.m.)
FURTHER DEPONENT SAITH NAUGHT.

I, CORINNE T. MARUT, C.S.R. No. 84-1968, Registered Professional Reporter and Certified Shorthand Reporter, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That the reading and signing by the witness of the deposition transcript was agreed upon as stated herein;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

______________________________
CORINNE T. MARUT, Certified Reporter

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

- - - - - -
E R R A T A
- - - - - -

PAGE LINE CHANGE

____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________

ACKNOWLEDGMENT OF DEPONENT

I, D.J.B., do hereby certify under oath that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

______________________________________
D.J.B. DATE

Subscribed and sworn
to before me this
_____ day of ______________, 20____.
My commission expires:______________

___________________________________ Notary Public

LAWYER'S NOTES

PAGE LINE

____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________