UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

RYAN KLAASSEN, JAIME CARINI, )
D.J.B., by and through his )
next friend and father, )
DANIEL G. BAUMGARTNER, )
ASHLEE MORRIS, SETH CROWDER, )
MACEY POLICKA, MARGARET ROTH, )
and NATALIE SPERAZZA, )
)
Plaintiffs, )
) CASE NO.
-vs- ) 1:21-cv-00238
)
THE TRUSTEES OF INDIANA )
UNIVERSITY, )
)
Defendant. )

DEPOSITION OF SETH CROWDER
June 30, 2021

Remote oral deposition of SETH CROWDER, commencing at 7:04 p.m., on the above date, before CORINNE T. MARUT, C.S.R. No. 84-1968, Registered Professional Reporter, Certified Realtime Reporter and Notary Public.

GOLKOW LITIGATION SERVICES
877.370.3377 ph / 917.591.5672 fax
deps@golkow.com

APPEARANCES
All Parties Appearing Via Zoom Videoconference

ON BEHALF OF THE PLAINTIFFS:
THE BOPP LAW FIRM
1 South 6th Street
Terre Haute, Indiana 47807
812-232-2434
BY: MELENA S. SIEBERT, ESQ.
msiebert@bopplaw.com

ON BEHALF OF THE DEFENDANT:
FAEGRE DRINKER BIDDLE & REATH LLP
300 North Meridian Street, Suite 2500
Indianapolis, Indiana 46204
317-237-0300
BY: ANNE K. RICCHIUTO, ESQ.
anne.ricchiuto@faegredrinker.com

REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968

I N D E X

| SETH CROWDER | EXAMINATION |
|---|---|
| BY MS. RICCHIUTO............. | 4 |

E X H I B I T S

| CROWDER DEPOSITION EXHIBIT | | MARKED FOR ID |
|---|---|---|
| No. 1 | Signed Verification | 18 |
| No. 2 | Verified Complaint for Declaratory and Injunctive Relief | 19 |

EXHIBIT
124

THE REPORTER: All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.

Counsel will be noted on the stenographic record.

Counsel, do you so stipulate to the remote swearing in of the witness?

MS. SIEBERT: Plaintiffs' counsel does, yes.

MS. RICCHIUTO: IU does.

(WHEREUPON, the witness was duly sworn.)

SETH CROWDER,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. RICCHIUTO:

Q. Mr. Crowder, my name is Anne Ricchiuto. I'm the lawyer for Indiana University that's defending the lawsuit that you are one of the Plaintiffs in.

Before we start, I just want to put a

couple procedural matters on the record since the deposition is virtual.

If anything happens -- we had this happen in another one. If anything happens to your technology or you freeze or I freeze or whatever, we'll all just be patient with one another and get back together as soon as we can. Is that okay?

A. Yes, that's fine.

Q. Is there anybody in the room with you?

A. No. I live alone.

Q. Okay. They could be hiding behind the skyline, and that would be okay.

And then what I just need you to do is let me know if -- let me ask it a different way.

I'm going to ask you not to text or instant message or have any kind of live communications during the deposition. If you need to talk to your lawyer or she wants to talk to you, there is a way to do that. But I just need you to tell me. But, otherwise, there is no like phone-a-friend while we're talking. Okay?

A. Sure.

Q. Have you had your deposition ever taken before?

A. One other time. It's been several years ago. It was the result of a car accident I was involved in.

Q. Okay. So, you've done this once before, and you know that the purpose is for me to ask questions and get some answers and some information about what you know and think about this case.

You understand that you're under oath. Correct?

A. Correct.

Q. Okay. Do you have any documents or notes with you there, Mr. Crowder?

A. I don't. The only thing I have up at the moment is the e-mail with the invitation. And then there's also the share platform, and I'm just not sure if I -- if you see me in that or if I need to take any additional action to access that right now.

Q. So, the only thing -- I'm going to want to show you a copy of the Complaint, like the actual lawsuit, and you'll be able to see it in there if you log into that portal.

Do you have the credentials to do that?

A. Well, I see Zoom meeting with meeting ID

and pass code and then I see exhibit share platform with a link.

Q. Yep. So if you click that link. You don't have to do it right this second or you can. But that's -- we are going to have you go in there, and you can have a minute to make sure that you can get in and we can walk you through that.

A. Okay.

Q. Today while you're testifying, if at any time you don't understand my question, please tell me so that I can rephrase it and ask you a better question. If you answer my question, I'm going to assume that you understood it.

The Court Reporter is taking down what we say. And, so, even though in normal conversation we do a lot of, you know, kind of nodding or head shaking or uh-huh or uh-uhs, we are going to try to help each other and make sure that we give nice audible answers so she can get them down for the record. Do you understand?

A. Yes.

Q. Your attorney might have objections to some of my questions and if she does, that's okay. She'll say what they are. You will still answer

the question that was asked unless she specifically tells you not to.

So, we can deal with that when it comes up. I just want to let you know that you may hear her interrupt me from time to time with an objection and that's perfectly fine.

A. Okay.

Q. Could you state your name for the record, Mr. Crowder.

A. Seth Crowder.

Q. What did you do to prepare to testify today?

A. I talked with my attorney and also listened to a recording of some of the other Plaintiffs in the case. Initially they wanted to do that kind of in one shot. I had a schedule conflict. So, my attorney was kind enough to send me a recording of that session that I missed.

Q. Was that a session that your lawyers had for all the Plaintiffs kind of before you got deposed?

A. Yes.

Q. Okay. So, you just viewed a recording of that at a different time. Is that right?

A. It was an audio-only recording.
Q. Okay.
A. But yes.
Q. Anything else that you did to prepare to testify this evening?
A. No. Just kind of tried to anticipate some questions that you may ask, but that's kind of impossible to do. So...
Q. Okay. Tell me about the lawsuit.
A. I'm not sure I understand your question.
Q. Well, you've sued Indiana University, correct?
A. Correct.
Q. Why did you do that?
A. I feel that the requirement infringes on my religious beliefs.
Q. What's "the requirement" that you're talking about?
A. The vaccine requirement and the additional requirements for masking and testing.
Q. Okay. Did you -- how did you become involved in the case?
A. I -- trying to remember. I don't remember specifically timelines, but I do remember

seeing a Facebook group having to do with concerns about the mandate; and I remember thinking to myself that I would volunteer to be involved in a case if one came.
But I don't remember specifically how that happened, if I had contacted somebody in the Facebook group. I don't remember the specific action of that. But that's how I initially found out about it.
Q. Does that Facebook group have a name?
A. It does, yes.
Q. What is the name?
A. I don't want to misquote it. It's something with the effect of IU Families for Choice, Not Mandates. Something of that nature. I don't want to give you the wrong --
Q. Okay. That's fine.
A. -- the wrong word for that.
Q. Some name with maybe some or all of those words in it?
A. Correct.
Q. Is that something that you just stumbled upon in your feed or did someone point you to it?
A. I don't remember anybody pointing me to

it. I don't remember if I was actively searching for it or if it came up in my feed, to be honest.
Q. You saw that and then either you contacted the Bopp Law Firm or they contacted you and now you are a Plaintiff in the case. Is that a fair summary?
A. I think that's fair.
Q. Okay. Did you review the Complaint that was filed in this case?
A. I reviewed portions of it. I wouldn't say that I poured over every single bit of text. But yes.
Q. Do you know what -- do you remember what portions you reviewed?
A. I made sure to kind of see where I was mentioned and made sure that it was accurate. So, I remember that piece specifically. But I know there were a lot of other Plaintiffs and there were some -- some different cases there. So, I don't know all their specific cases.
Q. Have you met or talked to any of the other Plaintiffs?
A. No.
Q. Did you review the -- do you know -- did

you review the Complaint before it was filed or after it was filed or the portions that you said you reviewed, did you do that before or after it was filed?
A. I believe after.
Q. Okay. What about the exhibits, did you review the exhibits?
A. Some of them.
Q. Do you remember which ones?
A. I don't.
Q. Did you -- do you remember signing a verification page?
A. Yes.
Q. What's your understanding of what that verification means or does?
A. I don't have it in front of me, but my main takeaway was that what I was claiming was accurate and that I am who I say I am. I am enrolled in the university and that everything that I was saying was true.
Q. Is that something that you signed before you reviewed the Complaint?
A. I don't believe so.
Q. Well, I'm just trying to figure out the

sequence because I think you said you reviewed the Complaint after it was filed, and I will just tell you your verification was filed with the Complaint.

So, there was a -- there was a signature on the verification, filing the verification, and then maybe you reviewed the Complaint if I'm understanding your testimony. But tell me if I don't have that sequence right.

A. It could be. I don't remember the sequence myself. I know that there were some conversations via e-mail with an attorney. I know that we had had a Zoom call about the case. I don't remember where that falls in the timeline of when she was requesting a verification and when the case was filed.

Q. Fair enough. Okay. So, you're currently an MBA student, Mr. Crowder?

A. Correct.

Q. What year are you?

A. I have one quarter left after this quarter.

Q. I don't think I knew MBA was on quarters.

A. Um-hmm. The evening MBA through -- it's

on the IUPUI campus.

Q. Do I take it that you work full time?

A. I do.

Q. And then you get deposed --

A. Yeah.

Q. -- when you're really lucky, at 7:00 at night.

A. Yep.

Q. What's your full-time job?

A. I work in digital marketing for an ad agency in Indianapolis.

Q. So, you have one quarter. If you have a full-time -- well, I'm not going to guess. Do you live on campus?

A. No.

Q. You live somewhere in your own residence?

A. Um-hmm.

Q. Okay.

A. Yes.

Q. And have you lived during -- since March of 2020, have you ever lived on an IU campus?

A. No.

Q. How often do you physically have class

for an evening MBA?

A. So, the way that the course is designed is a hybrid model. So, when we first started, we would have class one day a week on campus and we would have our other class for the week online and the two would rotate every week. So, the class that you would have in person one week would be the one that you would have online the following week.

And then at some point, whenever this pandemic started, they went to all online. And, so, since that time we've been all online, including this quarter. And next quarter they have said that they are going back to kind of the normal hybrid model.

Q. Okay. So, help me out with "this quarter" and "next quarter."

Is "this quarter," has that -- is what you're calling "this quarter," has that started yet?

A. Yes. I'm in the -- I'm in the middle of it.

Q. So, do you have one more quarter after this quarter or this is it?

A. Correct. I have one more after this

quarter is completed.

Q. And this quarter began when?

A. I don't remember the exact date. I believe we're roughly four or five weeks into it.

Q. Okay. So, it's kind of like a summer-ish quarter?

A. Yes.

Q. And then when does the next quarter start?

A. It's mid-August. Actually just got an e-mail today, and don't quote me, but I believe it's the 23rd of August.

Q. Okay. And IU has told you that the next quarter that begins in mid-August will have some in-person components, is that right?

A. Yeah, the e-mail that I got today indicated that it would be returning back to that kind of normal situation with the hybrid model.

Q. And the normal situation is physical class one day a week?

A. Correct.

Q. And how long is that class?

A. I believe they're scheduled for two hours and 40 minutes typically. Not every

professor always takes that entire time, but when I was physically present on class or in class, most did take that full time.

Q. Okay. So, right now in the current quarter, you are not going to campus at all for class. Is that correct?

A. That's correct.

Q. And beginning in mid-August, whenever the next quarter starts, you expect to be on campus for two hours and 40 minutes a week. Is that accurate?

A. Yes. It's accurate that that is the plan that they have laid out.

Q. Okay. If a professor lets you go after half an hour, you are probably not going to sit there for the rest of the time.

A. I won't fight him, no.

Q. In general, it sounds like that that's the expectation?

A. Correct.

Q. Mr. Crowder, have you been vaccinated against COVID-19?

A. I have not.

Q. Do you have any plans to be vaccinated?

A. I do not.

Q. Okay. If you can, log into that website and let us know if you need anything.

A. I think I am in, but it just says no files in here.

Q. Okay. Refresh it, if you will, for me. And then you should have one or two.

A. I see one.

Q. Okay. We'll start with that one while the other one comes up.

Is it called "Seth Crowder Verification"?

A. It said like Exhibit.

Q. Oh, yeah. Okay. Exhibit 1.

Okay. Can you open it up for me?

A. Yes.

Q. Is it your verification page?

A. Yes.

MS. RICCHIUTO: Okay. So, we'll mark this as Exhibit 1.

(WHEREUPON, Crowder Deposition Exhibit No. 1 was marked for identification: Signed Verification.)

BY MS. RICCHIUTO:

Q. This is docket entry 1-13 in the lawsuit, and this is -- I just want to confirm, Seth, that this is the verification page that you signed --

A. It is.

Q. -- in connection with the Complaint. Okay.

Now, if we go back, if you refresh one more time, hopefully you will have the actual Complaint.

A. I see "Exhibit 002."

Q. Do you see Exhibit 2?

A. Yeah.

Q. Okay. So, when you pull that up, this is the Complaint in the lawsuit, which we're going to mark as Exhibit 2. It's docket entry No. 1.

(WHEREUPON, Crowder Deposition Exhibit No. 2 was marked for identification: Verified Complaint for Declaratory and Injunctive Relief.)

BY MS. RICCHIUTO:

Q. And you see in the left hand -- the

upper left, Seth, where you can adjust to the page numbers?

A. Um-hmm, yes.

Q. You are free to look at any page that you want, but what I am the most interested in is on page 44.

So, you can either enter 44 there or you can scroll down to 44 so that we can find paragraphs 205 and 206, and these are paragraphs that are about you. Is that correct?

A. Yep. I see them.

Q. Have you seen them before?

A. Yes.

Q. Are they accurate?

A. Yes.

Q. Are those the paragraphs that you were verifying when you signed that verification page?

A. Yes.

Q. So, paragraph 205 says you're pursuing your MBA. We have talked about that.

That you have a religious objection to the vaccine. We've talked about that.

You have been granted an exemption. Correct?

A. From the vaccine, yes.
Q. Yes. And that was a religious exemption, correct?
A. Correct.
Q. Okay. So, is it your -- do you understand, then, that when you go to campus starting in mid-August that you do not have to be vaccinated?
A. I do understand that.
Q. Okay. Paragraph 206 identifies "religious objection to the extra requirements." Tell me what the extra requirements are.
A. My understanding of the extra requirements is being masked while on campus with no exception and being subject to potential COVID testing requirements.
Q. Okay. And you have religious objection to both of those?
A. Correct.
Q. So, let's talk about masking first.
Since March of 2020, when the pandemic began, have you ever worn a mask -- not -- I keep saying not Halloween -- but a mask associated with COVID-19 precautions?

A. Yes.
Q. How many times since March of 2020 would you estimate that you've worn a mask?
A. Gosh, I don't know that I'd be able to give you an accurate estimate. I would say maybe once or twice per week.
Q. Did your employer switch to virtual during when everything was kind of really shut down in 2020?
A. Yes.
Q. Okay. So, where else did you go in 2020 that required you to wear a mask?
A. FedEx, other stores, restaurants, grocery store, I believe the hardware store.
Q. Okay. Is there anywhere that you went since March of 2020 that required a mask where you did not wear one?
A. I don't know. I don't know. I don't think so, but I don't know for sure.
Q. Is it fair to say that if you did do that, if you did go to a place that required a mask and not wear a mask, that that was infrequent if it happened?
A. I think that's fair.

Q. Given the list of places that you identified for me that you did wear a mask, it sounds like generally during the time that masking was required, you were wearing a mask at places that required it. Is that fair?
A. I think that's fair. I tried to avoid instances where I'd be required to wear a mask for more than a minute or two. So, that's -- that's kind of what I dealt with I guess.
Q. Okay. So, during -- during the last -- do you go -- do you do your MBA program sort of straight through?
A. Yes.
Q. Have you had any quarters off? No?
A. No.
Q. Okay. So, while you were virtual, did you ever have to go to campus and wear a mask on campus?
A. No.
Q. When is the last time that you went to a physical class for your MBA or visited campus physically based on your MBA program?
A. I can't remember. It would have been in the quarter that we were last required, but it's

been such a blur and I don't remember how quickly they locked that down. So, I couldn't give you a firm date, but it would have been when we were still on campus.
Q. Was there ever a time, maybe at that tail end leading up to the transition to virtual, when you were required to wear a mask on campus?
A. Not that I remember.
Q. They may have cleared you out before they --
A. Yeah.
Q. -- before they got that far.
You know there was spring break and then spring break was delayed, and that was sort of the sequence at that time.
When we're thinking about other places that you might have worn a mask since March of 2020, have you worn a mask at any house of worship since that time?
A. No, I don't believe so.
Q. Is that because you didn't visit a house of worship or because masking wasn't required or because you just didn't wear one?
A. I don't honestly remember. The last

time I would have been in a house of worship would have been with my parents up near Kokomo. But I don't remember if I wore a mask or if they were being required at that time.

Q. Do you remember approximately when that was?

A. I don't. I'm sorry.

Q. Okay. Have you ever had COVID, Mr. Crowder?

A. I believe that I have, but I was never tested for it. So, I can't say conclusively. But the symptoms that I experienced were very much aligned with COVID symptoms.

Q. What were they?

A. Just extreme fatigue, just in the middle of the day, not being able to keep my eyes open, difficulty breathing and some symptoms that were kind of related to allergies.

So, at first I thought that I might have had just bad allergies; but in hearing more about what COVID entails and the symptoms that are often present, it made me believe that I -- that's what I had.

Q. Did you seek medical treatment at the

time that you thought you might have had COVID?

A. No. I just tried to rest.

Q. Have you ever had a COVID test?

A. No.

Q. Did you at the time that you had those COVID symptoms, did you quarantine or did you go out and about? How did you handle that aspect of it?

A. I don't remember quarantining because I didn't even know that -- what COVID was. So, it was not even on my radar as something I should consider doing because it was so early.

Q. When was it?

A. If I remember correctly, it was December of 2019 or January 2020, somewhere in that time frame.

Q. So, at the time that you were having the symptoms, did it occur to you that you had COVID or was it later when we all started to learn more?

A. It was later when we started to learn more because the thing that was really different for me during that experience was the fatigue. It was just something I don't think I had ever experienced and it was odd. It seemed odd at the

time.

And then as I would hear more about other people having COVID and what their experience was like, it kind of made a light bulb go off in my head, oh, okay, maybe that's what I had, because it was so different than bad allergies or a regular cold.

Q. How long did your symptoms last?

A. It's tough to say. I think the extreme fatigue was roughly a couple of weeks, maybe one to two weeks.

Q. Did you interact with other people during that time?

A. I am sure that I did. I don't have any reason to think that I didn't.

Q. Was it around like the end-of-year holidays?

A. If my estimate is accurate, then that would be correct. I mean, I did see my folks around that time.

Q. Have you ever been tested for COVID antibodies?

A. I've not.

Q. Last year when you were switched to

virtual in your MBA program, were you aware that IU had masking and testing rules in place for students?

A. It's tough because I -- I'll see e-mails come through that talk about it and from what I can recall, the timelines aren't always aligned with the quarter system.

And, so, when they have a certain practice in place and they anticipate it being in effect on a certain date, it may or may not affect the quarter system as much.

Q. Okay. So, you didn't -- we know that you didn't have to wear a mask because you didn't have to go to campus, is that right?

A. Correct.

Q. And were you ever subject to COVID testing by IU?

A. I don't -- no, I don't think so.

Q. Well, you know you didn't get one, right?

A. Right, right.

Q. So, it sounds like what you're saying is maybe in theory they could have asked you to, but if they -- if they could have, they didn't because

you didn't get a test?

A. Yeah. The e-mails were confusing, and it wasn't always clear to me whether they were urging people to get tested or they were requiring me specifically to get a test.

I never got any separate e-mail that I can remember that was different from the general e-mail or any separate phone call or communication that was asking me specifically to come in and take a test that I can recall.

Q. Okay. Your -- 206 of the Complaint that we looked at, Exhibit 2, says that you tried to apply for an exemption from masking and testing but that was not granted. Is that correct?

A. That's correct.

Q. And was that to be a medical exemption or religious exemption?

A. Religious exemption.

Q. And what were you told about why that was not granted?

A. I don't recall if there was a reason given.

Q. Why did you feel like you needed that exemption if you had the vaccine exemption?

A. I don't -- for me, the testing requirement is especially invasive and I believe that masks are very unhealthy. So, my religious beliefs I feel are tied to my judgment and my discernment and I am not comfortable with it.

Q. Let's talk about masks being unhealthy. Tell me what's the basis for that belief.

A. I believe they restrict breathing. They're harder to, you know, get oxygen when you're wearing them.

And I've also seen studies, there was a recent study that -- where somebody had sent a mask to a lab and it came back with lots of different bacteria and appeared to be pretty unhealthy to me.

Q. Was there any information in that study about how long that mask had been worn or where or by how many people?

A. I don't recall.

Q. How did you become aware of that study?

A. I don't remember. I'm guessing through social media feed.

Q. Did you read the actual study or did you read an article about the study?

A. I saw the article that had mentioned the

mask being sent in for the lab test.

Q. Do you remember anything else about that study or that article, like who wrote them or where the publication was?

A. I don't, but I would probably recognize it again. If it's helpful to you, I could look for it.

Q. Melena doesn't want you to do any homework.

A. Okay.

Q. That's okay.

A. Okay.

MS. SIEBERT: You do enough homework for your MBA.

MS. RICCHIUTO: Witnesses are so nice, though, aren't they sometimes?

BY MS. RICCHIUTO:

Q. I won't ask you to do that. I just was curious if you remembered any other details about it.

Okay. So, masks make it hard to get oxygen. They have bacteria. And those are concerns that are tied to your religious beliefs?

A. Correct.

Q. Any other harm that you would experience if you had to wear a mask for two hours and 40 minutes a week in your MBA program?

A. The other concerns are more I guess related to potential in-class impact. I do worry that they could cause folks to sort of discriminate against others that do have masks.

I also know through my experience being on campus and participating in class discussion in a really large room was already very difficult. Many times the professor had challenges and had difficulty hearing everybody speak up in the room. So, I feel that adding a mask on top of that would make it even more difficult to communicate with the class.

And some classes do have a classroom participation component to them in terms of grading. So, that's also a concern.

And then I also have concerns that, you know, others may not want to work in a group with me if I'm the only one, for instance, that is required to wear a mask.

But those are my other additional concerns with masks.

Q. Okay. The class that -- how many classes will you have next quarter when you're back on campus?

A. It remains to be seen. I -- we don't register for a few more days. I believe I'm required to take 7-1/2 credits if I'm -- if I'm accurate on that, which would equate to three classes. Two three-hour classes and one one-and-a-half hour class I believe would be the breakdown.

Q. Do you have any idea of the size that those classes will be based on kind of what you have left to take?

A. I don't because when I was on campus, I'm pretty certain that all the classes that I was in were considered the core classes that the entire cohort has to take.

So, my expectation would be that they would be a little bit smaller in classes that aren't considered core classes and the elective classes, but I wouldn't be able to give you a great guess since I haven't been on campus for those elective classes yet.

Q. Okay. But is it right that you only

have elective classes left?

A. I think that's right. I don't want to say for certain. I may still have one core class left. I haven't looked at the registration schedule yet for next quarter.

Q. I was just trying to discern whether we had any way to predict whether you would be in one of those really large rooms or if we thought you might have smaller classes this next quarter.

A. I see. Yeah. I don't have a way to predict that right now I don't think.

Q. Okay. The participation component of your class, has that been a component of your classes while you've been virtual?

A. It has.

Q. And has being virtual impaired your ability to obtain that element of your grade?

A. I don't think so. I think professors are still trying to figure that out and how they marry class participation with the virtual environment, and some have done that through the use of discussion boards.

I'm actually in a class right now where the professor, he's made it obvious that he's

keeping track of who is participating and he's included that in his sort of grading rubric.

He says if you are participating frequently and it's sort of normal feedback or input, you fall into one sort of grading bucket. And if you're also providing really fantastic feedback and viewpoints, then that kind of puts you in another category in terms of his grading scale.

So, I think each professor has approached it a little bit differently, but I think they've overall done a good job of trying to get group participation out of the online environment.

Q. Do you have any reason to think that they wouldn't apply the same effort to get participation for students who are masked?

A. Can you maybe restate that?

Q. Sure. I think that you told me that one of the things that you're worried about is being able to participate in your in-person classes with a mask on. Is that right?

A. That's right.

Q. And I think I understood you to say that in the virtual environment, professors are doing a pretty good job of figuring out ways to gauge

participation even though it's something new for all of us. Is that accurate?

A. That's accurate.

Q. So, I guess I was just wondering, you know, what's the reason or is there any expectation that professors would try less hard with students who are masked next quarter to assign them fair participation given your observations that they have done a good job with that in the virtual environment?

A. Oh. I don't think that they would try less to encourage participation. But I can see a situation where they're frustrated by somebody trying to communicate through masks, because I know that there was already some frustration demonstrated when masks weren't required about professors not being able to hear students very well. One had even tried to place these kind of table microphones around the room, and that -- those didn't work. And, so, I know that on its own was even challenging and frustrating for a professor.

So, that's my thought process.

Q. Do you know if that professor, if that

frustration that you perceived, if that impacted the professor's grading?

A. I don't know.

Q. And have any of the professors that you could have in the fall issued any kind of, you know, sort of expectations about masking next quarter and whether that will impact participation grades?

A. Can you ask it again?

Q. Have any of the professors that you could possibly have next quarter published anything saying, "Here's how I grade my class. Participation is really important. If you wear a mask, that's going to impact negatively your grade"?

A. Not to my knowledge.

Q. Your concern about people not wanting to work in a group with you, what is that based on?

A. Well, I'm concerned that the mask is sort of an indication and a giveaway that I haven't been vaccinated, and I'm concerned that some students may be fearful of that and may not want me to be in a close circle with them in breakout groups for discussions or in larger group projects.

Q. Do you typically, MBA students in your program, do you typically choose your groups for group projects?

A. Usually.

Q. So they're not assigned?

A. Not typically.

Q. When you said they may be -- other students may be fearful, why would they be fearful?

A. Just from observing societal commentary and seeing how some have reacted.

Q. To what?

A. To being around people that are not vaccinated.

Q. Well, what are they reacting to or what are they worried about?

A. It seems to me that they're worried that even though they're vaccinated that somehow somebody who is not vaccinated is going to infect them.

Q. Do you have a view about whether that's a risk to students who are vaccinated?

A. Do I have -- sorry. Can you say that again?

Q. Yeah. Do you believe that students who

have been vaccinated are at risk for potentially being exposed to, for example, a variant that wasn't covered by their vaccine if they're exposed to somebody who is not vaccinated?

A. I -- I don't know. I wouldn't want to speculate that -- speculate on that. I would leave that to the data and the medical experts. But I don't have a firm opinion on it.

Q. Are there other -- I don't need to know what they are, but are there other medical procedures or treatments over the course of your life that you have declined for religious reasons?

A. Not that I can think of.

Q. Okay. I think the other aspect of the extra requirements that you're objecting to in paragraph 206 is testing.

Tell me how you will be harmed if you are tested for COVID.

A. I think it depends a little bit on the test. I feel that the testing that I have see that requires a swab inserted very far up into the nasal cavity is a problem for me. If there were a test available that was less invasive, I don't think I would have the same reaction to it.

Q. What's the problem for you -- I think you said it's a problem for you. What's the problem for you with the swab in the nasal cavity?

A. I don't like how far it's inserted. It feels like it's -- it's too far. It's too much of an intrusion I feel like.

Q. And, again, is that a religious view or some other view?

A. It's tied to religious views, yes.

Q. So, if the swab, for example, didn't go as far in the nasal cavity, would you have -- would your religious view change?

A. I would be more comfortable with a test that was much more surface level.

Q. Like what if it was a swab to the fingertip?

A. That I would be -- I'd be okay with.

Q. No religious objection to that?

A. Correct, correct.

Q. What about a test using saliva?

A. I think I would be okay with that if I was certain on where that was going and who was accessing it just because of the DNA component of saliva.

Q. What if it were a blood test?
A. I think that would be okay with me.
Q. I'm not -- I'm not a scientist. Do you know if there is DNA in blood?
A. I'm not a scientist either.
Q. Okay.
MS. SIEBERT: My avid watching of CSI and Law and Order tells me the answer is yes. But that's not scientific unless Hollywood is science now.
MS. RICCHIUTO: I'm sure if it's in a movie it's true, Melena.
MS. SIEBERT: It's got to be true.
MS. RICCHIUTO: We'll take that.
BY MS. RICCHIUTO:
Q. Let me ask it way, Seth, since neither you nor I nor CSI are the right source for this.
Assuming, let's assume for a hypothetical, that blood contains DNA just the same as saliva does; but you said you were maybe comfortable with saliva and definitely comfortable with blood, is that right?
A. That's right.
Q. Are there any other ways that you are harmed, if you don't have -- let me ask it this way.
If you don't have to be tested for COVID by a swab in the nasal cavity, are you harmed by the testing requirement?
A. Speaking about testing specifically?
Q. Yes.
A. No. Any harm beyond that in my mind would just be more about inconvenience and what I feel would be unnecessary if I'm not experiencing any symptoms.
Q. What are your plans with respect to your attendance at IU next quarter if the injunction is not granted?
A. I'm asking myself the same question. I don't know at this point. Obviously, you know, these beliefs are sincerely held enough for me to attach my name to this Complaint. So, it is something that's important to me.
But I've tried not to put the cart before the horse, and I think at this point my plan is to cross that bridge when we get there and make that decision at a future time.
Q. You're pretty close to graduation, right?

A. It's true.
Q. Okay. So, if the injunction is not granted, we'll know that before the middle of August and you'll make your decision then, is that your testimony?
A. That is my testimony, yes.
Q. Just one second here.
MS. RICCHIUTO: That's all the questions I have for you now.
Melena, do you have any questions?
MS. SIEBERT: I don't.
MS. RICCHIUTO: Okay.
THE REPORTER: Read and sign on all of these?
MS. SIEBERT: Yes, please. Thank you.
(Time noted: 7:53 p.m.)
FURTHER DEPONENT SAITH NAUGHT

I, CORINNE T. MARUT, C.S.R. No. 84-1968, Registered Professional Reporter and Certified Shorthand Reporter, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That the reading and signing by the witness of the deposition transcript was agreed upon as stated herein;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

____________________________________
CORINNE T. MARUT, Certified Reporter

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

\- - - - - -
E R R A T A
\- - - - - -

PAGE LINE CHANGE

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

RYAN KLAASSEN, et al., )
)
Plaintiffs, )
) CASE NO.
-vs- ) 1:21-cv-00238
)
THE TRUSTEES OF INDIANA )
UNIVERSITY, )
)
Defendant. )

AFFIDAVIT

I, SETH CROWDER, the undersigned affiant, being first duly sworn, on oath say that the testimony given at my deposition at the time and place aforesaid is the truth, the whole truth, and nothing but the truth, and that I have read the foregoing transcript consisting of Pages 1 to 48 inclusive, and do subscribe and make oath that the same is a true, correct, and complete transcript of my deposition so given as aforesaid, and includes changes, if any, so made by me.

FURTHER AFFIANT SAITH NAUGHT.

____________________________
AFFIANT, SETH CROWDER

SUBSCRIBED AND SWORN TO before me this day of , A.D. 20 .

____________________________
Notary Public

LAWYER'S NOTES

PAGE LINE

____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________