UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

RYAN KLAASSEN, JAIME CARINI, )
D.J.B., by and through his )
next friend and father, )
DANIEL G. BAUMGARTNER, )
ASHLEE MORRIS, SETH CROWDER, )
MACEY POLICKA, MARGARET ROTH, )
and NATALIE SPERAZZA, )
)
Plaintiffs, )
) CASE NO.
-vs- ) 1:21-cv-00238
)
THE TRUSTEES OF INDIANA )
UNIVERSITY, )
)
Defendant. )

DEPOSITION OF MACEY ROSE POLICKA
June 30, 2021

Remote oral deposition of MACEY ROSE POLICKA, commencing at 2:30 p.m., on the above date, before CORINNE T. MARUT, C.S.R. No. 84-1968, Registered Professional Reporter, Certified Realtime Reporter and Notary Public.

GOLKOW LITIGATION SERVICES
877.370.3377 ph / 917.591.5672 fax
deps@golkow.com

APPEARANCES
All Parties Appearing Via Zoom Videoconference

ON BEHALF OF THE PLAINTIFFS:
THE BOPP LAW FIRM
1 South 6th Street
Terre Haute, Indiana 47807
812-232-2434
BY: MELENA S. SIEBERT, ESQ.
msiebert@bopplaw.com

ON BEHALF OF THE DEFENDANT:
FAEGRE DRINKER BIDDLE & REATH LLP
300 North Meridian Street, Suite 2500
Indianapolis, Indiana 46204
317-237-0300
BY: STEPHANIE GUTWEIN, ESQ.
stephanie.gutwein@faegredrinker.com

REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968

I N D E X

| MACEY ROSE POLICKA | EXAMINATION |
|---|---|
| BY MS. GUTWEIN................ | 4 |
| BY MS. SIEBERT................ | 38 |
| BY MS. GUTWEIN................ | 45 |
| BY MS. SIEBERT................ | 46 |

E X H I B I T S

| POLICKA DEPOSITION EXHIBIT | | MARKED FOR ID |
|---|---|---|
| No. 1 | Signed Verification | 19 |
| No. 2 | Verified Complaint for Declaratory and Injunctive Relief | 21 |

THE REPORTER: All parties to this deposition to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.

Counsel will be noted on the stenographic record.

Counsel, do you so stipulate to the remote swearing in of the witness?

MS. SIEBERT: Plaintiffs' counsel does, yes.

MS. GUTWEIN: As does Defendants.

(WHEREUPON, the witness was duly sworn.)

MACEY ROSE POLICKA,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. GUTWEIN:

Q. Hi, Macey. Thank you for being here today. My name is Stephanie Gutwein, and I am one of the attorneys for Indiana University. I might refer to that as IU, just to shorten it up.

Before we get started, really fast, I

EXHIBIT
125

just want to add for the record that your lawyers and IU's lawyers have agreed that if there are technical issues that we encounter in the course of this virtual deposition, if for some reason we lose you or you freeze or I freeze or your lawyer can't hear what I'm saying and isn't able to object, we'll pause to make sure we get that resolved before we keep going. If something happens, type it in the chat or just let us know however you can. Okay?

A. (Nodding head.)

Q. Do you have anyone in the room with you right now?

A. No.

Q. Okay. If at some point during your deposition someone comes into the room, will you let me know, please?

A. Yes.

Q. Thank you. The other thing that while we are doing this deposition and we are on the record, you shouldn't be texting with anyone or chatting with anyone or anything like that. Is that okay?

A. Of course.

Q. Okay. Thank you. Have you ever given a deposition before?

A. No.

Q. Okay. Well, you probably have talked with your lawyers a little bit about it, but just -- and I don't want to know about that, but just to review what the process is going to be like.

We're just here for me to ask you some questions. There is no right or wrong answers as long as they're truthful. It's just for me to find out some information.

You just gave an oath to the Court Reporter and you understand that you have to testify truthfully today to the best of your ability?

A. Yes.

Q. Okay. And I see you nodding your head. So, I'll just remind you the Court Reporter can only take down words that you say out loud.

So, we have to make sure, and I will try to help you and your lawyer will also try to help I'm sure, that you say your answers out loud. It's natural for everybody to make hand motions and head

motions, but...

Can you think of any reason that you wouldn't be able to testify truthfully today?

A. No. I can't think of anything.

Q. Okay. Do you have any notes with you that you brought to your deposition?

A. No.

Q. Okay. If you make any notes during your deposition, will you let me know, please?

A. Yes.

Q. Thank you. If at any point today you don't understand my question, I'm going to ask that you let me know that so I can rephrase it and make it a better question. If you answer my question and you haven't said that you don't understand it, I'm going to assume that you understood the question.

Can we agree on that?

A. Yes.

Q. Okay. Your attorney might object. She might have talked to you about that before. If you hear her object, you still can answer my question unless she tells you not to answer. Otherwise you can go ahead and answer.

Are you comfortable with my calling you Macey or would you like me to refer to you as something else?

A. Macey is fine.

Q. Okay. All right. Thank you. Can you please state your full name for the record.

A. Yeah. Macey Rose Policka.

Q. Will you spell your last name, please.

A. P-o-l-i-c-k-a.

Q. Thank you. How old are you, Macey?

A. I am 22.

Q. Okay. Are you aware that one of your co-Plaintiffs in the lawsuit that this deposition is being taken in was deposed yesterday?

A. No.

Q. Okay. So I assume, then, you haven't read any transcript of that deposition. Is that right?

A. Correct.

Q. Where have you been living this summer?

A. I've been living in Bloomington.

Q. Is that where you lived over the course of last school year?

A. Yes.

Q. Where in Bloomington do you live?
A. I live just west of the football stadium.
Q. Okay. I went to IU too.
A. Awesome.
Q. Familiar with the campus.
And I understand that you're going to be an incoming senior, is that right?
A. I'm more of a super senior. This is my fifth year.
Q. Okay. So, are you -- do you have a full year planned or will it just be part of a year?
A. Just one semester.
Q. What are you studying?
A. I'm studying theater, English and medieval studies.
Q. Are you looking forward to being finished?
A. Yes.
Q. So, have you left Bloomington at all since last school year or did you just stay down there?
A. I went home sometimes to visit my family, but otherwise I stay and live here.

Q. So, your residence is there?
A. Um-hmm.
Q. Where is home for your family that you visited?
A. Cicero, Indiana.
Q. And is where you're living now where you will be living for this coming school year?
A. Yes.
Q. Okay. How did you come to learn about this lawsuit that you are a Plaintiff in?
A. My father told me about it.
Q. And when -- (audio difficulty). Sorry. Forgive me.
When did he -- when did you first talk to your father about it?
A. I don't remember.
Q. If -- would it have been a matter of months ago, weeks ago, days?
A. Probably weeks ago, but I don't really remember.
Q. Do you know if it was before the lawsuit was filed?
A. Yes.
Q. Okay. And when your father talked to

you about it, what was your initial reaction?
A. I was curious about it. I wanted to know more.
Q. What made you curious about it?
A. I don't really know. I don't remember IU getting any lawsuits lately. So, it was kind of new to me, and I was curious to know more about it since it was brand-new information.
Q. Okay. Had you thought about wanting to file a claim against IU before your father brought it to you?
A. No.
Q. Have you ever sued anyone else before?
A. No.
Q. Do you know whether your father had contacted a lawyer, your lawyers or whether your lawyers contacted your father?
A. I think my father contacted the lawyers.
Q. Okay. Do you remember if you read the Complaint before it was filed?
A. Yes, I read the Complaint.
Q. Did you read all the exhibits to the Complaint?
A. Yes.

Q. Do you remember signing a verification page?
A. Yes.
Q. What do you understand to be the significance of that verification page?
A. It's to certify, like to certify that I understand what the Complaint is and why the lawsuit is moving forward.
Q. Okay. Do you understand that that verification page means that you're confirming that all of the allegations about you in the Complaint are true?
A. Yes.
Q. Okay. Do you still agree with that today?
A. Yes.
Q. I want to talk a little bit about COVID, which has dominated everybody's lives for the last 16 months.
Have you ever had COVID?
A. No.
Q. Do you know if anyone in your family has had COVID?
A. Yes.

Page 13

Q. Who in your family has had COVID?
A. My twin brother.
Q. And is he -- I assume he's the same age since you're twins?
A. Yeah.
Q. Okay.
MS. SIEBERT: Older or younger, Macey?
THE WITNESS: Me by a minute.
MS. SIEBERT: Excellent, excellent. The older sister.
BY MS. GUTWEIN:
Q. Does he live somewhere else apart from you?
A. Yes.
Q. So, do you have any understanding of what his experience with COVID was like?
A. Yes.
Q. What do you know about that?
A. His symptoms were mild. He did lose his sense of smell and taste. But it felt like a flu to him.
Q. Do you know about how long he felt sick?
A. I don't remember exactly, but it might have been a week.

Page 14

Q. And where does your brother live?
A. He lives in Louisville, Kentucky.
Q. Do you know whether he has any reason to know how he contracted COVID?
A. Yes.
Q. What is that?
A. His roommates caught it first and they spread it to him.
Q. That stinks. Have you been vaccinated for COVID?
A. No.
Q. Do you have any plans to get vaccinated?
A. No.
Q. Do you know whether anyone in your immediate family has been vaccinated?
A. Yes. No one has been vaccinated in my family.
Q. Were you attending IU last year throughout the COVID pandemic, so the school year 2020 through 2021?
A. Yes.
Q. Did you live in Bloomington on or by campus during that time?
A. Yes.

Page 15

Q. What was that experience like for you?
A. It was easy. I'm a homebody. So, the COVID pandemic never bothered me.
Q. Do you have any roommates?
A. No. I live alone.
Q. Okay. Did you have to undergo any COVID testing while you were at IU last year?
A. Yes. We had the weekly mitigation testing.
Q. Okay. And how was that for you? What was that like?
A. It was okay. It took five minutes at most.
Q. Can you walk me through what that process was like?
A. Sure. I would drive over to the testing site and walk through, and they would ask me a few questions like whether I have eaten or not 30 minutes prior to the test. And if you answer no to their questions, you move forward.
You scan your Crimson Card and then you receive the vial and they confirm that the vial is yours. And then you take the test, and then you turn it in to a person who gives you a sanitation

Page 16

wipe. And you clean it, stick it into the sample tray, use hand sanitizer and leave.
Q. When you said -- there was part of that where you said then you take the test. Is that -- was it, you know, a swab in your nose or was it something else?
A. It was a saliva test.
Q. A saliva test. Was that a swab in your mouth?
A. It was a vial that we had to spit into.
Q. Oh, okay. That's helpful. Thank you.
So, you didn't ever have to put anything in your body it sounds like?
A. Right.
Q. Okay. When you took those tests, would you say that you suffered harm at all from taking them?
A. No.
Q. Okay. It sounds like based on your earlier answers that your results were always negative?
A. Right.
Q. That must be nice. Do you know -- I assume they'd tell you if your results are

positive?
A. Yes.
Q. Do they tell you either way?
A. Yeah, they tell you if it is positive or negative.
Q. Okay. When you were at IU over the last school year, did you have to wear a mask?
A. Yes.
Q. And I'm trying to think of a way to ask that that's not sort of very generic.
What were sort of the parameters under which you were obligated to wear a mask?
A. I don't understand the question.
Q. That's fair.
A. Could you rephrase it.
Q. When you were at IU, when did you have to wear a mask?
A. I had to wear the mask on the bus and anywhere on campus, in the buildings, even in the classrooms during lectures. You couldn't take it off at any point unless you were off campus.
Q. And did you ride the bus sometimes during this time?
A. Yes.

Q. And you would wear a mask, you would comply with that policy?
A. Yes.
Q. Did you attend some classes or lectures also, you know, during the 2020 through 2021 school year?
A. Yes.
Q. In person?
A. Right.
Q. Were some of your classes online or were they all in person?
A. Some were online. Some were in person.
Q. Okay. And when you attended those in-person lectures, did you also comply with the masking policy?
A. Yes.
Q. Do you feel like you suffered any harm from having to mask in those situations you just described?
A. No.
Q. Outside of the testing that you just described, sort of I think you called it mitigation testing, did you ever get any other type of COVID test?

A. Not that I remember.
Q. Okay. Outside of the masking that you just described, were there circumstances when you ever wore a mask if you went other places or anything like that?
A. Yes.
Q. Can you tell me about what some of those experiences were?
A. Yes. I would wear a mask in grocery stores, restaurants, really anywhere in public that had a sign on their front door saying that they required a mask.
Q. Okay. All right. I'm going to -- do you have the link to the exhibit platform?
A. Yes.
Q. You do. Okay. We don't have very many today. So, don't worry, it won't take very long. I'm going to add the first one there now. So, give me just a second.
(WHEREUPON, Policka Deposition Exhibit No. 1 was marked for identification: Signed Verification.)
BY MS. GUTWEIN:

Q. Okay. If you refresh your screen, you should see a pdf. Do you see that pdf there?
A. Yes.
Q. Do you recognize this document?
A. Yes.
Q. And it looks to me like the signature at the bottom is maybe an electronic signature?
A. Right.
Q. Notwithstanding that it's electronic, did you intend that to reflect your signature on this document?
A. Yes.
Q. Okay. I know it's hard with we're all different places but...
Okay. So, this document, as we talked about earlier, relates to, you know, the allegations in the Complaint. So, the next thing I want to do is talk a little bit about those allegations.
So, I'm going to add the Complaint now so we can talk about that. So, if you refresh your screen, you should see that.
(Clarification requested by the reporter.)

MS. GUTWEIN: The verification page is Exhibit 1 and the Complaint is Exhibit 2.

(WHEREUPON, Policka Deposition Exhibit No. 2 was marked for identification: Verified Complaint for Declaratory and Injunctive Relief.)

BY MS. GUTWEIN:

Q. Do you see the Complaint, Macey?

A. Yes.

Q. Okay. And you're welcome to, you know, scroll as much as you want. We are going to talk about allegations that are on page 44. So, at the top left, if you want to type 44 into that box, you can get there quickly too.

A. Um-hmm.

Q. Okay. So, other than alleging your residency at the very beginning of the Complaint, the first paragraph that I see that talks about you is paragraph 207.

Do you see that?

A. Yes.

Q. Is it right that you read these paragraphs before you signed that verification

page?

A. Yes.

Q. And it says here that you have a sincerely held religious objection to the vaccine. Is that right?

A. Yes.

Q. So, you have sought and have been granted a religious exemption to the vaccine?

A. Right.

Q. Do you understand that that exemption means that you can continue on with school in the fall and you won't be subject to the requirement that you have to have a COVID vaccination?

A. Yes.

Q. Then in paragraph 208 it says that you also object generally to the extra requirements of masks and testing applied to you. Do you agree with that?

A. Yes.

Q. Can we talk a little bit about why -- what aspects of those extra requirements do you object to?

A. I object to how some people don't have to wear a mask and some people do. I think there

is a social separation and can expose the person wearing a mask as potentially being someone who isn't vaccinated and that could risk being alienated or judged. Same would apply with the testing.

Q. Okay. Let's -- can we take that in pieces just a little bit.

A. Sure.

Q. Have you yet, since you're living in Bloomington and near campus, have you so far experienced the -- hang on one second. My computer is freezing -- the alienation or being judged that you just described?

A. Yes.

Q. How so?

A. My fellow students and a professor sort of judged me when I told them I wasn't vaccinated.

Q. And when you say sort of judged you, can you tell me more about what happened?

A. Yeah. They started pushing questions on me about why I wasn't vaccinated, and I didn't think it was their place to question it.

Q. Okay. So, first of all, it sounds like you said that you told them that you were not

vaccinated, is that right?

A. Right.

Q. So, whatever their reaction was, it sounds like was not based on the fact that you were wearing a mask. Is that right?

A. I do not understand the question. Could you rephrase it, please.

Q. Yeah, sure. When we were talking a couple minutes ago, you said that your objection to the masking and testing policy is in part that you're worried about feeling judged or alienated because of this I think what you said was social separation that you're worried it would cause because it might cause people to believe that people who are wearing masks are unvaccinated. Right?

And I asked you whether you'd experienced being judged at all yet, and I think what you're describing to me is an experience where you felt judged for being unvaccinated but it's not an experience where you felt judged for wearing a mask. Is that right?

A. Right.

Q. Okay. So, I want to talk about those

two different things.
Before we get back to this experience you were just describing, have you had any experiences where you felt judged for wearing a mask in the context of being at IU?
A. No.
Q. Okay. Have you had any experiences where you felt alienated for wearing a mask in the context of being at IU?
A. No.
Q. Okay. What about being tested, have you had any experience where you felt judged or alienated for being tested while at IU?
A. No.
Q. So, the experience you did have it sounds like was potentially feeling judged by your peers or your teacher I think you said for choosing not to get vaccinated, right?
A. Right.
Q. You said they asked you some questions. Do you remember what kinds of questions they asked you?
A. Sort of. I do remember them asking me exactly why I haven't gotten the vaccine yet, and

they asked me if I had any medical issues that would be why I haven't gotten the vaccine.
Q. Okay. So, was it -- is there anything that they explicitly said that was, you know, derogatory or negative towards you or was it sort of you were reading between the lines of their questions and you felt, you know, that they were implicitly judging you?
A. I was reading between the lines.
Q. Okay. I'm sorry you felt that way. That stinks.
With respect to your objections to the masking and testing requirement, is it fair to say, then, that your concerns about being judged or feeling alienated are worries that you have about what might happen in the fall of 2021?
A. Yes.
Q. Besides, and I just want to make sure that I have, besides what you described what your concerns were, which is the risk of being alienated or judged, are there any other objections that you have to the masking or the testing requirements?
A. Yes.
Q. Okay. What are those?

A. Similar to what I said before with the potential alienation, I don't think it's fair to let some people not wear a mask or take part in what I think is a two-week -- like two-times-a-week testing now and also forcing some people to wear the mask or do the two-day-testing-per-week.
Q. Okay. So, is that -- it's more of a fairness issue as to how certain -- a certain group of people is being treated as compared to another group, not so much that you object to actually whether or not you have to wear a mask, but that you might have to but that other people wouldn't?
A. Yeah. It's a fairness thing.
Q. So, if everyone had to wear a mask the same amount, would you object to that?
A. No. If everyone wore a mask, I would be okay with it.
Q. What about if everyone had to be tested the same frequency?
A. Yeah. If everyone had to be tested, I would be okay with it.
Q. Okay. So, in -- if we look back at paragraph 208, it says that you object to the extra requirements given their unreasonableness. Can you

tell me what you think is unreasonable about the masking and testing policies?
A. Yes. So, people in my age group have minimal risk of COVID. My twin brother experienced very mild symptoms of COVID, and I would guess that my reaction would be the same, if not similar. What else?
People who are vaccinated should not be concerned about people who are not vaccinated because the vaccine should work. They shouldn't be concerned that they will catch COVID from someone who is not vaccinated if they are vaccinated.
And I'm not sure if it is entirely correct, but there was a study done recently saying that vegans and pescatarians are 57 to 73% less likely to contract dangerous COVID cases. I am vegan.
Q. Okay. Any other reason that you think that the masking/testing policies are unreasonable?
A. For me personally, I cannot think of anything else.
Q. Okay. And when you're looking at the screen, are you looking at the Complaint or are you looking at something else?

A. I am looking at the Complaint.
Q. Okay. So, I want to talk about each of those reasons that you just gave me. Is that okay?
A. Sure.
Q. Okay. All right. You said that people in your age group have minimal risk of COVID, and you mentioned your twin brother.
What is your understanding of that people in your age group have minimal risk of COVID based on?
A. Based on studies I have read.
Q. Okay. Do you know which studies those are?
A. Not at the top of my head. I'm not very good at remembering names and numbers.
Q. Okay. Fair. Have you talked to any medical professionals about the risk that COVID might pose to you?
A. Yes.
Q. And what have those professionals told you?
A. They told me that the risks of the vaccine are not worth it. You should not get the vaccine because of the statistics of how minimal

the risk is for someone of my age group and to put my life or well-being at risk for the potential side effects of the vaccine is not worth it.
Q. And is it one medical professional that told you this or more than one?
A. More than one.
Q. Where did you come into contact with these medical professionals?
A. I have had one doctor in the past, and I have been receiving e-mails from him; and another doctor I have visited recently that I have been referred to.
Q. Are these doctors in Bloomington?
A. No.
Q. So, it sounds like you have e-mails from at least one of the doctors that might reflect this advice?
A. Yes.
Q. Okay. Are these like general practitioners? Are they general doctors or do they have a specialty?
A. I cannot remember off the top of my head what their exact specialty is. One of them is more of like a holistic health doctor. He does have a

Doctorate, though. The other one, I think he is a general doctor who specializes in other things as well.
Q. Okay. Besides these two doctors' opinions and your experience with your brother's experience with COVID, is there any other basis for your -- and I guess -- I'm sorry -- you said you also had read some studies.
Any other basis for your thinking that people in your age group have minimal risk from COVID?
A. Not that I can think of.
Q. Okay. And when you say your age group, what does that mean to you?
A. That would mean people who are in their 30s and under, like 30 years old and younger.
Q. Okay. You also said that you think people who are vaccinated should not be concerned about people who are unvaccinated. Is that right?
A. Right.
Q. Why do you think that?
A. Because the vaccine is supposedly supposed to work and from what I've seen statistically, the vaccine seems to be working.

So, I do not see why someone who is vaccinated should be concerned about catching COVID from someone who is not vaccinated if the vaccine is supposed to work.
Q. When you say that the vaccine seems to be working, what do you mean by that?
A. The statistics that have been posted about the effectiveness of the COVID vaccine are on the high side, which suggests that the vaccine is pretty effective in preventing the -- contracting COVID.
Q. Have the statistics that you've seen concerned whether vaccinated individuals can contract COVID or whether they become severely ill or die if they do contract COVID?
A. I think they do take it into account.
Q. Take what into account?
A. The -- so, there is the percentage of effectiveness, and whatever is left over is what the cases of people who have still gotten COVID despite getting a vaccine.
Q. Okay. So, you acknowledge that there are still some instances in which a vaccinated person can catch COVID?

A. Yes. However, statistically, the odds seem pretty low.
Q. And the study that you mentioned about vegetarians and pescatarians I think you said or vegans maybe. Vegans and pescatarians. I'm sorry.
A. Right.
Q. Do you know where you saw that study?
A. It is on Healthline I think. There are different sources that have spoken about the study.
Q. Is your brother vegan or pescatarian?
A. No.
Q. Okay. So, the -- the things that we just talked about, the minimal risk of COVID to your age group, the thought that people who are vaccinated shouldn't be concerned about people who are unvaccinated, and the study that you were talking about about vegetarians or vegans, do those relate to why you don't -- you don't think it's necessary to get vaccinated or do those also relate to why you don't think it's necessary to be masking or be tested for COVID?
A. I think they would apply to both. They are just some of the reasons.
Q. Okay. Are there other reasons that you

don't think that the masking or testing policies are reasonable?
A. For the testing and masking, no. But for the vaccine itself, yes.
Q. Okay. But you have an exemption from the vaccine policy, right?
A. Right.
Q. Do you agree that some individuals might have medical reasons that they can't get vaccinated even if they'd like to?
A. Right. Yes.
Q. How does your thinking, you know, where you said people who are vaccinated shouldn't be concerned about people who are unvaccinated, how do the people who can't get vaccinated even though they wish they could fit into that?
A. So, they would continue doing what we've been doing all along, which is they can wear a mask by choice if they wish, they can social distance and wash their hands regularly, try not to touch surfaces in public that may be dirty. Just doing their part to protect themselves.
Q. Okay. When you said that people who are vaccinated shouldn't be concerned about people who

are unvaccinated because vaccines could work, I took that to mean that people who are vaccinated shouldn't worry if an unvaccinated person isn't wearing a mask because the vaccinated person is, in your view, less likely to contract COVID even if the unvaccinated person has it?
A. Right.
Q. So, what about the person who isn't vaccinated but wishes they could be. Should they be concerned around someone who is unvaccinated and not wearing a mask?
A. Depending on the people they're surrounding themselves with. With people of our age group, I think they would be less concerned since it's been statistically shown that risks of COVID are pretty low with our age group.
I just don't believe that someone else's bodily autonomy and integrity should be affected by somebody else.
Q. Okay. When you wore a mask last year on campus, did you feel like your bodily integrity or autonomy was affected?
A. Yes.
Q. Did you raise any objection to the

masking policy then?
A. No, since everybody had to do it.
Q. So, that goes back to the fairness point that you were making?
A. Right.
Q. So, you don't think that masking and testing are necessary, but if everybody had to do it you wouldn't have an objection to it?
A. Not necessarily. It would be an inconvenience to me, but if everybody had to do it, I would probably take part in it as well.
Q. We have talked about your concerns about the potential for being judged or alienated if the Court were to say, "Yeah, IU, you can continue to have the masking and testing policies" that we're talking about.
Besides your concerns about being judged or feeling alienated, is there any other way that you think you would be harmed if you had to comply with the masking and the testing policies?
A. No.
Q. Okay. If the Court tells IU that it can -- it can move forward with its masking and testing policies, what does that mean for you going

forward with school?
A. I am a transfer student. I transferred from New Orleans. So, that set my course work behind quite a bit, so I had to put extra time into my education here at IU to catch up.
Since I've put so much time and effort into it and I'm fortunate to have my parents pay for the tuition, they have poured a lot of money into my education, I would just have to deal with it and just push forward for one more semester.
Q. Okay. This is a little bit unrelated but just curious. Where in New Orleans were you?
A. Loyola University right next to Tulane.
Q. I spent a good amount of time after the hurricanes rebuilding stuff down there. So...
A. Nice.
Q. It's a lovely city.
A. It sure is.
Q. Yeah. Do you miss it sometimes?
A. Absolutely. All the time.
MS. GUTWEIN: Okay. Melena, I think I don't have anything else. I don't know if you --
MS. SIEBERT: I have just a couple follow-ups, but I don't think it will take long.

MS. GUTWEIN: Okay.
MS. SIEBERT: Okay.
EXAMINATION
BY MS. SIEBERT:
Q. Macey, when you were talking, when Stephanie was asking you about the general topic of feeling alienated and perhaps judged for wearing a mask under this policy and you mentioned an instance, or I don't know if it was limited to one instance or if it was multiple instances, where some fellow students and a professor were asking you about why you weren't going to get vaccinated and kind of pushing you a little bit on that.
Do you remember that conversation?
A. Yes.
Q. Okay. Do you remember approximately when that conversation took place? Was that last semester? Was it this summer?
A. It was this summer.
Q. It was this summer. Were you in a class?
A. No.
Q. Okay. Do you remember what scenario you were in?

A. Yes. I was at like an after-class summer party. My professor held it at his house, and some of my classmates showed up to celebrate the end of the semester.
Q. Okay. And I think you also were talking about in general the fairness with the mask and the testing and so forth, and you mentioned I believe that you did not feel that risk of alienation last year when you had to wear a mask. Is that correct?
A. Right.
Q. Was it more the -- was it the case last year when you had to wear a mask that generally speaking everybody else was too?
A. Yeah, everyone else was wearing a mask. So, everybody blended in.
Q. Do you think that lowered in general the risk of that same kind of alienation --
A. Yes.
Q. -- when everyone else was? Okay.
So, do you think the risk of alienation and judging and the social -- I forget what phrase you used. It was a really good one. Social something. Anyway.
That social -- what did you use? Do you

remember?
MS. SIEBERT: Do you remember, Stephanie?
BY THE WITNESS:
A. Probably social separation or something.
BY MS. SIEBERT:
Q. That was it. I knew there was an alliteration there. Social separation.
Do you think that that risk is greater now than it would have been last year since presumably there will be a lot of people not wearing masks?
A. Yes.
Q. And I'm just curious. You said you're a theater major?
A. Correct.
Q. You have a lot of real interesting majors. Did you say medieval literature?
A. Medieval studies and English.
Q. One of my favorite classes I took in undergrad was Renaissance and medieval history. It was fascinating.
A. It sure is. I love it.
Q. I'm just curious in a theater major how you all have progressed and done performances and

how that has impacted -- how all of this has impacted your -- and by "all of this," I mean the whole COVID pandemic has affected your education in that respect.
A. It was devastating really. Ruined our performances. We could really only perform on Zoom, which can have a huge effect on how actors can interact with each other. It's not as natural. And in my acting classes, we had to wear a mask and social distance.
So, you had to yell at each other so you could hear what the other actor is saying and you could only read like half of their faces. So, you really can't respond the way you naturally would in an acting scenario where there wasn't masks.
Q. Understandable. So, in the fall, will you have any acting classes or classes within your major then?
A. Yes.
Q. And, so, in the fall, if you're in one of those classes and you're wearing a mask but because you fall under the mandate and there are those requirements and other actors working with you are not wearing the mask, do you think that

will impact your education and your performance?
A. Yes. I think it would impact my education as well as theirs.
Q. In what way would it -- some of the ways that you think it would impact your education?
A. Wearing a mask really changes the way you communicate with people. You have to raise your voice and enunciate more, which isn't entirely necessary in someone who does film work. For someone who does stage, that might be fine. But film is more my area of interest.
So, it's difficult for me to have to have that barrier in front of my face when I'm trying to communicate with other actors.
And since acting is a physical experience, I feel like wearing a mask and having to social distance from everybody else would really separate me and actors perhaps might not want to become like physically closer to me and interact with me physically.
Q. And how would that impact their education, the other actors?
MS. GUTWEIN: Objection; speculation.
BY MS. SIEBERT:

Q. You may go ahead and answer, Macey.
A. Like what I've mentioned before, it's hard to see only the top half of somebody's face and know how to respond to them organically in a performance situation.
So, the other actors would have a hard time looking at me and knowing how to gauge the situation and how I'm trying to steer the scene. It just creates a separation and they will have a harder time hearing me sometimes.
Q. Have you had over the course of the past, you know, 16 months since all of this has been in place, have you had conversations with other theater majors or film student majors, whatever the -- in acting classes where you all have talked about the difficulty of performing and acting with -- while wearing masks and social distancing?
A. Yes, we spoke about it often.
MS. GUTWEIN: Objection; hearsay.
BY MS. SIEBERT:
Q. And to the best of your recollection, do those conversations match with what you just talked about as far as the issues with -- with acting with

somebody while wearing a mask?
A. Yes.
MS. GUTWEIN: Same objection.
MS. SIEBERT: Sorry, Stephanie.
MS. GUTWEIN: It's okay.
BY MS. SIEBERT:
Q. Go ahead, Macey. You may answer.
A. Yes. What I said matched what everybody else complained about.
Q. All right. Thank you.
What do you want to go with your -- do you want to go into film then?
A. Yes. I think it's a lot of fun.
Q. That's fun. I would be terrified. But God bless you. It's such a neat talent.
You're not musical theater. Do you sing or just act?
A. I can sing and do stage, but I prefer film.
Q. Okay. All right. Great.
Well, I don't have -- oh, actually I do. I'm sorry.
You spoke about the issue of bodily autonomy. Do you think the issues surrounding

bodily autonomy are greater when you're speaking specifically about the shot versus perhaps when you're talking about the masks and those other requirements?

A. Yes, because something is being actually put into my body versus the masks and doing a saliva test doesn't really alter my body in any way.

Q. Okay. But, again, going back to that bodily autonomy in connection with the masks and the testing, it has more to do with the fairness in your view, correct?

A. Correct.

Q. Okay.

MS. SIEBERT: I think that is it for me too.

MS. GUTWEIN: Just a couple of follow-up.

FURTHER EXAMINATION

BY MS. GUTWEIN:

Q. On the discussion that you were just having about your experience last year when you were masking during the school year, do you have any reason to think that the masking requirement affected your ultimate grades that your professors gave you?

A. No. I think my professors understood the situation really well and were very lenient.

Q. Okay. Do you have any reason to think that they will be different this coming semester?

A. I don't think so.

Q. Okay.

MS. GUTWEIN: I have no further questions, Melena.

MS. SIEBERT: I have one follow-up, then, from that.

FURTHER EXAMINATION

BY MS. SIEBERT:

Q. Macey, do you think that your education has more than grades involved with it?

A. Yes.

Q. What other things are important to you in your education?

A. What I'm actually learning. It's important that I'm getting the most out of my school experience so I can take that knowledge with me into my career.

Q. And, so, do you think that this coming semester, by being forced to comply with the masking requirements and so forth and some of the

impacts that you've already discussed within your specific major, will that impact your education beyond grades?

A. Yes.

Q. Okay.

MS. SIEBERT: That's it for me.

MS. GUTWEIN: I'm finished. Thank you very much, Macey. Really appreciate it.

THE WITNESS: Thank you.

MS. SIEBERT: Thank you so much, Macey.

THE REPORTER: Read and sign?

MS. SIEBERT: Yes, please. Same thing, we would like a rough and final and then expedited as well.

(Time Noted: 3:25 p.m.)

FURTHER DEPONENT SAITH NAUGHT.

I, CORINNE T. MARUT, C.S.R. No. 84-1968, Registered Professional Reporter and Certified Shorthand Reporter, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That the reading and signing by the witness of the deposition transcript was agreed upon as stated herein;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

____________________________________

CORINNE T. MARUT, Certified Reporter

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

\- - - - - -
ERRATA
\- - - - - -

PAGE LINE CHANGE

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

____ ____ ____________________________
REASON: ____________________________

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

RYAN KLAASSEN, et al., )
)
Plaintiffs, )
) CASE NO.
-vs- ) 1:21-cv-00238
)
THE TRUSTEES OF INDIANA )
UNIVERSITY, )
)
Defendant. )

AFFIDAVIT

I, MACEY ROSE POLICKA, the undersigned affiant, being first duly sworn, on oath say that the testimony given at my deposition at the time and place aforesaid is the truth, the whole truth, and nothing but the truth, and that I have read the foregoing transcript consisting of Pages 1 to 53 inclusive, and do subscribe and make oath that the same is a true, correct, and complete transcript of my deposition so given as aforesaid, and includes changes, if any, so made by me.

FURTHER AFFIANT SAITH NAUGHT.

______________________________
AFFIANT, MACEY ROSE POLICKA

SUBSCRIBED AND SWORN TO before me this day of , A.D. 20 .

______________________________
Notary Public

LAWYER'S NOTES

PAGE LINE

____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________