UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

RYAN KLAASSEN, JAIME CARINI, )
D.J.B. by and through his )
next friend and father, )
Daniel G. Baumgartner, ASHLEE)
MORRIS, SETH CROWDER, MACEY )
POLICKA, MARGARET ROTH, and )
NATALIE SPERAZZA, )
)
Plaintiffs, )
)
-v- ) CASE NO.
) 1:21-cv-238-DRL-SLC
THE TRUSTEES OF INDIANA )
UNIVERSITY, )
)
Defendant. )

The 30(b)(6) deposition upon oral examination of THE TRUSTEES OF INDIANA UNIVERSITY by AARON EDWARD CARROLL, M.D., a witness produced and sworn before me, Debbi S. Austin, RMR, CRR, Notary Public in and for the County of Hendricks, State of Indiana, taken on behalf of the Plaintiffs at the Health Information and Translational Sciences Building, 410 West 10th Street, Indianapolis, Indiana, on July 8, 2021, at 8:59 a.m., pursuant to the Federal Rules of Civil Procedure.

STEWART RICHARDSON & ASSOCIATES
Registered Professional Reporters
(800)869-0873

APPEARANCES

FOR THE PLAINTIFFS:

James Bopp, Jr., Esq.
THE BOPP LAW FIRM, PC
1 South Sixth Street
Terre Haute, IN 47807
jboppjr@aol.com

FOR THE DEFENDANT:

Anne K. Ricchiuto, Esq.
FAEGRE DRINKER BIDDLE & REATH LLP
300 North Meridian Street
Suite 2500
Indianapolis, IN 46204
anne.ricchiuto@faegredrinker.com

INDEX OF EXAMINATION

| EXAMINATION | PAGE |
|---|---|
| By Mr. Bopp: | 5 |

INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 6 |
| Exhibit 2 | Declaration of Aaron E. Carroll, M.D., M.S. | 7 |
| Exhibit 3 | 5-26-21 Indiana University Restart Committee Recommendations for Fall 2021 | 10 |
| Exhibit 4 | Indiana University COVID-19 FAQs | 44 |
| Exhibit 5 | IU COVID Response Surveillance and Mitigation Update April 21, 2021 | 73 |
| Exhibit 6 | 6-30-21 Indiana University COVID-19 Testing Dashboard | 78 |
| Exhibit 7 | Graphs from Dashboard | 79 |
| Exhibit 8 | Medical Response Team Organization | 83 |
| Exhibit 9 | ISDH 2019 Novel Coronavirus Dashboard and Map | 88 |
| Exhibit 10 | COVID Data Tracker Weekly Review - Interpretive Summary for July 2, 2021 | 90 |
| Exhibit 11 | Management of Infectious and Communicable Disease | 92 |

INDEX OF EXHIBITS (CONT'D.)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 12 | The Continuum of Pandemic Phases - 508 | 99 |
| Exhibit 13 | 9-26-14 Updated Preparedness and Response Framework for Influenza Pandemics | 106 |
| Exhibit 14 | 9-26-14 Appendix: CDC Intervals for a Novel Influenza A Virus Pandemic: State/Local and Federal Indicators, Decisions, and Actions | 108 |
| Exhibit 15 | Written Request for Religious Exemption from COVID-19 Vaccine | 115 |
| Exhibit 16 | 7-7-21 Article - Trustees approve plan to open West Lafayette campus to normal operations | 117 |
| Exhibit 17 | 7-7-21 Article - Protect Purdue for Fall 2021 | 123 |

EXHIBIT
129

THE REPORTER: My name is Debbi Austin, an associate of Stewart Richardson & Associates, One Indiana Square, Suite 2425, Indianapolis, Indiana. Today's date is July 8, 2021. The time is 8:59 a.m. This deposition is being held at the Health Information and Translational Sciences Building, 410 West 10th Street, Indianapolis, Indiana. The deponent is Aaron Carroll, M.D.

Will counsel please identify themselves and any persons present with you for the record.

MR. BOPP: James Bopp, Jr., for plaintiff.

MS. RICCHIUTO: Anne Ricchiuto for Indiana University.

AARON EDWARD CARROLL, M.D.,

having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. BOPP:

Q Good morning. Will you state your full name, please.

A Aaron Edward Carroll.

Q And what's your current position?

A I probably have a few. So I am -- I'm a distinguished professor of pediatrics in the IU

School of Medicine. I'm also the director of the Center for Pediatric and -- Pediatric and Adolescent Comparative Effectiveness Research. I'm associate dean for research mentoring in the school of medicine. I'm a vice chair in the department of pediatrics, vice president for faculty development at the Regenstrief Institute, and chief health officer for Indiana University.

Q Now, you understand that you have been designated by Indiana University Board of Trustees to be the 30(b)(6) deponent that would be testifying on behalf of Indiana University?

A Yes.

Q Did you receive a Notice of Deposition about this deposition?

A Yes.

(Deposition Exhibit 1 marked.)

Q Do you recognize that?

A Yes.

Q Note the third page is the subject matters for the deposition.

A Yes.

Q And those are the topics that plaintiffs propose to examine you on in this deposition.

Do you understand that?

A Yes.

Q And then when you testify, you will not be testifying only about your personal knowledge, but you will be testifying about the corporate knowledge of Indiana University on those subjects?

A Yes. Although I imagine if you ask me questions that I think you're asking me personally, I'll ask for clarification, but yes.

Q That will be fine. And you can ask for clarifications any time, of course.

A Yes.

Q What did you do to prepare for this deposition?

A I reviewed the materials that were part of the brief, or the briefs -- I may use wrong words, the complaints as far as I saw. I reviewed the documents that IU submitted as well, as well as to go over this list and feel that I was prepared to do so.

Q Did you prepare a declaration in this case?

A So if a declaration is the affidavit? I just want to make -- then yes, I did.

(Deposition Exhibit 2 marked.)

Q Is that your declaration in this case?

A Yes.

Q Now, you identified one of your responsibilities as

chief medical officer for Indiana University.

A It's chief health officer, but yes. It's just somebody might take offense.

Q I was looking for it to get it right, and I'm sorry about that. Chief health officer.

A No, no worries.

Q What do those duties encompass?

A That is a hard question to answer. The position was just created only a couple of weeks ago, and it was vaguely created because it was at the very end of President McRobbie's term and clearly needs to be more settled with the new president, President Whitten's wishes, as well as the executive vice president for clinical affairs, Jay Hess.

But in the short term, it's helping to reorganize and direct our COVID response and, you know, be prepared for other similar things in the future.

Q Now, what have you done with regard to the COVID response? What have you been involved with?

A Probably most aspects, but if we go back to the very beginning, it would have -- I was one of the members of what we called the restart committee. And then later became a member of what we called the medical response team. And mostly I was

overseeing our asymptomatic testing and some of our -- much of our communications efforts about COVID. And part of the general leadership team, I think, that directed and advised leadership and how we might move forward.
Q Let's talk about the restart committee for a moment. When was the restart committee formed?
A It was soon after campus closed or when we sent everyone home, so I think it would have been spring of 2020.
Q And what was your role in that committee?
A Member. It was overseen by Jay Hess, and I was asked to be a member on it.
Q And then headed up the asymptomatic testing?
A Well, it's -- restart was mostly advisory, and so I would say the medical response team was more implementation. And so those were two separate roles. So it was not leading asymptomatic testing for the restart committee. It would have been more as part of the medical response team.
Q Understood, okay. Now, ultimately the restart committee issued recommendations?
A Yes.
Q And when was that done?
A Well, it was done a number of times, so I think

originally we worked on what we called the restart document, which I think our first one was for fall semester of 2020. But then we later released other documents for spring of 2021, summer of 2021, fall of 2021. Those are the primary outputs.
Q I think we're focusing on the fall of 2021.
(Deposition Exhibit 3 marked.)
Q Let me show you what's been marked as Exhibit 3. Is this the document providing the recommendations of the restart committee for the fall of 2021?
A This appears to be the version from May 26th. I can tell you it has been revised since that time. But this appears to be that version.
Q And I'll be very interested as we go through this, any revisions that you could point us to.
A Sure.
Q Now, as a result of the recommendation on May 26, did IU issue a policy regarding the fall of 2021?
A Yes.
Q And that is called what?
A Well, I imagine there were a few policies. I'm not sure which one you're getting at.
Q Well, I'm referring to the COVID-19 vaccine requirement.
A Okay, so yes, that is a policy that came out of

this. It came probably I would imagine from recommendations here.
Q And then was that policy issued?
A I believe it was right after commencement of 2021. Commencements were done.
Q I mean, as a result of your recommendations on May 26, 2021.
A I believe this -- as I said, this is the May 26 version. I'm not sure this was the first version. I can't -- I think there might have been an earlier version of this, and that's the one that --
Q Okay. What I'm asking you about is what policies were issued by Indiana University as a result of this report.
A I do not remember the exact date that the vaccine policy was issued, if it was after this, then it would have been because of this, but there were -- if this is -- to be honest with you, I don't remember if this is the first version. Whatever it is -- the vaccine policy did come out of the restart org.
Q Let's look at Exhibit 3. Could you turn to page 6.
A Yes.
Q And I'm referring you to, of course, the introduction that is on page 6. And there's some

statements I want to ask you about. All right?
A Yes.
Q There is the second paragraph -- or second sentence after introduction. "It is a particular threat" -- "it" meaning the COVID-19 virus -- "is a particular threat for older patients and those with certain pre-existing conditions."
So when you say -- when this report says "a particular threat," what was the report referring to?
A COVID.
Q No, I mean the adjective particular threat to older patients.
A I think it's saying that it is a higher risk for older patients.
Q And what is the difference in risk between older and younger patients --
MS. RICCHIUTO: Object to form.
Q -- or persons?
MS. RICCHIUTO: You can answer.
A Of course it matters what you mean by "older" and "younger."
Q Well, let's say college age, which is, I think, typically referred to as 18 to 29; is that fair?
A Sure.

Q All right. And then people over 85.
A People over 85 I'd say would have a substantially higher risk of death and of significant illness, perhaps requiring hospitalization. Both of those risks would be much lower in healthy people who are 18 to 29.
Q Now, is it fair to say that the risk of adverse affects of a COVID-19 infection for those over 85 -- over 85 is over 600 times greater than those of college age?
MS. RICCHIUTO: Objection, lack of foundation.
You may answer.
A It depends what you are referring to as "adverse risk."
Q Well, let's say serious morbidity and mortality.
A The risk of death, yes, absolutely, yes.
Q Now, is it also true that the risk, adverse risks increase by age, of COVID-19 infection?
A I think generally with -- you know, in general, if you're lumping all risks together, then yes.
Q And so the very least risk is those -- the youngest, and the greatest risk is for those that are the oldest?
A If we're --
MS. RICCHIUTO: Object to form.

A If you're talking about a linear scale where we go all the way down to babies, I don't know if that is true. If you're talking about 18 to 29 going up to the very elderly, then yes.
Q The first line of the third paragraph says, "Our overall goal has always been to make it safer to be part of the IU community than not to be a part of it."
What was the goal of the recommendations of the committee when they issued this report, the overall goal?
A The overall goal of the -- this report or the first restart or all restart reports?
Q We're talking about this one.
A To prepare for the fall semester and give recommendations on how that could be as safe as possible.
Q Now, what does as safe as possible mean as far as the goal of the committee's recommendation?
A Well, safety is not binary, in the sense that things are safe or unsafe. There is always risk in the world. And I think our goal was to try to make things as safe as possible while all -- while also understanding that we wanted to have a full and open campus experience.

Q When you say "as safe as possible," is that -- are we talking about -- I want to try to get specific here. Are we talking about COVID spread; is that what we're talking about?
A I think it refers to -- I think COVID spread is also linked to worse outcomes of getting COVID, and so it's all tied up together.
Q Was the goal to reduce the spread of COVID-19 down to zero or as close to zero as we can get?
A I would never -- I mean, I think I've said, getting it to zero is not an attainable goal in the real world, that our goal was to reduce it as much as we could. But really, again, in the same vein of saying to be safer in the IU community than not to be safer, was to make it so that you were less likely, you know, to see spread or be exposed or get infected if you were part of the IU community than if you were not.
Q Now, the next sentence says, "This not only protects IU constituents but also protects the communities in which they operate."
So if I understand that sentence, that the committee's recommendations were based on safety of the IU community, but also the community outside the university in which these -- the campuses

exist; is that right?
A I'm not sure I would phrase it that way.
Q How would you phrase it?
A I think that we were attempting, again, to make IU as safe as possible. And one of the secondary benefits of that was that it was likely, if IU was safer, then the communities in which we reside become safer. Conversely, if IU was dangerous, we would potentially be a danger to outside communities.
Q So when you refer to the outside community, the goal as you understand it was to make the IU constituents safe, and a collateral benefit would be safety for the outside community; is that correct?
A Yes.
Q Were any of the recommendations that were made in the -- by the restart committee in Exhibit 3 based on benefit of people outside of the IU campus or community to make things safer for them while not having any appreciable benefit to the IU community?
MS. RICCHIUTO: Object to form.
A I don't think so. I think that our goal was focusing on the IU community with a secondary benefit of -- and that gives me notice here, that

this just not only happens to protect IU constituents, but those around.
Q Are there any particular people in the outside -- is that all right if I use that phrase, outside?
A Sure.
Q I want to use what you are comfortable with.
A Okay.
Q -- outside community, that were considered?
A I mean, I'm sure we talked about benefits to the outside community, but I don't recall any time we prioritized, if that's what you're asking, the outside community.
Q There's a sentence right in the middle of that paragraph that says, "Our systematic [sic] management and testing, contact tracing, quarantine, and isolation, widespread asymptomatic testing and mitigation, and robust communication and behavioral recommendations were a success during the 2020-2021 academic year."
How do you measure -- how does IU measure that success? What's the metrics?
A So first of all, I would say I think you just said systematic management. It was symptomatic management. I just want to correct that.
Q Thank you.

A I'd say there are a variety of metrics we would consider. Number of cases, number of severe cases, how we -- you know, how many outbreaks we might have seen, how our course compared to surrounding communities or Indiana, because again, I think if we go back to our goal of being safer to be part of the IU community than not, we were -- we could benchmark ourselves against those who were not in the community, meaning the rest of the state, if that's the closest probably benchmark that we would look at.
But we would look at a variety of metrics I think.
Q May 26, 2021, when this report was issued, how would you characterize, for instance, the incidence of positive COVID testing for students? Would you say high, low, middle?
A It was --
MS. RICCHIUTO: Object to form.
A I mean, again, those are all relative terms. But compared to other times during the semester, it was on the lower side.
Q So it was low enough that IU viewed it to be a success?
MS. RICCHIUTO: Object to form.

A I again think that the success is not a single point in time. We're talking about the entire 2020 to 2021 academic year.
Q Well, if you want to look at the entire one, isn't it true that the -- throughout the course of the infections, among IU students, went up; in fact, when the school year started in August of 2020, it was on the way up and then peaked and then came back down.
A I had actually --
MS. RICCHIUTO: Object to form.
A I think I would describe it also as it spiked. It was not just trickling up at the beginning. Like, we saw a pretty rapid spike.
Q Right.
A And then it came down. If I was thinking about it again, I'm going from memory, but I believe it actually started to go up again as we approached Thanksgiving. In December had a better handle on it. And then in the spring semester, yes, I believe much of the spring semester we had a more intense response and kept positivity rates, if we're just going to go by that, lower.
Q Well, what other metrics would you -- did the committee consider?

A Again, I think, you know, number of cases, but that's tightly tied to positivity because of all of the testing that we do.
We also saw, I think, fewer outbreaks in the spring. We certainly did not have the outbreaks in the Greek houses that we had in the fall. Even in the dorms when we did see even I think what we were concerned could become outbreaks, we pretty quickly were able to control them. And those are the top line things I think we probably would have -- you know, off my head.
Q To IU's knowledge about this subject, how many IU students died as a result of COVID infection?
A I would need to look at documents for that, but it was very small, if any.
Q I think we -- one study reports, and that's in the affidavit of our expert, that there was one.
A That is possible.
Q Do you know when that death occurred?
A I don't remember exactly, although I do remember discussions because we don't -- we don't go into medical records and look. So I don't know the exact details of that student's death, unfortunately.
Q Do you have an approximate time of when it

occurred?
A I don't know off the top of my head. I believe, yeah, others might, but I don't.
Q Now, if we go to the next page, please. The first sentence -- well, of course, at the top we see positivity rates; correct?
A Yes.
Q And that's from August 23rd of 2020 to May 9, 2021?
A Yes.
Q Then this reflects the numbers of tests and the positivity rate?
A The number of total tests, the number of positive tests, and then the percent positive for positivity rate, yes.
Q Now, as I understand the chart, and of course if -- if it was bigger, we'd probably -- it would be better.
A Yeah.
Q But is that the positivity rate starting somewhere in February, maybe February 14, let's start there, 2021, while not zero, was very close to zero?
A Overall, it depends what you mean by "very close," of course. But yes, 1 percentish, maybe lower, or about 1 percent.

Q Say below 1 percent?
A I don't want to say it never got above 1 percent because it's possible, but it hovered around 1 percent.
Q And that's in contrast with the spike we saw between August 23, 2020, and September 13, 2020?
A Yes. I believe if you were to turn this on your side, it would follow the course that I described before, where we spiked pretty quickly, came down, were rising again right before Thanksgiving, came down again in December, and then, you know, most of spring semester kept it pretty low with a trickling up towards the end.
Q Okay. Now, the first sentence after the chart said, "In developing recommendations for the 2021 fall semester, we are operating under the assumption that the vast majority of our constituents will be vaccinated, allowing us to achieve herd immunity in our community."
What did the committee mean or IU mean by saying "the vast majority"? What are we talking about?
A Well, again, I would say that this is the restart committee, which is not necessarily IU.
Q Yes, correct.

A I think vast majority means very high. I don't think that there was a number.
Q What would be the range of vast majority?
MS. RICCHIUTO: Object to form.
A I think that that would depend on who you asked.
Q Well, what's the range of opinions among who you would ask?
MS. RICCHIUTO: Object to form, no foundation.
A I mean, I can't speak for everybody. I think a number of people I would think about would say somewhere between 70 and 95.
Q And you understand that that vacc- -- the restart committee understood that requiring -- that having the vast majority of constituents vaccinated was necessary for herd immunity?
A Having the vast majority of people immune would be necessary for herd immunity.
Q Okay. And immunity is a good correction there. Immunity could be achieved by vaccinations or by having already been infected; correct?
MS. RICCHIUTO: Object to form.
A It would depend. Again, I think we're using herd immunity as a broad term. It's not the same as immunity.
Q Well, what about my question? Immunity -- what are

the other ways that immunity can be achieved other than by the vaccine?
A Those two ways. You're just saying that we could -- you can achieve -- you get immune either by being vaccinated or by being infected, but those are not necessarily equivalent levels of immunity. Immunity is not binary.
Q For either one; right? Either the vaccines or the --
A Well, immunity, the immunity achieved is achieved one of two ways. It is just not a binary term.
Q Well, what has IU done to try to determine how many students have been infected by the COVID vaccine?
MS. RICCHIUTO: Lacks foundation.
A What do you mean, "been infected"?
Q Have been infected by the COVID. What have they done to try to determine how many people have been infected by COVID?
A Oh, okay. That's a different -- you said the COVID vaccine, so I didn't understand the question. So you can't be infected by the vaccine.
Q I was doing that yesterday too, so I apologize.
A So infected by COVID?
Q Yes.
A I mean, we tested a lot of students which detected

a large number of infections.
Q Has IU computed a percentage or range of the students they estimate have been infected by the COVID virus?
A We know the number of students that we know have been infected by COVID.
Q And how many is that?
A I can look it up. I apologize, I need to find where I wrote it in the affidavit, but ...
Q That's all right.
A Well, I thought it was -- I thought I had put it in here, and I don't see it, so I can't find it exactly. Therefore, I can only estimate, but I believe it was something around 11,000. It might have been more.
Q 11,000 out of 90,000, approximately?
A Again, I don't know total enrollment, but that sounds right.
Q So it's somewhere --
A Yeah, I'm sure it's in that -- that is approximate, yes. That's not an order of magnitude off.
Q The second paragraph begins with "Hence, we recommend that IU implement a vaccination mandate that requires all constituents - IU faculty, staff, students, residents and Fellows - to be vaccinated

by a set date before the beginning of the Fall semester."
And IU implemented that recommendation; correct?
A Yes.
Q So as you -- so IU's policy on vaccines is that it is intended to achieve a hundred percent vaccination rate upon those groups at the IU campuses; is that correct?
MS. RICCHIUTO: Object to form.
A I don't think that that is correct.
Q What is the goal?
A I don't think we expected to achieve a hundred percent. There are, of course, exemptions.
Q About how many exemptions have been granted?
A That changes every day because we have more.
Q Sure.
A But I think probably today, somewhere on the order of 7,000.
Q 7,000?
A Uh-huh.
Q So that would mean that IU's vaccination mandate would require the other approximately 83,000, certainly students, and in this case is about students, so let's --

A Yeah, 7,000 is everyone, not just students. But I understand what you're saying.
Q Oh, okay. How many students?
A I would have to go look that up, but I would estimate 5- or 6,000.
Q So let's say 5-, and so that would mean approximately 85,000 students need to be vaccinated?
MS. RICCHIUTO: Object to form.
A No, we don't necessarily have -- not everyone has either filed an exemption or reported. So we don't -- I expect there will be more exemptions in the future.
Q Subject to people getting exemptions, everyone else is required in order to attend IU to be vaccinated?
A Yes.
Q Now, with respect to students that, for instance, get a medical exemption or a religious exemption, they are also required, as I understand the policy, to mask, to be tested twice a week, and that there are other potential restrictions.
A Mask, yes, when they are in certain situations. Testing, I don't believe we have set an amount. I think there were initially some language posted about twice a week, but that has all been removed

because that is not determined. And I don't know what other restrictions you're referring to because I'm not sure there are any.
Q So this is one of these changes you said might have occurred since the original mandate?
A Well, again, the mandate was for -- I believe even when that language was posted, it said perhaps up to two times a week because that is what -- that is what we did for higher risk people in the spring. But I don't think today we have necessarily determined how often we will test people in the fall.
Q Okay, we'll get to that then. Thank you.
Why is IU requiring exempted people to potentially mask, potentially be tested, and to potentially be subject to other limitations?
MS. RICCHIUTO: Objection, misstates the testimony.
A With -- we are requiring masking still because that is still CDC recommendations. And as I said in certain situations, indoors, around others, or when you can't properly distance, we're doing that.
With the testing, we have always focused our mitigation testing on those who were at highest risk in the fall and spring, as I said before, that

was our -- actually, I didn't say it before. Our students in congregate living, for instance, students in Greek houses, students in dorms, we tested them, for instance, twice a week, all spring, or most of the spring. And so moving into the fall, those who are unvaccinated are our highest risk of infection or illness population. And so therefore, that is where we will focus our mitigation testing.

Q So however often it happens, and we'll see about that soon, I think, in the materials, you would expect a -- well, this chart would suggest if things haven't changed that you would get a positivity rate of about 1 percent?

MS. RICCHIUTO: Object to form.

Q For the tests that are being administered to people who have an exemption?

A I do not know that.

Q What evidence do you have that it wouldn't be 1 percent?

A Because the world would be very different and the other things about IU will be very different in the fall than they were in the spring.

Q And what do you know will be different?

A We are liberalizing many things. We are no longer

requiring masking for those who are vaccinated. We are no longer requiring social distancing in classrooms. We're no longer prohibiting full dining rooms or going to football games or mass gatherings. And because people will be acting very differently and not doing many of the protective behavioral things that we sought to have people do in the spring, it's possible that there could be higher risk of transmission amongst those who are infected.

Q So in other words, part of your recommendations is to decrease the safety of IU students by lifting these requirements?

MS. RICCHIUTO: Objection, misstates the testimony, lack of foundation.

A I would not say it that way.

Q Well, but you said it increases the risk or it possibly does?

A I think that there is an increased risk amongst those who are unvaccinated that there could -- that they could, yes, have a higher chance of getting infected if they come into contact with someone because I expect they will not be engaging in the same kind of broad protective behavioral measures that were already -- that were implemented more

widely in 2020, you know, to the first half of 2021.

Q But the other thing that will be different I assume is they'll -- everyone without an exemption will be vaccinated?

A Correct.

Q And so if that achieves herd immunity, as you're hoping it does, then that risk should be diminished substantially?

MS. RICCHIUTO: Object to form.

Q Is that correct?

A Again, you're asking me to predict the future. I don't know that. That's one of the reasons we want to do testing to determine if that is the case.

Q But you've made a -- as you described here, the committee made a recommendation based upon that premise?

A I don't think that is the premise upon which we made it.

Q Okay. What -- and just so that I understand what premise you're saying you didn't, what premise do you?

A As I said, I think we've always focused our mitigation testing on those who are at highest risk in order to pick up asymptomatic cases before they

can spread. Most of the disease we're still seeing in the real world is being spread amongst unvaccinated people. They are still at risk. Therefore, we still have safety and protective measures in place for those who are at highest risk.

Q My question was focused on the positivity rate of less than 1 percent that you've experienced so far this -- the last few months and why you think the positivity rate would increase in the fall.

A Because this is a seasonal virus, and that's what we saw last year. And it's what we often see with seasonal viruses, that mostly spike into the fall and winter. And that's what we saw last year, and there's concern that that's what we'll see this year.

And there's also concern that, again, much of the disease spread cases, and therefore adverse outcomes, will be amongst those who are unvaccinated, which is why we are focus -- still maintain safety measures on those who are at highest risk.

Q And when you say you're creating a binary situation, again, here, vaccinated and unvaccinated, you're not taking into account those

that may have developed natural immunity by being infected?
MS. RICCHIUTO: Object to form.
Q Is that right?
A We do for 90 days after infection per CDC recommendations. Infection -- 90 days after infection.
Q Are you aware that there are recent studies that have found empirically that immunity goes much longer than 90 days; are you aware of that?
MS. RICCHIUTO: Object to form.
A I am aware of studies that have looked at certain populations and have found evidence which may indicate that immunity may last longer than 90 days.
Q So -- I mean, I know this was the committee, you know, cited a lot of CDC information. Was the committee just committed to follow whatever the CDC says, or were -- was the committee willing to take into account other evidence or other developments?
A I would say the latter.
Q But based on the evidence of the current state of COVID infections in, let's say, the state of Indiana, all right, what phase are we in in a pandemic? Are we accelerating, decelerating,

transitioning? Where are we?
MS. RICCHIUTO: Object to form and compound.
A I think you're asking a complicated question.
Q Indeed.
A So I think part of the problem is that we are -- the pandemic changes. And pandemics don't follow one specific path. If no more dangerous variants appear, then I think the fact that we are achieving higher and higher levels of immunization means that we are approaching the beginning of the end.
But I think if you're asking me about the fact that we have few cases in Indiana at this moment, that also is because it's a seasonal virus. And last summer looked great too before the major spike in the fall. So I think we're probably in a one phase with the overall pandemic, which could change, but some of what we're seeing right now is also seasonality.
Q I mean, I understand, you know, thinking about the future, the possibilities in the future and all that, but where are we now with the pandemic, the COVID pandemic? Where are we right now? What phase are we in?
MS. RICCHIUTO: Object to form, vague.
A It depends who you mean by "we," and it depends --

and you're asking --
Q The state of Indiana, let's just say.
A Okay. Again, it depends on how variants come and what happens in the future. We have not -- we cannot say that -- I do not know. We don't know that.
Q I mean, did the committee consider this --
A Absolutely.
Q -- where we are in the progress of the pandemic?
MS. RICCHIUTO: Object to form.
A Yes. But with --
Q And it came to no conclusion?
MS. RICCHIUTO: Object to form, misstates the testimony.
A No.
Q That was the question.
A We did come up -- we issued a report. I do think we came to a conclusion.
Q And what was that?
A That it is not -- that getting people -- again, if you're asking me specifically where we are in respect to the pandemic, it is that, again, if there are no changes in variants and therefore the risk of overcoming what immunity we have right now, that as more and more people get vaccinated, it

will become safer and safer. And the pandemic will --
Q And then tell me where you think we are in the phase of the pandemic.
A I don't understand --
MS. RICCHIUTO: Object to the question. It's been asked and answered multiple times.
A I don't understand the premise. As I said before, like, I don't think that pandemics have, like, you know, A, B, C, D, where you can say we're at B or C, especially since this is a global problem, and you're asking me to define it in a local area.
Q The next page, 8, the first bullet, full bullet point, The IU population to date has had a very low rate of hospitalization and death due to the COVID-19 infections.
We've already discussed death. What about hospitalizations? And again, I'm talking about students.
A I mean, I think low in general. But again, it's difficult for us. We can tell if a student is hospitalized and has had COVID, but we cannot tell if they have been hospitalized because of COVID. Like, again, we don't go into their medical record.
Q But what you know, in terms of hospitalization,

you're saying a very low rate.
A Yes.
Q What do you mean by "a very low rate"?
A I think, again, I don't have the numbers in front of me, and I don't know them for sure. I am sure we can look them up. But tens, I would imagine. I mean, it was low.
Q Ten over the period of the pandemic?
MS. RICCHIUTO: Objection, misstates the testimony.
A Tens. You know, it could be -- let's say somewhere between ten and a hundred, I don't know where it was. But over the course of the pandemic, yes.
Q In the middle of page 8, you have a section called "Major Changes from Summer 2021 Report." Of course, the first is that vaccines are now mandated for all IU constituents, with medical and religious exemptions; is that correct?
A Yes.
Q And that was implemented by IU?
A Yes.
Q And then No. 2, "Most restrictions on distancing and masking requirements are lifted with the exceptions described in the report."
Has that been implemented?

A Yes. I mean, it's implemented for fall.
Q For fall. Now, there was a change just like two days ago where the mask mandate for all vaccinated people was supposed to be lifted July 31, and tell me if I'm wrong about this. But then now that has been lifted earlier?
A Correct.
Q So that it is now optional for all vaccinated students?
A And faculty and staff, but yes.
Q What was the basis of that recommendation? Or the basis of that action?
A You know, I think even in the announcement it was said that it was, you know, one, we're achieving higher and higher levels of vaccines. We also are seeing very -- you know, COVID, it's the summer, we're seeing far fewer cases. And given the CDC's changes in recommendations and most of Indiana's changing recommendations, that we decided to move it up.
Q Will this change make IU students less safe?
A In a binary way, did the safety go up some unmeasurable -- like go -- you know, did the risk go up some small tiny amount, it is possible. But not probably to a level that we would -- that most

people would be concerned about.
Q Then No. 3, you had -- the committee recommended change in mitigation testing.
A Yes.
Q And has that been implemented?
A Again, it will be in the fall.
Q And by the way, I'm sorry about the yellow marks on it.
A That's mine. No, don't worry, it's my fault. We highlighted everything in the document that changed from summer so people could see. As you can see, a lot of this was revised.
Q Oh, so the yellow was what the committee did?
A No. Remember, we submitted some -- we had fall recommendations, spring recommendations, summer.
Q Right.
A Every time we rewrote the report, we would highlight the major changes from the previous report so that people who wanted to just see what's different from summer could go look.
Q I thought maybe one of my associates did this.
A No.
MS. RICCHIUTO: I think that's -- yeah, I think that's how it -- I think this is really what the report looks like.

A That is what the report looks like. And I did the highlighting, so you can blame me.
Q Well, I'm glad I clarified that.
MS. RICCHIUTO: Don't get anybody in trouble, Jim.
MR. BOPP: I know, I was like, why did you give me --
A No, this is my fault.
Q Turn to page 10, please. At the bottom regarding campus housing, No. 4, Any vaccinated person will be guaranteed a vaccinated roommate. Exempt students may be roomed with either exempt students. If the vaccinated student and exempt student both request to be roommates, this is permitted but must be documented.
Was that -- has that recommendation been implemented?
A I think you misread it a little bit, but the recommendation as written will be implemented for fall.
Q I'm sorry if I --
A It's okay.
Q -- misread it. I'm having a really difficult time because of the light coming in my eyes. And I only have one that works. So it's always a problem for

me.
A No worries.
Q Now, how is IU considering implementing this recommendation for the fall? What would be the implementation procedure?
A I believe that housing is running that, but that when they do their -- if people often request roommates, then as long as everyone agrees and understands, then they can be roommates. Otherwise they are randomly paired.
And we are -- because we've had a lot of concerns from parents who want -- if their child is vaccinated, want to know that the roommate is vaccinated, we are, saying, fine, vaccinated people will be paired with vaccinated people unless students don't want to be. And if they both agree, if they're both paired and they agree, then they can do what they like.
Q So will there be -- in implementing this recommendation in the fall, when you say roommate, you mean literally who they're rooming with?
A Correct, the person who lives in their room with them.
Q Now, is there any provision if people in the, you know, the wing, the hall, have objections to

recognizing those and segregating?
A As far as I --
MS. RICCHIUTO: Object to form.
A As far as I know, there is no assigning of floors. This is just by room.
Q Page 12, please. At the bottom, vaccination exemption, No. 2, Medical exemption with documentation from provider; allergy to the COVID-19 vaccine or their components.
So is the medical exemption limited to those with an allergic reaction to the COVID-19 vaccines as IU has implemented that recommendation?
A No.
Q Okay. What are the other categories?
A I think broadly we're following the CDC categories which continue on the next page. You know, we are objectively providing deferrals for those who are pregnant or breast-feeding, also for those who are immunocompromised under certain conditions. These are, of course, what we set up as the original CDC.
But as students have been -- if a doctor believes that there is a legitimate exemption outside of that and writes us on the form, explaining what they think that exemption is, we grant it.

Q Even if it doesn't fall within the specified conditions?
A Yes. Then we do ask for a doctor note to explain it, but then yes.
Q Oh, by the way, are you the principal author of this report?
A I would not -- I don't think that anybody claims principal authorship. The original document was written in March, and I think it was more divvied up then. I would say I probably take most of the responsibility of the editing and updating based upon, you know, sort of everyone's input. But the original report was more of a shared document.
Q Turn to page 19. And you have a couple of categories of references here. The first one at the top of page 19 is references cited. That refers to references cited in the report?
A Yes, like footnotes or things, yes.
Q And then the sources used would be sources consulted but not cited in the report?
A Correct.
Q Were there any sources that were used by the committee, consulted by the committee, that you don't list here?
A I imagine there were things people read that

perhaps did not get listed.
Q Now, how did you make the list? How do you get on the list? Do you have to share it with the committee?
A Correct. When people were saying, these are the sources I used for my part, we included them.
Q So if something was shared with the committee, it would make the list?
A If it was felt it contributed, yes, I would think so.
Q So this is just to summarize I guess, it seems obvious to even me, is that these are committee resources, not necessarily what resources an individual might have consulted who's a member of the committee?
A I think it might differ by committee member, but yes, broadly, likely.
(Deposition Exhibit 4 marked.)
Q I'll show you what's been marked as Exhibit 4. And I'll represent, you know, I got this from the IU website, which is frequently asked questions regarding the COVID-19 policy.
Are you familiar with this?
A I am familiar with the FAQ, yes.
Q Did you -- I mean, who drafted this? Did you play

any role in this?
A The communications department --
MS. RICCHIUTO: Object to form.
A The communications department is largely responsible for this, but I am sure there are times when they said, could you write something for this question, and I contributed.
Q Is this the best source for further information about the vaccination mandate policy for IU?
A I think it's the best easily referenced -- easily found source.
Q That's what I found.
A Yeah. I mean, I'm certain asking us direct questions is the best, but this is certainly what most people would go to.
Q And is it accurate as far as you know? I mean, not as far as you know. Does IU believe that it is accurate?
A It is, but I would also say that it gets updated. And so depending upon when you downloaded or read it, it could be different.
Q Well, my memory is yesterday. Oh, yeah, here it is, up at the top.
A As an example, if you checked the mask policy on Friday, it would be different than this week.

Q Right. And as you can see in the upper left-hand corner of the first page, I downloaded this on July 6th.
A Yes.
Q But yeah, of course, I invite you to advise us if there's any changes --
A Yeah.
Q -- that are not reflected here.
Turn to page 3. And this is a -- toward the top, a discussion of the COVID-19 vaccination requirement and including the question, "What criteria will be used for determining exemptions?"
A Yeah.
Q The first line says, "Approved exemptions will be extremely limited."
Is that still the case?
A I mean, extremely limited is a relative term. We're hoping it's as small as possible.
Q But is it still fair to describe it that way, as IU does?
A Yes. I mean, I think, again, it's extremely limited. It's going to be in the eyes of the beholder. I think people will see that differently, but we're trying to keep it as small as possible.

Q And then it says, the second one is "Medical exemptions with documentation from your provider of an allergy to the COVID-19 vaccines or other -- or their components," all right.
Now, that doesn't say anything about a medical exemption if your doctor -- if your attending physician requests one for you because they think there's a medical reason?
A What's the interpretation of allergy? I think that, you know, we're finding that there are physicians who think that my patient has a reaction to it that doesn't necessarily fall into the broad, let's say, CDC definition of allergy and, therefore, should be exempt for reasons outside of that. So most of the ones that we see that perhaps most people wouldn't think would fall into one of these boxes usually fall into allergy.
Q Turn to page 5. Here, of course, you know this, I just want to have this in the record, I guess, with your agreement. There are questions that are asked, and then next to them there's a plus --
A Yes.
Q -- which means there's information that you can access by clicking it on.
A Correct.

Q And I have done that in several places, which results in a negative sign, which means that I've opened it.
A Correct.
Q Now, the -- again, this -- the answer to the question, I want or need to be exempt from getting the vaccine, also uses the word extremely limited. And you would -- IU believes that that is accurate?
A I'll give the same answer I gave before, that I think extremely limited is in the eyes of the beholder, but yes.
Q Then go to at the bottom, "What criteria will be used for determining exemptions?" Oh, well, you use the extremely limited word here.
A Uh-huh.
Q But go to No. 2, documentation from your provider of an allergy to the COVID-19 vaccination or other components.
Again, there wasn't a more broader discussion or notice here of other circumstances that could warrant an exemption that you would grant?
MS. RICCHIUTO: Object to form.
A I believe we had discussion and we decided to make the top line reasons those that were recognized by the CDC. But again, if people contact us and their

physicians document other reasons that they believe would warrant their patients for medical reasons not getting the vaccine, we have honored those.
Q In the middle of page 6, we have the Who will review exceptions request, exception requests. IU's medical response team.
Now, you're a member of that personally?
A Correct.
Q With regard to religious exemptions, what's the implementation of that exemption? What are the parameters of the implementation?
A If someone attests to it, it is automatically approved.
Q And how long does that approval process typically take?
A I think it literally is automatic. I think it's done. It's electronic.
Q So there's no -- at this point --
A No review. There's no review committee or no one reviews or approves religious exemptions.
Q And so what you're saying is that when you request it, the computer program, let's say, will just generate an approval rather than have a human being review it and make a decision?
A For religious?

Q Yes, for religious.
A Yes.
Q Let's turn to page 8. At the very bottom, there's a question, "What happens if a student is not granted an exemption and refuses to be vaccinated?" which I opened. And the last sentence says, "If you still choose not to comply, there are strong consequences." I guess there's more than one here I'm going to read. Sorry.
"Students who choose not to comply with the COVID-19 vaccine requirement will have their class registration cancelled, CrimsonCard access terminated, access to IU systems (Canvas e-mail, et cetera) terminated, and will not be allowed to participate in any campus activities."
Is that the current policy of IU in implementing this vaccine mandate?
A Yes.
Q What is the CrimsonCard access? What is that?
A I think it just means your card's -- for instance, getting into a building.
Q So a CrimsonCard is what you handed me; right?
A Yes, it says at the top there, CrimsonCard, yes.
Q Then it says Canvas with a capital C. What does that refer to?

A I believe that that is the online system that teachers use or professors use to, you know, give assignments, post records. It is part of the academic process.
Q Turn to page 12, please. "Are the COVID-19 vaccines effective? Are they effective against variants too?" That was a question. I opened that. I want to refer you to the second paragraph.
However, how long this protection lasts is not yet certain. Even once vaccinated, you could still be capable of spreading the virus to others, including your friends and loved ones. This is why those vaccinated need to continue to use masks and practice social distancing.
You mentioned that this is one of the policies that changed.
A Yes.
Q Making masks optional, well, immediately.
A Yes.
Q It was July 31st, but then you --
A Yes.
Q What has changed about the protection that is afforded by the vaccines? Dr. Beeler estimated them between -- the effectiveness, depending on which one, in preventing COVID infection to be

somewhere between 70 percent and up to 95 percent, depending on the vaccine. What has changed?
MS. RICCHIUTO: Object to form.
A I'm not sure what you're asking. What has changed for what again?
Q Are the vaccines more effective now --
A No.
Q -- than they were when you implemented the -- let me finish.
A Okay.
Q When you implemented the requirement that masks are required for vaccinated people?
A No. The effectiveness of the vaccines have not changed, but the original studies, when we're talking about 70 to 95 percent effectiveness, refer to symptomatic disease. And so we know that looking at symptomatic people, that the risk of you being infected or becoming symptomatic is much reduced.
Those studies, however, did not necessarily look to see whether people were asymptomatically infected and, therefore, could transmit the disease still unbeknownst to others, which is why masking and distancing was still initially recommended, even as the vaccines were approved.

However, real world data and follow-up studies added to our fund of knowledge that not only do the vaccines seem to reduce the chance of symptomatic disease, but also lower the risk of transmitting it to others, even if one is asymptomatically infected. And that is what, you know, led to the changes in the CDC policy and our changes as well.

Q The next paragraph, "This guidance will continue until we have more scientific information about the duration of immunity and until the majority of the population is vaccinated, which is what it would take to achieve herd immunity."

So here, when we're talking about herd immunity, IU is saying that if a majority of the population is vaccinated, we would achieve herd immunity; is that correct?

A I don't think that that's what that sentence -- I'm not sure that that's what that sentence is saying. I think it's saying that when it's this guidance, it's -- you know, it's referring to the fact that, you know, even the previous sentence about wearing masks and practice physical distancing will continue until we have more scientific information about the duration of immunity and until the majority of the population is vaccinated.

We have more information on that all the time. But I -- yes.

Q Well, first the change that you described in the effect of the vaccinations is that they are more effective than you originally thought.

A I would take exception to the way you phrased that.

Q Well, how would you say it?

A Again, I think we've learned more about their ability to prevent asymptomatic spread in transmission than we knew before. The vaccines haven't changed. What we know about them has.

Q Well, yes, and what you know about them is they're more effective than you thought originally?

A I think more effective would mean that they are better at preventing disease. Again, we're --

Q Preventing spread?

A It's semantics. They have more ability to prevent asymptomatic -- we now know about their ability to prevent asymptomatic spread. We did not know that before.

Q And so that -- you describe that knowledge as justifying removing the mask mandate.

A Yes.

Q I'm still curious, though, about the second part of that sentence, which it says, "Until the majority

of the population is vaccinated." I mean, which is what it would take to achieve herd immunity.

I mean, that's pretty definitive, that this doesn't say, you know, 70 to 95 percent or whatever. This says a majority.

MS. RICCHIUTO: Object to form.

A I -- yes, I mean, that is what it says. But I would say it also has an "and." It's a broad sentence about that we need more information, the duration of immunity, and the majority. And I would agree, it should -- majority may be read by some to be 51 percent, and that is not what it would take to achieve herd immunity.

Q Well, I don't want to quibble over what the definition of majority is, but isn't that what the common understanding of majority is?

A I agree, but I think in other places we have written the vast majority or other ways of defining it. I'm not arguing with you that that is how some could read this. That is not, however, what we believe.

Q Okay, thank you.

Page 14. Toward the bottom is a question, "Haven't people died after getting a COVID-19 vaccination?"

And then there's a discussion of the VAERS system.

A Yeah.

Q Does IU encourage its constituents to report any adverse effects of receiving a vaccination to the VAERS system?

A We certainly don't discourage it, but I don't -- I mean -- yes, in principle, yes, absolutely.

Q Now, this also mentions in the first paragraph that healthcare providers are required to do that; is that right?

A They're required by the FDA to report any death.

Q Oh, okay. Good point.

Do healthcare providers provide a lot of the reporting to the VAERS system?

A I believe they do a chunk of it, yes.

Q Now, this -- the next paragraph, the second sentence, says, "During this same time." Now, I think that refers to between December 2020 and May 2021; is that correct?

A I believe so.

Q That there were 408,636 reports of death of people who had received a COVID vaccination, vaccine, COVID vaccine. And that's correct; right?

A Yes, correct, I believe that came from the CDC.

Q Now, then there's the second sentence, "Just because something follows another doesn't mean it was caused by it," which is absolutely true.
A Yes.
Q And what efforts are made by the VAERS system or people that utilize the VAERS system to confirm whether one followed the other?
MS. RICCHIUTO: Objection, lack of foundation.
Q One was caused by the other, then followed the other; do you know?
A To the best of my knowledge, the CDC or other, you know, affiliated organizations investigate every one of those deaths to determine as much as possible where it appears that the vaccine caused it. Now, of course, that's not the easiest thing to prove, but they do their due diligence to see if there's reason to believe that it is being caused by it.
I'd also say they probably look at rates of death to see if they seem like they're increasing or out of the range of what would be expected based upon what would otherwise normally occur.
Q Once those investigations are conducted, is the VAERS system updated or, you know, like, affected at all?

A I don't believe so.
MS. RICCHIUTO: Object to form, out of scope.
A I don't believe so. Which is why they still sit there, even if they don't believe that they're affiliated.
Q The next sentence, "Our vaccination efforts have focused on those most at risk."
Now, when you're saying "our vaccination efforts," what are you referring to?
A The United States. Or Indiana. One or the other.
Q But IU students do not fall in the category of those most at risk; right?
A Most -- it depends, again, risk, what we mean at risk. But this sentence, what it's describing is that the United States effort, or Indiana's effort, focused most of its vaccination efforts, at least originally, in December 2020 and leading up to May 2021, on those at high risk.
It then goes on to talk about that because of the fact they were at high risk, they were more likely to die and therefore it's not unexpected that there will be some number of deaths in that population reported to VAERS, which is about the country, than you would otherwise expect in a -- just a broad population.

Q Well, I'm asking the question based upon the words that IU uses, so --
A I agree, but in this case, "our" was referring I think to the United States or Indiana, not to IU.
Q And my question was that college age students are not those most at risk in comparison with the elderly, et cetera; is that true or not?
A Well, again, if they have chronic conditions, they could be. So I wouldn't classify them all. But as a broad population, 18- to 29-year-olds are at a lower risk in general than the elderly, yes.
Q And we've talked about how much that might be.
A Yes.
Q Page 15, toward the bottom paragraph, answering the question, "I still have COVID-19 antibodies. Why do I need the vaccine?"
A Uh-huh.
Q The first sentence is, "While the natural immunity from the antibodies you have after a COVID-19 infection may provide some protection from reinfection from COVID-19, it is not clear how long that protection -- this protection lasts or how effective this protection is."
Is that a true statement?
A I think in general, yes.

Q Page 16, in the middle, there's a question, "Are vaccinated individuals able to spread/carry COVID-19?"
The second paragraph -- or second paragraph, yes, under answer, under that question, "Perfect safety is unachievable. But we can achieve a level of safety where the risk from COVID-19 is the same as or less than other infectious diseases. If there are enough people vaccinated to achieve a level of herd immunity, then the risk is quite low."
Is that still a correct statement?
A Yes.
Q Accurate statement?
What would be the level of safety that is the same as or less than other infectious diseases? What would that be?
A The example I've used most often is that if we can make it so that COVID, say, was no more dangerous than the flu is every year, we have lived our lives normally with flu -- with flu seasons every year, and we could achieve, for instance, that level of safety, then that would be something that people rationally should be able to then go back to normal life.

Q What is the level of safety of the flu?
A I mean, in a bad flu season or, I mean, in a good flu season, I would say 20- to 30,000 Americans die a year. You know, right now, I think we've had, in 2021, if I remember correctly, the CDC said that 750 deaths have occurred in vaccinated people so far. My argument would be that if those trends continue, that would be very low risk, and at that point it seems totally rational to go back to normal life. But I think different people would have different thresholds on what they would deem safe enough.
Q Page 17, please.
MR. BOPP: I tell you what, how would you like a break.
(Recess taken.)
BY MR. BOPP:
Q Turn to page 17.
A Okay.
Q The third paragraph under the question, "Do I still need to wear a mask after I receive the COVID-19 vaccine?" I think that's a repeat of that same paragraph before.
A Most likely.
Q About the majority of the population, that phrase

related to --
A Yes. I'm sure this was a copy and paste job by communication.
Q Page 18, under the question, "Why would I need the COVID-19 vaccine if I still needed to follow all the CDC guidelines," et cetera.
The last paragraph, "We need all strategies to protect ourselves, our loved ones, and our community from COVID-19."
To a prior question, you said protecting other people, the communities, the Bloomington communities, was a secondary or corollary benefit.
A Uh-huh.
Q Not the reason for the policy.
A Yes.
Q Go to page 28. At the bottom, "What are the different types of tests used to detect COVID-19 and how accurate are they?"
Does this -- the answer to this question describe the tests that are being used that IU is using for mitigation testing, asymptomatic testing?
A That is not about that. This is a general question. This is a general question, like what tests are being used broadly for COVID, for the general public.

Q To determine whether you are infected?
A Well, no, see, a PCR test and an antigen test will identify current infection. An antibody test can identify past infection.
Q What tests are IU -- is IU using in the mitigation or asymptomatic testing?
A Well, those are two different things. So broadly for asymptomatic, we have used both antigen and PCR tests, but our mitigation testing is PCR based.
Q How accurate is the PCR test for determining that a subject has the COVID-19 infection?
A That's a difficult question to answer simply because, of course, tests are -- tests in general are not only dependent on what goes on in the lab but how good the sample is. For instance, lots of tests in the general public using nasopharyngeal swab, well, depending upon how good a sample or how deep somebody is willing to go, the test cannot detect or detect just based upon that.
But if we're talking about how good are the laboratory procedures, and you know, if the sample is good at detecting it, the PCR are widely accepted to be the best.
Q Well, since we are in the real world, and that those are things that you talked about --

A Well, that's one of the reasons why we use saliva, because it's not dependent on sample -- we don't use swabs. Basically people just have to give us a certain amount of saliva, and we believe that provides a, you know, more standardized sample.
Q For the PCR test, what's the incidence of false positives and what's the incidence of false negatives?
A It's nearly --
MS. RICCHIUTO: Objection, this is all outside the scope of the notice.
A It's nearly impossible to answer that because in order to answer questions like that, you need what we call a gold standard, meaning I need to have proof positive of whether or not someone's infected. And unfortunately, with COVID, things are still so new that the proof positive is often PCR testing.
So there's -- there have been studies that have -- on a small scale, which have been done on different labs or different techniques to try to estimate that, but they're small. And, of course, that doesn't mean that it's exactly the same as any other lab would do because there could be slight differences.

But there's no question that there probably are a greater than zero number of false negatives or false positives. But we consider what we're looking for when we do that testing.

With mitigation testing, we're testing for the most part asymptomatic people. We don't -- if we miss a couple people, because the test isn't perfectly great at picking up every case of COVID, so be it. More is better than perfect. And so we believe that the PCR test is more than adequate to that effort.

Q When a test returns a positive result, what is the procedure then?

A So for a test to be considered positive in our labs, we look for three different RNA chains to be detected. Most of our tests turn back -- turn up all three. Some turn up only two. We still call a two positive. If it is only one, it's invalid or we just need to run it again, and we do. And if it is zero, they're clean.

So a two or three will be labeled positive. Some twos are because of variants, because some of the RNA chains have changed.

When we have a positive in mitigation testing, those results are sent to our contact tracing team

who then gets in touch with the person who is infected, talks to them about whether or not they've had any symptoms. A lot of times they have and they just didn't report them or didn't think that they were serious.

We explain to them isolation protocols. We do a history to see who they might have been in close contact with. We track down those people. We tell them they're close contacts and get them to quarantine. And after we feel that we've gotten to the end of it and talked to all the close contacts, the case is considered closed.

Q Are they offered treatment?

A Treatment is, of course, up to them and their physician. And like we don't deny anyone treatment. But most treatment is -- you know, as far as I know, is aimed at people who are severely ill and who are usually hospitalized. So most of our students do not get treatment. And again, most of the students we pick up are asymptomatic.

Q Is there any further effort made to confirm the positive result?

A After a PCR --

Q Right.

A -- no.

Q Turn to page 33. Under the question, "Since vaccines are not a hundred percent effective and people have contracted COVID-19 despite being fully vaccinated," et cetera, the third -- fourth sentence says, If we get the pandemic to a point that a vast majority of people who become sick get well, that the number of people who are hospitalized and dying is low, and that this really isn't any worse than your average seasonal respiratory virus, then it's reasonable to start seriously relaxing our restrictions.

At the current state of the -- of your knowledge about the -- IU's knowledge about COVID infection rates, et cetera, treatments, et cetera, isn't it true that a vast majority of people who become sick get well?

A I don't know that that is necessarily true. In fact, the rates of people who are sick still, you know, getting sick or getting infected, getting sick, is still reasonably the same. I think benefits that we're seeing are fewer people at the moment are getting infected.

Q Well, what's the survival rate of people who get COVID?

A It depends on when --

MS. RICCHIUTO: Outside the scope.

A It depends on the individual. If you're still an unvaccinated 85-year-old, it's still really bad. If you're a pretty healthy 25-year-old, it's still pretty good.

Q And what would that rate of survival be for somebody of a college age population?

A Again, what we said before. I don't know the exact number, but survival rates -- I don't know that we've actually studied survival rates of that population, but survival rates of people under 40 are, you know, significantly better than survival rates of people who are 75.

Q And it would be true at this point that a vast majority of people of a college age who get sick get well?

A Yes.

Q It would also be true that among college age students, the number of people who get -- who are hospitalized and dying is low?

A Yes.

Q And it's also true that this, referring back to people getting sick, hospitalized, and dying, I think; right?

A Say it again.

Q In the next part of the sentence, it says, "and that this really," that the "this" is referring, if I understand --
A I would say the pandemic, yes. I would say that our -- that COVID really isn't any worse than your average --
Q Oh, okay. Let's say COVID in Indiana isn't any worse than your average seasonal respiratory virus.
A Yes.
Q That would be a true statement also, wouldn't it?
A Yes. We just don't know if that's true or not.
Q We don't know that it's true?
A No. As I said before, it's summer, and it's also -- this is -- COVID looked great last summer too. Our concern is when the seasonal kicks in, when the fall kicks in, that's when influenza hits. That's when COVID seems to hit. That's what we're concerned about. Measuring influenza season in July and saying it's a great influenza season doesn't tell us about influenza season.
Q So you're preparing for another outbreak?
A We're concerned about it, which is one of the reasons we're trying to get immunity as high as possible.
Q Turn to page 41. Under the masks and the question

is, "Is everyone required to wear a mask on campus?" Second sentence, "Masks are optional for everyone who is fully vaccinated."
That's the new policy; right?
A Yes.
Q So this has been updated, at least this part?
A You literally printed this off on July 6th. It was probably in the midst of while they were doing edits.
Q I think I did it in the middle of the night.
A July 6 was the day we announced, so I don't doubt that you caught this in the middle.
Q Page 42, toward the bottom, there's a question, "How will the guidance to wear a mask on campus be enforced? Is there a way to enforce violations of IU policy?"
The first paragraph, second sentence, "Complaints should be sent to faculty, supervisors, or Student Affairs."
So is there -- in implementing this policy, is there a complaint procedure?
A There was an anonymous complaint procedure in the fall, last fall. I don't know if there is now, but I imagine that, you know, complaints are usually directed towards the appropriate person who would

have any kind of complaint with respect to daily life, workplace, or educational.
Q So does IU encourage people to make complaints about compliance with its policy?
A I don't believe we encourage complaints about masking, no. I would say our broad local -- you know, our broad guidance has been that we should not be judging others for wearing -- whether or not that they wear masks, and we should not be in the business of policing each other.
Q The next page, 43, continuing to answer that question, it says, "Report non-compliance with IU COVID-19 health and safety director as described in these policies through this form."
So there is a current form?
A There was, but again, it is possible you caught this in the midst of updating. So there was a form. And again, I will have to check if this was specifically about masking. But there's a difference in policy when everyone was expected to wear a mask, in which case it was very easy to know someone is not in compliance, versus now we're moving into a new -- where a lot of people, if not most people, will not be wearing masks. Some may choose to wear masks, but we're not going to be --

we're not encouraging people to police each other.
Q So you're saying it's possible that this form is no longer utilized?
A It's possible. Or it could be used for bigger, broader things. I don't know, but I would say that I don't believe our future -- once we liberalized masking, I don't believe we want people to be reporting or policing each other's masking.
Q Thank you.
Page 46, there's a question, "How can I protect myself from COVID-19?"
And there are several measures listed here.
Is IU still recommending these?
A Yes.
Q And other than the get vaccinated, if someone did the other measures, how effective would that be in preventing them from being infected?
MS. RICCHIUTO: Outside the scope.
A Probably -- I mean, of course the specific risk to any one individual can change, but not great. We theoretically were telling people to do this at the beginning of the pandemic, and it spread like wildfire. It also depends how diligent you are.
Q Of course.
Let's go back to Exhibit 2, your declaration.

Let's go back to Exhibit 3. And turn to page 19. I asked you about this page and subsequent pages, about what you all consider.

(Deposition Exhibit 5 marked.)

Q I'll show you what's been marked as Exhibit 5, and you can see from the lower right corner, this was a document produced by Indiana University pursuant to a document request.
A Yeah.
Q And do you recognize this sort of a report?
A I made these slides.
Q Pardon?
A I made these slides.
Q Oh, okay.
A Yes.
Q Well, there you go.

Unless you have my memory, you wouldn't remember.
A Yes.
Q What is this report intended to present? And this was presented to the committee?
A No, this is the kind of thing that I would present to what we call EALC, which is our Executive Academic Leadership -- I don't know what C stands for. President McRobbie, the executive vice

presidents, sometimes other people, just sort of the weekly COVID update.
Q Were these reports submitted to the committee?
A Which committee are you asking?
Q The restart committee.
A The restart? No.
Q The date of this report is April 21, 2021. IU was in session; right?
A Correct. That would have been week 16, I believe, because I'm summarizing week 15's data.
Q Okay. And page 589, at that point the positivity rate for four campuses of IU was .24 percent?
A So the positivity, I would not say it's of the campuses. It's the positivity rate of the tests we performed was .24 percent.
Q That's what I meant, sorry.
A Yes.
Q And speaking of that, would this reflect the tests that this chart reflects the results of?
A Yes.
Q Were those -- could -- to be included in the tests, could someone have been tested more than once?

MS. RICCHIUTO: Object to form.
A These absolutely were tested more than once. These were the dorms. We were testing many of these

students twice a week. That's why I want to be specific that it's the tests, not the people.
Q Right. I think one of your other things says unique individuals.
A Then we tried sometimes to go back, you'll see one of these slides is prevalence, where we do back calculation to try to estimate actual prevalence of disease. But again, this population, again, in the dorms, Bloomington's dorms, we tested twice a week.
Q And you subdivide your tests into various populations, the Greeks?
A Yes. In fact, the Greeks were tested twice a week. The faculty weren't tested. They were randomly sampled.
Q All right. If you go to 599, there is -- and these are copies of slides; is that what you testified?
A Correct.
Q You say positivity versus prevalence.
A Uh-huh.
Q What does prevalence mean?
A So prevalence is when we do a back calculation depending upon the populations that we selected where we actually tried to estimate what -- what's the actual existence of disease by the whole population as opposed to -- because we're looking

at -- we're not testing all populations equally. So we do some epidemiologic calculations to think like how prevalent is the disease.
Q So at this point among, it looks like, all campuses of IU, the prevalence was .4 percent regarding the total population of students?
A Correct.
Q In all those campuses?
A It's the weekly point prevalence, yes.
Q Now, the next page, 600, that would reflect how over time the prevalence, you're churning out the prevalence over time, and it would indicate a reduction in prevalence as you went along certainly from week 7?
A Correct.
Q And is it fair to say at this point we're now below 1 percent?
A The prevalence, yes.
Q Then you have beginning on page 602, analysis of infections in previously infected.
A Uh-huh.
Q So explain what you're charting.
A We were -- because we actually had data on -- because we're testing people, we're testing people asymptomatically, once they get out the 90-day

window, we were looking to see if people who were infected were being -- people who had been previously infected were being infected again.
Q So if you had -- so if they had a positive result, then you're testing them later to see if they got a reinfection?
A Correct.
Q And what was the -- what was the number of reinfections?
A At -- it depends on the week. I mean, if you're looking at -- which page are you looking at, I'm sorry?
Q 602.
A So on 602, I'm showing data from week 14 and week 15. So of the previous -- so of the previously not infected, you can see, let's pick week 15, for example, 129 out of, I don't know, 129 were not -- were positive and 17,826 were not. And the previously infected, 2 versus 3,156.
Q So it had been -- if I -- so for previously infected, you have a negative and a positive. So that means adding those together, that was a number that was tested?
A Correct.
Q And so it was two out of the --

A 3,158.
Q Yeah. That actually showed positive?
A Uh-huh. And then the next is basically showing you the rates over time.
Q And again, the rates are going down; right?
A Yes. They went down -- they definitely went down amongst -- I mean, you see more of a variation I think than those who were not previously infected. But yes, they both went down.
Q Oh, okay. And then 604 has the reinfection percentage.
A Uh-huh.
Q All right. Which is all under 1 percent.
(Deposition Exhibit 6 marked.)
Q I'll show you what's been marked as Exhibit 6, and this is the printout of the Indiana University COVID-19 testing dashboard on July 5, 2021.
Do you recognize this?
A Yes.
Q Was this information made available to the restart committee?
A Yes. This is a public dashboard. Everyone has access to this.
Q Were they -- well, I understand that. But was the committee advised about this and told to consult it

as an ongoing, you know, information?
A Oh, yes, although I would say that -- yes, but, you know, I think in general, like this -- I'm not sure what you're asking, but yes, they absolutely knew about this.
Q And why would this information be pertinent to their deliberations?
A Well, this is -- we tried to be very transparent about all our data, so this told us how we were doing.
Q I recognize that chart on page 2.
A Yes. Well, that's where we're getting it. You're seeing it at a different time now.
Q Now, there were some pulldown menus again, and you see on page 7, this was the detail that I was able to pull down.
A Yeah.
Q Is this information accurate?
A As far as I know, yes.
Q Was it obtained from IU's -- from IU?
A Yes.
Q Is that how it is populated?
A Yes.
(Deposition Exhibit 7 marked.)
Q Let me show you what's been marked as Exhibit 7.

And as you can see from the bottom right corner, this information was provided by IU pursuant to a document request. And do you recognize this chart?
A Yes.
Q And where did it come from and who prepared it, or whatever you know?
A This -- this looks like it was drawn from one of our dashboards, but it's basically based on the data that you're seeing in another form. This is just the number of positives. And I think this is only looking at students, it looks like.
Q And this is the absolute number of positives per week?
A Yes. When you asked me before how many students had been positive, this would say 11,140. So that was my guess.
Q All right. The next one is what is called self-report close contact. What is that?
A So sometimes we -- people would report to us, like, I have been exposed to someone who has had COVID or I've been notified, in which case they would need to quarantine. And they would report it, because they would report it to us, which is one of the things we asked them to do.
Q And so this is a record of the number of those

self-reports?
A Correct.
Q When did students -- when did the classes end at IU?
A Oh, I couldn't give you the exact date, but it had to be like the very beginning of May I think or the very end of April. We started, I think, commencement testing the first week of May.
Q All right. The next one is page 77. What is this chart?
A This is what we know about vaccinations. It looks like the chart is students.
Q Okay. So these are all students, and this reports on the number of students that have been vaccinated?
A That is what this looks like, yes. Although I will be very honest with you, you know, it depends -- the numbers change by what we mean by students. So, for instance, the number of students in like April, some of them will have graduated. So they may not be current students, but this is in general, I imagine, students. I don't know for sure whether this is current students or all students.
Q Well, I don't -- I mean, is there a date on this

that we can consult?
A Well, but just -- this says student vaccinations by week, and I don't know looking at this whether this is -- this is the kind of thing I would ask the -- I don't know looking at this, whether this is current students or students at the time that they were vaccinated.
Q Well, that's the way I'd interpret it, if I'm looking at this.
A I don't think the numbers will make tremendous amounts of difference, but it could make a difference.
Q Because this is vaccinations per week of students?
A Yeah, I'm just saying it's possible, as an example, if there were 662 students vaccinated the week of March, it's possible, because I don't know, that some number of that 622 have graduated since then and will not be students in the fall is what I'm saying.
Q I understand.
A Yeah.
Q Now, 67,000 of 90,000, what is that?
A 70 some percent. I don't know for sure.
Q I hardly ever use this. I don't know -- this is going to be a disaster I feel. Oh, well.

That's how you calculate the percentage is --
A Yes. And that would be students who have had at least one dose.
Q I didn't see that on it. Where --
A Well, because if you look at the breakdown there, 7,407 have had one dose. 2,853 have had two doses.
Q Okay.
A 57,596 are considered fully vaccinated, meaning at least two weeks since the last dose, for a total of 67,856.
Q Got it, thank you.
(Deposition Exhibit 8 marked.)
Q I'll show you what's been marked as Exhibit 8. Do you recognize this?
A Yes, I do.
Q And what is it?
A This looks like a slide presentation that Cole would prepare for the same kind of meeting, Cole Beeler, would prepare for the same kind of meeting that I prepared my slides for.
Q And was this information presented to the restart committee?
A This would have been a presentation to the EALC.
Q The EALC, which is what?
A Which, again, is the Executive Academic -- it's

leadership. It's the president and the executive vice presidents and sometimes others. This also could have been the cabinet. We'd give this same presentation to the cabinet, vice presidents.
Q And I see you, I think, under surveillance and mitigation?
A There you go, yes. Yeah, that's me.
Q Very good.
All right. Turn to page 1350. This is really -- these slides are so small. This really --
A They look better on a computer or a screen.
Q These look like charts I've seen on the Indiana --
A Yeah, these are screenshots of the ISDH dashboard.
Q The next page, 1351.
A Uh-huh.
Q Oh, I'm sorry. One other question before I get farther into this.
Can we figure out when these charts are, the dates of them? I mean, I'm looking on page 2 -- I mean, page 1350.
A I mean, you can sort of figure it out because you can see how far the rate goes. I see June 11th checkmarked there, so it's after June 11th, but I don't know how far out it goes. Do you know

what -- do you know which slideshow this was? Because every slideshow probably had a date.
Q I don't know, because they produced --
A Whichever file -- no, I mean the file itself might have had a date.
Q This is -- well, one of my associates went through the documents and gave this to me. So I don't know if there's something.
A I don't know either, but this one here says 6-11, so I'm going to guess that perhaps this goes through June 11th, but I'm guessing. It looks like most of these things seem to end on June 11th or thereabouts, so sometime in June. June 11th, June 12th, somewhere in there.
Q So these statistics are about the state of Indiana?
A Some are. Some are. Some are about IU.
Q Some are about Marion County and Monroe County?
A So one of Cole's responsibilities was to place some context, how we were doing with respect to the state, the county, the country, sort of just give an overview of what was going on with COVID in general and also IU. But he also focused on symptomatic testing. So 1351, for instance, is our, IU's, symptomatic testing.
Q And the hospitalizations, ICU beds. Turn to page

1360. I'm having a hard time understanding what this chart represents. In other words, like the colors.
A Yep. So these charts Cole created to sort of give people a picture of whether things were good/improving, stable, or worsening. So red is bad. Orange is slightly better. Yellow is better. Green is the best. And then you can see in the columns, some of the metrics that he followed or we followed at a county level; for instance, the first column is the percent change in seven-day rolling average of new cases. So if cases are decreasing, you're going to get a green. If they're increasing dramatically, you get a red. Second column is absolute value of seven-day rolling average of positive. So instead of the new cases, it's the percent positives.

Third column is percent positives over last two weeks. So it's a longer term way of looking at it. Then there's the ten-day average R, the percent change in R over the last seven days, the percent change in hospital census over the two weeks, percent change of ICU beds for COVID, and then the percent change of ICU beds for COVID over the last two weeks.

And if everything looks green or most things look green, we know that things in general in the outside world are looking pretty good, which they were in June.
Q And this is -- on page 1361 is a continuation?
A Basically shows you what it looked like this week. So this presentation looks like 6-15, that's what he's saying. And then he shows us the previous week so that you can see, do things look better this week than last week or worse this week than last week.
Q 1362, wow. Okay, he's now tried --
A Yeah. He's tried basically in 1362 to reduce the slide to one color. So there's like all the information from the previous slide listed, and then he can show -- you can see like at the beginning of the year, we had spikes. And then things got better, and then they got worse, and then they got better. He's trying to give a broad picture.
Q 1365, what is that chart?
A Same kind of color-coded snapshot but for more internal metrics. So again, looking at the columns here is test time turnaround time for symptomatic tests, like how long it took us to get tests back

to people. Second is percent positive cases, seven-day rolling average, and then it's a three-day rolling average, then it's a symptomatic rate, then it's the mitigation test positive rate. I can't see that, test percent of IU population. So, again, he's looking at the whole population, how much we tested.

The contact tracing success rate, contact tracing efficiency, overall case management, Q&I utilization, how much of our quarantine and isolation space was being used, percent residential in QI, how much of our population was actually in quarantine or isolation, and percent of total in QI. That's the percent of the whole IU population, not our residential population, that was in quarantine or isolation.

And as you can see, whenever this was, most of it was green.
Q And then there's charts to represent that information?
A This is I think giving you a flavor of the metrics that we would look at when you asked before about how we were monitoring things.

(Deposition Exhibit 9 marked.)
Q I'll show you what's been marked as Exhibit 9. And

are you familiar with this website?
A I'm sorry, my staples are on the opposite side.
Q Well, I put them there.
A I see, but it goes on its side. This looks like the ISDH dashboard, I think, that's what it looks like.
Q And I'll represent that it is. And you can see in the second page it's from July 6th.
A Okay.
Q Oh, my Lord. At 11:59 p.m. Was I really up that late?
A Or somebody that works for you.
Q Now, what does this dashboard accumulate and report on? What is it?
MS. RICCHIUTO: Objection, outside the scope.
A I'll tell you what I think ISDH is trying to report, but I think they're trying to give a snapshot of how Indiana does much as our public dashboard gives a snapshot of how IU is doing.
Q And do you know where they get their figures?
A I assume from State-based data.
Q And is this something, someone would rely upon, reasonably rely upon as accurate?
A As accurate, yes.
Q Unfortunately the pages are not numbered. Sorry

about that.
Page 5, it says positive cases and tests.
A Yes.
Q I think I recognize the --
A Yeah, I mean this is, I'm sure, where Cole copied it from.
(Deposition Exhibit 10 marked.)
Q I'll show you what's been marked as Exhibit 10. Are you familiar with this website?
A This looks like a CDC summary of the state of COVID.
Q Is this information -- well, do you know how the CDC accumulates this information?
A I imagine --
MS. RICCHIUTO: Objection, outside the scope.
A I imagine they get reports from states and then they collate.
Q Do you view this information as reliable and is relied upon by people working in this area?
A I can't attest to who uses it, but I think it's accurate.
Q Now, in looking at -- back to Exhibit 3, starting on page 19, I don't see listed IU's management of infectious and communicable diseases policy.
A I don't know that that would have been a source

of -- like a reference cited for this.
Q Well, it wasn't cited, but I also didn't see it as a source being used.
A Well, again, I would say restart was an advisory committee, but implementation was handled outside of restart. So if restart would give advice, that policy would be created.
Q Was any of the advice based on the IU's policy of management of infectious and communicable disease?
A People who were on the committee would have had knowledge of that.
Q Was it shared with the committee in your recollection?
A I do not remember. But again, I can't speak for the entire committee of who reviewed what.
Q But it didn't make the list as being a document shared with the committee; right?
A I think it didn't make the list of sources. Again, I would say that policy usually comes out of -- you know, it's when we implement, not necessarily -- we were not considering past policy for advising what to do. You know, the past policy was not a source of COVID information or the current -- you know, what we were probably considering here.
Q So what you're saying is you would view that policy

as being irrelevant to the considerations of the restart committee?
MS. RICCHIUTO: Object to form, misstates testimony.
A I don't know. I'd have to look at it. I'd have to review it.
Q But the key point is they -- you don't recall -- I mean, it didn't make the list, and you don't recall it being consulted in -- during the deliberations?
A I don't recall -- again, my personally, but I am absolutely positive that people on the committee would have talked about what our current policy was as we moved forward. It's just not necessarily I think what people might have considered as a source in the same way as many of these were.
(Deposition Exhibit 11 marked.)
Q I'll show you what's been marked as Exhibit 11. Are you familiar with this policy?
A I have seen it before.
Q Are you familiar with its content?
A Yes.
Q Now, the policy statement is, and in the first page -- and by the way, this was also produced by IU as you can see at the bottom. "Indiana University will take all reasonable measures to

ensure the safety of members of the university community during global and local infectious disease events."

Now, and then the second reasons for the policy, it says, The purpose of this document is to provide guidelines for the response to a wide variety of infectious disease risks at Indiana University. And the restart committee was, of course, tasked with recommending a response to COVID-19.

A Uh-huh.

Q But the committee did not use this policy as guidance for their deliberation?

MS. RICCHIUTO: Objection, misstates the testimony.

A I would not say that's true. In fact, the policy contact on this, Graham McKeen, was on the committee and I am sure discussed what our current policies were as moving forward. You asked me before if this was in the list as a specific reference of that kind, and no. But that does not mean we did not discuss it or know about this.

Q Do you recall ever discussing the policy?

A I'm -- in fact, Graham and I work quite closely, so I'm sure he discussed what the policies were.

Q Sir, I'm asking about your recollection.

A Yes.

Q Did you remember discussing the policy as part of the deliberations of the committee?

A I can remember Graham absolutely talking about current policies.

Q Well, current policies encompasses many different policies. So I am asking you about this policy.

A Yes. I can -- I remember Graham discussing current management and infectious and communicable disease policy.

Q I want you to turn to the third to the last page. And did the committee determine which level the COVID pandemic was when you made your recommendations in May of 2021?

MS. RICCHIUTO: I'm going to object to the extent that calls for deliberations.

A What -- I don't understand the question. When you say what level, what do you mean? I mean, I'm looking -- I'm sorry, I'm looking at a different page.

Q Oh, okay. There you go.

A All right.

Q Sorry about that.

Did the committee make a determination on what

level, that is IU action level, the -- IU was at at the time of the committee's report?

A I do not remember that.

Q Now, there's nothing in the report that suggests that?

A No. I mean, I think part of the reason for the creation of the restart committee was that we recognized that the threat of COVID and the pandemic actually went beyond what we had in place, and therefore, President McRobbie asked a specific group to devise recommendations on how to proceed because it wasn't -- it was not going well, in the country or on campus.

Q So that's just another way of saying you considered this irrelevant, so you didn't --

A I don't think we considered it --

MS. RICCHIUTO: Objection, argumentative, misstates the testimony.

A I don't think we considered it irrelevant. I think we felt that we needed a better -- we considered this, but we needed a more -- a much larger response than would be managed, for instance, by this infrastructure, which is why we created the medical response team and other infrastructure.

Q Isn't it fair to say that at the time that the

report under the IU action level that the -- that you were at a -- that we were at with respect to COVID-19, the recovery level?

MS. RICCHIUTO: Objection, lack of foundation.

A Which report are you talking about?

Q The one we talked about the whole time, your May 28th.

A But there were many restart reports.

Q I am asking you about one of them.

A If you're asking me about this one.

Q Because it is the one you imposed the vaccine mandate. I'm asking you about May 28th report, report.

A And no, I would not say we would consider it -- did you say insignificant? What did you say?

Q I said that you were -- that we were at the IU action level of recovery.

MS. RICCHIUTO: Same objection.

A No.

Q Okay. What would suggest you were not at the recovery?

A We are still in the pandemic.

Q These are --

A No, I'm sorry, 2B to 4B, say WHO pandemic. Below that is alert or inter-pandemic. And above that is

transitioning. Or deceleration from CDC. I don't know that we believe we're in that.
Q Do you know that those words you just said, WHO transition, CDC deceleration, and CDC preparation, are stages of the pandemic described by them?
A I think that they could be stages of the pandemic, but I do not believe that we're in them necessarily.
Q Okay. Well, what suggests that you were not -- we were not in the -- on May 28th, the recovery state? What contraindicates that?
A Because --
MS. RICCHIUTO: Object to form.
A -- we still have around the world significant levels of disease and a massively high level of the population in May that was still not vaccinated; and, therefore, potentially at risk.
Q Where in this report, this policy, does it suggest that the rate of vaccination is a factor in determining the state of the pandemic?
MS. RICCHIUTO: Objection.
A Because it gives us some insight into how at risk the population is when seasonality returns.
Q If we were not in the recovery stage on May 28, 2021, what stage -- what level were we at?

MS. RICCHIUTO: Objection, outside the scope.
A I mean, I guess my best guess on this kind of classification would probably be three maybe. I mean, you only need one case to have three.
Q One case of what?
A I would imagine whatever disease was being considered in this policy. But for this one, it would be COVID.
Q So you're in phase 3?
A One case.
Q If you have one case of the -- of infection of the virus?
A That's what this says. One case at high severity or third -- so I take that back. But we probably are in -- I mean, according to this, it would -- I think -- in fact, I'm not sure. It would be very difficult to place COVID into this context, which is one of the reasons I think we had to create other policies.
Q And the committee didn't even try to place the COVID situation in May of 2021 into this content?
MS. RICCHIUTO: Object to form, misstates the testimony.
A We were -- it was not that we took no effort to do that. It was that we were explicitly discussing at

that point COVID and not necessarily trying to fit it into this framework.
(Deposition Exhibit 12 marked.)
Q Let me show you what's been marked as Exhibit 12, which is printed out from the website at CDC regarding the continuum of pandemic phases.
Are you familiar with this?
A Yes.
Q Did the restart committee attempt to determine what phase the pandemic was at when they made their report in May of 2021?
A I don't explicitly think we tried to fit it into one of these six categories, but we definitely thought about how the pandemic was progressing.
Q Under this -- the six phases, which phase do you think we were in when you -- the restart committee issued this report?
MS. RICCHIUTO: Objection, out of scope, no foundation.
A As I said, we didn't really explicitly fit it into one of these six categories.
Q Now, if you turn to page 3, you see a bell graph; right?
A Yeah.
Q And where they describe the phases as the -- as

over time as we go up the bell graph and back down and back down. Now, at the time of the May report, 2021 report, wouldn't it be fair to say that we were where this line appears, between deceleration and preparation?
MS. RICCHIUTO: Objection.
A No.
MS. RICCHIUTO: Out of scope, no foundation. And this is a 2016 document.
A And I'd still say no.
Q Well, then where were we on the bell graph?
A I'm sorry, this is a description --
MS. RICCHIUTO: Same objection.
A I'm sorry, this is a description of an influenza year. Influenza is a one-year thing. Every year is a new influenza. So yes, influenza gets worse and then it gets better. And then the next year, it gets worse and it gets better. We're preparing -- we don't expect something brand new. We're still in the midst of a global pandemic. And while the cases may be somewhat down, that's not the end of the pandemic. The pandemic is still continuing.
Q And of course you see under the bell graph, it says pandemic intervals.

A I agree. It's just -- but this is looking at a year-to-year thing. And so to declare that the pandemic is over is a misunderstanding. And besides, we cannot look at this in a vacuum. We're looking -- you're describing Indiana. The world's, however -- there are countries that are spiking. There are -- it can absolutely come back. We are not at the end of the pandemic. Again, IU has never fit this model because we've been doing different things the entire time.
Q Where were we in the bell graph at that time --
MS. RICCHIUTO: Objection.
Q -- in terms of mortality, case positivity, and all that?
A I don't think this is --
MS. RICCHIUTO: Wait. Whoa, whoa, whoa. Vague, asked and answered, compound, no foundation.
A I don't think that's an appropriate way to define this, and I could not place us in this.
Q Could you not place us in -- place the COVID pandemic on this chart?
A No.
MS. RICCHIUTO: Objection, out of scope, asked and answered, no foundation to place the COVID pandemic on a chart reflecting hypothetical number

of influenza cases.
A No, for a variety of reasons, including if we wanted to further expand, there are variants coming. Influenza is not -- this is -- influenza and COVID are not the same.
Q Now, the description of the six intervals, intervals is the word they use here, preparation for future pandemic waves, it says, when pandemic influenza has subsided?
A Influenza.
Q I'm reading the words.
A I agree. That's it. Go ahead.
Q Well, I can't ask my question if you interrupt me.
A I apologize.
Q Okay. -- "has subsided, public health" -- now, had the COVID pandemic subsided at the -- in May of 2021?
MS. RICCHIUTO: Objection, out of scope, no foundation.
A It's impossible to answer that question. For what? Worldwide? No, the COVID pandemic has not subsided.
Q In Indiana, had the -- had it subsided?
A No. The number of cases have, but we do not know that the pandemic has subsided.

Q And at IU, had it subsided?
A I will answer the question again.
MS. RICCHIUTO: Same objections.
A The number of cases has reduced, as it did last summer. That does not mean the pandemic is over.
Q And you understand that No. 6 incorporates that concept of the pandemic not being over because it says, "Preparation for future pandemic waves," so there's not something like -- they're not thinking about this, this is part of the preparation phase?
A So if you're asking me --
MS. RICCHIUTO: Objection, out of scope, form, foundation.
A So but that is not what you're asking me. You did not ask me if the wave was subsiding. You asked me if the pandemic was subsiding. I absolutely think we are not in a surge. We are -- perhaps the wave has subsided, but you've asked me repeatedly if the pandemic has subsided.
Q All right. Where on the chart, No. 3 regarding the wave, were we in May of 2021?
MS. RICCHIUTO: Objection, out of scope, no foundation to place the COVID cases on a hypothetical number of influenza cases chart. You can do this for the rest of your time if you want

to, Jim.
MR. BOPP: Oh, I've got plenty of time. And would the record please indicate that Anne is raising her voice. I have been able to hear her objections the whole time. And she is -- I think it's unprofessional to raise your voice at me.
MS. RICCHIUTO: Yesterday I was criticized by the court reporter for not talking loudly enough because I'm wearing a mask.
Also, the witness and the attorney are talking over one another, and so to make it easier for the court reporter to capture my objections, it is correct that I am speaking loudly to ensure that she can hear me while the two of them talk over one another.
MR. BOPP: Well, Anne, you were not talking loudly until just a few minutes ago. And I want the record to indicate that you just started it. And speaking in a hostile voice. And look, just make your objections, and we'll move on.
MS. RICCHIUTO: Well, this question has been asked multiple times, and we are pretty close to moving on from this chart.
BY MR. BOPP:
Q Where are we on the wave, which is the third page?

Where were we in May of 2021 regarding the COVID pandemic?

MS. RICCHIUTO: Asked and answered. I need everybody to be very quiet so that I don't talk loudly and upset Mr. Bopp. This question has been asked and answered. It is out of scope of the deposition notice, and there is no foundation for it.

A If we're talking about the wave, we're definitely seeing a deceleration -- we were seeing a deceleration of cases in -- which is what this is measuring, number of cases, we were seeing a deceleration of cases in May.

Q Well, isn't it true that we were beyond the deceleration to the -- to the flattening out that you see at the -- you know, the second to the last lane, wasn't it flattening out?

MS. RICCHIUTO: Aaron, please wait so that I can quietly state my objection, which is, asked and answered, out of scope, no foundation.

MR. BOPP: Okay, go ahead.

A We do not measure waves of pandemics on the campus. If you're asking me if Indiana was, no, I do not think Indiana was there yet. Indiana was coming down still.

(Deposition Exhibit 13 marked.)

Q Let me show you what's been marked as Exhibit 13. Again, a printout from the Center for Disease Control, also discussing their framework for influenza pandemic. Turn to page 11, please. Now, toward the bottom, it has a deceleration phase, which you said, correct me if I'm wrong, that we were in in May 2021?

MS. RICCHIUTO: Objection.

Q Is that correct?

MS. RICCHIUTO: Out of scope, no foundation. This is a 2014 CDC document that the witness has not established that he's seen or relied upon.

A I think if this is describing pandemic influenza cases in the United States and not on campus, are you asking me about the United States, or are you asking me about a campus?

Q I already asked about Indiana, and that's what you answered.

A Okay.

Q You said deceleration.

A I think that you were asking me like -- but now that I'm looking at this, this is actually talking about the United States. So as this would define it, I think even in the United States probably it

would have been a -- but again, this is -- this is influenza. Where usually the pandemic -- they last a year perhaps. This is not COVID -- COVID is very different. This is the worst pandemic we've seen in about a century. So asking me to constantly fit this into the framework of normal influenza is very difficult.

Q Well, I'm asking you to apply the principles and the statements and the criteria to Indiana, and you said applying it to Indiana, we were in deceleration.

Do you disagree with that now?

MS. RICCHIUTO: Objection.

A No, I think it's the -- this says consistently decreasing rate of pandemic influenza cases in the state. So yes, that would be deceleration of the pandemic wave.

Q Now, if you turn below that to preparation, it describes the situation as low pandemic influenza activity but continued outbreaks possible in some jurisdiction.

Wouldn't that accurately describe the situation in May of 2021 in Indiana?

MS. RICCHIUTO: Objection, out of scope, lack of foundation.

A Yes, but this applies. But this is influenza again. But I suppose if I was trying to fit COVID into this framework, yes. But not everyone -- I mean, in Indiana, in May, it was lower. I don't know that I'd say low, but it was lower.

Q And then the next statement is that low pandemic influenza activity but continued outbreaks possible in the state. And that would be accurate in May of 2021; correct?

MS. RICCHIUTO: Objection, out of scope, lack of foundation. There's been no evidence that the state of Indiana was in an influenza pandemic in May of 2021.

A I'd say low is also relative, and I don't know what they mean by low.

Q I should ask you, you didn't -- the committee in its deliberations didn't rely upon this CDC material, Exhibit 13 and Exhibit 12; is that right?

A I would have to go through and look specifically if we listed it, but I don't know if we explicitly looked at this, no.

Q Well, I know you -- yeah. And I know -- I know you didn't list it, so the record speaks for itself. I'm not going to characterize it.

(Deposition Exhibit 14 marked.)

Q If you turn to page 12, all right, at the very bottom, you see Table 5, novel influenza A virus pandemic (deceleration interval). Now, you see on the next page, recommendations for state and local. I assume, I don't know, IU would be local in eight or ten communities; right?
A Sure.
Q That would be fair.
And if you go to halfway down the page, it says, "Community mitigation." Under state and local, "Assess plan for and implement targeted cessation of community mitigation measures if appropriate."
Now, the restart committee did that, didn't they?
A Yes.
MS. RICCHIUTO: Whoa, whoa, whoa.
THE WITNESS: Sorry.
Q I mean, they recommended --
MS. RICCHIUTO: I need you to make sure to leave me plenty of time to quietly object so I don't upset Mr. Bopp.
THE WITNESS: Apologize.
MS. RICCHIUTO: This is out of scope. There has been no foundation established to ask the

witness any questions about this document, and I object to the form of the question.
Q All right. Second -- you can answer, I'm sorry.
A Yes.
Q Under Medicare and counter measures, initiate targeted cessation of surge capacity strategies as appropriate, maintain aggressive infection control measures in the community.
Up until the May -- as a result of the May restart committee report, was there any consideration of targeted cessation of surge capacity strategies as appropriate?
MS. RICCHIUTO: Objection to form, lack of foundation, out of scope.
A Yes.
Q And up until the report, IU maintained aggressive infection control measures in the community; right?
MS. RICCHIUTO: Same objections.
A I would push back on the question. I think that we have maintained some, and we have reduced some.
Q Then we go to the next page, Table 6, which is now the preparation interval. So let's go -- let's see. Under laboratory, okay, return to routine interpandemic virologic surveillance.
Did the committee decide to do that?

MS. RICCHIUTO: Objection.
Q Or recommend that that be done --
MS. RICCHIUTO: Objection, lack of foundation that the committee considered anything related to CDC guidance on influenza A pandemic preparation.
You can answer.
A I think that this, again, misunderstands the difference between influenza and where we are.
Q I'm just asking a factual question about whether or not you made those sort of recommendations that fall into that category.
A We made recommendations --
MS. RICCHIUTO: Object to form.
A We made recommendations to reduce surveillance but not to go to interpandemic surveillance because we do not believe the pandemic is over.
Q Under community mitigation, "Modify community mitigation measures as necessary."
Did the committee make a recommendation that falls under that category?
MS. RICCHIUTO: Objection, lack of foundation.
A Yes.
Q And what was that?
A I mean, again, some of the things we did was to reduce our level of testing. We've changed our

mask policies recently. I mean, again that's more recently correct. But we recognized that in the summer and the fall, things would be different.
Q The next page, under vaccine, "Participate in vaccine recovery as appropriate."
Did the committee make a recommendation on that?
MS. RICCHIUTO: Objection, lack of foundation.
A I have the same -- again, I'm just going to say for the record, again, you're asking me to fit this into an influenza, and you're reading the United States column, where the state is -- the local, state -- correction, is that the local, I apologize. That is the state or local. I apologize.
This assumes when I believe it's saying participate in vaccine recovery, it assumes that in the previous phase, you know, we were continuing vaccination response as appropriate and getting there. We have not achieved the goals of the previous phase where we are in this stage of a pandemic.
Q I just asked you what you did. I didn't ask you for your justification for whatever it was. And -- but I don't mind continuing to ask you questions,

honestly.
A That's fine.
Q So did the committee in May of 2021 recommend participation in vaccine recovery as appropriate, recommend any steps that would fall in that category?
MS. RICCHIUTO: Lack of foundation.
A I don't believe this was the advice we gave, no.
Q The next, under vaccine is "Continue to vaccinate with a focus on hard to reach populations in anticipation of a subsequent wave."
Did IU make any recommendations that would fall under that category?
MS. RICCHIUTO: Lack of foundation.
A I certainly think we recommended to continue to vaccinate. And we've certainly always pushed to reach hard to reach populations.
Q Now, do you agree that nowhere does the CDC recommend that either at that stage or at any stage of the pandemic, including the COVID pandemic, that people of college age should be mandated to take the COVID vaccination?
MS. RICCHIUTO: Object to form and out of scope.
A The CDC does not usually I think make

recommendations on any diseases with respect to vaccine policy. They delegate that responsibility to states and local entities.
Q So what's the answer to my question? Have they made the recommendation or not?
A The CDC doesn't make those recommendations.
MS. RICCHIUTO: And I want to put on the record that Mr. Bopp has taken a tone with my witness since we're doing that today.
MR. BOPP: Boy, I can't match you yet, Anne, but I'm working on it.
Q So I assume that when you say they haven't made -- they don't make any recommendations like that, you are acknowledging that they have not made that recommendation?
MS. RICCHIUTO: Object to form, misstates testimony.
A I will say the same answer. That is not what the CDC does.
Q I didn't ask why they did something or didn't do something. I asked what they did.
MS. RICCHIUTO: Objection.
Q Very simple answer. No, they have never recommended a mandate; isn't that correct?
MS. RICCHIUTO: Object to form, misstates the

testimony, argumentative, and I'm concerned about Mr. Bopp's tone of voice.
MR. BOPP: Oh, my word.
A The CDC has not yet, no, but I think they never will because they do not do that.
Q Thank you. That was easy.
I'm sorry, it's going to take me a minute to find one of your answers. Could you relook at Exhibit 2. Go to page 9. Paragraph 37. And that is -- that statement is, "To date, IU has not denied any student's request for a religious exemption from the vaccination requirement."
Is that a true statement?
A To my knowledge, yes.
(Deposition Exhibit 15 marked.)
Q If you look at Exhibit 15, of course, I assume you've not seen any of these e-mails?
A Oh, I have.
Q What?
A I have.
Q You have?
A Yes.
Q Well, they appear to be a denial of religious exemption. For instance, the first one, 5-13, to whom it may concern, religious -- written request

for religious exemption. Then at --
A I believe this --
Q It's a denial. And then the second one is similarly a request on the denial based on the vaccination history.
What -- how can you account for this? You know more about it than I do. I don't know.
A So the vaccination --
MS. RICCHIUTO: Object to form.
A I took the vaccination requirement to mean our policy. This took place before the policy according to the date. And so it was actually rejected before we created the policy and we defined the religious exemptions.
The other one, the last one you're showing is about a study abroad program in London, and it is very possible that study abroad programs will have different requirements than we do and perhaps may deny a religious exemption.
Q So what you meant when you said on paragraph 37, when you said, to date, you meant under the policy instituted after the restart committee's recommendation?
A So the vaccine requirement. I think it's possible that there has been a religious denial of a vaccine

in our past even. I don't know that for sure. But under this current policy, we are not denying religious exemptions.
Q Are you aware that Purdue University has, by action of their board of trustees, lifted all of their COVID-related restrictions?
MS. RICCHIUTO: Objection, outside the scope.
A Today I think that might have been, wasn't it? I think it's possible.
Q Let's see. Is today -- what day is today?
A I don't know, but my wife got the e-mail today for our son, so I think I heard about that this morning.
Q Okay. That was adopted on the 7th.
A Which would have been yesterday, so perhaps we just got the e-mail today.
(Deposition Exhibit 16 marked.)
Q I'll show you what's been marked as Exhibit 16. And you were saying you have a student -- I mean, a son that's a student at IU -- at Purdue?
A Correct.
Q Okay, very good. And he got notified of this new policy?
A I can't speak to him. My wife got the e-mail.
Q Got it.

I show you 16, which we got off the Purdue website, which announced the policy. And if you turn to page 2, Return all campus basis to full density, full venues, full occupancy, pre -- then it says, In addition, Purdue intends to begin the fall semester with little or no use of face masks. Final decision to be made.
Now, I think you'd agree this is a much different policy than IU's pursuing; correct?
A I completely --
MS. RICCHIUTO: Objection, outside the scope, no foundation to ask this witness any questions about a Purdue policy that came up yesterday. He's here to talk about a decision made by IU on or before May 21 of 2021.
A No, I disagree with you. I don't think this sounds different. I think if you read those five bullet points in the next semester, it'll actually describe IU.
Q Where is the vaccine mandate?
MS. RICCHIUTO: Same objection.
A You didn't ask me that. You asked me if that sounds like IU. This absolutely does sound like IU.
Q I didn't ask you that. And let me clarify it if

you misinterpreted my question.
I asked you whether or not -- I said -- I actually made a statement in the form of a question, which was, isn't this policy much different than IU's? So go ahead and tell me.
MS. RICCHIUTO: Outside the scope, lack of foundation.
A I will say the parts that you read me sounded exactly like IU.
Q Including no -- little or no use of face masks?
A I think if we are only requiring face masks of people who are exempt, that will be a very small percentage of IU.
Q Then what about the vaccine mandate, is that different than Purdue's policy?
A Yes.
MS. RICCHIUTO: Objection, out of scope, no foundation.
Q And attendant to the vaccine mandate are the exceptions, and if you obtain the exceptions, you are required to wear a mask, aren't you?
A At IU?
Q Yes.
A Yes.
Q And at Purdue, however, intends to have little or

no use of face masks?
MS. RICCHIUTO: Objection, out of scope.
Q That would be a difference, wouldn't it?
MS. RICCHIUTO: No foundation, object to form.
A No. Because they are not clear. They have not made a final decision. And in previous, which we are not looking at here, previous things they said that they would expect those that chose not to be vaccinated to continue to wear masks. This does not say that that has been lifted.
Q Now, next they say, "Key factors in that decision would include the percentage of the campus population that has been vaccinated."
Do you think that's a relevant consideration for determining policy regarding COVID-19?
A On IU or -- you're asking me about IU?
Q Generally. For IU, sure.
A Yes.
Q For IU, sure, fine.
A Yes.
Q And how does the vaccination percentage of Purdue vary, if it does, from IU's?
MS. RICCHIUTO: Objection, out of scope, no foundation.
A You need to ask Purdue. I do not know.

Q The next factor was the number and severity of local and campus cases. Is that an appropriate consideration for the policy?
A Yes.
Q And how does IU's numbers and severity of campus cases differ from Purdue's?
MS. RICCHIUTO: Objection, out of scope, no foundation.
A They cannot be compared. We do different testing.
Q What testing do they do and what testing do you do that is different?
MS. RICCHIUTO: Objection, out of scope, no foundation.
A I can't speak to the details of Purdue's testing, but I know the volume of our testing is significantly higher.
Q So do you know whether they use the same test that you use?
MS. RICCHIUTO: Objection, out of scope.
A I can give you my belief. I think that they use a PCR test. I don't know that it's the same as ours, but I think they've also used antigen tests. So, no, I think some of the tests they do might be antigen and require nasal swabbing.
Q Have they had any deaths of Purdue students?

MS. RICCHIUTO: Objection, out of scope, no foundation.
Q From the COVID infections.
A I don't know.
Q And then the next is the latest scientific information relevant to variants and the risks they pose.
Is that a suitable and appropriate consideration in determining the policy that should be pursued with respect to the COVID-19 virus?
A Yes.
Q Now, that would be the same, wouldn't it, for both Purdue and IU, that we're talking about scientific information that would -- about variants or the risks, that would be generally available information?
A Yes.
MS. RICCHIUTO: Objection, out of scope.
A Yes.
Q And next is -- it looks like they would also -- they also considered the unique environments that are densely populated and involve many individuals congregating together indoors for a prolonged period of time in determining the risk.
That would be an appropriate consideration

also?
MS. RICCHIUTO: Object to form.
A Yes.
Q Is there a significant difference in the density of population between Purdue and IU or the frequency of individuals congregating indoors for long periods?
MS. RICCHIUTO: Out of scope, no foundation.
A I would guess not, but I don't know the details of Purdue to answer you.
(Deposition Exhibit 17 marked.)
Q I show you what's been marked as Exhibit 17, and this we also obtained from their website, Purdue's website, which was linked to the adoption of the policy by their board of trustees that is reflected in Exhibit 16.
I'd invite you to read it, please. If you turn to the third page, they will continue to, as I understand what they've said here, and correct me if I'm wrong, they will continue to encourage people to -- their students to become vaccinated. And, of course, IU is doing that; right?
A Well, they're --
MS. RICCHIUTO: Objection, out of scope, no foundation.

A I think there are differences that they list right here between IU and Purdue.
Q And what would that be?
A Well, it seems that Purdue is requiring people to submit valid proof. We are not. It also says that -- I mean, that would be different.
Q But I asked you specifically about they're encouraging their students to become vaccinated and IU is also; is that correct?
A Yes. Those things are the same.
Q However, it is also true that they are not mandating that their students become vaccinated?
MS. RICCHIUTO: Out of scope.
A That is true, yes.
Q Now, they say something here as one of the reasons, they say, "Our commitment to personal choice remain."
Does IU share in a commitment to personal choice of the students?
MS. RICCHIUTO: Objection, out of scope, lack of foundation.
A I think we would view personal choice different.
Q How would you view it?
A Students can still choose whether to get vaccinated or not.

Q At IU and remain at IU?
A That was not what I was asked. But no, they can choose, however, to get vaccinated or not. We believe that's a choice.
Q But Purdue, if somebody does not get vaccinated, they're not kicked out of Purdue, are they?
A That's a different choice.
MS. RICCHIUTO: Objection, out of scope.
Q But at IU, you are kicked out?
MS. RICCHIUTO: Object to form.
A That is not what you asked. You asked me if they have a choice.
Q I know, but I'm asking another question, okay.
A Oh, well, then, please, I'm sorry, ask me that question again.
Q Purdue, while encouraging vaccinations, does not kick people out if they don't get vaccinated; is that correct?
MS. RICCHIUTO: Objection, out of scope.
A I think if they don't get vaccinated but follow all of their other rules, such as those listed here, I believe that that is true. But that's Purdue, not IU, and I can't speak to it.
Q Well, it says it right here. Does it say that they get kicked out if they're not vaccinated?

MS. RICCHIUTO: Objection, lack of personal knowledge by this witness.
A It makes a lot of claims about the Protect the Purdue Pledge, and I don't know exactly what that involves.
Q You think it involves kicking them out of campus if they don't get vaccinated?
MS. RICCHIUTO: Objection, out of scope, lack of personal knowledge, lack of foundation, calls for speculation.
A I think it involves kicking them out of school if they don't follow other rules related to COVID, and I'm pretty sure they have.
Q I was just asking about the vaccination mandate. You don't need to tell me about other things, honestly. This -- we can go to lunch. You understood my question. You're a very bright guy.
MS. RICCHIUTO: Objection, argumentative.
A I actually think that was insulting. That was not the question I believe I was asked. I believe I was asked if they could get kicked out for -- I don't remember the exact question.
Q Failure to become vaccinated.
A Then I don't --
MS. RICCHIUTO: Objection --

A -- know.
MS. RICCHIUTO: -- out of scope, lack of personal knowledge.
Q You don't know?
A I don't know if they will. I assume, according to this, not, but I also think that there's a lot of legal words in here about making decisions based on how things go.
Q And but at IU, if you don't get vaccinated and don't get either of the exemptions, you are subject to being virtually expelled by the consequences of cancellation of your classes and all the other things we talked about earlier; is that correct?
MS. RICCHIUTO: Object to form.
Q Well, let me finish --
MS. RICCHIUTO: Asked and answered.
Q Let me finish my question, okay. I think you heard it. Go ahead.
A If they choose not to get vaccinated or file and have an approved exemption, then yes.
Q And my questioning on that flowed from your statement about where Purdue said our commitment to personal choice. You said you just viewed the choice differently; is that right?
A Well, I think it -- I don't think that was the

question you asked me. You said does IU have a different view -- does IU not have the same commitment to personal choice, and I think I responded, we view choice differently.
Q Okay. All right, choice differently.
A Or a different choice.
Q Do you consider that the severe consequences that will flow from failing to choose what IU is mandating, you think that's coercion?
MS. RICCHIUTO: Objection to the extent it calls for a legal conclusion, out of scope, no foundation for this witness.
A I guess it depends what you mean by "coercion."
Q Do you consider that a free and voluntary choice?
MS. RICCHIUTO: Same objections.
A Yes.
Q Oh, so there's no value in going to IU or getting an IU education or getting the degree that you are maybe within two -- Ph.D.s, you're maybe within a semester of getting, you just think that is not coercive in its effect on students like that?
MS. RICCHIUTO: Objection to form, misstates testimony.
A I don't believe that that's what you asked me originally. You said is it a free choice, and I

said yes.
Q Okay. Well, how about answer this question I just asked you.
A I'm sorry, then, could you ask that one again? I was still thinking about the previous question.
MR. BOPP: Please.
(Record read.)
A Could you read -- there's two parts of that question. I'm happy to respond to both of them individually. If I can wrap my head around the thing, so if you don't mind asking the first part. I think it was, do I think there's no value. No, of course, I think there's value in getting an education.
What was the second part?
(Record read.)
A Do I think that that is -- again, what does that mean by "coercive"?
Q You don't know what the word "coercive" means?
MS. RICCHIUTO: Objection, argumentative.
A I do not know what the word "coercive" means.
Q How would you define it?
A I don't think it's forcing people. I think they have a choice.
Q So if you give somebody a choice and put a gun to

their head and say, if you choose one that I don't like, then I'm going to pull the trigger; and the other one, if you choose the other one, I won't pull the trigger, do you consider that coercive?
MS. RICCHIUTO: Objection, hypothetical, out of scope, no relationship to the facts of this case.
A No, if that's your definition of coercive, then this is not coercive.
MR. BOPP: Okay. Thank you. Enjoyed it.
MS. RICCHIUTO: Read and sign.
(The deposition concluded at 12:40 p.m.)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

RYAN KLAASSEN, JAIME CARINI, )
D.J.B. by and through his )
next friend and father, )
Daniel G. Baumgartner, ASHLEE)
MORRIS, SETH CROWDER, MACEY )
POLICKA, MARGARET ROTH, and )
NATALIE SPERAZZA, )
)
Plaintiffs, )
)
-v- ) CASE NO.
) 1:21-cv-238-DRL-SLC
THE TRUSTEES OF INDIANA )
UNIVERSITY, )
)
Defendant. )

Job No. 163718

I, AARON EDWARD CARROLL, M.D., state that I have read the foregoing transcript of the testimony given by me at my deposition on July 8, 2021, and that said transcript constitutes a true and correct record of the testimony given by me at said deposition except as I have so indicated on the errata sheets provided herein.

____________________________
AARON EDWARD CARROLL, M.D.

STEWART RICHARDSON & ASSOCIATES
Registered Professional Reporters
One Indiana Square, Suite 2425
Indianapolis, IN 46204
(800)869-0873

STATE OF INDIANA
COUNTY OF HENDRICKS

I, Debbi S. Austin, a Notary Public in and for said county and state, do hereby certify that the deponent herein was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of the Plaintiffs; that said deposition was taken at the time and place heretofore mentioned between 8:59 a.m. and 12:40 p.m.;

That said deposition was taken down in stenograph notes and afterwards reduced to typewriting under my direction; and that the typewritten transcript is a true record of the testimony given by said deponent;

And thereafter presented to said witness for signature; that this certificate does not purport to acknowledge or verify the signature hereto of the deponent.

I do further certify that I am a disinterested person in this cause of action; that I am not a relative of the attorneys for any of the parties.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 9th day of July, 2021.

_______________________________
Debbi S. Austin, Notary Public

My Commission Expires:
July 13, 2023

Job No. 163718