```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF INDIANA
 2                        FORT WAYNE DIVISION

 3

 4   RYAN KLAASSEN, et al.,        )
                                   )   CAUSE NUMBER 1:21cv00238
 5          Plaintiffs,            )
                                   )
 6          vs                     )
                                   )
 7   THE TRUSTEES OF INDIANA       )
     UNIVERSITY,                   )
 8                                 )   JULY 13, 2021
                Defendant.         )
 9

10

11                    TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE DAMON R. LEICHTY
12

13   APPEARANCES:

14

15   For the Plaintiffs:      MR. JAMES BOPP, JR.
                              MS. MELENA S. SIEBERT
16                            The Bopp Law Firm
                              The National Building
17                            1 South Sixth Street
                              Terre Haute, Indiana 47807
18
     For the Defendant:       MS. ANNE K. RICCHIUTO
19                            MS. STEPHANIE L. GUTWEIN
                              Faegre, Drinker, Biddle & Reath
20                            300 North Meridian Street, Suite 2500
                              Indianapolis, Indiana 46802
21

22

23

24

25
```

1          **THE COURT:**  All right.  This is **Ryan Klaassen versus**

2   **the Trustees of Indiana University**, 1:21cv00238.  We're here

3   for purposes of the preliminary injunction motion and argument.

4          Good afternoon to counsel today.

5          I see we have Jim Bopp here for the students.

6          Mr. Bopp, good afternoon.

7          **MR. BOPP:**  Thank you, Your Honor.

8          **THE COURT:**  And also Melena Siebert.

9          Ms. Siebert, good afternoon.

10          **MS. SIEBERT:**  Yes, Your Honor.  Thank you.

11          **THE COURT:**  And then we have Anne Ricchiuto and

12   Stephanie Gutwein here for the university.

13          Good afternoon to you both.

14          **MS. RICCHIUTO:**  Thank you for having us.  Yes.

15          **THE COURT:**  Mr. Bopp, do you have any of your clients

16   here for the hearing today?

17          **MR. BOPP:**  I do, Your Honor.

18          **THE COURT:**  Would you like to introduce those

19   students?

20          **MR. BOPP:**  I'd be pleased to.

21          Jamie Carini.

22          **THE COURT:**  Ms. Carini, good afternoon.

23          **MS. CARINI:**  Good afternoon.

24          **MR. BOPP:**  Daniel Baumgartener, that is, if you grant

25   the substitution of his parents.

1            THE COURT:  No objection to that, right?

2            MS. RICCHIUTO:  Correct.

3            THE COURT:  All right.  So the Court will grant the

4    motion to substitute for Mr. Baumgartener and welcome him to

5    today's hearing.

6            Good afternoon, sir.

7            MR. BAUMGARTNER:  Good afternoon.

8            MR. BOPP:  And Margaret Roth.

9            THE COURT:  Ms. Roth, good afternoon.

10           MS. ROTH:  Good afternoon, Your Honor.

11           THE COURT:  All right.  Does the university have any

12   representative present today?

13           MS. RICCHIUTO:  We do, Your Honor.  We have two of

14   our counsel.  We have Claire McRoberts and Tom Gannon.

15           THE COURT:  Mr. Gannon and Ms. Roberts -- McRoberts.

16   Is it McRoberts or Roberts?

17           MS. RICCHIUTO:  Mc, yes.

18           THE COURT:  Ms. McRoberts and Mr. Gannon, good

19   afternoon to you both.

20           MS. RICCHIUTO:  Thank you.

21           MS. McROBERTS:  Good afternoon.

22           THE COURT:  All right.  Very good.

23           All right.  With introductions out of the way, just a

24   couple housekeeping matters on my end before we commence

25   today's proceeding.

1          I did receive from the parties last week your

2   stipulation, if I can call it that, concerning an evidentiary

3   hearing.  It seems that the parties are still in agreement that

4   there's no need to duplicate what you would otherwise or have

5   already submitted by way of the written record in this case.

6          Is that still the view of the students today,

7   Mr. Bopp?

8          **MR. BOPP:**  It is, Your Honor.

9          **THE COURT:**  And for the university, Ms. Ricchiuto?

10          **MS. RICCHIUTO:**  Yes, Your Honor.

11          **THE COURT:**  All right.  I do agree that so long as

12   counsel are in agreement that the record that I have, which is

13   extensive, if that were to be merely duplicated by the oral

14   testimony I would receive today, there's no need to waste

15   anyone's time in that regard.

16          In terms of the exhibits, let me turn to that subject

17   now.  By my count -- and counsel check me to make sure that I

18   have my fingers on everything that you have submitted to me, as

19   there are at least, by my count, more than a hundred

20   exhibits -- there are Exhibits 100 to 129, 200 to 259, and 300

21   to 321.

22          Do I have the count right, Mr. Bopp?

23          **MS. SIEBERT:**  Yes.

24          **THE COURT:**  Ms. Gutwein (sic), thank you.

25          Ms. Ricchiuto?

1          **MS. RICCHIUTO:**  Yes.

2          **THE COURT:**  All right.  Have the parties agreed to

3    the admission of all of these exhibits, Mr. Bopp?

4          **MR. BOPP:**  As far as I know.

5          **THE COURT:**  All right.  Any objections to any of the

6    exhibits that are submitted?

7          **MR. BOPP:**  No.

8          **THE COURT:**  Ms. Ricchiuto?

9          **MS. RICCHIUTO:**  I think, Your Honor, that we don't

10   want to spend your time today necessarily hashing through

11   evidentiary objections.  I think that what makes the most sense

12   to me is that they can be stipulated as to admissibility, and

13   then obviously Your Honor can give them whatever weight you

14   deem appropriate.  That seems like the most efficient way to

15   handle it to me.

16          **THE COURT:**  All right.  So all those exhibits are

17   admitted.  And, yes, you're right.  I will ultimately decide,

18   once I've reviewed them all, what weight to give the various

19   exhibits.  And I realize there is much in the way of deposition

20   testimony in there, too.

21          It occurred to me, as I started to review these

22   yesterday afternoon and last evening, that there are some

23   duplicates in here.  I think counsel made an effort to try to

24   streamline some of these exhibits to correspond perhaps with

25   your presentation today, so I recognized that there were some

1    duplications -- "excerpting" perhaps is the better word -- and

2    I took that into account as I was reviewing.

3          I have, just so the parties are aware, read all your

4    briefs.  I am familiar with the law.  I have reviewed a great

5    mass of the exhibits and deposition testimony.  I must confess,

6    I have not reviewed it all thus far.  But I was up until the

7    wee hours of the morning last night reviewing as much as I

8    could take before I had to sleep, and then I reviewed some more

9    this morning.

10         So if there are -- I say that only to share with you

11   that if there are particular excerpts that you think are

12   important, say in the deposition testimony or in these

13   PowerPoint presentations or in the medical studies or the

14   declarations from either Dr. McCullough or Dr. Beeler, it would

15   be helpful that you point those out to me to facilitate my

16   review today.  But I have waded through a great majority of the

17   exhibits at this time.

18         All right.  Other than the motion to substitute,

19   which I've already granted, that's all I had on my agenda,

20   other than to set out a plan for today's hearing, in light of

21   the fact that we are going to hear argument and no new

22   evidence.

23         Mr. Bopp, how much time were you anticipating needing

24   for your remarks?

25         **MR. BOPP:**  An hour, and I'd like 20 minutes for

1   rebuttal.

2            **THE COURT:**  All right.  Ms. Ricchiuto?

3            **MS. RICCHIUTO:**  I don't exactly know what Jim's going

4   to say, but I've got a pretty good idea, so I think probably

5   roughly an hour is going to be sufficient for me, as well.

6            **THE COURT:**  All right.  I'll give both sides an hour

7   and 20 minutes.  I'll give you an hour on the open and 20

8   minutes in rebuttal.  I gave you a little extra time there only

9   because I probably will have some questions along the way.  And

10  so to the extent I interfere with your otherwise prepared

11  remarks, you should still have sufficient time to get through

12  everything today.

13            All right.  That's all I had on my agenda.

14            Mr. Bopp, anything else by way of preliminary matters

15  before we begin?

16            **MR. BOPP:**  Nothing else, Your Honor.

17            **THE COURT:**  Ms. Ricchiuto, anything else for the

18  university?

19            **MS. RICCHIUTO:**  No, Your Honor.

20            **THE COURT:**  All right.  Mr. Bopp, it's your motion.

21            **MR. BOPP:**  Thank you, Your Honor.

22            May it please the Court.

23            First, thank you for accommodating the expedited

24  nature of this case.  I know it's an imposition, and we

25  appreciate you addressing these matters in an expedited way.

1          I have already introduced the students.  But since

2    we've referred to them as students, I'd like to also note that

3    they're adults.  Many times we think of students as children,

4    but these are college-age students.  All the plaintiffs now, as

5    of Sunday, reached the age of majority.  And the vast majority

6    of students at Indiana University are all adults.  So we really

7    don't think we have the need to discuss the authority of a

8    college or a school in a parents' capacity because these are

9    adults.

10          First, I'd like to start with the context in which

11   this mandate was issued.

12          First, the mandate was issued contrary to the

13   emergency use authorization by the FDA.  That authorization

14   specifically requires that the provider do two things pertinent

15   to this.  One is provide informed consent; and, two, provide to

16   the patient "option to accept or refuse" the vaccination.  And

17   that's kind of inherent in the nature of this authorization and

18   doesn't really exist with respect to other forms of

19   authorization.  And, of course, that legal requirement does not

20   apply to IU -- certainly they're not a health care provider in

21   this context -- but it obviously is contrary to that and

22   certainly to the policy under which vaccines such as this are

23   authorized.

24          Second, it is contrary to modern medical ethics.  One

25   of the principal developments over the last several decades in

1    ethics has been the concept of voluntary, informed consent for

2    medical treatment of any kind, including whether it's research

3    or provision of normal medical care.

4         There are historical examples when this has not taken

5    place, and we in this modern era have rejected that, that

6    people can be required to take or unknowingly take medicines or

7    engage in research or anything without their knowledge and full

8    informed consent.

9         Of course, the mandate prohibits that consent, except

10   conditioned on, as I will get to, a severe punishment if the

11   person does not consent.

12        Third is contrary to any vaccinations that have been

13   historically required in three different ways.

14        First, the vaccinations currently required and

15   historically required have had decades of use so that the risks

16   were known, if there were any.  And that takes you to the

17   second part, is none of these required vaccinations really have

18   any side effects except extremely, extremely rare.  And they

19   are also given and prescribed to a vulnerable population.  In

20   other words, those that are required for children when they go

21   to elementary school are all diseases that particularly

22   adversely affect children.  So there is a -- they're a very

23   vulnerable population to the disease.

24        Of course, we're going to talk about **Jacobson**, but

25   the context of **Jacobson** in 1904 was the smallpox epidemic.  And

1   the smallpox epidemic was -- smallpox was very virulent.  And

2   from 1900 to 1976 when it was eradicated, finally, mercifully,

3   200 million people in the world died in that time period

4   because of that disease.

5            Now, as bad as COVID is -- and we agree it is bad.

6   We agree that it was a pandemic.  We agree at the beginning

7   that stern measures were required, and in fact there was a

8   compelling interest at the beginning of this pandemic -- but,

9   so far, worldwide, four million people have died.  So we have

10  orders of magnitude which -- and, of course, we have a much

11  larger population than they did in 1904.  So the rate -- the

12  death rate of smallpox is astronomically larger worldwide than

13  the death rate of COVID.

14           Now, furthermore, the vaccine had been around for

15  decades and had been developed by -- it was found that another

16  form of pox called cowpox -- if a person had had cowpox, which

17  is a much, much milder form of pox, would be also immune from

18  smallpox.  So based on that, they developed a way of infecting

19  people with cowpox.  In fact, when I was young, that happened

20  to me.  I still have the scar to prove it.  And so that is how

21  it was developed, and it has basically no risk.  And, of

22  course, smallpox was -- in fact, the whole population was

23  vulnerable to smallpox.  So that's an example of such a

24  development.

25           Now, next, the mandate is contrary to CDC

1   recommendations.  The CDC certainly recommends, as they should,

2   vaccines, and we would recommend them.  But they do not mandate

3   them.  They do not -- they do not recommend or suggest that

4   they ought to be mandated to any part of the population, much

5   less the least vulnerable, which, as I will describe, are

6   college children.  And college-age people are the least

7   vulnerable.  Those that are the most -- it goes up by age, in

8   fact geometrically goes up by age in terms of the adverse

9   effects of COVID if you get infected, until those over 85 have

10  a minimum of a 600 times greater risk of mortality and

11  morbidity from a COVID infection than do college students.  But

12  nobody recommends they be mandated to be vaccinated.

13         It is also contrary to every state in the United

14  States, every county in the United States, and every city in

15  the United States that has issued any mandates regarding COVID.

16  None of them mandate any part of the population be vaccinated

17  at all.

18         Now, it is true, there are a few universities that

19  do, and there are a few employers that do.  That is contrary to

20  all the Indiana state universities.  No other state university

21  in Indiana mandates a COVID vaccination.  Notre Dame does.

22  They're a private university.  They're in a different posture.

23  But no public university in Indiana does so, including most

24  recently Purdue that has lifted all restrictions.  So has the

25  State of Indiana virtually lifted all restrictions.  So has the

1    vast majority of counties and cities, have lifted nearly

2    every -- not necessarily every, but the vast majority of

3    restrictions, because all of them recognize that we're at the

4    end stage of the pandemic where these sort of -- that would

5    otherwise be viewed as harsh measures, restrictive measures,

6    rights-violating measures are not being employed.  In fact,

7    they're being lifted uniformly throughout the country.

8             **THE COURT:**  But not yet?

9             **MR. BOPP:**  I'm sorry?

10            **THE COURT:**  But not yet, right?  The State of Indiana

11   is not yet there.  They've not lifted all restrictions,

12   correct?

13            **MR. BOPP:**  Well, they did lift a whole bunch of them

14   in the last -- the issuance of the last emergency order.

15            **THE COURT:**  The State of Indiana has not lifted all

16   restrictions, correct?

17            **MR. BOPP:**  No.  They have still some, but they're

18   very narrow.  They lifted the mask mandate, social distancing

19   mandate, you know, the ones trying to stem the progress of the

20   disease, and they're very limited.  And we set those out in our

21   brief.

22            **THE COURT:**  And from the federal perspective, the

23   Secretary of Health and Human Services declaration of a public

24   health crisis hasn't been rescinded at this time, right?

25            **MR. BOPP:**  Not that I know of.

1          **THE COURT:**  So that's still in effect, as well?

2          **MR. BOPP:**  Yes, but it doesn't require -- it doesn't

3   mandate vaccination, which is pertinent to this.

4          **THE COURT:**  Well, I appreciate that.  But the notion

5   that we are completely out of the woods hasn't been recognized

6   by either the highest authority here in the State of Indiana,

7   or one of the highest authorities in the State of Indiana, nor

8   by the authority on the federal government side who deals

9   specifically with these types of health issues, correct?

10         **MR. BOPP:**  Well, yes.  We're not -- it hasn't been

11  eradicated.  That's true.  COVID has not been eradicated.

12  However, as I will soon demonstrate to you, we are in an end

13  stage of the pandemic.  We're not saying we're out of the

14  pandemic, but we're at the end stage.  And you will soon see

15  the CDC recommendations that explain what should be done in a

16  situation like we find ourselves.

17         In other words, there are different measures that are

18  recommended based on the stage of the pandemic.  You know, you

19  first find out about it, the recognition stage; then the

20  acceleration stage; and then the deceleration stage; and then

21  IU calls it, as you will soon see, the recovery stage.  The CDC

22  calls it the transition stage.  And it's much different in

23  terms of the response that is recommended and that IU's policy,

24  which unfortunately they didn't implement, recommends, as well.

25         Now, there are legal limits to IU's authority.

 1    They're the government, and they're not a private university,

 2    so the Constitution applies to them.  And they're not dealing

 3    with children; they're dealing with adults at the university.

 4    And so their legal limits, in terms of what rights they can

 5    violate, are limited by due process of law.

 6            Now, IU, however, claims nearly unreviewable

 7    authority to mandate vaccinations and other health measures

 8    that they, in their judgment, think they are to do, and that's

 9    regardless of whether we're in a pandemic or not.  They claim

10    this authority every day, all day, for the rest of the time of

11    the world, regardless of the situation, even if there's a

12    pandemic that they're trying to address.

13            That sweeping level of authority is so contrary to

14    modern constitutional jurisprudence, it's breathtaking.  What

15    government agency would ever make such a claim and believe that

16    they can willy-nilly violate rights and never be reviewed and

17    never have to demonstrate that there's any justification for

18    what they do?

19            And that is even under **Jacobson**, because there's an

20    exception to **Jacobson** -- there's an exception in **Jacobson** that

21    we think is applicable here, and I'll soon describe that.

22            So the task for this Court is to look at the current

23    situation, not add up all the deaths of a pandemic that has

24    gone like this, and now we're down here, but look at the

25    current situation and whether or not their mandate, which is

1   brand-new, is justified by the circumstances under the

2   appropriate level of scrutiny.

3         Now, we do know some things now that we didn't know a

4   year-and-a-half ago about the COVID virus, its risks, its

5   treatment, and the progress of the disease in the United

6   States, State of Indiana, and at IU.  Well, these are all

7   things that the Court, in our opinion, must take into account

8   to determine whether or not, under the circumstances, the

9   vaccine mandate is required.

10        Now, the first thing we know is it affects age groups

11  differently, is that the youngest are the least affected, the

12  oldest are the most affected.  But it isn't just, you know,

13  like a little bit.  It is astronomically different.

14        I tendered to the Court our exhibits that I was going

15  to refer to in this presentation.

16        **THE COURT:**  Mr. Bopp, are these the handouts we got

17  this afternoon?

18        **MR. BOPP:**  Yes.

19        **THE COURT:**  All right.

20        **MR. BOPP:**  Yes.

21        Yeah, I had to kill more trees.

22        So, anyway, if you look at -- if you look at what is

23  Exhibit 243 -- and I hope it's on the top.

24        **THE COURT:**  It is.

25        **MR. BOPP:**  Okay.

1           -- you will see, on the upper left-hand corner, in

2    November of 2020, the CDC estimate of the infection fatality

3    ratio for the coronavirus.  And you will see different rates at

4    ages 20 to 49, and then they have at 70.  Well, the difference

5    in the rate -- and they're talking about death rate here -- is

6    that those in the age group above 70 have a 2,700 times greater

7    risk of death than those in the 20 to 49, so we're talking

8    astronomical differences.

9           Now, Dr. Carroll in his deposition agreed that the

10   number 600 times -- he would agree to the number 600 times

11   between college-age students and people over the age of 85.  He

12   would agree 600 times greater risk of adverse effect.

13          Now, you can also look at this in absolute terms.  We

14   presented a study of -- I forget now how many -- 50 or so

15   colleges, maybe more, and what the study found was one death

16   and 17 hospitalizations in the last year-and-a-half of

17   college-aged students from the COVID infection.

18          At IU, Dr. Carroll agreed that there was, they

19   believe, one death of IU students -- of an IU student in the

20   last year-and-a-half from the COVID infection.

21          **THE COURT:**  And how many hospitalizations?

22          **MR. BOPP:**  I don't know.  I don't know.

23          And, of course, these numbers can be compared with

24   things like homicides, you know, for the last -- for a year in

25   this group, and that's 146; suicides, 143 -- and this is just

1  for a year -- inflammatory heart, 13; congenital abnormalities,

2  11.  So we're talking about, in either relative terms or in

3  absolute terms, something that is extremely rare, extremely

4  rare.

5          IU has 90,000 students, 90,000, in all of its

6  campuses, and --

7          THE COURT:  Do we know the statistics related to IU's

8  experience for its other community members?  You know, this is

9  not just about students, but there are faculty and staff and

10 employees who work at Indiana University who, every day, come

11 in contact with students.

12         MR. BOPP:  Right.

13         THE COURT:  So what is the experience vis-a-vis the

14 entire community at Indiana University and its campuses?

15         MR. BOPP:  Well, I don't know about faculty and

16 students -- I mean faculty and staff.  I am not representing

17 them.  I didn't --

18         THE COURT:  Shouldn't I consider that evidence, as

19 well, in running the calculus here, the constitutional

20 calculous?

21         MR. BOPP:  Well, students are close -- they're more

22 close -- well, it depends on what you're thinking about.  If

23 you're thinking about students need to be vaccinated in order

24 to protect other people, all right, well, I asked Dr. Carroll

25 about that -- he was the 30(b)(6) witness for Indiana

1   University -- and he said it's not the purpose of this mandate

2   to protect these other people.  The purpose is to protect IU

3   students; and that if other people in the community are

4   protected, well, that's a beneficial collateral effect, if that

5   is the case.  But that is not the purpose of this.  This is to

6   protect people in the IU community, which includes faculty and

7   staff, all to be vaccinated.

8          Now, the only other thing I know I could tell you

9   about is the vaccination rate among IU students is 75 percent

10  as of June of this year, and that was right after the mandate

11  was issued, that figure arose, and it was -- and, of course,

12  they -- of course, then, you know, campus was emptied out

13  because of Summer.

14         I understand that faculty and staff have a higher

15  vaccination rate than do the students.  That's what I

16  understand.  But, believe you me, I had enough to do than try

17  to figure that out.

18         All right.  Now, second, the vaccination risk for the

19  population and for college -- there is a vaccination risk for

20  the population and for college-age students.  And it appears,

21  even though, you know, things are just emerging, that they seem

22  to be at greater risk of an adverse effect than the general

23  population.  So we may have an inverse in terms of the effect

24  of the vaccination.  Rather than the fact of the adverse events

25  affecting older people more, it seems it is affecting younger

1    people more.

2           And if you'll turn to the next exhibit, 257, you will

3    see, as of July 9, they report it through the VAERS system,

4    which is very well recognized, even though it has its

5    limitations, a system that has reported both various adverse

6    reactions and effects to 18 to 29-year-olds at the top,

7    including one death -- and this is in Indiana -- and at the

8    bottom is all ages in Indiana, and they report 123 deaths.

9           So there are known adverse effects to this vaccine,

10   as opposed to the other vaccines I described.  I mean, as a

11   result, you know, there is a risk/benefit analysis that needs

12   to be done for anyone who is allowed to make a decision, to

13   give informed consent, to being vaccinated.

14          Now, another interesting statistic is that heart

15   inflammation has recently emerged, that college-age men

16   predominantly are having a reaction, which is a heart

17   inflammation.  And for those that are 12 to 24 -- you know,

18   everybody does their statistics with different age ranges,

19   unfortunately -- for that age group, they have received 8.8

20   percent of all vaccines and, however, have suffered 52 percent

21   of the heart inflammation.

22          **THE COURT:**  So is there any -- Mr. Bopp, is there any

23   authoritative peer-reviewed study that establishes a causative

24   link between the vaccine, any one of the vaccines approved

25   under EUA and heart inflammation?

1          MR. BOPP:  Not yet.

2          THE COURT:  So the evidence we have today -- and I

3    realize that, much like the pandemic, the science as it

4    concerns COVID-19 and the vaccines is ever-evolving.  What we

5    know today won't be what we know in 20 years -- but at least as

6    to what we know today, the evidence that associates a link

7    between heart inflammation and any one of the COVID-19

8    vaccinations is anecdotal?

9          MR. BOPP:  Yes.

10         Now, there is -- and we have in our exhibits --

11   Hill's Causation, and it's well accepted.

12         THE COURT:  It goes through several factors as to how

13   you go about determining causation?

14         MR. BOPP:  Exactly.

15         And, of course, those that have used that, okay, see

16   a link, all right.

17         THE COURT:  And one of those is temporal association?

18         MR. BOPP:  Right.

19         THE COURT:  Which is, in large measure, what this

20   anecdotal information is based on; do you agree?

21         MR. BOPP:  In part, yes.

22         THE COURT:  In other words, when there are reports in

23   the VAERS system, that is anecdotal evidence largely based on

24   this time association, the temporal association?

25         MR. BOPP:  Uh-huh.  That's one of the factors that is

1    considered.

2            And, you know, of course, as we know, which bears on

3    the reasonableness of their mandate, this was emergency-use

4    authorization, was how this was approved.  There weren't

5    long-term studies, even though they are being done now and

6    should be done by 2023.  We will, I'm sure, know a lot more.

7    And we have seen in real time, you know, how the use of a

8    particular drug -- you know, as you go along in time, you find

9    out things.  Because the heart inflammation association was not

10   even suspected and wasn't manifest at the beginning, you know,

11   say six months ago when they started using the vaccine.  But

12   now it's emerging, and there are other problems emerging.  I

13   don't want to say anything about it because I just heard it on

14   the news, but there's another concern about Johnson & Johnson

15   on causing an autoimmune disease.  That's all I know.  But

16   that's one of the realities of what we are dealing with, which

17   surely is why everyone else in the United States is not

18   mandating these vaccinations, you know, and letting people make

19   a choice, not assume risks by government mandate.

20           **THE COURT:**  Don't the students have a choice here?

21           **MR. BOPP:**  I'm sorry, sir?

22           **THE COURT:**  Don't the students have a choice here?

23           **MR. BOPP:**  Not --

24           **THE COURT:**  They can attend Indiana University and

25   receive the vaccine, save for certain exemptions, which I'm

1    sure we'll get into, or they can attend university elsewhere.

2         MR. BOPP:  Yeah.  That's IU's argument, of course.

3    And, of course, the problem with that is the Unconstitutional

4    Condition Doctrine that establishes that, if the government

5    conditions a benefit, and the benefit doesn't -- you know, you

6    don't have to be entitled to it in any way, in fact you don't

7    even have to violate your rights, in order to assert that, if

8    the government conditions a benefit on the waiver of a

9    constitutional right, that that itself is a violation of that

10   right.

11        Of course, **Regan versus Taxation Without**

12   **Representation** was well-known.  The **Koontz** case recently

13   decided by the court lays out all the cases.  That was an

14   opinion by Justice Alito that we cite in our brief -- in our

15   reply.  It lays out the entire legal theory under which

16   conditioning a benefit on waiver of a constitutional right is

17   itself a violation of that right.

18        THE COURT:  And, of course, in running that analysis,

19   we have to then define what the right is, right?

20        MR. BOPP:  Yes.

21        THE COURT:  So what is the right here?

22        MR. BOPP:  To bodily integrity; to medical treatment

23   choice; and, in a couple of cases of our plaintiffs, to free

24   exercise of religion.

25        THE COURT:  Well, the free exercise of religion, to

1    be clear, concerns the face mask mandate, right?

2         I mean, there's two issues here.  There's one related

3    to whether they have to take the vaccine, subject to certain

4    exemptions; and then there's the additional requirements?

5         **MR. BOPP:**  Right.

6         **THE COURT:**  And I realize the university has an

7    argument about whether those are really here in the case or

8    not.  Mr. Bopp says they are, so I'm entertaining that.

9         So with respect to religious rights, that concerns

10   the face mask and the other additional requirements, right?

11        **MR. BOPP:**  Yes.  In other words, they are not getting

12   a true religious exemption because they have to now comply with

13   a second set of requirements that violates their religion, and

14   they can't get a waiver for those.

15        **THE COURT:**  Right.

16        So coming back then to the vaccination -- I want to

17   focus on that, Mr. Bopp -- if we run the analysis under the

18   Unconstitutional Conditions Doctrine, we're really focused on

19   what specific right?

20        **MR. BOPP:**  Well, I say all three of the ones are at

21   issue:  Bodily integrity; medical treatment choice; and

22   religious freedom, in some instances.

23        Now, bodily integrity --

24        **THE COURT:**  But there's a religious exemption.  I'm

25   not sure I see why the religious choice, the exercise of

1   religious choice, bears on the vaccination when there is an

2   exemption under this policy for --

3           **MR. BOPP:**  But there's not an exemption to all the

4   religious objections.

5           See, this is like saying, you know, to a Muslim,

6   "We're not going to exclude you from our restaurant," okay,

7   "but we're going to make you eat pork if you come in," okay.

8           In other words, yeah, the initial requirement they're

9   exempted from.  But what is imposed upon them is an equally

10  offensive violation of their religious beliefs that they cannot

11  get an exemption for, which means --

12          **THE COURT:**  Wearing a mask?

13          **MR. BOPP:**  Yeah.

14          -- which means that the exemption is phony.  It's not

15  for religious objections.  It's only for certain religious

16  objections.

17          And you can look at it another way.  Have you ever

18  heard of a religious objection in which additional requirements

19  are imposed upon you that nobody else has to comply with?  So,

20  I mean, I call that a penalty.  You're being penalized for

21  getting an exemption.

22          **THE COURT:**  What you call a penalty one might say is

23  enabling?

24          **MR. BOPP:**  Is what?

25          **THE COURT:**  Enabling.  In other words, it's a

1    benefit.  This is a mechanism by which the university allows

2    people to exercise their religion.

3              **MR. BOPP:**  Well, number one, you cannot condition a

4    benefit like going to the university on wearing a mask if it

5    violates your rights, and I'm explaining how it does, religious

6    right, and so --

7              Anyway, I'm losing my train of thought, where we're

8    at now, but --

9              **THE COURT:**  Well, let me take you back to where I

10   started.  I'll help you here.  This is the unconstitutional

11   conditions analysis.

12             **MR. BOPP:**  Uh-huh.

13             **THE COURT:**  Let's focus on -- outside of the

14   religious freedom context, let's focus on this right to bodily

15   autonomy and the right to choose medical treatment or not.

16             **MR. BOPP:**  Uh-huh.  Sure.

17             **THE COURT:**  Based on the law to date, nowhere does

18   the Constitution say that there is a fundamental right, or even

19   a right in that regard, though it has been recognized as a

20   liberty interest under the case law, at least assumed as one

21   under **Cruzan**, under **Glucksberg**, right?  There are certain cases

22   that have recognized, or at least assumed, that that right has

23   existed as a liberty interest that then is protected by the due

24   process clause of the Fourteenth Amendment.  Do you agree?

25             **MR. BOPP:**  Right.  And under a liberty interest, it

1    would be subject to rational basis, which requires

2    justification and evidence and everything that IU says they

3    don't have to provide.

4           **THE COURT:**  So let me make sure I understand this

5    right, Mr. Bopp.

6           So you agree that, under that analysis, that gets us

7    to rational basis review; it doesn't get us to strict scrutiny?

8           **MR. BOPP:**  Well, I think -- no, I didn't mean that.

9    I think that a violation of bodily integrity requires strict

10   scrutiny.

11          **THE COURT:**  Okay.  You're going to have to help me

12   get there, because what I'm reading in terms of **Glucksberg** and

13   **Cruzan** and --

14          **MR. BOPP:**  Those are the medical treatment cases.

15          **THE COURT:**  Sure.

16          **MR. BOPP:**  I'm talking about -- I'm talking about

17   contraceptives, abortion, those lines of cases, where bodily --

18   you know, the right to do with your body as you choose.  I

19   mean, that's the way people --

20          **THE COURT:**  So you want me to -- you want me to

21   expand the substantive due process rights that are recognized

22   today to make a new one?

23          **MR. BOPP:**  No.  No, but the bodily integrity right

24   has been recognized --

25          **THE COURT:**  As a liberty interest, not as a

 1   fundamental right.

 2           **MR. BOPP:**  Only in the -- well, what I'm saying --

 3           **THE COURT:**  Is that correct?

 4           **MR. BOPP:**  No.

 5           Abortion --

 6           **THE COURT:**  What case has recognized it as a

 7   fundamental right, the right that you want to assert here today

 8   on behalf of the students?

 9           **MR. BOPP:**  The line of cases starting with

10   **Roe v. Wade** is one, and that is --

11           **THE COURT:**  Well, let's be very clear, Mr. Bopp.  The

12   Supreme Court has been very specific about this.  When we look

13   in the penumbra of substantive due process to determine what

14   rights exist there, that the right has to be clearly,

15   specifically defined.

16           **MR. BOPP:**  Uh-huh.

17           **THE COURT:**  It's not enough to say, "Well, there's a

18   right to private decisions within your home, and therefore

19   there is now this right to refuse a vaccine," right.  You agree

20   with me; the case law doesn't make that leap or allow that

21   leap?  Instead, when we're dealing with substantive due

22   process, we have to clearly define the right that we're going

23   to wrestle with today.

24           **MR. BOPP:**  Understood, and that -- and that is the

25   application -- that would be an application of the -- of

1    general rights, I agree; that you have to define properly the

2    application of that right; and then at that level of

3    specificity, the Courts determine whether or not it fits and is

4    fundamental.

5          THE COURT:  So my question is a precise one.

6          MR. BOPP:  Uh-huh.

7          THE COURT:  The Bill of Rights were ratified in 1791.

8    The Fourteenth Amendment is approved in 1868.

9          Since that time, has there been a single case

10   anywhere in the country that has recognized the right that you

11   want to assert on behalf of the students as a fundamental

12   right?

13         MR. BOPP:  You know, the best I can do is what we did

14   in our brief, Your Honor, and we cited specific cases we

15   believe establish that --

16         THE COURT:  Again, I want a specific answer to my

17   question, Mr. Bopp.

18         Is there --

19         MR. BOPP:  I don't --

20         THE COURT:  No.  Excuse me, sir.

21         MR. BOPP:  Sorry.

22         THE COURT:  Is there a single case that has

23   recognized the right, this right, the right to not just bodily

24   autonomy to refuse the vaccine --

25         MR. BOPP:  Vaccines?

1           **THE COURT:**  Yes, sir.

2           -- as a fundamental right?

3           **MR. BOPP:**  There's been two cases that address this

4    by the United States Supreme Court, and they were in 1904,

5    **Jacobson,** and then they were in -- and then the **Zucht** case,

6    Z-U-R-K (sic), I think it is, that specifically upheld

7    vaccination requirements for school-aged, meaning elementary or

8    high school or whatever, not college.

9           And those --

10          **THE COURT:**  And if we go back to **Jacobson** --

11          **MR. BOPP:**  Yeah.

12          **THE COURT:**  -- **Jacobson** is just a rational basis

13   review case by another name, is it not, in effect a precursor

14   to rational basis, before rational basis was known as it's

15   constitutionally known today in terms of the modern tiers of

16   scrutiny?

17          **MR. BOPP:**  As one judge said it, **Jacobson**'s exception

18   is analytically different but gets you to the same place as

19   rational basis, because under the exception, the government has

20   to recognize that the requirement is not unreasonable and that

21   there's a sufficient connection between the requirement and

22   public safety that it can be upheld, and that is if there's a

23   right violated.  And, of course, **Jacobson**'s central holding was

24   there weren't any rights violated and therefore you can just

25   willy-nilly do this.

1              But, you know, since 1904, I mean, my goodness sakes,

2    look at the whole line of cases that have, you know, harkened

3    back to dissents, you know, the right to be left alone, things

4    like that, and we have right now a very fulsome set of

5    constitutional principles that establish rights.  Sometimes --

6    and what we're talking about right now is like a new

7    application of an enduring, well-recognized principle.  And

8    there is -- other than those two cases in the Progressive Era,

9    there's just, you know, nothing else to point to as far as the

10   Supreme Court is concerned.

11            **THE COURT:**  So, Mr. Bopp, I may well agree that

12   there's a well recognized, at least in the case law that has

13   built on the concept of substantive due process, liberty

14   interest in bodily autonomy, the right to refuse unwanted

15   medical treatment, even a case that recognized that liberty

16   interest in refusing anti-psychotic drugs in the prison

17   context, right.  There are a line of cases that recognize that

18   as a liberty interest.  I'm trying to get clarity as to whether

19   there's any authority for recognizing it as so fundamental that

20   we now leap into strict scrutiny.

21            Recognizing that as a liberty interest, like

22   **Glucksberg** did, I think, led the Court to a rational basis

23   review, did it not?

24            **MR. BOPP:**  Arguably.

25            **THE COURT:**  Sorry?

 1          MR. BOPP:  Arguably, yes.

 2          THE COURT:  I mean, that was the conclusion of the

 3  case, that there was a legitimate interest that the, I think,

 4  State of Washington was pursuing that was rationally related to

 5  that interest, that is, the law that was passed that prohibited

 6  assisted suicide.

 7          MR. BOPP:  Often they default to rational basis even

 8  though it could be subject to scrutiny because they want to do

 9  it at, you know, the lowest level.  And if it won't even pass

10  rational basis, why do we have to think about strict scrutiny?

11          You know, I do understand that dynamic in the courts,

12  and that, I think, has resulted in the default in some of these

13  cases, including **Glucksberg**, to a rational basis review,

14  because if it won't pass that, it certainly is not going to

15  pass strict scrutiny.

16          THE COURT:  That doesn't really answer the question

17  for us in terms of **Glucksberg**, because they said it did pass

18  rational basis review in **Glucksberg**, the law that was passed by

19  Washington, right?

20          MR. BOPP:  Right.

21          THE COURT:  So who knows what the analysis might have

22  been had strict scrutiny been appropriate.

23          MR. BOPP:  Sure.

24          THE COURT:  So my question is one aimed at:  What is

25  the right constitutional analysis that needs to be employed

1   here?

2          And I know I'm pressing you with questions, but I'm

3   not sure I'm seeing the case for why strict scrutiny applies as

4   opposed to rational basis.

5          **MR. BOPP:**  Well, you have to determine the

6   seriousness of the intervention, because it is recognized as at

7   least a liberty interest, and you have to understand the

8   seriousness of it.

9          And we have plaintiffs who -- their attending

10  physician has told them that their underlying medical

11  conditions mean that they are at serious risk to their health

12  or life if they take the vaccine and so don't take it.  That

13  plaintiff sought a medical exemption and was refused it.

14         **THE COURT:**  You're talking about Ms. Carini?

15         **MR. BOPP:**  I'm currently thinking about Jaime Carini.

16         **THE COURT:**  Ms. Carini?

17         **MR. BOPP:**  Yeah.

18         **THE COURT:**  So Ms. Carini has a religious exemption?

19         **MR. BOPP:**  Yes.

20         **THE COURT:**  Which she received prior to the time that

21  that she sought a medical exemption?

22         **MR. BOPP:**  Yes.

23         **THE COURT:**  All right.  So she had already an

24  exemption and went after a second exemption?

25         **MR. BOPP:**  Yes.

CERTIFIED TRANSCRIPT OF PROCEEDINGS - JULY 13, 2021

1          **THE COURT:**  Are there any students among the eight

2   who are plaintiffs in this case who have a doctor's opinion or

3   a doctor's note who says they should not get the vaccine?

4          **MR. BOPP:**  There's two of them.

5          **THE COURT:**  Other than Ms. Carini, who has already

6   got an exemption, who else is there?

7          **MR. BOPP:**  Do you remember?

8          **MS. SIEBERT:**  Hold on.

9          **MR. BOPP:**  We'll have that answer for you.

10          **THE COURT:**  Sure.  Thank you.

11          **MR. BOPP:**  Let me finish up the thought about the

12   risk of vaccine, the COVID vaccine versus others.

13          We cite a study which compared the number of

14   COVID-related deaths in the six months the vaccines have been

15   utilized throughout the United States, and that's 6,136, with

16   the total number of deaths for all other vaccinations,

17   vaccines, for the last 20 years, all right, and that number is

18   half of what the COVID wracked up -- COVID vaccine wracked up

19   in six months, and that number is 3,167.  Adjusted per year --

20          **THE COURT:**  3,167 deaths?

21          **MR. BOPP:**  Deaths.

22          **THE COURT:**  Based on what study?

23          **MR. BOPP:**  We cite it in our --

24          **THE COURT:**  Is this the abstract?

25          **MR. BOPP:**  Yes.  I don't have -- I didn't pull it out

1    to show you.

2          **THE COURT:**  So I read last night an abstract --

3          **MR. BOPP:**  Yeah.

4          **THE COURT:**  -- which I presume is not peer-reviewed,

5    correct?

6          **MR. BOPP:**  I'm not sure which one you're referring

7    to.

8          **THE COURT:**  Okay.  Well, let's be specific so when I

9    looked at the evidence, you know, after today's hearing I'm on

10   the same page with you, Mr. Bopp.

11         **MR. BOPP:**  Sure.

12         **THE COURT:**  But there was an abstract that was based

13   on an analysis of the VAERS data.

14         Is that the one that you're referring to?

15         **MR. BOPP:**  Yes.

16         **THE COURT:**  Okay.  And that's an abstract?  It was

17   not peer-reviewed, correct?

18         **MR. BOPP:**  That's correct.  I now know what you're

19   asking me about.

20         **THE COURT:**  Okay.  And that's based on the VAERS

21   anecdotal data?

22         **MR. BOPP:**  True.

23         **THE COURT:**  So it's not a study?

24         **MR. BOPP:**  Well, true.  There are limitations on the

25   VAERS data.  It's passive reporting.  It's self-reporting,

1    usually by health care providers, sometimes by laypeople.  But,

2    you know, all the experts in the field rely upon this

3    information.  And it's not -- certainly not perfect, that's for

4    sure.

5            THE COURT:  Well, I saw that the authors of that --

6            MR. BOPP:  By the way, could I finish that?

7            There are people -- there is, I think -- I am trying

8    to remember.  It might be the CDC that does follow up on these

9    reports to try to verify them, but they don't -- but the

10   results of that investigation is not then reflected in the

11   VAERS data.  It's still the raw data.

12           THE COURT:  And I'm not dismissing the fact that

13   temporal association may be the beginnings of a causative link.

14           MR. BOPP:  Right.

15           THE COURT:  But I'm focused particularly on this

16   abstract.

17           I noted that the authors there noted a couple of

18   things.  First, that, in large measure, this anecdotal

19   information was shared, I would say, by the majority, or in the

20   majority, by health care professionals, as you've said.  And,

21   second, then they draw a conclusion that there is a link

22   between the vaccines and the risk of death.  What was not clear

23   to me in reading the abstract was how they reached that

24   conclusion.

25           MR. BOPP:  Right.

1          THE COURT:  They say it.  But on what basis do they

2    say it, particularly when they're basing this conclusion on

3    anecdotal information within the VAERS system?

4          MR. BOPP:  Uh-huh.

5          THE COURT:  I didn't see any explanation for how they

6    then drew the conclusion that there was a causative link.

7          Did you see any evidence of that?

8          MR. BOPP:  No, not in the abstract.

9          THE COURT:  How am I to, then, absent true medical

10   evidence of causation -- that's just a theory.  That's not

11   proof of anything; do you agree -- how am I to base the

12   conclusion that you want me to base this conclusion on that

13   there is a definitive or causative link between the vaccines

14   and the risk of death?

15         MR. BOPP:  You know, I haven't yet said the word

16   "definitive" because we have a brand-new vaccination, vaccine.

17         THE COURT:  Well, let's say it's to a reasonable

18   degree of medical certainty.  It's not definitive, but it's at

19   least causative.  It's not speculative.

20         How am I to draw that link or draw that conclusion

21   based on something that is merely a theory but not established

22   to any reasonable degree of medical certainty?

23         MR. BOPP:  Well, it's certainly not a theory.  It's

24   more than a theory, because some of the Hill Factors are

25   certainly existing there, so it's not just a theory, you know,

1    taken out of the blue.  It is a methodology that is used for

2    all vaccines; that is, there's a self-reporting and then they

3    go investigate.

4           And, again, one of the -- see, it's like I'm getting

5    hoisted, you know -- I mean, they didn't do the lengthy trials

6    that they would normally do.  And now I'm hearing that, because

7    of that, it's my fault that we don't have the absolute, 100

8    percent proof through peer-reviewed studies of links of things

9    that are just appearing that would have appeared in the trials

10   before it had national roll-out, and there would have been

11   those studies and we would have known for sure, okay.  Well,

12   that's not the students' fault.  It is the context in which we

13   are, okay.  That's the context.  There are known risks and then

14   there are known -- it is known that there are unknown risks,

15   and now they're starting to manifest itself in ways that the

16   scientific community uses all the time.  That's the reason they

17   have the VAERS system, so that there will be anecdotal reports.

18           THE COURT:  I'm sorry, sir.  I'm sorry.

19           So do we agree that the risk of death vis-a-vis any

20   one vaccine is an unknown risk?

21           MR. BOPP:  No.  We know -- for many of the vaccines,

22   we know the risks, because they've -- they went through full

23   trials, and many of them have been used for decades.

24           THE COURT:  No, I'm talking about the COVID-19

25   vaccine.

1          **MR. BOPP:**  Oh, the three.

2          **THE COURT:**  What we're here to talk about today,

3  Mr. Bopp.

4          **MR. BOPP:**  Sorry.

5          **THE COURT:**  Yeah.  With respect to any of one of the

6  three that have EUA approval, are we in agreement that the risk

7  of death from one of those vaccines is today medically unknown?

8          **MR. BOPP:**  No.  It's a strong suspicion, but it's not

9  established to a reasonable degree of medical certainty.

10          And the context here is not -- we're not suing the

11  drugs, you know, saying the students ought to get damages.

12  That would have to have been -- that causation link would have

13  to be shown.  We're suing Indiana University for making them

14  take the vaccine and thereby stripping them of their right to

15  decide for themselves and assume their own -- assume the risk

16  and the benefits and make that judgment.

17          IU can strip that from them, all right.  The choice

18  is the problem here.  And the nature of the roll-out of the

19  vaccine, including, you know, how it works, is novel, even

20  though the mechanism is known.  It's just never been approved

21  by the FDA for use in vaccines.  It's a known mechanism.  I

22  mean, there's just a number of aspects about this that -- why

23  in the world is IU University practicing medicine?  What

24  studies have they seen that ensure -- ensure the safety of this

25  vaccine they're requiring their students to take?

CERTIFIED TRANSCRIPT OF PROCEEDINGS - JULY 13, 2021

1          You know, we can only know what we know under the
2    circumstances, but there is suspicion, you know, justifiable
3    suspicion, that there are problems here.
4          And the thing I just told you about, I was told that
5    the CDC is going to make a statement about this emerging
6    problem with the J & J vaccine of an autoimmune disease,
7    association with an autoimmune disease.  I don't know.
8          But, you know, it would seem to me that it's
9    unreasonable, even irrational, to require people to take a
10   vaccine when there is so many unknowns and peculiarities.
11         **THE COURT:**  It certainly begs the question "who makes
12   that choice," right?
13         **MR. BOPP:**  Well, under modern constitutional
14   jurisprudence, you do, whether or not their choice was
15   reasonable under the circumstances.
16         I mean, surely, we would say that it is unreasonable
17   for IU to open the door of a room, dark room, and throw someone
18   in there because of all the unknowns, right.  I mean, that
19   would surely be unreasonable, all right.
20         Well, to a certain extent -- and not fully, I
21   understand, but to a certain extent -- that's the way we feel,
22   you know.  It's one thing to have the choice.  And the students
23   are all in favor of these vaccines being rolled out and people
24   taking them if they choose to.  They're not suing the vaccine.
25   But they want -- they want to have their right of bodily

1  integrity not to have a foreign substance introduced into their

2  body that they're required to take when they haven't consented,

3  and particularly in this context in which there are so many

4  unknowns but suspicion.

5          I mean, it's a perfectly rational choice for somebody

6  to say, "Well," you know, "I understand you say this is going

7  to help me," you know, "do X.  But what are the problems with

8  this medicine?"

9          And the person will say, you know, "Well" -- you

10  would tell this person all the things we just were discussing.

11  You know, it would be a perfectly rational decision by that

12  person to say, "No."  You know, "You say it's going to help me,

13  but you can't tell me really, even though there's suspicions

14  now, what the problems are associated with it."  That's

15  stripped by them from these people, and it's inexplicable to

16  me, honestly.

17          Now, I mean, there's a couple of other things that

18  are aspects to this.  We have evidence but, no doubt, not to a

19  reasonable degree of medical certainty, but we have evidence.

20  We have evidence of vaccine reactions for COVID-positive

21  people, students.

22          We have -- one of our plaintiffs had COVID, has

23  antibodies, believes he is immune, but Indiana University will

24  not exempt him, and that's in the face of emerging studies that

25  say there's an increased risk of the -- recent UK study that

1    says there's an increased risk for adverse effects of the

2    vaccine if you're COVID-positive, all right.

3             We also have --

4        **THE COURT:**  How long do those antibodies last, based

5    on current medical science?  I know I've seen an article, a

6    study, indicating that its longevity may be eight months.  I'm

7    not sure that was even in the context of this case.  But what

8    have you seen, Mr. Bopp, in that respect?

9        **MR. BOPP:**  Well, that was going to be my next point.

10            You know, the problem is, they didn't do the

11   long-term studies to determine the immunity that's afforded by

12   the vaccines, and they also have not done long-term studies on

13   natural immunity that arises from being infected.  So, again,

14   there's just a degree of unknown there.

15            There are some studies.  Cleveland Clinic recently

16   did one, but it was only for five months, but it's because

17   that's when the vaccine became available, you know.  So you

18   can't study something that you don't have anything about.  And

19   they said that natural immunity from having the COVID infection

20   provides the same level of immunity as do the vaccines.

21            Now, IU wants to argue over that and only talk about

22   vaccines, but we don't even know for sure how long the immunity

23   for that lasts.  And we also don't know -- even though there's

24   some emerging evidence on this, as well -- what effect the

25   vaccinations have on protecting people from variants that are

1   coming along.  So even the efficacy of the vaccines are now

2   being called into question, whether or not they do anything,

3   particularly against certain strains like the Delta.

4          But this isn't our problem.  This isn't the students'

5   problem.  They didn't cause this problem.  The problem is

6   they're mandating it.  They're forcing them to do this, despite

7   all these unknowns.

8          So that does take us back to due process.  Those were

9   the contexts I wanted to mention to due process.

10         And we've already covered the fact that the law, the

11  recent case of **Koontz** that sets out all of the cases, that if

12  you condition a benefit on waiving a constitutional right --

13  and it's not just a fundamental one.  It would be a liberty

14  one -- that means it's violated and triggers the appropriate

15  level of scrutiny.

16         IU says, "Well, just go to another school."

17         Now, I represent a plaintiff here who has been at IU

18  for years because she is one semester away --

19         **THE COURT:**  From a Ph.D?

20         **MR. BOPP:**  Yeah, not one but two Ph.Ds in just a few

21  months.

22         So IU says, "Well, whatever.  Go to another school."

23         What, and start all over, to get two Ph.Ds and spend

24  another four or five years somewhere trying to do this?  You

25  know, that's coercive, to do that to somebody.  You're coercing

1    a choice.

2         Now, Dr. -- yeah.  Well, he is a doctor -- Dr.

3    Carroll, who was a 30(b)(6) witness, when I asked him about

4    that, he said, "Well, that's not coercion in the way" -- first,

5    frankly, he quibbled a lot, said he didn't know what "coercion"

6    means, but he said that's not coercion in his point of view.

7         Well, IU needs to understand that it is.  They need

8    to understand that.  Because they make a lot of decisions about

9    these students.  And they right now think they can do anything

10   as far as conditioning any benefit or any requirement, no

11   matter what it is.

12        And, you know, and they've taken it so far not only

13   about **Jacobson,** but to its progeny, **Buck v Bell.**  They still

14   think it's good law, **Buck v Bell** is good law.  And, of course,

15   as you know, **Jacobson** led directly to **Buck v Bell.**  In fact, a

16   quote out of **Buck v Bell** was that, you know, the mandate of

17   forced vaccinations is broad enough to encompass forced

18   sterilization -- I don't know if I can get through this one --

19   and they cite **Jacobson.**  And then the very next sentence is

20   that horrific statement, "Three generations of imbeciles is

21   enough."  That is what **Jacobson** is.  That's what it is.  It's

22   **Buck v Bell.**  And Indiana University still thinks **Buck v Bell**

23   is good law.  They need to know that's not the case.

24        **THE COURT:**  Mr. Bopp, if the vaccines, any one of

25   those, were to achieve full FDA approval, does your

1    constitutional issue on behalf of the students fall away?

2         **MR. BOPP:**  Oh, no.  My goodness, no.  I mean, one

3    context, which is a certain amount of this insecurity -- I mean

4    not insecurity -- unknown, you know, uncertainties, would

5    surely be resolved, you know, at least in part, maybe in whole,

6    once they do proper studies and do it for long enough that they

7    can figure out these things, okay.

8         So, you know, that would simply mean that maybe

9    they'll resolve that heart inflammations are not caused by the

10   vaccine, okay.  Well, then that falls away certainly.

11        But, no, we're not basing -- we're not suing them

12   under the FDA claiming they improperly approved the drug.

13   We're just saying it is part of the context.  None of the other

14   contexts fall away at all.  I mean, the astronomical -- I mean,

15   talk about -- you want to stop the spread of a disease, all

16   right, Indiana University wants to -- and that's a very

17   admirable goal, and there are many ways to do that, all

18   right -- and you want to stop deaths by getting a COVID

19   infection, so what you do is you order the people who are least

20   vulnerable to adverse effects and death to take a vaccine.

21        The people that are somewhere between 600 times up to

22   1700 times more at risk, nobody is telling them to get --

23   nobody is mandating them.

24        I mean, there was one death at Indiana University

25   through this whole pandemic, and there was a pandemic.  There

1    was one death.  Now, that's terrible, of course.  But they're

2    going to mandate everybody to get a vaccine in order to prevent

3    one death?

4         Well, look.  How many IU students die from car

5    accidents and drug overdoses and suicides and all these other

6    things.  They don't ban cars at Indiana University to

7    prevent -- and that's a right, to travel.  They don't ban cars,

8    you know.  They just let them go willy-nilly out, out there,

9    and kill themselves.

10        So it's -- so where is the narrow tailoring here,

11   right?

12        Now, the other thing, of course, is where is the

13   least restrictive means, as well.  Depending on your level of

14   scrutiny, I understand.  They say masks work.  That's the

15   reason they're requiring them.  They say testing works.  That's

16   the reason they're requiring it, as an extra requirement for

17   people who get an exemption.  They say that masking and testing

18   did work over the last year-and-a-half, all right.  Now, there

19   were more severe measures, as well, of course, but, of course,

20   the situation was much more severe.  You know, we were going up

21   and to the top of a bell curve where the numbers were, you

22   know, a hundred times what they are now, all right.  So I

23   understand that, but they still think they work now, okay, and

24   should be required now, all right.

25        And people who -- if you're talking about other

1    people, which they do talk about, even though Dr. Carroll

2    disclaimed that, if they're talking about other people, well,

3    those other people could get vaccinated.  And IU says -- and we

4    agree -- the vaccination works.  So, you know, you don't need

5    to, from our standpoint, strip these people of rights in order

6    to benefit these other people.

7           And, in fact, historically, as a medical ethics

8    thing, that is forbidden.  It is forbidden to force somebody

9    to, you know, take medical treatment because you're trying to

10   benefit somebody else, you know.  And so if that is the basis,

11   they've really taken an extreme position.

12         **THE COURT:**  Mr. Bopp, I don't mean to interrupt you,

13   but I think I've given you a little more than an hour at this

14   point in terms of your opening remarks.  Time has flown, of

15   course, as we have had our discussion.

16         I do have more questions for you, but we have 20

17   minutes in rebuttal, so perhaps we can rejoin at that time.

18         **MR. BOPP:**  And I have a few other things to say, too.

19         **THE COURT:**  I suspect you probably do.  Thank you,

20   sir.

21         Ms. Ricchiuto, good afternoon.

22         **MS. RICCHIUTO:**  Good afternoon, Your Honor.

23         May it please the Court.

24         We've got -- oh, good.  There is a shot clock.  I

25   couldn't see it from where I was sitting.

 1              We have a presentation that we're going to use just
 2      to kind of guide my remarks, if we can.
 3              Can everybody see that okay?
 4              **THE COURT:**  Mr. Dahm, could we turn that slightly,
 5      that screen?  That way, I can keep my focus on counsel here,
 6      too.  I'll probably look at that one rather than the one behind
 7      me.
 8              **LAW CLERK:**  (Complies.)
 9              **THE COURT:**  Thank you.
10              **MS. RICCHIUTO:**  Would you like a hard copy, Your
11      Honor?
12              **THE COURT:**  If you have one, I will take one.  Thank
13      you.
14              **MS. RICCHIUTO:**  Sure.
15              May I approach?
16              **THE COURT:**  You may.
17              Mr. Bopp, do you have a copy of this one, as well?
18              **MR. BOPP:**  I do.  Thank you.
19              **MS. RICCHIUTO:**  Okay.  Again, Your Honor, may it
20      please the Court.
21              We join Mr. Bopp in thanking you for your really
22      devoted attention to this on such an expedited timeline.
23      Obviously, this is a matter of great importance to Indiana
24      University, and we are grateful for the time that you and your
25      staff have devoted to it and will continue to do so.

1          I want to start out by just taking a look at some

2     recent data related to the pandemic.  As I think Mr. Bopp and I

3     agree, this is data that's changing every day.  But what we

4     know is that, as of yesterday in Indiana, we had over 600,000

5     deaths or -- excuse me -- 600,000 nationwide, almost 14,000 in

6     Indiana, and more people are testing positive every day.

7          And so if you look at that box, the second line, Your

8     Honor, that says 7.5.  I was rereading plaintiffs' reply brief

9     last night.  And at that time, which I think was filed on

10    July 6th, that same statistic was 3.1.  So just in that time,

11    you know, that's roughly doubled, or more than doubled, just

12    since that brief has been filed.  So the point is, obviously,

13    you know, these are numbers that are continuing to move.

14         There are lots of graphs and charts that look like

15    this in the materials, Your Honor, but the main point that I

16    want to make to you is that the wide variety of trend data

17    that's available really demonstrates that you cannot look at a

18    fixed moment in time and say that this pandemic is over.  Or if

19    you can, we haven't gotten there yet.

20         For example, looking at the charts that are in front

21    of you, if you look at the time that the mandate was issued,

22    which was late May, the cases were at a different point than

23    even they are today.  So, to the extent that someone thought,

24    "Oh, gosh.  We seem to be at a low point in May.  We must be on

25    the downward trajectory forever," we've already seen in the

1    time that the requirement has been in place cases are

2    continuing to rise.

3              And, for example, I think Missouri, or parts of

4    Missouri, might have just reinstituted a mask mandate.  You

5    know, things are continuing to change.

6              We also know -- and Dr. Carroll testified -- this is

7    a seasonal virus, so we're not surprised to see cases dipping

8    in warmer months.  And Dr. Carroll specifically testified, you

9    know, last summer looked not so bad.  And, then, as we all

10   recall last Fall and last Winter, I know my kids got in school

11   and out of school and in school and out of school, you know, as

12   this situation continued to evolve.

13             So what I would just caution you is, as you're

14   looking at the wide variety of data that we've put in front of

15   you, please do pay attention to the end point on the chart.

16             I know that plaintiffs have submitted -- for example,

17   they have an Exhibit 221.  That stops on June 24th.  Again,

18   you look at that same chart, later point in time, and the data

19   keeps moving.

20             I don't want to dwell on this because Mr. Bopp didn't

21   dwell on it yet today.  Although we may hear it from him, so I

22   want to mention it.  The plaintiffs have, at least in their

23   discussion with our 30(b)(6) witness, constructed kind of an

24   alternative mechanism in which to try to place the pandemic,

25   and they rely on a couple of things.  They rely on some CDC

1    guidance from 2014 and 2016 about Influenza A.  Those are --

2    these are their Exhibits 230 to 232.

3         And what I want to say about that CDC guidance is

4    it's exactly what it looks like.  It's regarding Influenza A,

5    which is annual and cyclical, and not, you know, ever risen to

6    the level of COVID.  The CDC has never referred anybody with

7    respect to COVID, "Hey, go look at our guidance from 2014," you

8    know, "That's all we have to say about it."  So the CDC isn't

9    referencing anybody there.  And I'd also note, IU requires a

10   flu shot.  So that's one construct that we just think -- and

11   Dr. Carroll testified about that -- that really isn't

12   appropriate here.

13        Plaintiffs also rely on an IU infectious disease

14   policy that predates the pandemic.  It was last updated in

15   April of 2019.  That's a little bit tricky because you have to

16   take Exhibit 211 and 215 in their book.  Those actually go

17   together with the remaining exhibit, which is at 229.  So I

18   don't exactly know why they're separated.  But the point I just

19   want to make to you is that that IU infectious disease policy

20   is part of a past separate policy.  The entire policy is

21   Exhibit 11 in Carroll's deposition, and you can read what he

22   said about it.

23        But, in sum, IU, when hit with the COVID-19 pandemic,

24   concluded it needed a whole new paradigm, that the existing

25   policy that it had for infectious diseases generally wasn't the

1  right fit for the circumstances.  And so to the extent that

2  plaintiffs' position is that IU's kind of new restart work

3  isn't applicable here and that they should be stuck with their

4  2019 guidance, we just would note, you know, kind of the

5  extraordinary new work that IU has done to develop a specific

6  COVID policy.

7        THE COURT:  So, let me ask you, Ms. Ricchiuto, if I

8  can interrupt you.

9        In looking at the two different policies, the policy

10  that IU has vis-a-vis other vaccines and the policy that it's

11  adopted vis-a-vis the COVID-19, there are some fundamental

12  differences in those two policies; do you agree?

13        MS. RICCHIUTO:  Regarding other vaccines, Your Honor?

14        THE COURT:  Well, in particular, it struck me -- and

15  maybe this is an incorrect view -- that the policy that

16  concerns other vaccines, measles and so on, has a true medical

17  exemption in it.

18        The COVID-19 policy that IU has adopted doesn't seem

19  to have a true medical exemption.  In other words, it allows

20  for an exemption if there are allergies to the ingredients of

21  the vaccines, but it's a much broader medical exemption in the

22  other policy, the policy that concerns these vaccines that have

23  existed for a long time.  And that struck me as odd, because in

24  the world of EUA approval -- not vaccines that have full FDA

25  approval and have existed for years and years and years -- IU

 1  has chosen to be less forgiving in its COVID policy than it is

 2  in the other, and I would expect to see the inverse of that.

 3          Why is that rational?

 4          **MS. RICCHIUTO:**  I certainly understand why, based on

 5  the written restart materials, that's exactly what it looks

 6  like.  There are a couple of responses to that, Your Honor.

 7          One is that the true -- and Dr. Beeler testified

 8  about this.  The only contraindication specified for these

 9  vaccines specifically is these two allergy modes, so either the

10  actual vaccine or a component.  So from that perspective, IU's

11  written exemption policy --

12          **THE COURT:**  Well, that's a rather myopic policy then,

13  isn't it?

14          In a world in which what we know about COVID-19, the

15  virus and the vaccines, knowing that that is ever-evolving and

16  ever-changing, why not simply word it in the same way; that if

17  there are contraindications, that a student can get a medical

18  exemption?

19          That's not the way the policy reads.  Isn't that

20  rather myopic and irrational?

21          **MS. RICCHIUTO:**  I agree with you, Your Honor, that

22  that's the way that the policy reads.

23          **THE COURT:**  Isn't that myopic?

24          **MS. RICCHIUTO:**  I agree that it's more narrow than

25  the other policies are written.

1           What the testimony is from the two representatives

2    who are on the medical response team who are responsible for

3    handling medical exemptions is that, in practice, they are

4    daily communicating with physicians who provide information to

5    them seeking exemptions and that very many of those have been

6    granted.

7           So, for example, the doctor's note concept --

8           **THE COURT:**  But that's not the policy.  Whether

9    university in implementation is, you know, enforcing it in a

10   more relaxed way, that's not the way the policy reads.

11          Do you agree?

12          **MS. RICCHIUTO:**  I do.

13          **THE COURT:**  And so if a student comes in with a note

14   from his or her doctor who says, "You should not take this

15   vaccine," even if that has nothing to do with an allergy to one

16   of the ingredients, the position of Indiana University today

17   is, "Tough.  You don't get a medical exemption under our

18   policy"?  That's the university's position, right?

19          **MS. RICCHIUTO:**  I don't agree that it's their

20   position.  I agree that it is what is reflected in their

21   written materials and that there's tension there.  I understand

22   that, Your Honor.

23          **THE COURT:**  Why is that rational?

24          This strikes me as completely on its head.

25          If we have, for all these other vaccines, full FDA

1  approval, with an allowance for a counter-indication by a

2  medical professional on behalf of a student, but when it comes

3  to emergency use approval vis-a-vis these COVID-19 vaccines, IU

4  says, "No.  We're going to take a much more stringent view of

5  these medical exemptions, and we're going to give you a small

6  window in which to fit," if I have a medical doctor who says I

7  should not take a vaccine, why does IU think they're in a

8  better position to say, "That student, nonetheless, must have

9  the vaccine"?

10        That strikes me as completely irrational.

11        **MS. RICCHIUTO:**  I don't believe, as a matter of

12  implementation, that that's the position that IU has taken.

13        **THE COURT:**  Well, I don't have any evidence in the

14  record as to its implementation, do I?

15        **MS. RICCHIUTO:**  You have --

16        **THE COURT:**  I have the policy.

17        **MS. RICCHIUTO:**  I'm sorry, Your Honor.

18        You do have testimony from both Dr. Beeler and

19  Dr. Carroll.  They are two of the individual humans at Indiana

20  University that process these exemptions, and they do testify

21  under oath in the record to the way that they've been

22  processing them and the way that they've been granting them, so

23  you do have that information as implementation in the record.

24        And our demonstrative at the end of our book that

25  refers to testimony, there should be an entry related to

1    exemptions, and that would point you to the relevant testimony

2    on that.

3         **THE COURT:**  Then why didn't Ms. Carini get a medical

4    exemption?

5         **MS. RICCHIUTO:**  So I'm glad that you asked that

6    because I was going to raise that also.

7         Ms. Carini -- I think you asked Mr. Bopp whether any

8    plaintiff had a medical exemption and no other exemption, and

9    the answer to that is "no."  Ms. Carini is the only one who has

10   said in the complaint, or in her deposition, that she actually

11   has a doctor's note, as opposed to, for example, a concern

12   herself.

13        And she is eligible for an exemption, a medical

14   exemption.  She already has a religious exemption.  And so IU

15   simply communicated to her, you know, from their perspective,

16   you're either exempt or you're not exempt.  She was having some

17   trouble uploading the paperwork in the portal and getting

18   frustrated about that, and they said, "You know what, you're

19   already exempt from a religious perspective.  There's not a

20   difference in the exemption.  You're covered."

21        But she is -- under the testimony of Dr. Carroll and

22   Dr. Beeler, she's eligible for that medical exemption, and I

23   have every reason to expect that that would be granted if, for

24   some reason, they were of value to her in having two exemptions

25   from the same requirement.

 1          **THE COURT:**  So maybe I missed some evidence in the

 2   mass here in reviewing this stuff quickly last night.

 3          But when I read Ms. Carini's deposition, I thought

 4   she testified, did she not, that she sought a medical exemption

 5   and was denied that?

 6          **MS. RICCHIUTO:**  I don't believe that -- I agree with

 7   you -- I agree with Ms. Carini.  She does not have one.  So I

 8   don't want to have like a matter of semantics.  But I think

 9   what the communications are that we have seen are that she had

10   a religious exemption in place.  She reached out to IU try to

11   get a medical exemption.  She tried to do that by e-mail.  They

12   said, "Actually, you need to use this portal."  She had a hard

13   time with the upload.  She was getting frustrated, like, "Hey,"

14   you know, "I want to give you the information."  And so someone

15   as a matter -- you know, I think probably trying to be

16   convenient to Ms. Carini, said, "You know what, don't worry

17   about it.  You're already covered by an exemption."

18          So if you deem that a denial, then I suppose that's a

19   denial.  I don't think that I would deem that a denial of an

20   exemption.

21          **THE COURT:**  I'm sorry to interrupt you.  Give us a

22   moment.

23          Ms. Gutwein [verbatim], did you find whether any

24   other student has a physician's note that says that they should

25   not be taking the vaccine?

 1              **MS. SIEBERT:**  Thank you.  Miss Siebert for the
 2    plaintiff.
 3              **THE COURT:**  Oh, Siebert.  I'm sorry.  I said,
 4    "Gutwein."
 5              **MS. SIEBERT:**  It's fine.  It's fine.
 6              **THE COURT:**  Ms. Siebert.
 7              **MS. SIEBERT:**  Ms. Roth did not have a doctor's note,
 8    but she has her own personal concerns, but based upon the
 9    written policy of IU knows that she would not qualify for a
10    medical exemption.
11              **THE COURT:**  All right.  Thank you.
12              **MS. SIEBERT:**  Uh-huh.
13              **THE COURT:**  I'm sorry.  I wondered if we had run that
14    to ground.
15              **MS. SIEBERT:**  No problem.
16              **THE COURT:**  So, if I want to look at how IU is
17    actually implementing the medical exemption, then I need to
18    look closely at Mr. Carroll's deposition?
19              **MS. RICCHIUTO:**  I would -- yes, I would point you to
20    Exhibit 320, which is our kind of guidepost for you for
21    specific topical information testified to by our witnesses, and
22    you will find citations to Dr. Beeler's testimony and
23    Dr. Carroll's testimony.  They are both members of IU's Medical
24    Response Team.  And they both personally review, really on a
25    daily basis, I think they testified, Judge, these medical

1    exemptions, and from time to time interact with providers.

2         You'll have a provider say -- I think there's

3    testimony that says, you know, "Gosh, I don't think my patient

4    should get the vaccine.  They have diabetes."  And then IU

5    might respond and say, "Gosh, let us give you some information.

6    Diabetes is not actually a contraindication."  And a lot of

7    times, the testimony is the physicians say, "Oh, thank you for

8    telling me.  I agree my patient should get vaccinated."

9         Other times, there's another reason.  You know, the

10   classic example is people who are on immunosuppressant drugs

11   where they wouldn't have an immune response to anything anyway.

12        **COURT REPORTER:**  Ma'am, would you slow down, please?

13        **MS. RICCHIUTO:**  I'm sorry.

14        **MS. RICH:**  They wouldn't have an immune response,

15   anyway.  And so Indiana University says, "Certainly, right now

16   isn't a time that makes sense for you to be vaccinated," you

17   know, "let's talk through your course of treatment.  Will there

18   be a good time in the future where you may be off of your

19   immunosuppressants."  And those things really have been dealt

20   with on a case-by-case basis in consultation with the

21   physicians who have submitted exemptions.

22        **THE COURT:**  So according to these two depositions,

23   Dr. Beeler's deposition and, is it, Dr. Carroll or Mr. Carroll?

24        **MS. RICCHIUTO:**  Dr. Carroll.  He's the chief health

25   officer for IU.

1          **THE COURT:**  Okay.  Dr. Beeler and Dr. Carroll.

2          Is it your view that when I review those depositions,

3     what they will say to me is that, when it comes to this medical

4     exemption, Indiana University is not enforcing the policy to

5     its letter, but instead going beyond allergies to the

6     ingredients of these vaccines and providing ongoing medical

7     exemptions if a student's physician says he or she should not

8     take it and remain unconvinced after this give and take?

9          **MS. RICCHIUTO:**  That is exactly correct, Your Honor,

10    and that wouldn't cover, you know, as --

11         **THE COURT:**  Then why didn't IU revise its policy?

12         **MS. RICCHIUTO:**  It's possible they'll consider doing

13    it.

14         **THE COURT:**  Because, as written, it sounds

15    troublesome.

16         Don't you agree that, as written, it's troublesome?

17         **MS. RICCHIUTO:**  I think, as written, it very exactly

18    tracks the CDC contraindications.  And as written, it does not

19    exactly match the way they're implementing it.

20         I want to make one other point here just almost,

21    frankly, so I don't forget, Judge.

22         Mr. Bopp talked to you about considerations taken on

23    behalf of others in the community and, you know, whether that's

24    reasonable and who those people should be.  And I think you

25    asked a question about whether you should take into account the

1    rest of IU's population.  And I want to just clarify a little

2    bit because I think the description and the testimony maybe

3    doesn't exactly match the way the testimony came in.

4           Dr. Carroll was asked basically, with respect to, for

5    example, the community of Bloomington or the county of Monroe,

6    "Is the purpose of this policy to protect all of those people,"

7    and Dr. Carroll's testimony on that was, "No, that's not the

8    primary goal of this policy.  It's a great secondary benefit,"

9    you know, "We're for fewer people getting COVID.  But that's

10   not the purpose of the policy."  So that Q and A was not

11   directed at kind of the IU community as a whole.

12          It is absolutely the case, given that this policy

13   extends to faculty, staff, students -- obviously, we're focused

14   on students in this lawsuit, but the policy itself is broader

15   than that -- and it is absolutely the case that IU does care

16   and has focused on the general population health of its

17   community at large, you know, kind of IU community being people

18   in and affiliated with the university, as opposed to, you know,

19   physically in the same town as the campus.

20          And there's a number in Carroll's declaration that

21   estimates -- that's at Paragraph 26, and it estimates

22   approximately 8500 staff at risk.  I will tell you that is, you

23   know, kind of rough, quick math based on what we know about

24   what conditions the IU staff has.  So it's good numbers, but

25   it's probably -- you know, it could be over- or

1    under-inclusive, based upon what data we were able to have

2    access to.  But that is information that IU did consider, and

3    that's also in the record, so I just wanted to clear that up,

4    if I could.

5              **THE COURT:**  All right.  Thank you.

6              **MS. RICCHIUTO:**  So, getting just a little bit back on

7    track, Mr. Bopp mentioned variants.  Obviously, those are out

8    there.

9              There is this question about herd immunity.

10   Plaintiffs have an Exhibit 243 that is a techstartups.com

11   article.  There's extensive testimony in Dr. Beeler's

12   deposition around where Exhibit 14 was marked that explains why

13   his view is that it's not herd immunity.

14             The easiest lay way for me to understand it, Judge,

15   is that we see the numbers going up.  If there were herd

16   immunity in the U.S. or in Indiana, you wouldn't see that.  So

17   that's not scientific, but that's the way that's very easy for

18   me to get my head around the herd immunity concept.

19             So, as I said, IU had this existing policy that had

20   been last updated in April of 2019.  And what it did in

21   response to COVID is that President McRobbie, you know, mounted

22   a very robust, educated, expert group of people in terms of a

23   Restart Committee that was formed, not just on this policy,

24   Your Honor, but way back at the beginning in Spring of 2020, to

25   start thinking about how are we going to bring people back,

1    what's that going to look like for each semester, and to keep

2    track of that.

3          You can see -- and this is in the Restart Committee

4    report that you have.  It's the most updated one.  It's already

5    been updated since this case has been filed.  So the most

6    updated one -- I think that's one that both parties probably

7    put in the books -- for us, it's 300.  And you've got a wide

8    variety of expertise.  These folks worked together to provide

9    detailed reporting to IU's leadership on a weekly basis.

10         We did not give you every single presentation that

11   was made to IU's leadership for the relevant period.  Our

12   Exhibits 302 to 317 give you examples, and I would, you know,

13   certainly commend those to your attention if you are interested

14   in what are the types of things that the Restart Committee was

15   considering.

16         It is the case that the Restart Committee was not the

17   decision maker.  The Restart Committee is an advisory body that

18   advised IU's leadership, who obviously ultimately made the

19   policy.  But you can see they were focused on vaccine

20   development, surveillance, contract tracing --

21         **COURT REPORTER:**  Ma'am, please slow down.

22         **MS. RICCHIUTO:**  I'm sorry.

23         Dr. Beeler -- this kind of funny cover sheet --

24   Dr. Beeler is all business, so it doesn't surprise me that he

25   doesn't have a fancy cover on his decs.  But his decs deal with

1    current stats all the time.  He testified in his deposition

2    that he reads, every single day, the latest in, you know, kind

3    of COVID studies or other information that's coming out.  So,

4    anyway, those are the types of inputs that the Restart

5    Committee was getting.

6         IU also did not -- you know, even with these inputs,

7    they didn't create their policy based on a blank piece of

8    paper.  There's substantial federal guidance, obviously.  The

9    CDC has issued specific recommendations for institutes of

10   higher education, of which IU is one.

11        And plaintiffs stress that the CDC doesn't recommend

12   or require a mandate.  And it is right, and both of our IU

13   witnesses testified, the CDC doesn't take a position one way or

14   another on a mandate.  It's certainly not contrary to federal

15   guidance to have a requirement in place.  And, you know,

16   certainly our position is it can't be unreasonable to follow

17   what federal authorities say is the very best tool that we

18   have.  For IU to want to implement that widely, that seems like

19   that certainly has to be reasonable.  You know, you could dig a

20   hole with a spoon.  But why would you do that if you have a

21   shovel?  So the science and the CDC recommendations are very

22   clear that the vaccine is the most effective tool, and IU has

23   absolutely taken the position that it wants to use that tool as

24   widely as it can.

25        The Department of Education, which is another federal

 1   entity, also has issued guidance.  These sources are cited

 2   extensively in our brief and in Dr. Carroll's declaration.

 3          THE COURT:  What is it, Ms. Ricchiuto, about the EUA

 4   approval of the vaccines that either gave the Restart Committee

 5   comfort that mandating the vaccine was wise or sound policy or

 6   gave the Board of Trustees comfort that this was the right

 7   decision to make?

 8          MS. RICCHIUTO:  I'm reluctant to exactly speak for

 9   leadership, but I understand your question.

10          The EUA statute that is discussed in the **Bridges**

11   lawsuit, which is the recent Texas case dealing with an

12   employer/employee relationship -- so slightly different

13   context -- but that one also analyzes this EUA argument.  The

14   EUA -- and I think Mr. Bopp even said -- it's not something

15   that places restrictions on universities.  It talks about when

16   you have a drug or device that has this level of approval -- so

17   EUA as opposed to full approval -- you have to make sure that

18   people know that and that they're not getting, you know, the

19   drug or the device without fully knowing that, and they have to

20   have the ability to say "no."

21          THE COURT:  And I understand that and I appreciate

22   where you're heading here.  And maybe my question wasn't very

23   clear, so let me re-ask it.

24          I'm not so concerned about the statute under which

25   the Secretary of Health and Human Services operates that has

 1   been cited as a concern with the EUA.  I'm focused on the EUA

 2   process itself.

 3           The reality is, these vaccines don't have full FDA

 4   approval.  They've gone through this EUA process, which, if I

 5   understand the history correctly -- and you all can correct me

 6   on this -- is something that was created in the early 2000s at

 7   the time of anthrax, correct, around 2005?

 8           **MS. RICCHIUTO:**  I will have to take your word on

 9   that, Judge.

10           **THE COURT:**  Okay.  So this EUA process is something

11   that is fairly novel, from what I understand.

12           What is it, nonetheless, about the EUA process, the

13   fact that these vaccines have received that approval, though

14   not full FDA approval, that, nonetheless, gave the Restart

15   Committee and the Board of Trustees comfort that this is the

16   right policy for Indiana University and its students?

17           **MS. RICCHIUTO:**  Dr. Beeler testified in his

18   deposition that these are the most widely-studied vaccines

19   ever.  Certainly they were developed relatively quickly, from

20   the lay perspective, but I think the sciences that they were

21   based on, building blocks that have been around for a long

22   time, they went through full Phase 3 trials.  Dr. Beeler

23   testified about the robust Phase 3 trials.

24           And he got asked a question by Mr. Bopp about, you

25   know, "Well, if there were all these trials, why didn't this

1    heart issue arise or why didn't these other side effects

2    surface," and Dr. Beeler's answer was "because they are that

3    rare."  So even despite the very widespread Phase 3, which

4    means kind of, you know, live-in-humans testing, the side

5    effects that now that Mr. Bopp is maybe concerned about, number

6    one, they're the causation issues that you discussed with him,

7    but, also, those didn't surface, despite the (unintelligible).

8            So I think that, you know, we all have come to be

9    comfortable with the concept of FDA approval, but I think the

10   supposition that EUA is somehow automatically inferior or

11   implies a not-robust process at all just isn't supported by

12   what went into that process and the amount of testing that

13   really has been done by the government on these three options.

14       THE COURT:  And do I have evidence in the record

15   that, in fact, the FDA's EUA process that led to that type of

16   approval was more stringent or rigorous than its EUA process as

17   stated by its industry practice or regulation?

18       MS. RICCHIUTO:  I think that you -- I don't know

19   about that comparator, Your Honor.  I think that you certainly

20   have evidence in the record from Dr. Beeler about the scope of

21   the work that went into the FDA's process leading up to EUA

22   approval.

23           Okay.  So, turning to the actual policies at issue,

24   we have talked about -- obviously the main concern of the

25   plaintiffs is the requirement that they be vaccinated or

1    subject to an exemption.  We have talked about the medical

2    exemptions already during our time together.

3            The religious exemption, what the testimony describes

4    is that it is -- just one second, Your Honor.  Oh, okay -- is

5    that the religious exemption is that it's automatic, so there's

6    not even a human that reviews a religious exemption.  You, you

7    know, click the box, if you will, you say you have one, and you

8    immediately get an approval back.

9            **THE COURT:**  So how is the university going to police

10   this policy?

11           **MS. RICCHIUTO:**  So from the perspective of religious

12   exemptions for the vaccine itself, they are relying merely on,

13   you know, representations and attestations by folks that they

14   have a sincere religious objection, and they are leaving it at

15   that.

16           With respect to, for example, masking, which would be

17   kind of the most obvious thing that you could police, right,

18   because you can see -- you know, if you have someone in front

19   of you, and you think "I know that person is not vaccinated,

20   but I also don't see them wearing a mask.  That concerns me"

21   -- Dr. Carroll testified in his deposition that IU will not be

22   giving guidance to students or others about reporting each

23   other or tattling on each other or saying, you know,

24   "Ms. Gutwein is not wearing a mask," or, "I'm worried about

25   that."

1          **THE COURT:**  It's the honor system?

2          **MS. RICCHIUTO:**  I think that it is a policy of the

3    university that is subject to the ways that all university

4    policies are subject to enforcement, but that IU does not

5    intend to have like a strike force out in the streets asking

6    for vax cards or looking for masks or anything of the sort.

7    They're issuing requirements that they expect their students to

8    follow, just like lots of other requirements that their

9    students have to follow that they don't, you know, sort of

10   follow them around and monitor them for.

11          And with respect --

12          **THE COURT:**  So this won't be a basis for discipline

13   at the university through the student group?

14          **MS. RICCHIUTO:**  Oh, I don't want to say that.  I

15   mean, I think it's a policy that will be enforced.  You know,

16   if there were some student who -- you know, I hesitate to make

17   a hypothetical, but I don't think that the intention is to

18   disregard it or call it aspirational.  But I also know that

19   what Dr. Carroll testified to was that there was no intention

20   to have like a robust enforcement arm with respect to masking

21   and certainly not student-to-student.

22          So you could have, for example -- I mean, I'm just

23   imagining here -- like an RA, for example, who may be aware of

24   a situation with a student who is repeatedly going into, you

25   know, a dorm meeting with lots of people who is subject to the

1    mask requirement and isn't masking.  Could there be some

2    consequence for that?  I think IU has reserved the right for

3    there to be.  But, again, you know, the testimony is that IU

4    does not have any kind of robust enforcement with respect to

5    masking.

6            With respect to testing, there is some amount of

7    testing that will apply to everyone, regardless of vaccination

8    status, so that's what we call surveillance testing, and that's

9    to see whether there have been break-through infections of

10   concern, and that applies to the whole IU community in terms of

11   students, faculty, staff, everyone.  And then there's

12   mitigation testing for the people that are most at risk, and

13   that is focused on unvaccinated people because, as a factual

14   matter, they happen to be most at risk.

15           **THE COURT:**  And the university is comfortable with

16   that system in place?  In other words, for those who have

17   exemptions, they're comfortable addressing the nature of the

18   pandemic, whatever it is in the Fall of this year, in terms of

19   social distancing, masking, and surveillance testing?

20           **MS. RICCHIUTO:**  And vaccination, Your Honor, yes.

21           **THE COURT:**  Well, I mean, for those who are

22   exempted --

23           **MS. RICCHIUTO:**  Yes.

24           **THE COURT:**  -- they're comfortable with that process?

25           **MS. RICCHIUTO:**  They --

1        **THE COURT:**  They don't have any health concerns about

2    the safety of its campuses for those who have obtained

3    exemptions?

4        **MS. RICCHIUTO:**  I don't think that I would agree that

5    they have no concerns.  I think Dr. Carroll testified

6    unequivocally; their goal is to have as many people vaccinated

7    as they possibly can.

8        **THE COURT:**  Well, whatever their concerns are, they

9    must be comfortable enough that whatever number of students

10   receive exemptions under IU's policy can be addressed in a safe

11   way through masking, social distancing, and surveillance

12   testing, right?

13       **MS. RICCHIUTO:**  I agree with you.

14       **THE COURT:**  Then why not allow that to happen for

15   students who want to opt out altogether?  If that's sufficient

16   for whatever vast number of the student population at Indiana

17   University to be handled in a safe enough way, why not let

18   students opt out?  Why not let students choose and handle it,

19   again, in the way of masking, social distancing, and

20   surveillance testing, just as the university did last year?

21       **MS. RICCHIUTO:**  I agree that that's an option that IU

22   had available to it.  They have opted, instead, to take the

23   most robust possible approach that they can, based on the

24   federal guidance, and really do everything they can do to

25   encourage maximum vaccination.

1              If you leave it to choice, you --

2         **THE COURT:**  Well, one person might say taking a

3    nuclear bomb to a mosquito is rational.  Someone else may say

4    it's not.

5              So why is taking the most robust way, as you put it,

6    the rational choice here?

7         **MS. RICCHIUTO:**  Well, I think the question gets a

8    little bit into level of scrutiny, Your Honor.  Under **Jacobson**,

9    a rational basis, it just has to be reasonable.  And it is

10   certainly reasonable for IU to use all of the tools that it has

11   at its disposal to try to mitigate the spread on its campus.

12             Last Fall, it didn't have this additional tool,

13   right.  So, yes, they had masking and distancing and testing,

14   and they did the very best that they could with what they had,

15   and now they have an additional tool available to them.  And we

16   believe that the law finds that it's reasonable for IU to make

17   the decision to avail itself, for the safety of its community,

18   of every tool that's available.  It doesn't mean that some

19   other alternative --

20        **THE COURT:**  Can the university -- can the university

21   mandate that its students get the HPV vaccine?

22        **MS. RICCHIUTO:**  The university certainly mandates

23   other vaccines.

24        **THE COURT:**  I'm talking about HPV.

25        **MS. RICCHIUTO:**  I think it would depend on what the

1    risks were to the campus posed by HPV.  If HPV were airborne --

2         **THE COURT:**  The CDC recommends HPV, does it not?

3         **MS. RICCHIUTO:**  I think they do, yes.

4         **THE COURT:**  Okay.  So why doesn't Indiana University,

5    in its infinite wisdom, think that it's rational, reasonable to

6    mandate that its students receive the HPV vaccine?

7         **MS. RICCHIUTO:**  I don't assume that they don't think

8    that's reasonable.  I think they've at this point concluded

9    that that's not a policy that they're going to pursue, but I

10   don't think it's reasonable --

11        **THE COURT:**  So your view is the university could do

12   that next?

13        **MS. RICCHIUTO:**  No, Your Honor.  My view is that --

14        **THE COURT:**  So they couldn't mandate HPV as a vaccine

15   for its student population?

16        **MS. RICCHIUTO:**  My view is that if the university had

17   the same --

18        **THE COURT:**  Is that a "no" or a "yes"?

19        **MS. RICCHIUTO:**  If the university -- I think they

20   could if they had the same data available to them about the

21   danger and the widespread contagion caused by HPV to members of

22   their general population.  I think it --

23        **THE COURT:**  What if the Trustees said, in their

24   infinite wisdom, that the benefits of cervical cancer could be

25   addressed by the HPV vaccine such that we think that all

1    students at IU should get it?  Is that reasonable?

2        MS. RICCHIUTO:  If the data were reflective of a

3    comparable risk to IU, then I think the analysis would be

4    similar.

5        I'm not a -- I don't have a record developed on, you

6    know, the precise risks or --

7        THE COURT:  Well, suppose the university said, in its

8    infinite wisdom, that it wanted to prescribe to its students,

9    mandate to its students, the receipt of a fully FDA-approved

10   drug, say Adderall.  "Adderall helps people focus, so our

11   students will get better grades.  We think the IU population

12   should receive that drug."

13       Can the university do that?

14       MS. RICCHIUTO:  I don't think you have the same

15   government interests at stake from that perspective.

16       THE COURT:  It's not a legitimate interest that our

17   students excel?

18       MS. RICCHIUTO:  It's not a matter of public health

19   and safety.  That is something that is firmly within the

20   school's powers.

21       For example, IU does require the flu vaccine, and it

22   requires the flu vaccine for similar reasons to why it requires

23   the COVID vaccine.  So IU does consider various treatments and

24   determine whether or not they need to be required.

25       But I want to make sure to say to you, Judge, that IU

1    is not contending that its decisions on these things are

2    unreviewable, that it has limitless power, that it is standing

3    in the shoes of everyone's physician.  IU's decisions are

4    reviewable.  They're reviewable under the framework that we'll

5    go over.  And there are unquestionably probably some decisions

6    that IU could make along the lines that you're suggesting that

7    would go over the line, that would become unconstitutional.

8               The COVID vaccine today --

9          THE COURT:  You want to put me on that slippery

10   slope?

11         MS. RICCHIUTO:  Huh?

12         THE COURT:  You want to put me on that slippery

13   slope?

14         MS. RICCHIUTO:  I want you to, Your Honor, consider

15   the current state of --

16         THE COURT:  That's the slippery slope Mr. Bopp's

17   concerned about, right, that ultimately led to a rather

18   infamous decision?

19         MS. RICCHIUTO:  Your Honor, whether it's slippery is

20   not the same as whether it's limitless.  And so reading --

21   whether you read **Jacobson**, whether you use the rational basis

22   standard, as it's more modern, you know, more modernly phrased,

23   there are limits.  Upholding this vaccine is not the same as

24   saying IU can do whatever it wants whenever it wants with

25   respect to its students.  What upholding and denying the

CERTIFIED TRANSCRIPT OF PROCEEDINGS - JULY 13, 2021

1    injunction today does, Your Honor, is say that there is a

2    legitimate government interest here, which multiple courts have

3    acknowledged, even that it's compelling -- so it's certainly

4    legitimate.  I think even plaintiffs' reply brief concedes it's

5    legitimate -- and that this is a reasonable way to deal with

6    it.  It's not the only way to deal with it.

7              THE COURT:  When will it end?

8              MS. RICCHIUTO:  The pandemic?

9              THE COURT:  No.  When will this vaccine mandate end?

10             MS. RICCHIUTO:  I can't answer that, given the way

11   that the data is running around.

12             THE COURT:  How long is this policy in place?

13             MS. RICCHIUTO:  Right now, this is a policy that is

14   in place for the Fall semester.

15             THE COURT:  And what's the plan of either the Restart

16   Committee or the Trustees in terms of reviewing the plan?

17             MS. RICCHIUTO:  What I can tell you on that is that

18   they have consistently reviewed and updated their -- you know,

19   we can only go by what they've done so far, and what they've

20   done so far is, since Spring of '20, issued multiple updates to

21   this plan, again including one since plaintiffs filed their

22   case.  So can I promise you what day they're going to update

23   the policy?  No, I can't.  What I can tell you is that, based

24   on the way that they've been behaving and their transparency in

25   their decision making, I have every expectation that, if

CERTIFIED TRANSCRIPT OF PROCEEDINGS - JULY 13, 2021

1    circumstances were to change, IU would be investigating whether

2    it's time to update its policy.  We know that it has done that

3    with respect to other policies since COVID began, and there's

4    every reason to think that they would do so here, as well.

5            THE COURT:  So Mr. Bopp wants me to put the onus on

6    the university.  Maybe that's not unfair to do so here.  So let

7    me ask you a question that I asked him.

8            With respect to the risk of the vaccine -- and let's

9    start with death, the most serious one -- is there any

10   authoritative peer-reviewed study that establishes that there

11   is no risk of death vis-a-vis any one of the vaccines?

12           MS. RICCHIUTO:  I don't believe there's any such

13   study in the record.  I also don't believe there's any such

14   study that conclusively establishes the risk of COVID itself,

15   and so --

16           THE COURT:  There's an unknown there.

17           MS. RICCHIUTO:  Yes.  Both things are continuing to

18   be studied.

19           THE COURT:  What about heart inflammation or

20   myocarditis?  Is there any study that would show that there is

21   no causative link, to a reasonable degree of medical certainty,

22   between the COVID-19 vaccine and those conditions?

23           MS. RICCHIUTO:  I'm not aware of a study that has

24   disproven causation to date.

25           What Dr. Beeler testified to --

1          THE COURT:  How is it, then, that the university is

2    so prescient that it can forecast into the future that these

3    seeming temporal associations, nonetheless, have no causative

4    link?

5          In other words, what happens five years down the road

6    when medical science catches up and establishes a link between

7    either death and the vaccine, or myocarditis and the vaccine,

8    or any number of these conditions and the vaccine, and we look

9    back in history and say, "Gosh, I wish we would have known that

10   before we told all these students to get it"?

11         MS. RICCHIUTO:  I don't --

12         THE COURT:  How is that rational for the university

13   to make a prescient decision that's not based on any medical

14   science?

15         MS. RICCHIUTO:  Well, Your Honor, I think that the

16   university is not required to be prescient.  What the

17   university is required to do to be reasonable is to take into

18   account the information that we have today.

19         Dr. Beeler testified that, as of right now, the

20   incidents of myocarditis resulting from the actual COVID virus

21   are higher than the incidents of myocarditis resulting from the

22   vaccine, so that's one input that is rational for the

23   university to take into account, and so --

24         THE COURT:  Well, it simply says -- it simply says

25   that there may also be the risk, you know, if you got COVID-19,

1   right.

2          **MS. RICCHIUTO:**  Correct.

3          **THE COURT:**  Which you may get or you may not.  But,

4   gosh darn it, if you get the vaccine and there's a risk, a

5   medically linked risk of myocarditis, well, you eliminated the

6   possibility of chance there altogether, right?

7          There's a distinct difference between those two.

8   Mandating that someone get a vaccine, injecting that into their

9   body, creates a certainty if in fact there is a medical link

10  that is eventually established.  Whereas, if a student

11  decides -- if in fact it's his or her decision -- not to get

12  the vaccine and to run the risk of whether or not to get COVID

13  at all, that may or may not occur.

14         One seems more certain than the other, does it not?

15         **MS. RICCHIUTO:**  That's correct, Your Honor, but I

16  think that that comparison --

17         **THE COURT:**  The EUA process, to date, has it fleshed

18  out the risk of these vaccines in terms of women who want to

19  have children?

20         In other words, have there been either clinical

21  studies done, Phase 3 or whatever, or other studies done, to

22  flesh out whether these vaccines pose any such risk?

23         **MS. RICCHIUTO:**  I think that Dr. Beeler -- I believe

24  that he testified that that is probably work that is ongoing.

25         **THE COURT:**  It's ongoing, okay.

1          So we have how many number of women who are students

2    who may want to have children some day?

3          MS. RICCHIUTO:  I don't have that number, but I'm

4    sure it's high.

5          THE COURT:  All right.  Why is it rational for

6    Indiana University, not knowing what the medical science is,

7    having no basis to know what the medical science is in that

8    respect with respect to these vaccines, thinking, in its

9    infinite wisdom, that we're going to, nonetheless, tell these

10   women that you must get the vaccine?

11         MS. RICCHIUTO:  I think I disagree, Your Honor, with

12   the characterization about whether the women have a choice.

13   They -- no one has to get a vaccine.  The students are the

14   decision makers.  I think that's a question you asked to

15   Mr. Bopp.  The students are the decision makers with their

16   medical providers about whether or not to get the vaccine.

17         Could it be a hard choice for some of them?

18         I will grant you, for Natalie Sperazza -- who, by the

19   way, is the only person that we have here who is not exempt

20   from this.  Although, she's not physically here --

21   Ms. Sperazza is the only person who has this choice to make.

22         Could that be a hard choice for Ms. Sperazza?  I'm

23   sure it might be a hard choice.

24         THE COURT:  You agree she has standing here, by the

25   way?

1          **MS. RICCHIUTO:**  Yes.

2          **THE COURT:**  So if she has standing, I don't need to

3    address the standing of every other student under the law; do

4    you agree?

5          **MS. RICCHIUTO:**  I agree with that with respect to the

6    vaccine mandate.  I think that with respect to the extra

7    requirements, even setting aside our kind of broader concern

8    about those, what we've seen in the filings is that they sort

9    of have pieced together like, well, this person is kind of

10   worried about this, and this person thinks there might be harm

11   from the mask, and this person -- and I don't believe that,

12   with respect to the extras, they've actually demonstrated

13   standing with respect to everybody.  But with respect to the

14   vaccine requirement, I agree that Ms. Sperazza has standing,

15   and everybody else either has or could have an exemption.

16         **THE COURT:**  But under the law, I just have to

17   establish that there is a case or controversy under Article

18   III, not that a case or controversy is presented by each and

19   every plaintiff, correct?

20         **MS. RICCHIUTO:**  I agree with that.

21         **THE COURT:**  Okay.

22         **MS. RICCHIUTO:**  So if you find that one person has

23   adequately alleged what they need to allege on masking and

24   testing, then there would be standing over there.

25         But to finish my point about Ms. Sperazza, you know,

1    to the extent this is a hard choice for her, I have empathy for

2    that.  Hard choices are not unconstitutional.

3         And we have cited a case, **Hodges,** that talks about a

4    wide variety of different reasons why students can be dismissed

5    from their school or not allowed to go to their school anymore

6    because of violating policies.  And in that way, this is not

7    different from that.

8         So, she has testified -- specifically with respect to

9    Ms. Sperazza, she's testified she'll either go to community

10   college.  She'll work full-time.  That case directly deals with

11   facts like that and says --

12        **THE COURT:**  I appreciate your choice argument here,

13   but you agree with me that the Unconstitutional Conditions

14   Doctrine applies?

15        **MS. RICCHIUTO:**  Your Honor, only insofar as you

16   believe that there's no choice.

17        **THE COURT:**  Well, I mean, I think the doctrine is

18   hinged on something altogether different, right, has the state

19   conferred a benefit on these students.  And by admitting them,

20   while there may not be a constitutional right to a collegiate

21   education, they have admitted them and thereby conferred a

22   benefit on them to attend Indiana University.

23        Do you agree?

24        **MS. RICCHIUTO:**  Yes.

25        **THE COURT:**  All right.  And so based on that, does

1    that not then trigger the Unconstitutional Conditions Doctrine?

2         **MS. RICCHIUTO:**  If Indiana University is doing

3    something unconstitutional, which we believe they are not.

4         **THE COURT:**  Right.

5         And so answering "yes" to that question merely gets

6    us to then defining the right and deciding under which tier of

7    scrutiny we're going to analyze this constitutional question.

8         But it still gets us back to this idea that, well,

9    they can just attend somewhere else simply begs the question

10   ultimately of:  Has IU done something that meets rational basis

11   review, at least as the university would pitch it to me?

12        Do you agree?

13        **MS. RICCHIUTO:**  Yes.

14        **THE COURT:**  Okay.  So that's the real question we

15   have to answer here, not whether they can just simply go

16   somewhere else.  Has the university done something rational to

17   achieve a legitimate end?

18        **MS. RICCHIUTO:**  Correct.

19        **THE COURT:**  Which then leads me back to my original

20   question and how we got here, which is:  If these medical

21   questions have not been answered in the EUA process, the risk

22   of women who -- you know, a risk to their fertility, the risk

23   of having children, perhaps other risks that we don't yet know,

24   if those things haven't yet been established, on what medical

25   basis, on what rational basis, has the university said, in its

1   infinite wisdom, "We don't care what the science will

2   eventually say is the risk in the future.  Today, we're going

3   to mandate that our students get the vaccine, nonetheless"?

4   Why is that rational?

5         **MS. RICCHIUTO:**  I don't agree that Indiana University

6   doesn't care what happens to its students now or ever.

7         I think that Indiana University is making decisions

8   based on very, very, very robust federal guidance about the

9   safety and the efficacy of the vaccines.  Do they know every

10  single thing?  No.  No one knows every single thing.

11        But is it reasonable for them to take guidance from

12  the federal government that says, "Hey, IHEs, colleges, you are

13  a place where" -- "you are a prime ground for control of COVID

14  or spread of COVID.  Here are tools that are at your disposal.

15  The very most effective one is vaccine," I believe that it is

16  eminently reasonable for IU to make the decision to implement

17  that to the fullest extent that it can in an effort -- coupled

18  with its compelling, at least, legitimate interest in the

19  safety and health of its students, faculty, and staff.

20        **THE COURT:**  Are there any exceptions to the masking

21  requirement?  So for those students who receive exemptions and

22  have to comply with the additional requirements, masking,

23  social distancing, and surveillance testing, are there any

24  exemptions to that?

25        In other words, as an example, do athletes have to

1    wear masks when they're on campus and competing in sports?

2         **MS. RICCHIUTO:**  If athletes are not vaccinated and,

3    for example, in a classroom environment, just because they're

4    an athlete, they're not exempt from masking.  I'm confident

5    that athletes are probably highly encouraged to --

6         **THE COURT:**  What if they're on the football field?

7    If they got an exemption and they're on the football field,

8    does the running back who chooses not to get the vaccine and

9    applies for, gets an exemption, does he have to wear a mask

10   while he performs on the football field?

11        **MS. RICCHIUTO:**  I don't believe that information is

12   in the record, one way or the other, Your Honor.  I haven't

13   seen it stated, you know, as a written exemption, so I don't

14   know exactly how athletes are treated.

15        **THE COURT:**  So, so far as you know, the policy of

16   Indiana University for this Fall is, if you have an exemption

17   and you're on campus, you must wear a mask?

18        **MS. RICCHIUTO:**  Not in every circumstance, no.  If

19   you're in your dorm room by yourself, if you're outside and not

20   near people.  It's a little bit more nuanced than that.  But in

21   general, unvaccinated people, who are mixing and interacting

22   with others, the policy says they need to be masked.

23        **THE COURT:**  One of the students, of course, had a

24   concern in her deposition, as I read it last night, about her

25   ability to perform musically and whether there would be any

1    exception at all to that.

2            What's IU's plan in that regard?

3            **MS. RICCHIUTO:**  That plaintiff has an exemption so

4    she will not be vaccinated.  She will be required to mask.

5            **THE COURT:**  Even while she sings?  When she does her

6    recitals, she's got to mask up?

7            **MS. RICCHIUTO:**  I believe she plays the organ.

8            **THE COURT:**  Oh.

9            **MS. RICCHIUTO:**  But, yes.

10           **THE COURT:**  So as she plays the organ, she has to

11   mask up?

12           **MS. RICCHIUTO:**  That's correct.

13           **THE COURT:**  All right.  There's no separate recital

14   aside from playing the organ?  In other words, she's not

15   singing?  She's not performing in that respect?

16           **MS. RICCHIUTO:**  I don't believe she's a singer.  I

17   think she's -- I think she's an organist.

18           **THE COURT:**  All right.  So at least as to what IU's

19   plans are with respect to masking, except for some exceptions,

20   otherwise, the intent is you must wear a mask at all times

21   while on campus?

22           **MS. RICCHIUTO:**  Subject to exceptions, yes.  In

23   general, yes.

24           **THE COURT:**  Who decides those exceptions?

25           **MS. RICCHIUTO:**  They are in the restart report, and I

1    think they're -- you know, that's part of -- kind of skipping

2    ahead, Your Honor, we obviously don't think that we should be

3    talking about narrow tailoring.  We don't think that this is a

4    strict scrutiny case.  But one of the indicia that this is

5    narrowly tailored is that, for example, everybody is not

6    required to mask.  The guidance is, if you're unvaccinated, you

7    should be masking.  I noticed that that's the rule of the

8    courthouse.  People don't always comply with that unless

9    they're required to, and so --

10          **THE COURT:**  Maybe even today.

11          **MS. RICCHIUTO:**  -- and so IU is implementing policies

12   designed to keep the people who are most at risk from COVID

13   safe from COVID, and the reality is that those people are the

14   unvaccinated.  They can also impact others.  But the policy is

15   not just to protect the -- you know, the desire is to protect

16   the IU community as a whole, again not City of Bloomington, but

17   students, faculty, staff, people on the Indiana University

18   campus.

19          Your Honor, you may say you don't want to hear us say

20   this anymore.  We really believe that this case only challenges

21   the vaccine requirement.

22          And the only other thing I want to say --

23          **THE COURT:**  You're right.

24          **MS. RICCHIUTO:**  Well, the only other thing, if you'll

25   just indulge me one point on that, the reason why that matters

1    to us is it's not a gotcha of, like, you didn't write your

2    papers right.  The way that it's been pled, it was focused on

3    vaccines.  Now they say, "Well, it's vaccines and masking and

4    testing."

5            Well, there's a whole bunch more to the policy.  So

6    are they asking you to throw out the whole policy and have IU

7    be the only organization in modern times that has no COVID

8    policy?  Are they only asking you to throw out these few

9    things?

10           So that's why we're focused on that, and that's the

11   last thing I'll say about that.

12           You can skip on ahead.

13           We've talked about standing.  Let's go ahead.

14           With respect to the scrutiny, Your Honor, which is,

15   you know, for us, the prime decision that you've got to make, I

16   think that you called **Jacobson** sort of kind of the precursor of

17   rational basis.  The standards seem awfully similar when you

18   read them, but **Jacobson** does provide limits.  **Jacobson** does

19   provide limits.  So we think that, technically, as a matter of

20   precedent, **Jacobson** still controls.

21           And I wish that **Buck v Bell** hadn't been decided

22   either.  But what the authority is is not that if a case that

23   nobody likes, cites a case that's still good law, you know, the

24   first case is thrown out.  That's not how the authority works,

25   and we've got cases cited to that effect.

1          **THE COURT:**  So answer me this.  Help me with the

2   interesting legal question here.  I realize the case is much

3   bigger than this.  But as we think about the right shape of the

4   law, is **Jacobson** rational basis by any other name before

5   rational basis was recognized as one of the tiers of scrutiny,

6   or does it stand on its own and deal with situations in which

7   there is a public health crisis?

8          **MS. RICCHIUTO:**  Certainly the cases that rely on

9   **Jacobson**, all the school vax cases, those are not

10  pandemic-specific.  Those are regular old, you know, "I don't

11  want my kid to get vaccinated to go to school," and there are

12  lots and lots and lots of those.  So, to me, that undermines

13  this idea that **Jacobson** is an emergency pandemic-specific case

14  because it has been replied on so broadly for non-emergency.

15  It's been relied on for flu shots.  It's been relied on for,

16  you know, every-day shots.  So I don't -- if that's what you

17  mean by "standing alone," then --

18         **THE COURT:**  So suppose the Secretary of Health and

19  Human Services were to rescind the announcement of a public

20  health crisis.  At that point, do the underpinnings to IU's

21  policy fall away in such a way that they must rescind their

22  policy?

23         **MS. RICCHIUTO:**  I don't believe so, Your Honor, and

24  the reason why is because just the end of the current public

25  health crisis does not say anything about the efficacy or the

 1  safety that is provided by vaccines.

 2          If they came out and said, "Oh, my gosh.  We've

 3  changed our minds.  Nobody should be getting vaccinated

 4  anymore," and IU said, "No.  Everyone at IU is getting

 5  vaccinated," then I think you're looking at some tension that

 6  may not be tenable.

 7          But the fact that we are all hoping and praying that

 8  this pandemic -- we're going to reach a day where someone who

 9  is wiser than I am says "it's over" is not a reason not to

10  control for it with every tool that we have today.

11          So when it comes to -- so these are some of the

12  cases, Your Honor, that I had cited about -- you know, they're

13  just kind of run-of-the-mill school vax cases.  You'll see

14  those in your dec.  These are a couple of cases that stand for

15  the principle that I just gave you, which is, respectfully,

16  Your Honor, it's not your prerogative necessarily to pick and

17  choose which Supreme Court precedent you're fond of or not, and

18  the Seventh Circuit has recognized that, and certainly the

19  Supreme Court has recognized that.

20          We believe that this is your standard.  For you to

21  disregard **Jacobson**, you would have to be very sure that the

22  Supreme Court was going to do that.  And quite to the contrary,

23  I think we can be very sure that they're not, because the cases

24  that plaintiffs rely on don't go that far.  Setting aside

25  **Buck v Bell**, these are First Amendment cases.  They are

CERTIFIED TRANSCRIPT OF PROCEEDINGS - JULY 13, 2021

1    certainly COVID Supreme Court cases.  They are First Amendment

2    cases that either don't have majorities or the majority finds

3    one thing but the dissent finds something else.  They're not

4    Fourteenth Amendment cases.  They're not mandatory vaccine

5    cases.  And several of them say really nice and helpful things

6    for IU.

7            For example, in **Roman Catholic Diocese** -- and this is

8    the case that I think that plaintiffs would say is kind of

9    their main case -- that's a First Amendment case, not a vaccine

10   case.  The only substantive analysis of **Jacobson** in that case,

11   Judge, is in the concurrence.  So there is no substantive

12   analysis of **Jacobson** anywhere but there.  The per curiam

13   doesn't cite **Jacobson**.

14           This was a First Amendment injunction based on church

15   restrictions where, you know, you could have unlimited people

16   in the shopping mall, but very few in the church.  And in the

17   concurrence, they walk right through.  This is very different,

18   and it cautions against applying **Jacobson** in First Amendment

19   cases.

20           We don't disagree, Your Honor.  We're not standing

21   here -- I'm not standing here asking you to apply **Jacobson** to a

22   First Amendment case.  I'm asking you to apply **Jacobson** to a

23   case that is squarely on point with **Jacobson,** which is a

24   Supreme Court case that hasn't been overturned.

25           The other things that --

1          **THE COURT:**  What about the masking, the additional

2     requirements?  Because, of course, the students are challenging

3     this on a First Amendment basis.  So what is your view in terms

4     of how I analyze that portion of the policy?  Is that **Jacobson**

5     or something else then?

6          **MS. RICCHIUTO:**  I'm not sure that we agree that they

7     have a First Amendment challenge to masking.

8          I know that, every once in a while, Mr. Bopp says

9     "free exercise," but they don't have a First Amendment claim in

10    this case, Judge.  They have one count, and it's for

11    substantive due process.

12          The concurrence in **Roman Catholic** confirms that

13    **Jacobson** applied the right standard for the circumstances.  It

14    confirms that **Jacobson** met rational basis and says it may even

15    have survived strict scrutiny.  It also confirms that the issue

16    there did not constitute a serious and long-standing intrusion

17    into settled constitutional rights.

18          And let's remind ourselves, **Jacobson** was criminal.

19    This is not -- the circumstances with IU are certainly far

20    short of throwing people in prison if they do not get

21    vaccinated.

22          Applying **Jacobson** is not disregarding the

23    Constitution, Your Honor, or even disregarding rational basis.

24    It is applying the correct standard for the claims that

25    plaintiffs have brought.  So it doesn't require you to make a

1    finding one way or another about whether the pandemic is close

2    to over, right in the middle.  We don't believe that that's a

3    finding that you have to make to decide this case.  **Jacobson**

4    applies even if there's disagreement among the parties or even

5    experts about efficacy, validity.

6         I mean, it was very striking to me to read **Jacobson**

7    and see such a lengthy discussion of basically the disagreement

8    about the science at that time, right, concerns that maybe the

9    vaccine wasn't as efficacious as some thought, concerns about

10   possible side effects.  I mean, we're talking about 1904.  It

11   was the same conversation.  And what the Court found there was

12   that the minority doesn't get to dictate the policy for the

13   policy makers, that the policy makers are entitled to take in

14   the information that's available to them, make decisions about

15   the way that they are going to -- you know, govern isn't

16   exactly right, but, you know, the policies that the people they

17   are policy makers for are going to be subject to.

18        And the Chief Justice, in another one of his

19   opinions, cautions against, you know, you sort of feeling like

20   you have to take on the burden of deciding exactly on, you

21   know, what's the precise risk of myocarditis or what's the

22   precise risk of long-haul COVID, which there's lots of

23   testimony that students this age, they don't necessarily die,

24   but they get long-haul COVID, and the long-term symptoms of

25   that are not known.  That's something else that's in the record

1    as a serious concern for IU.

2         And then I think the briefing may say that we don't

3    have authority after **Roman Catholic**, applying **Jacobson**, and so

4    these are just a couple of examples of authority that does do

5    that.

6         So absent **Jacobson**, if you determine, for example,

7    Your Honor, that that is limited to its facts or only applies

8    in a pandemic, then unquestionably we are at rational basis

9    scrutiny.  There is no fundamental right that is actually

10   implicated by the vaccine requirement, and that is because of

11   the conversation that we had about these plaintiffs having a

12   choice.

13        Now, these particular plaintiffs, all except for one,

14   are exempt on the vaccine.  But even more broadly, there is

15   absolutely a choice, albeit possibly a difficult choice, that

16   these plaintiffs have.  No one is forcing anything to go into

17   their bodies.  No one is -- I think their brief talks about

18   organ harvesting or sterilization.  I mean, these are not --

19   those are very false equivalents, Your Honor.

20        **THE COURT:**  It's still rather coercive, though,

21   particularly with respect to the Ph.D. student who is on the

22   eve of obtaining two Ph.Ds, right?

23        **MS. RICCHIUTO:**  She has an exemption so she is not

24   required to be vaccinated, and her testimony at her deposition

25   was that she most likely would attend IU regardless of the

1    status of the injunction.

2          So these are the fundamental rights.  Some of them

3    Mr. Bopp talked about today.  Some of them, you know, we really

4    tried to look through their papers and see which were the ones

5    that we thought they were claiming, and none of them are

6    implicated for the very, very, very important fact that these

7    students have a choice about whether to be vaccinated.

8          Masking and testing, that's already been decided,

9    whether those implicate fundamental rights.  We've got cases in

10   our briefs, and here there's the masking case, the testing

11   case.  I don't know that I've heard him contend that those

12   are -- again, in the due process context, Your Honor -- that

13   those are strict scrutiny, but I think that those arguments

14   have already been disposed of.

15         So in the absence of a fundamental right, you know,

16   you are contending with rational basis analysis.  We believe

17   that we could meet strict scrutiny.  IU's interests are

18   compelling.  The Supreme Court has said that COVID is

19   unquestionably a compelling interest.  They're continuing to,

20   you know -- right up to the Judge Hamilton decision, the

21   Seventh Circuit decision that plaintiffs rely on, that was in

22   March, and that continues to describe COVID as, you know, very

23   deadly and a serious concern.

24         Again, whether or not you -- you don't have to decide

25   specifically where we are in the life span of the pandemic.  To

 1    your point earlier to Mr. Bopp, no one in any authoritative

 2    position has said that it's over.  The federal government

 3    hasn't said that it's over.

 4          I think policy makers all around are changing

 5    restrictions as they have throughout this entire pandemic to

 6    try to best meet the needs of their constituents.  But the fact

 7    that there are double the cases in Indiana than there were just

 8    on July 6th tells us that the pandemic is not over.  So I think

 9    the issue of IU having a compelling interest, and then

10    obviously certainly a legitimate interest, should not be

11    subject to much dispute.

12          I think you pointed out that Governor Holcomb also

13    again made -- these are observations, right -- but that 98.5

14    percent of new cases are with unvaccinated individuals.  So IU

15    has a very, very, very reasonable interest in minimizing the

16    number of unvaccinated individuals that it has in its

17    community, not eliminating.  It's not going to be zero.  They

18    can't -- they're not going to get to 100 percent vaccination.

19    They haven't set -- you know, they have religious exemptions.

20    They have these medical exemptions.  They're doing it as

21    narrowly as they can while absolutely encouraging as much

22    vaccination as they can accomplish.  And Dr. Carroll, you know,

23    testified to that very clearly.

24          IU also has, you know, a very wide range of data that

25    it has considered about the safety, the efficacy, the amount of

1    testing.  Dr. Beeler has lots of testimony on that and all the

2    things that they considered.

3         We also have, when it comes to tailoring, the federal

4    guidance.  And then, as I pointed out, Your Honor, this issue

5    of, you know, everybody is not getting tested everyday, right.

6    Regardless of whether you're vaccinated, they're not saying,

7    "Every single person tested for COVID everyday.  Everyone has

8    to wear a masking while they're sleeping.  Everyone has to have

9    three doses of the vaccine instead of the mandatory two."

10   They're adhering as closely as they can to what the guidance

11   is, given that the other piece of the guidance is, unvaccinated

12   are at highest risk.  Vaccine is the strongest tool that we

13   have.  That is unquestionably -- that's unquestionably

14   reasonable.

15        So then we get to irreparable harm.  From our

16   perspective -- although the constitutional analysis might be

17   more intellectually interesting for all of us -- we also

18   believe that they just cannot meet the standard of irreparable

19   harm.

20        Ms. Sperazza, again, is the only plaintiff who

21   potentially has a problem with the actual vaccine requirement.

22   Of course, IU is not interested in having her leave the school,

23   and they would love to have her remain a student, but the

24   **Hodges** case talks about her choices.  The exempt plaintiffs

25   certainly don't have irreparable harm.

1              Speculative concerns about future events.  So there's

2      some testimony that you may see in the depositions about

3      concerns about segregation or discrimination or, you know, "My

4      professor won't be able to hear me" or "No one will want to be

5      my friend."  You know, certainly we hope that none of those

6      things happen.  We don't have any expectation that they will

7      happen.  But as of today, those are speculative and

8      hypothetical, and they are not irreparable.

9              Also, there are several students who -- because let's

10     remember, a lot of these students are past freshman, so they

11     were at school, last year, you know, masking all the time and

12     testing very routinely.  And none of them -- we asked them

13     about all of that in their depositions, and none of them

14     claimed any ongoing harm from the testing that they did.

15             Ms. Sperazza even testified that, at one of her jobs,

16     she could take a break from her job if she would volunteer to

17     get COVID tested, and she did that three or four times just to

18     have some time off work.  So the idea that they have -- not

19     everybody has had a COVID test.  But the ones that have had

20     COVID tests, some of them have had many.  And that you would

21     voluntarily submit to it for other reasons and then say, "But,

22     no, when I'm in Bloomington this Fall, it's irreparable harm,"

23     the law just doesn't bear that out.

24             There's this concern about timing.  Will the students

25     get to choose, you know, kind of when they get tested?  There's

 1    not a set schedule about how often they'll be tested.  So all

 2    of that falls under, you know, either speculative or

 3    inconvenient or both.  Neither of those are irreparable.

 4          And we -- this is on our Exhibit 320, Your Honor --

 5    321.  Excuse me.  We have some charts that we thought might be

 6    helpful to you or your clerks that talks about all of the

 7    relevant testimony from the plaintiffs specific to the basis

 8    for their objection, so what type of objection do they have;

 9    what's their alleged harm from masking and testing, again

10    including the extra requirements; and then how often had they

11    done that in the past.

12          There are no plaintiffs in this case, Your Honor,

13    that have never worn a mask.  There are no plaintiffs in this

14    case, Your Honor, who have testified to any type of like

15    medical injury or ongoing irreparable harm based on wearing a

16    mask.  So it really just comes down to "I've done it everywhere

17    I've been required to do it" -- or sometimes not.  You know,

18    some of them were candid and said, "I don't comply with masking

19    requirements" -- "but when I get to IU, I shouldn't have to do

20    it.  And not only should I not have to do it, that's

21    irreparable," and we don't think that that's an adequate

22    showing of irreparable harm.

23          If you look at plaintiffs' reply brief, they don't

24    particularly try to dispute any of these specific pieces of

25    testimony about whether there's been harm.  They ask you to,

1    instead, presume harm.  Obviously, that's a little bit -- we've

2    had a couple of different conversations today that felt a

3    little circular or begging the question, but we think that this

4    is one.

5         Irreparable harm has been presumed in certain type of

6    constitutional cases, First and Second.  It's not been presumed

7    in a case just like this where it's substantive due process on

8    some basis that's not, you know, actual incursion into bodily

9    integrity.

10        So if IU were lining everybody up, you know, and

11   giving them vaccines against their will, that would be a

12   different set of facts.  That's not what we have here.

13        So the law doesn't permit you to just presume

14   irreparable harm here.  And, in fact, this **Campbell** case, which

15   is a Seventh Circuit case, it really urges you to not be sort

16   of overbroad about assuming irreparable harm just because

17   there's been a constitutional claim.

18        You know, sort of in the back of our head, we think,

19   "Well, if it's Constitutional, maybe there's some kind of

20   presumption," and that's not exactly what the law says.  There

21   can be, for example, money damages available in the context of

22   a constitutional harm.

23        So, then, again, if we get this far, Your Honor, then

24   we get to the balance of harms and the public interests.  What

25   the Seventh Circuit says in that **Cassell** case, the Judge

1    Hamilton case that's pretty recent, that affirms denial of an

2    injunction.  I think Illinois, "stay at home."  That's a First

3    Amendment case.

4          Just as an aside, it does not actually say that

5    **Jacobson** doesn't apply to substantive due process.  It does

6    acknowledge that maybe things are -- the winds are starting to

7    change when it comes to the First Amendment.  We don't think

8    that that's a thing that you have to concern yourself with for

9    purposes of this analysis.

10          But what's really compelling about this opinion is

11    that it takes into account more than just the plaintiffs.  So,

12    how -- and, again, when it comes to the vaccine itself, we're

13    just talking about one plaintiff, Your Honor.  So you're

14    talking about one plaintiff, who would prefer not to get

15    vaccinated, has the option not to get vaccinated and to go on

16    and have a very happy and successful life, not having gotten

17    vaccinated, and weighed against the body of IU's community as a

18    whole, including lots of people who don't get to make a choice,

19    people who are immunocompromised who really cannot get

20    vaccinated and maybe would prefer to, people who have family

21    members who are at risk.

22          And what this **Cassell** case talks about is the concept

23    of personal choice when that personal choice increases risks

24    for others.  It's one thing to make a decision about what I

25    want to do with my body when there's no way that what I do with

1    my body can impact other people.  What Cassell says is this is

2    something different.  You do have a choice about what to do

3    with your body.  But when it comes to an analysis like this, we

4    also get to take into account, your choice about your body,

5    what impact that might have on other bodies, and there's this

6    nice line about "COVID can sicken and kill those who did not

7    consent to the trade-off," so that's not to minimize these

8    plaintiffs' right to decide that they don't want to be

9    vaccinated.

10         **THE COURT:**  Doesn't that draw an interesting

11   distinction, then, between what the students are characterizing

12   as the bodily autonomy cases in **Cruzan** and **Glucksberg**?  If

13   **Cruzan** is about denying unwanted hydration and nutrition, and

14   **Glucksberg** is about, you know, any right to assisted suicide,

15   do you view those cases as necessarily looking at an individual

16   right without repercussion or ripple effects to the greater

17   community?

18         **MS. RICCHIUTO:**  I think that's right, Your Honor.  I

19   mean, they also, you know, sort of deal with the inverse,

20   right, where it's my right to not have treatment.  And here I

21   think plaintiffs would say, "You're requiring us to get medical

22   intervention that we don't want."

23         But that's exactly right.  I mean, someone who

24   decides to end their life medically, obviously, undoubtedly,

25   that has an impact on their friends and family -- and, you

1  know, I don't mean to say that that life is not important --

2  but it does not cause all the people in their house or in their

3  school or in their class or in their dorm room to fall ill.

4  And so that is an important distinction here when it comes to

5  the balance of harms, and that is what the analysis is in this

6  Seventh Circuit **Cassell** case, which is, again, I think, from

7  March of this year, that we think is really instructive on the

8  balance of harms.

9         Aaron Carroll -- Dr. Aaron Carroll's declaration and

10  his testimony, IU's goal is this:  They are trying to get as

11  close to normal as they can safely get for their constituents.

12  And based on very, very, very considered and robust analysis,

13  they have concluded that this is the very safest and most

14  reasonable way to do that.

15         So I know my time has expired.  I appreciate your

16  attention, Your Honor.

17         **THE COURT:**  Thank you, Ms. Ricchiuto.

18         Mr. Bopp, before you do your rebuttal, I think I'm

19  going to take a break, if you'll forgive me and allow me.  I

20  think everyone could use a break.  We've been going at some

21  distance here at this point, so bear with me.  We'll come

22  back -- I'll come back at 4:30.  We'll take a 20-minute break

23  here, and then I'll hear your rebuttal.

24         **MR. BOPP:**  Thank you.

25         **LAW CLERK:**  All rise.

1          **(All comply; short recess taken.)**

2          **MR. BOPP:**  I've excerpted my excerpts.

3          **THE COURT:**  All right.  Very good.

4          **MR. BOPP:**  Thank you, Your Honor.

5     I'm going to start with a few rebuttal items.

6          I don't know why IU wants to tell you about their

7     secret non-enforcement policy regarding the medical exemption.

8          There's two ways of looking at that.  That either

9     indicates a due process violation because they're acting

10    arbitrarily and capriciously and granting exemptions to people

11    that don't qualify under the written policy, or they're asking

12    you to not address the policy itself because they don't enforce

13    it.

14          Actually, that second thing I've litigated and won, I

15    think, in six circuits, and that is, the fact that the

16    administrators don't follow their own policy does not immunize

17    the policy from constitutional challenge because, as courts

18    would say, they could just return to the policy.  In other

19    words, at any time that they choose, arbitrarily and

20    capriciously, they can just go back to the policy, as opposed

21    to their secret non-enforcement policy.  So their policy is

22    still on the table.

23          Second, this position about there's something

24    different between the mandate of the vaccination and the

25    exemptions puzzles me.  If they're right and you would, as we

1    hope, enjoin the mandate for the vaccination, well, what would

2    the exemptions be exempting you from?  I mean, it's

3    nonsensical.  They're inextricably linked, because the

4    exemption is from the vaccine mandate.  So they're not like

5    separate policies, and nor can the exceptions stand alone

6    because they make no sense standing alone.

7           Third, you know, **Jacobson**'s core holding they've

8    abandoned, and I'm glad because I think we've been arguing that

9    this case should be litigated either under the exception that

10   **Jacobson** recognized or under modern constitutional

11   jurisprudence, because the central holding of **Jacobson** is that

12   this Court has no authority to review, question, or even take

13   evidence about policies that are adopted in the name of public

14   health.  And, of course, they affirmed the trial court, the

15   district court, that refused to take evidence because the trial

16   court gave the government bureaucrats cart blanche in

17   determining what public health measures should be adopted and

18   whether they're reasonable or whatever.

19          Now, the exception, however, does demand that this

20   Court decide and take evidence on whether the action taken is

21   "reasonably required for the safety of the public," reasonably

22   required for the safety of the public.

23          Now, you hear nothing -- there's nothing in the

24   record that IU applied that standard.  They weren't looking for

25   reasonable measures, because they were quite clear -- and this

1   is in the excerpts on Exhibit 206 from Carroll -- that their

2   goal was to be as safe as possible.  In other words, not adopt

3   reasonable measures to be safe as possible, but to be as safe

4   as possible.  So they have just, you know, picked one, and it

5   happens to be the most extreme measure, in our opinion,

6   obviously the most rights violative, and that's what they have

7   implemented.

8           Now, if they just can do whatever they think is safe

9   as possible, number one, it has led them to the irrational

10  position that they are going to impose measures until there are

11  no or virtually no infections at all.  Well, what disease has

12  that situation?  I mean, very few.  A few have been eradicated,

13  hopefully.  But zero infections when these measures are being

14  instituted in the name of a pandemic?  That they are entitled

15  to pick whatever measure takes them to zero infections?  And I

16  have excerpts here, not only -- Number 206 is what their goal

17  was, to be as safe as possible.

18          But the next one is when they were talking about herd

19  immunity -- in other words, when can they back off -- they

20  said, Beeler said, "I would expect to see zero or very low, no

21  new positive cases."  "I would expect to see zero or very close

22  to zero percent positivity in those testing with adequate

23  testing going on."  That's when they're going to back off the

24  mandate, when there's zero.

25          Now, it is true -- or virtually zero.  Now, it is

1  true that Carroll acknowledges that's an impossibility and all

2  that, but that is their goal, and it's repeatedly their goal

3  and why they have adopted these measures.  They didn't measure

4  this on the basis of reasonableness or rationality.  They

5  measured it on the basis of:  Our goal is to be as safe as

6  possible to get to zero or to virtually zero.

7         So that answers your question.  When are they going

8  to back off?  Never, never, because they'll always have a

9  justification because there will very likely always be COVID

10 infections out there, at least one or a dozen or maybe a few

11 hundred or whatever.

12        Now, you know, their position -- you brought up the

13 question of the HPV vaccine.  And, of course, their position

14 would be on that, "Well, we're entitled to do what is the most

15 effective means for public safety," most effective means, not a

16 reasonable means but most effective means for public safety.

17        Well, why just do the vaccination?  Why not prohibit

18 anyone that is HPV positive from having sex?  Because it is

19 transmitted that way.  So if they get cart blanche authority

20 and it's not judged by true reasonableness, evidentiary-based

21 reasonableness when you have to make a decision that the

22 current situation justifies it, well, then, they just have cart

23 blanche to do all sorts of things.

24        Now, that takes me to Exhibit 319, and these are

25 those graphs that they had up on the screen.  You know,

1   everything like this pandemic goes up and down day-to-day.  You

2   know, there's more cases one day and fewer cases the next day

3   and bam, bam, bam, bam.  So what you do is you look at the

4   trend line.  You don't do what they did, pick out three days in

5   this graph and say, "The cases are going up," three days in a

6   pandemic that has lasted for a year-and-a-half.  No.  She

7   didn't show you the trend line, and we have that in our

8   evidence.

9        You also -- if you really want to understand what is

10   happening, you also don't do what they did in the second graph,

11   all right, that has this long sloping thing down and long

12   sloping up.

13        This side of the graph is -- the top is not 100

14   percent.  The top is 4 percent.  And then to make it bigger,

15   they have 3.5 and 3.  So they even went to the .5 to make that

16   larger, okay, so that the slope looks bigger, all right.  And

17   then from here to here (indicating) is within 1 percent.  That

18   whole line is within 1 percent on that graph, all right.  And

19   the part where this part goes up is two weeks in an infectious

20   disease that has been going on for a year-and-a-half.

21        And what?  What?  They're going to make long-term

22   policy, you know, consider here mandating a vaccination for an

23   entire semester?  They're going to justify that based on what

24   happened in three days or over two weeks that was less than a 1

25   percent increase, less than a 1 percent increase?

 1          This line, if you would normally graph it, it would

 2   be way down there, okay.  And everybody would look at it -- you

 3   know, you'd have 100 percent down to zero percent, and you'd be

 4   right down here -- and they would say, "Well, whatever," okay.

 5          So these, unfortunately, don't really help the

 6   decision because you have to look at the overall progress of

 7   the disease, which takes me to Exhibit 222, all right.  This is

 8   the graph of the progress of the disease with respect to

 9   positive cases, all right.

10          You see way down here on the right, way down at the

11   bottom, that's where this is, all right.  And anyone looking at

12   this chart would say, "Wow, have things changed," you know.

13          At the heighth, there were 5,628 positive cases a

14   day, all right.  And by July 8th, there's 395.  That is an

15   86 percent decrease in the number of cases.  And we are down

16   toward, you know, a stabilization, if you will, of the numbers.

17          Now, everybody that talks about dealing with

18   pandemics always says that things could change and things could

19   happen in the future, and there's no question about that.  And

20   that, to a certain degree, they're all different, to a certain

21   degree.  But that doesn't invalidate the whole idea -- and now

22   I'll go to 229 -- of IU's policy.

23          They adopted this policy.  They say, "The purpose of

24   this document is to provide guidelines for the response to a

25   wide variety of infectious disease threats to Indiana

 1   University."  So it's not limited to the flu or something like

 2   that.  They want to give thoughtful, advanced guidance on how

 3   we're going to look at these problems and deal with them, all

 4   right.

 5          **THE COURT:**  This is the policy that existed prior to

 6   the COVID policy, right?

 7          **MR. BOPP:**  Yes, because it was adopted for any

 8   infectious disease threat, okay.

 9          And the evidence is they didn't -- in the report,

10   they didn't cite it.  They didn't quote it.  They didn't

11   analyze it in accordance with the policy.

12          And even though there was, you know, some quibbling,

13   I think a fair reading of Dr. Carroll's answer, numerous

14   answers on this one question, "Did you talk about it," was they

15   didn't even talk about.  In other words, they did it ad hoc as

16   if this was sui generis, and it's not, all right.

17          You turn to the next exhibit, 212.  These are the

18   levels, all right.  And each level requires a different policy

19   response.  And if you go -- and this was attached to the

20   policy.  This is attached to the policy, all right, and

21   referred to in the policy.  If you go to the far right side,

22   you see "recovery".  And then you see -- under "warning and

23   threat," you see -- first you see a reference to "WHO," then

24   "U.S. 6."  But then you see "CDC deceleration" and "CDC

25   preparation."

1          Those are references to a CDC publication that, just

2    like this policy -- and they're using the CDC -- established

3    how you are to deal with infectious diseases, all right.

4          Now, I'm going to reserve this one for one second and

5    go to the next one, the chart, Exhibit 230.

6          This is the CDC chart on the progress of infectious

7    diseases.  It's a bell curve, right.  And if you turn back to

8    what happened with respect to COVID, that's a bell curve.  And

9    they look very similar, don't they?

10         Well, they have come to understand that when you are

11   in different phases of a pandemic, then you will have a

12   different response.  And they have named the phases here, all

13   right:  Investigation, recognition, when it's just starting

14   off, just starting off; then acceleration; initiation when it

15   begins it's upward trajectory; then acceleration when it really

16   goes up fast, right there.  You get to the top.  Then you have

17   deceleration, and then it levels off into preparation.

18         Now, they tell you you're supposed to do different

19   things at the different phases.  And looking at their chart, if

20   we're not at least in the middle between deceleration and

21   preparation, then we're in preparation.  We're certainly at the

22   end of deceleration if we're even -- if we haven't passed it,

23   all right, in terms of the graphing of the pandemic.

24         Now, going back to Exhibit 231, they tell you what

25   you're supposed to do, okay.  And they say -- on the second

1    page, here's deceleration, all right.  This is the deceleration

2    intervals indicated by a consistently decreasing rate of

3    pandemic, influenza cases -- and they use that as an example --

4    in the United States.  And that's, of course, exactly what we

5    see there in the deceleration phase.

6         "During this interval, planning for appropriate

7    suspension of community mitigation measures and recovery

8    begins."

9         No, deceleration isn't the time to whip on some

10   massive regulation like forcing everybody to be vaccinated.

11   No.  It's the time for suspension of mitigation measures

12   because of recovery and plan for recovery to begin.

13        Then, preparation, which is the next phase, the

14   leveling off at the end phase.  It says, "Primary actions focus

15   on discontinuing community mitigation measures."

16        They're no longer justified.  That's why the

17   situation matters.  They want you to pretend that this doesn't

18   happen and all we're supposed to do is add up all the deaths.

19   And I suppose the more deaths, the more Draconian they can be,

20   even though we're in the final stage of the pandemic.  We're in

21   the final stage where the risk of death -- well, risk of

22   infection, of death, of everything, has now gone down at least

23   85 percent.  One of the exhibits we present to you says

24   95 percent from the CDC.  It says 95 percent it has gone down

25   from the top, all right.

1        And in those -- and so -- and that is why --

2        **THE COURT:**  So, Mr. Bopp, let me question you on

3   these intervals that are set out here.  There's the

4   deceleration interval and then the preparation interval.

5        Deceleration interval is defined as when no new cases

6   are occurring or are occurring infrequently.  The preparation

7   interval, at least as stated in this exhibit, is when a

8   pandemic is declared ended, when evidence indicates that

9   influenza worldwide is transitioning to seasonal patterns of

10  transmission.

11       Today, are we in either one of those circumstances?

12       **MR. BOPP:**  Yes.  In fact, we are in -- we are just

13  reaching seasonal -- the seasonal burden of influenza.  Look at

14  Exhibit 259.  This is the estimated burden of -- the burden

15  historically of influenza, seasonal influenza, in the United

16  States per year, all right.

17       I didn't put it with my excerpts of my excerpts, but

18  Exhibit 258 has the information on July 9th, in terms of the

19  7-day average of deaths per day, okay, which is now down to 154

20  per day.  If you multiply that by 365 to put it into a yearly

21  basis, all right, it would be 56,210.  That is under the worst

22  seasonal influenza we've had.

23       Now, I'm not saying we should declare it over.  I'm

24  not saying that.  This chart is pandemic intervals.  It's not

25  like -- preparation is not you're no longer in the pandemic.

1   You're just in a much different phase.  And that phase, they

2   say, logically, means because all the risks and consequences

3   and spreads and all that has ameliorated so much that you can

4   start lifting these restrictions.  That's what everybody is

5   doing.  They're not being crazy, you know.

6           **THE COURT:**  All right, Mr. Bopp.  I think your time

7   has run.  I have a couple questions before you sit down, if I

8   might.

9           Thank you for your rebuttal, first of all.

10          We haven't addressed this today in argument, thus

11  far, but I want to make sure that you understand the students'

12  position.  Aside from the constitutional issue, there is the

13  issue of Indiana's anti-passport law, if I can fairly

14  characterize it as such.

15          **MR. BOPP:**  And we've withdrawn that claim.

16          **THE COURT:**  You have withdrawn that?

17          **MR. BOPP:**  Yeah.

18          **THE COURT:**  Okay.  So I need not decide anything

19  related to that?

20          **MR. BOPP:**  No.  In our footnote, we said we hadn't

21  thought of the question of a private cause of action.  We

22  researched.  I don't think we said that, but we did research

23  it.  We hadn't thought of it, and we did research it, and we

24  decided IU is correct on that.

25          **THE COURT:**  All right.  That was one of my questions,

1    and thank you for that clarification.

2            Second, is there not something rational about the

3    university's concern that the additional requirements won't

4    prove enough; in other words, that it won't stem the tide of

5    any pandemic that may linger, that students won't comply, that

6    it's a difficult policy to police?

7            **MR. BOPP:**  Yes.

8            **THE COURT:**  Now, for instance, just as an example,

9    the policy of this federal building is that anyone who is

10   vaccinated need not wear a mask; whereas, anyone who is not

11   vaccinated is supposed to wear a mask in this courtroom and in

12   this federal building.  And we have followed, and I follow, the

13   honor system whereby people do what they're supposed to do in

14   terms of how they conduct themselves, not just in this

15   courtroom, but in the federal building.

16           If there are people in this federal building,

17   including in this courtroom, who are not vaccinated and who

18   should be wearing masks, according to the policy that this

19   federal court has implemented, is that not judicial notice or a

20   basis for me to take judicial notice that perhaps the masking

21   additional requirements and other additional requirements that

22   the university has in place won't prove enough for the safety

23   of the campus this Fall?

24           **MR. BOPP:**  Well, if it doesn't, then they have a

25   basis to take action.

1            And if you look at the last page of Exhibit 231, in

2    the preparation stage, one thing you're supposed to do is --

3    well, it's defined as low pandemic influenza activity, but

4    continued outbreaks possible, okay, and you're supposed to plan

5    for those, all right.

6            **THE COURT:**  But my question is:  Isn't there

7    something rational about the university's position or belief

8    that the additional requirements, while they may be

9    well-intended for those who are exempted, nonetheless, won't be

10   enough come this Fall, because, like it or not, even when

11   there's a requirement to wear masks when you're not vaccinated,

12   people will flout the rules?

13           **MR. BOPP:**  No, because that's not evidence-based.

14   That's speculation, you know.

15           **THE COURT:**  Is it speculation in this courtroom right

16   now?

17           **MR. BOPP:**  Well, I don't want to comment on that, but

18   I -- but, you know, you can't strip away people's rights on the

19   basis of speculation.  You know, you have to have adopted a

20   reasonable measure that's evidence-based.

21           In the preparation phase, which I believe we are in

22   here in Indiana and the United States and certainly at IU, I

23   mean, herd immunity, according to their question and answers,

24   is a majority vaccinated, majority.

25           Beeler kind of raised the bar in his deposition.  He

 1  said 60 to 80 percent.  Well, 75 percent of IU students are

 2  vaccinated.  So by their own definitions, we've reached herd

 3  immunity.  And, of course, they don't even take into account

 4  people that are naturally immune because of infection.

 5          But you are -- in the preparation phase, you are to

 6  substantially reduce your mitigation measures, which is another

 7  way of saying "take off restrictions that violates people's

 8  rights because they're no longer justified by the level of the

 9  pandemic, but get ready for another outbreak.  And when you see

10  that coming, then you take additional measures."

11          And of course you do.  I mean --

12          **THE COURT:**  All right, Mr. Bopp.  I think I've got

13  your point.

14          **MR. BOPP:**  All right.  Thank you, sir.

15          **THE COURT:**  Thank you, sir.

16          All right, ladies and gentlemen.  Thank you for your

17  submissions, your written submissions.  Earlier, of course, how

18  you've organized and compiled the exhibits to ease my review as

19  best you could, particularly under circumstances that were

20  emergent themselves in just a short couple of weeks, that is

21  very much appreciated by me in enabling my review.

22          Likewise, let me commend counsel for today's

23  performance, your remarks, your responsiveness to my questions,

24  and the nature and quality of your presentation.  That also is

25  very much appreciated.  And your clients on both sides, no

1    matter the result from this preliminary injunction request,

2    should be very happy, pleased, proud of your performance on

3    both sides.

4            I know there is an urgency to a ruling, and I do not

5    intend to tarry long.  That being said, as anyone can see, I

6    have stacks and stacks of paper.  And I have devoted many hours

7    already in its review, but I have more to think on and to

8    review even after the arguments this afternoon.

9            So I won't give you a firm prediction on when to

10   expect a ruling, but it will be very, very soon.  And I

11   understand that the parties on both sides have an interest in

12   not just a deliberate decision but as immediate one as I can

13   perform, so I will certainly put my full effort into this case.

14   And I have been able to clear a couple days yet this week,

15   notwithstanding the importance of other matters, to tend to

16   this one, so I've allotted some time for that purpose.  So with

17   those comments, I will take the matter under advisement and

18   hope to have a ruling out very soon.

19           That all being said, Mr. Bopp, anything else for your

20   clients, the students, today?

21           **MR. BOPP:**  No.  Thank you, again.

22           **THE COURT:**  Thank you, sir.

23           Ms. Ricchiuto, anything else for the university

24   today?

25           **MS. RICCHIUTO:**  No.  Thank you so much for your time.

1          **THE COURT:**  Thank you.  Thank you both, as well.

2    Thank you.

3          All right.  We'll stand adjourned.

4          **LAW CLERK:**  All rise.

5          **(All comply; proceedings concluded.)**

6                          **\*\*\***

7                        CERTIFICATE

8      I, DEBRA J. BONK, certify that the foregoing is a

9    correct transcript of the record of proceedings in the

10   above-entitled matter.

11       DATED THIS 22nd DAY OF JULY, 2021.

12                      S/S DEBRA J. BONK

13                      DEBRA J. BONK
                        FEDERAL CERTIFIED REALTIME REPORTER
14

15

16

17

18

19

20

21

22

23

24

25